2023-1661

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

**OMAN FASTENERS, LLC,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**MID CONTINENT STEEL & WIRE, INC.,**
*Defendant-Appellant*

---

Appeal from the United States Court of International Trade in No. 1:22-cv-00348-MMB, Judge M. Miller Baker

---

## MOTION FOR EXPEDITED BRIEFING

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**

Dated:  March 27, 2023

*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 2 and Federal Circuit Local Rule 27, Appellant Mid Continent Steel & Wire, Inc. ("Mid Continent" or "Appellant") hereby moves this Court to set an expedited briefing schedule in this appeal. This appeal challenges an order of the U.S. Court of International Trade (the "Trade Court") permanently enjoining "Defendant the United States, as well as all its officers and agencies . . . from taking any action to enforce, implement, or execute the Department's *Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 78,639 (Dec. 22, 2022)," which arises from U.S. Department of Commerce's ("Commerce") sixth annual review of its antidumping duty order on *Certain Steel Nails from the Sultanate of Oman.*

Mid Continent further respectfully requests that the Court schedule oral argument in this appeal during the next available argument calendar week after the joint appendix in this appeal is filed.

Good cause exists to expedite this appeal. First, if the appeal is not expedited, it is highly likely that the legal issues to be addressed before this Court – whether the Trade Court abused its discretion by

1

consolidating the hearing for a preliminary injunction with a trial on the merits and whether the Trade Court made a reversable error in finding that the permanent injunction standard was met – will be mooted by operation of law before the appeal is decided.

Second, the Trade Court's permanent injunction creates ongoing harm to Mid Continent because it improperly blocks the Congressionally-intended remedial effect of the final results of the underlying proceeding, and the trade laws generally, before a final judgment on the merits in the underlying appeal has been reached following remand proceedings and any appeals therefrom.

Appellant will be filing its Opening Brief within 14 days after the filing of this motion.  Appellant respectfully requests that the Court order that:  (1) Appellee's Responsive Brief be filed no later than 14 days thereafter; (2) Appellant's Reply Brief be filed no later than 14 days after the Responsive Brief; (3) the joint appendix be filed no later than three days after the Reply Brief; and (4) oral argument be held during the first available argument calendar week after the joint appendix is filed.

Appellant respectfully requests that the Court order Appellee to file any opposition to this motion no later than three days after this motion.

On March 27, 2023, counsel for Mid Continent contacted Michael P. House, Esq., counsel for Appellee Oman Fasteners LLC ("Oman Fasteners"), and Kelly Geddes, Esq., counsel for the United States, to obtain each party's position regarding this motion. Mr. House indicated that Oman Fasteners will oppose this motion, and intends to file a response within 10 days of this filing. Undersigned counsel has not received a response from Ms. Geddes as of the time this motion is being filed.

## BACKGROUND

This appeal stems from the Trade Court's February 15, 2023 opinion (Ex. A) and order (Ex. B) granting extraordinary relief – a permanent injunction – in an appeal of the final results of an antidumping duty administrative review.[1]

An antidumping duty order covering certain steel nails from the Sultanate of Oman ("Oman") has been in place since 2015. Appellant

---

[1] The public version of the opinion was released on February 27, 2023.

Mid Continent is one of the largest producers of steel nails in the United States, and is the petitioner in the underlying antidumping proceeding. Appellee Oman Fasteners is a large producer of steel nails in Oman and one of the largest shippers of steel nails to the United States from any source. Periodic or annual reviews of the antidumping order have been conducted pursuant to 19 U.S.C. § 1675 each year since the order was imposed. This appeal arises from the sixth such review.

Consistent with its standard practice, during the sixth administrative review of the antidumping duty order in *Certain Steel Nails from the Sultanate of Oman*, Commerce gathered information by issuing questionnaires to which Oman Fasteners responded. The responses submitted by the Oman Fasteners failed to provide all of the information requested by Commerce and gave rise to the need for additional information.

Commerce accordingly issued a supplemental questionnaire concerning Oman Fasteners' U.S. sales information and data. After requesting and receiving multiple extensions to prepare and file its

response to this critical supplemental questionnaire, Oman Fasteners

failed to file its response in full by the deadline.[2]

By its own admission, Oman Fasteners missed the deadline

because its counsel lacked sufficient internal controls, and because its

counsel made unwarranted and incorrect assumptions about its ability

to file the response in a timely manner.  *See* Letter from Perkins Coie,

LLP to Sec'y of Commerce, *Certain Steel Nails from Oman; Sixth*

*Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for*

*Reconsideration* (Mar. 30, 2022) (Ex. C).  In counsel's own words:

- they "failed to ensure that all the electronic data files accompanying Oman Fasteners' Supplemental Section C Response were confirmed in ACCESS before the 5:00pm deadline, and failed to recognize the importance of immediately requesting an extension with respect to those electronic data files";
- "counsel's expectations regarding the time required to submit all the accompanying electronic data files proved incorrect";
- "counsel failed to appreciate the materiality of the late submission of certain of the electronic data files"; and
- "undersigned counsel regrettably failed to appreciate that the Department would deem the entire submission untimely, and therefore failed to immediately request leave to submit out of time."

---

[2] We acknowledge that Oman Fasteners completed filing the response 16 minutes after the deadline.  That said, among the parts filed after the deadline was the company's revised U.S. sales database, without which Commerce could not perform its calculations.

*Id.*

Oman Fasteners' counsel knew that they would not be able to complete the filing on time, yet they did not reach out to Commerce to seek assistance or a modest additional extension. By their own admission, Oman Fasteners' counsel failed to recognize the importance of seeking such help or an additional small extension. *See id.* at 2 (Ex. C).

Oman Fasteners' counsel completed filing the response after the deadline, knowing it was late. But even then, counsel did not file a request for a retroactive extension of time, as Commerce's regulations explicitly allow when extraordinary circumstances are shown pursuant to 19 C.F.R. § 351.302(c). Instead, Oman Fasteners *ignored* the problem, bringing it to no one's attention and evidently hoping that no one would notice the late filing.

But Commerce did notice it, and rejected the filing in accordance with its clear regulations as well as precedent from both the Trade Court and this Court. *See, e.g., Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015); *Trinity Mfg., Inc. v.*

*United States*, 549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021), *aff'd*, No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023) (per curiam).

Only then – more than 38 days after the late filing – did Oman Fasteners request that Commerce accept the late filing. Commerce gave Oman Fasteners multiple opportunities to plead its case, but concluded each time that the circumstances surrounding the late filing – at best, carelessness, inattention, and incompetence of counsel in missing the deadline, coupled critically with ignoring the matter for 38 days in hopes it would not be noticed – failed to demonstrate the "extraordinary circumstances" that Commerce's regulations require. *See* Letter from Dep't of Commerce to Perkins Coie LLP, *Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails from Oman; 2020-2021: Extension of Deadline to Submit Response to Section D Supplemental Questionnaire* (Mar. 22, 2022); Letter from Dep't of Commerce to Perkins Coie LLP, C*ertain Steel Nails from the Sultanate of Oman: Rejection of Untimely Submission from Oman Fasteners LLC* (Apr. 20, 2022); Letter from Dep't of Commerce to Perkins Coie LLP, *Certain Steel Nails from the Sultanate of Oman: Rejection of Untimely Submission from Oman Fasteners LLC* (May 20, 2022) (Ex. D).

The importance of the filing at issue – a supplemental response addressing numerous flaws in Oman Fasteners' U.S. sales data reporting – cannot be overstated.  Two things reside at the heart of Commerce's antidumping analysis:  (1) a respondent's U.S. sales data, and (2) a respondent's data to establish normal value, typically prices in their home market.  These data are compared to determine the degree of dumping, so their accuracy is of paramount importance.

The supplemental questionnaire at issue addressed numerous problems with some of the most fundamental parts of Oman Fasteners' U.S. sales response.  *See* Oman Fasteners' Compl. (Dec. 23, 2022), ECF No. 10, at ¶ 14 (Ex. E) ("The supplemental Section C questionnaire was extensive, containing 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit

expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database.").

Having rejected the late filing, Commerce determined that its ability to conduct a reliable and accurate margin calculation was fatally undermined by reason of Oman Fasteners' failure to file the response in a timely manner, coupled with the company's choice to ignore the issue until Commerce rejected the late filing. *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021,* 87 Fed. Reg. 43,240 (July 20, 2022) (Ex. F); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021,* 87 Fed. Reg. 78,639 (Dec. 22, 2022) (Ex. G).

Because of this, and in order to induce future full cooperation by Oman Fasteners, Commerce correctly assigned a dumping margin based on total facts available with inferences adverse ("total AFA") to Oman Fasteners, as the statute permits. *See id.*; 19 U.S.C. § 1677e; *Dongtai Peak*, 777 F.3d 1343.

Commerce's margin options were limited – the record of the proceeding, going back to the 2014 petition, contained several very low margins, in the range of 4 percent or lower, that had been calculated using the respondent's own data.  It also contained the margin alleged in the 2014 petition, 154.33%, which was reviewed and corroborated by Commerce when the petition was filed.[3]  This margin had been used as the adverse facts available rate in the first and second reviews.  In fact, its earlier use had been validated by reference to the range of dumping margins observed in U.S. sales *made by Oman Fasteners itself*.  *See Certain Steel Nails From the Sultanate of Oman:  Preliminary Results of Antidumping Duty Administrative Review and Partial Recission of Antidumping Duty Administrative Review; 2014–2016*, 82 Fed. Reg. 36,738, 36,740 (Dep't of Commerce Aug. 7, 2017) ("Specifically, we are applying a rate {as AFA} of 154.33 percent, which was calculated by Petitioner in the petition in this investigation.  We have corroborated

---

[3] As is typically the case with margins alleged in a petition, this is a transaction-specific margin, that is, it relates to a single sale or offer to sell.  This is in contrast to the weighted-average margin calculated at the end of an investigation or review, which averages the margins for *all* of a foreign company's U.S. sales – some of which may be quite small, but others of which may be quite large.

this rate with information obtained in the course of this administrative review, consistent with section 776(c)(1) of the Act. For further discussion, see the Preliminary Decision Memorandum."), and accompanying Preliminary Decision Memorandum at 10 ("We compared the petition dumping margin of 154.33 percent to the transaction-specific margins calculated for Oman Fasteners, which were not calculated using total AFA. We preliminarily find that the 154.33 percent petition margin falls within the range of the highest transaction-specific margins calculated for Oman Fasteners, which appear to be non-aberrational sales in terms of transaction quantities or other such terms when compared with other sales in Oman Fasteners' database.") (Ex. H).

Consistent with its past practice in this very proceeding, in the review on appeal Commerce determined to assign the 154.33% margin to Oman Fasteners as total facts available with adverse inferences. The low margins previously calculated on the record would not have provided a sufficient inducement to ensure full future cooperation. And Commerce could not simply conjure a compromise margin to "split the

baby" without running afoul of the requirement that its decisions be made in accordance with law and supported by substantial evidence.

In both the preliminary results and in the final results of the review, Commerce rejected Oman Fasteners' arguments and determined to assign the 154.33 percent margin to the company. *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021*, 87 Fed. Reg. 43,240, 43,241 (Dep't of Commerce Jul. 20, 2022) (Ex. F); *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020– 2021*, 87 Fed. Reg. 78.639 (Dep't of Commerce Dec. 22, 2022) (Ex. G).

Oman Fasteners appealed to the Trade Court and sought a preliminary injunction. *See Oman Fasteners, LLC v. United States*, CIT No. 22-00348 (Dec. 30, 2022), ECF No. 38 (Ex. I). After expedited briefing and a hearing, the Trade Court consolidated its ruling on the motion for preliminary injunction with a ruling on the merits. The Trade Court held that Commerce had abused its discretion by not accepting the late filing, by rejecting the late response, by determining

to resort to facts available with adverse inference, and by assigning the

154.33 percent margin as the adverse rate.  *See generally Oman*

*Fasteners, LLC v. United States and Mid Continent Steel & Wire, Inc.*,

CIT No. 22-00348, slip. op. 23-17 (Ct. Int'l Trade Feb. 22, 2023) (Ex. A).

The Trade Court separately issued an Order remanding the case

to Commerce with instructions that it "shall . . . consider that

supplemental section C response for purposes of calculating Oman's

rate."  Order (Feb. 15, 2023) at 1 ¶ 3 (Ex. B).  The remand proceeding is

ongoing.

In its Order, the Trade Court permanently enjoined "Defendant

the United States, as well as all its officers and agencies . . . from taking

any action to enforce, implement, or execute the Department's *Final*

*Results of the Antidumping Duty Administrative Review; 2020–2021*, 87

Fed. Reg. 78,639 (Dec. 22, 2022)."  Order at 3 ¶ 4 (Ex. B).

The Trade Court also ordered that instead of using the 154.33%

rate from the final results of the sixth review, Commerce was required

to instruct U.S. Customs and Border Protection ("Customs") to collect

cash deposits on imports of Oman Fasteners' subject merchandise using

a rate pulled forward from a prior review, based on a different record, of

merely 1.65 percent *ad valorem*:

> Upon entry into the United States on and after
> December 22, 2022, of subject merchandise produced
> by Oman, Defendant, through its agent Customs, is
> **ENJOINED** to continue to collect estimated
> antidumping duty cash deposits equal to 1.65 percent
> (the cash deposit rate applicable to Oman Fasteners set
> in *Certain Steel Nails from the Sultanate of Oman:*
> *Final Results of Antidumping Duty Administrative*
> *Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't
> Commerce Nov. 29, 2021)).

*Id.* at 3 ¶ 6.

Mid Continent filed this appeal on March 23, 2023.

## DISCUSSION

## I.    WITHOUT EXPEDITED CONSIDERATION, THIS APPEAL WILL LIKELY BECOME MOOT BEFORE THE CASE IS DECIDED

The margin of dumping calculated in an antidumping review

serves two purposes.  First, it is the "assessment rate," or the rate used

to calculate the final amount of duties assessed on the specific imports

covered by the review itself.  This allows Commerce to collect duties on

these imports that are the actual amount by which they have been

unfairly priced, or dumped.

Second, the rate is used by Customs to calculate and collect deposits of estimated duties on future entries. In this role, the rate remains in place until the completion of a subsequent review that generates a new rate. Given the ability of interested parties to request reviews under 19 U.S.C. § 1675 each year, and that such reviews take approximately a year at most to complete, the cash deposit margin can be revised as often as every year.

As noted above, this appeal involves the final results of Commerce's sixth administrative review of the *Nails from Oman* antidumping order. The seventh review, whose final results will result in a revised margin that supersedes the margin from the sixth review as the cash deposit rate, was initiated on September 6, 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54,463, 54,466 (Dep't of Commerce Sept. 6, 2022) (Ex. J).

On March 2, 2023, Commerce fully extended the deadline for the preliminary results of the seventh review to July 28, 2023. *See* Memorandum To James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, Through Eric

15

Greynolds, Office Director, Office IV, Antidumping and Countervailing

Duty Operations, From Dakota Potts, International Trade Compliance

Analyst, Office IV, Antidumping and Countervailing Duty Operations,

*Certain Steel Nails from the Sultanate of Oman:  Extension of Deadline*

*for Preliminary Results of Antidumping Duty Administrative Review*

(Mar. 2, 2023) (Ex. K).

Based on the fully extended deadline for the preliminary results of

the seventh review, pursuant to 19 U.S.C. § 1675(a)(3)(A) and 19 C.F.R.

§ 351.213(h), the final results of that review could be issued as soon as

December 4, 2023 if the final results are not extended, and will be

issued no later than January 31, 2024 if the final results are fully

extended.  Partial extension of the deadline for the final results to a

date between these two is also possible.

As this shows, the cash deposit rate covering imports from Oman

Fasteners will be revised at some point between December 4, 2022 and

January 31, 2024.  This cash deposit rate will supersede the 1.65

percent rate imposed by the Trade Court, thus mooting any challenge to

the permanent injunction.  Given the typical life of an appeal before the

Court, if the instant appeal is not expedited, it is highly likely if not

certain that the case will not be decided until after this occurs,

rendering moot this appeal and the important legal issues it raises.

## II.    THE PERMANENT INJUNCTION CREATES ONGOING HARM TO MID CONTINENT BY IMPROPERLY BLOCKING THE CONGRESSIONALLY-INTENDED REMEDIAL BENEFITS OF THE TRADE LAWS

Expedited consideration of this appeal is warranted for a second,

equally compelling reason.  Specifically, the permanent injunction

issued by the Trade Court interferes with the Congressionally-intended

remedial benefit of the trade laws.

As a member of the domestic industry, and indeed, as the party

who petitioned the government to investigate unfairly-traded imports

from Oman in the first place, Mid Continent is an intended beneficiary

of the remedial effects of the antidumping duty laws included in the

Tariff Act of 1930, as amended.  *See, e.g.*, *SeAH Steel VINA Corp. v.*

*United States*, 950 F.3d 833, 837 (Fed. Cir. 2020) (stating that

antidumping duties are imposed to protect domestic industries against

unfair trade practices); *Canadian Wheat Bd. v. United States*, 641 F.3d

1344, 1351 (Fed. Cir. 2011) (stating that antidumping duty orders "are

imposed to protect American industries against unfair trade practices

by foreign entities who sell in the American market") (citing *Consol.*
*Bearings Co. v. United States,* 348 F.3d 997, 1002–03 (Fed. Cir. 2003)).

By ordering Commerce to adopt a cash deposit rate from an
entirely different review without affording the agency the opportunity
to address any perceived infirmities in its prior decision, the Trade
Court has improperly short-circuited and undermined the legislative
scheme imposed by Congress.  This Congressionally-mandated system
creates an orderly process whereby rates assigned through the
administrative review process remain in place until a final decision is
entered after any appeals, remands, and subsequent appeals.  Indeed,
this scheme, consistent with the laws dealing with unfair trade as a
whole, is intended to provide important remedial benefits to affected
domestic industries and producers such as Mid Continent.

The questions that this Court will consider are whether the Trade
Court abused its discretion by consolidating the hearing for a
preliminary injunction with a trial on the merits and whether the Trade
Court made a reversable error in finding that the permanent injunction
standard was met.  If this Court determines that the Trade Court's
decision was erroneous, then it will have harmed Mid Continent by

artificially distorting the dynamics of the domestic market, contrary to Congressional intent, by ordering Commerce to use a cash deposit rate of 1.65 percent rather than 154.33 percent. The real-world consequences of such an error are significant, in terms of lost sales and lost revenue by virtue of improperly facilitated import competition. We respectfully submit that expedited consideration is warranted to avoid, or at least minimize, any such negative ramifications.

As a related matter, we note that when an importer is required to deposit antidumping duties that ultimately exceed the final assessment rate, it is entitled to a refund with interest. *See* 19 U.S.C. § 1677g. No such remedy exists for domestic producers whose ability to sell or to maximize returns are improperly undermined by unfairly traded imports facilitated by an improper judicial ruling.

## III. ALTERNATIVELY, THE COURT SHOULD DENY ANY REQUESTS FOR EXTENSION OF THE BRIEFING SCHEDULE

In any event, Mid Continent intends to move this appeal forward as quickly as possible by filing its opening brief within 14 days of this motion. At minimum, we respectfully request that the Court not grant the parties any extensions of the briefing schedule, and place the case

on the next available oral argument calendar after briefing is complete

and the joint appendix is filed, consistent with its order in a different

appeal.  *See Amsted Rail Co. v. U.S. Int'l Trade Comm'n*, No. 2023-1355,

Order, ECF No. 42 (Fed. Cir. Jan. 23, 2023) (denying motion to expedite

but stating that the parties "should not anticipate extensions of time,

and the case will be placed on the next available oral argument

calendar after briefing is complete").

## CONCLUSION

For the foregoing reasons, the Court should expedite the briefing

in this appeal of the Trade Court's permanent injunction, or at

minimum, deny any request(s) for extension of the briefing schedule

and place the case on the next available oral argument calendar after

briefing is complete and the joint appendix is filed.

Respectfully submitted,


*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700

Dated:  March 27, 2023          *Counsel to Defendant-Appellant Mid*
                                *Continent Steel & Wire, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 23-1661 |
| **Short Case Caption** | Oman Fasteners, LLC v. US |
| **Filing Party/Entity** | Mid Continent Steel & Wire, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/27/2023

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Mid Continent Steel & Wire, Inc. | | Wholly owned by DEACERO USA Inc., a subsidiary of DEACERO S.A.P.I. de C.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| The Bristol Group PLLC | Adam H. Gordon | Jennifer M. Smith |
| Lauren Fraid | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)     ☑  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure.

This motion contains 3,743 words.

This motion complies with the typeface requirements Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rule of Appellate Procedure, in accordance with Rule 27(d)(1)(E) of the Federal Rule of Appellate Procedure.

This response has been prepared in a proportionally spaced type face using Microsoft Word in Century Schoolbook 14-point font.

Dated: March 27, 2023

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

# EXHIBIT A

**PUBLIC VERSION**

**Slip Op. 23-17**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

_____

**Court No. 22-00348**

_____

OMAN FASTENERS, LLC,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

MID CONTINENT STEEL & WIRE, INC.,

*Defendant-Intervenor.*

_____

Before: M. Miller Baker, Judge

**OPINION**

[Consolidating Plaintiff's motion for a preliminary in-
junction with trial on the merits, granting judgment
on the agency record in favor of Plaintiff, remanding
for further proceedings, and enjoining Defendant from
requiring Plaintiff to post 154.33 percent cash deposits
on subject merchandise pending further order of the
court.]

Dated: February 15, 2023
Amended: February 22, 2023

*Michael R. Huston*, Perkins Coie LLP of Washington,
DC, argued for Plaintiff. With him on the briefs were

**PUBLIC VERSION**

*Michael P. House* and *Andrew Caridas*. *John M. Devaney* examined Plaintiff's witness.

*Kelly M. Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant and cross-examined Plaintiff's witness. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Ian A. McInerney*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Adam H. Gordon*, The Bristol Law Group PLLC of Washington, DC, argued for Defendant-Intervenor and cross-examined Plaintiff's witness. With him on the brief were *Jennifer M. Smith* and *Lauren Fraid*.

   *Baker*, Judge: "[T]he power to tax [is] the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819) (Marshall, C.J.). Wielding that power, the Commerce Department imposed a duty rate of 154.33 percent on Oman Fasteners, LLC (Oman), an importer of steel nails, solely for missing a filing deadline by 16 minutes. *See Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg.

**PUBLIC VERSION**

78,639 (Dep't Commerce Dec. 22, 2022).[1] The rate previously applicable to such imports was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't Commerce Nov. 29, 2021), meaning that Commerce raised Oman's duty rate by more than *ninety-three-fold*.

Oman brings this suit challenging Commerce's decision. In the ordinary course, Oman would move for judgment on the agency record and, if successful, the court would remand to the Department for a recalculation of the challenged antidumping duties. In the meantime, however, Oman would still be required to pay estimated cash deposits[2] set at 154.33 percent

---

[1] For background on administrative reviews in antidumping proceedings and the role of mandatory respondents such as Oman, see *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334–35 (CIT 2020).

[2] The Tariff Act of 1930 provides that when Commerce makes an affirmative determination that merchandise is being dumped, the Department "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin"—here, 154.33 percent. 19 U.S.C. § 1673d(c)(1)(B)(ii). This requirement is intended as security for the eventual payment of antidumping duties.

Later, U.S. Customs and Border Protection "liquidates" the entry to make a "final computation or ascertainment of duties owed." *ARP Materials, Inc. v. United States*, 520 F. Supp. 3d 1341, 1347 (CIT 2021) (citing 19 C.F.R. § 159.1;

**PUBLIC VERSION**

until the court entered a final judgment affirming a new rate recalculated by Commerce. The Department then would issue new cash deposit instructions and revoke the 154.33 percent rate. *See Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1313–14 (CIT 2022) (discussing 19 U.S.C. § 1516a(c)(3) and holding that remand redeterminations do not become effective until sustained by a "final disposition of the court").

Claiming that it can't afford to pay such exorbitant cash deposits or (alternatively) shut down most of its business while this litigation and administrative proceedings play out, Oman moves for a preliminary injunction requiring the government to collect such deposits at the preexisting 1.65 percent rate set in the preceding administrative review. Exercising its discretion, the court consolidates Oman's motion with trial on the merits—in this context, a motion for judgment on the agency record.

Because Commerce's challenged actions here are the very definition of abuse of discretion, the court grants judgment on the agency record in favor of Oman and remands for further proceedings consistent with this opinion. And because the company has demonstrated    the    requirements    for    obtaining

---

19 U.S.C. § 1500), *aff'd*, 47 F.4th 1370 (Fed. Cir. 2022). Following liquidation, if the importer's deposit was lower than the final duty assessed, Customs collects any additional amounts due, with interest; if the deposit exceeded the final assessment, Customs refunds the difference, with interest. *Id.* (citing 19 U.S.C. § 1505(b)).

injunctive relief, including showing irreparable injury, the court enjoins the government to collect cash deposits at the previous rate of 1.65 percent pending further order of the court. *Cf. Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting) ("The power to tax is not the power to destroy while this Court sits.").

I

A

The memorandum accompanying Commerce's decision explains that Oman had until 5:00 p.m. Eastern Time on February 14, 2022, to upload its supplemental section C questionnaire response to the Department's ACCESS electronic filing system, but Commerce received the response "between 4:41 p.m. ET and 5:16 p.m. ET." ECF 38-3, at 17.[3] The Department "received no notification from Oman . . . of filing difficulties or an additional request for extension of the deadline prior to 5:00 p.m." and cited a regulation providing that "[a]n electronically filed document must be received successfully *in its entirety* by . . . ACCESS, by 5 p.m. [ET] on the due date." *Id.* (emphasis and brackets in original) (quoting 19 C.F.R. § 351.303(b)(1)).

---

[3] ECF 38-3 contains exhibits to the public version of Oman's motion. ECF 36-3 contains sealed versions of the same material. In this opinion, citations to exhibits refer to the page numbers stated in the ECF header.

PUBLIC VERSION

Oman explains[4] that ACCESS offers a "check file" feature that pre-screens a submission to ensure there are no technical issues that will cause it to be rejected. Counsel used that feature and it found no problems, so he began uploading material 50 minutes prior to the 5:00 p.m. deadline, which he believed—based on past experience—would be sufficient time. ECF 38-1, at 7–8. Unexpectedly, and notwithstanding the "check file" feature's approval of the submission, ACCESS rejected the first submission twice due to technical defects, and it took a total of 17 minutes for the system to issue the two error messages. *Id.* at 8. Counsel reformatted the problem materials and filed them at 4:41 p.m. and 4:46 p.m. He then began uploading additional files, "all but one of which were Excel-format copies of the PDF exhibits that counsel had already uploaded." *Id.* at 9. But the system ran slowly and did not accept the "U.S. sales SAS database" piece of the submission until 5:16 p.m. *Id.* at 9.

---

[4] Oman did not provide a declaration from counsel substantiating its account of the events surrounding its 16-minute delay in completing its filing. The record contains counsel's statements offered before Commerce that were not under oath but were subject to false statement liability under 18 U.S.C. § 1001. *See* 19 C.F.R. § 351.303(g). As the parties have not addressed whether representations encompassed by § 1001 suffice to support injunctive relief in lieu of sworn testimony, the court recounts counsel's explanation solely for purposes of providing context. No party disputes that Oman completed its filing 16 minutes late, so the court accepts that fact as true.

### PUBLIC VERSION

Counsel decided not to contact Commerce about the matter for two reasons. First, the Department had said there would be no further extensions. *Id.* at 9–10; *see also* ECF 38-3, at 63 (Commerce letter to counsel stating, in relevant part, "Commerce does not anticipate providing any additional extension for Oman Fasteners' response . . . ."). Second, the February 14 submissions were "bracketing not final" versions, and the next day counsel timely filed the final versions under Commerce's "one-day lag rule."[5] ECF 38-1, at 10.

Just over five weeks later, the Department rejected Oman's entire supplemental section C questionnaire response (including the portions submitted prior to 5:00) as untimely and struck it from the record. ECF 38-3, at 17. In response, Oman made several requests that Commerce reconsider and grant a retroactive extension of time, but the Department refused, finding that "Oman . . . failed to demonstrate that a qualifying extraordinary circumstance existed to warrant an untimely extension of the deadline." *Id.* (citing 19 C.F.R.

---

[5] The "one-day lag rule" allows a party to submit only a business proprietary version of a document by the deadline with a notice that "bracketing of business proprietary information is not final for one business day after date of filing." 19 C.F.R. § 351.303(d)(2)(v) (title case removed). The party then has one extra business day to double-check its designations of confidential information and then to file a final confidential submission together with a redacted public version. *Id.* § 351.303(c), (c)(2)(iii). The party may make no changes to the final submission other than adjusting bracketing and removing the notice about bracketing not being final. *Id.* § 351.303(c)(2)(ii).

**PUBLIC VERSION**

§ 351.302(c)(2)).[6] Commerce faulted counsel for not seeking an extension before the deadline and instead "wait[ing] until 38 days after the untimely submission of the [response] to bring any filing issues to Commerce's attention . . . ." *Id.* The Department said counsel did not allow enough time to file because, as is often said on Wall Street, past performance is no guarantee of future results: Oman's "assertion that certain prior filings took a particular amount of time is not relevant.

---

[6] The regulation the Department cited provides as follows:

> (c) *Requests for extension of specific time limit.* Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section. An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists. The request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303, and state the reasons for the request. An extension granted to a party must be approved in writing.
>
> > (1) An extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary.
> >
> > (2) An extraordinary circumstance is an unexpected event that:
> >
> > > (i) Could not have been prevented if reasonable measures had been taken, and
> > >
> > > (ii) Precludes a party or its representative from timely filing an extension request through all reasonable means.

19 C.F.R. § 351.302(c).

PUBLIC VERSION

Prior filing times do not guarantee a given submission will require a specific length of time to file, and simply because filing on ACCESS had taken less time in previous cases does not constitute an extraordinary circumstance." *Id.* at 225.

The Department cited its "broad discretion" in establishing and enforcing deadlines and said past cases "demonstrate that Commerce establishes deadlines and maintains those deadlines throughout the proceeding and *occasionally accepts late filings depending on the facts of the particular case before it.*" *Id.* at 18 (emphasis added).

Commerce then found that "the record lacks necessary information because Oman Fasteners did not timely file its SCQR. Oman Fasteners failed to act to the best of its ability and provide requested information by the deadline for submission of that information. . . . Therefore, in accordance with [19 U.S.C. § 1677e(a)], we are relying on facts available." *Id.* at 25 (emphasis added).

In selecting from facts otherwise available, Commerce also applied an adverse inference. In considering what rate to assign Oman, the Department noted that "the record of this proceeding includes certain calculated margins, ranging from 0.63 percent to 9.10 percent, as well as the Petition rate of 154.33 percent from the initiation of the underlying investigation," *id.* at 29, and decided, "[I]t is appropriate to assign Oman Fasteners the Petition rate of 154.33 percent based on its failure to cooperate, because it is a rate on the

**PUBLIC VERSION**

record which would confer an adverse inference and induce cooperation." *Id.* at 30. Oman thus suffered what trade cases commonly refer to as "adverse facts available," or "AFA," a fate statutorily reserved to respondents that do not "cooperate . . . to the best of [their] ability" with an antidumping or countervailing duty investigation. 19 U.S.C. § 1677e(b).[7]

### B

Oman timely sued on December 23, 2022, the day after Commerce issued its decision. *See* ECF 1 (summons); ECF 10 (complaint). Three days later, Oman filed public (ECF 38) and confidential (ECF 36) versions of its motion for a preliminary injunction. At that time the court set an expedited briefing schedule and advised the parties that it was considering consolidating Oman's preliminary injunction motion with trial on the merits—in this context, treating Oman's motion as a motion for judgment on the agency record. *See* USCIT R. 56.2 (providing for judgment on the agency record); *see also* USCIT R. 65(a)(2) (allowing consolidation of a preliminary injunction motion with trial on the merits).

Mid Continent Steel & Wire, Inc., then intervened as a defendant as of right. ECF 37. After the completion of briefing and limited discovery, the court conducted an evidentiary hearing with live witness

---

[7] For background on Commerce's use of adverse facts available in antidumping proceedings, see *Hung Vuong*, 483 F. Supp. 3d at 1336–39.

## PUBLIC VERSION

testimony and heard legal argument on February 1, 2023. At the outset of the hearing, the court advised the parties that it would likely consolidate the preliminary injunction motion with trial on the merits by treating the motion as one for judgment on the agency record. *See* ECF 83, at 4:12–5:19.

## II

Oman sues under § 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii), challenging Commerce's final determination in an administrative review of an antidumping order under 19 U.S.C. § 1675. ECF 10, at 2. The court has jurisdiction per 28 U.S.C. § 1581(c).

In cases brought under § 516A of the Tariff Act, the Court of International Trade "shall review the matter as specified in subsection (b) of such section." 28 U.S.C. § 2640(b). In relevant part, subsection (b) provides that "the Court of International Trade must sustain 'any determination, finding[,] or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' " *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). In addition, Commerce's exercise of discretion in § 516A cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see*

**PUBLIC VERSION**

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in cases reviewed under 28 U.S.C. § 2640(b), "section 706 review applies since no law provides otherwise").

### III

### A

Under Rule 65, the court has discretion to consolidate a hearing on a preliminary injunction with the trial on the merits. *See* USCIT R. 65(a)(2). In this administrative law context, that means treating Oman's motion as one for judgment on the agency record. *See* USCIT R. 56.2. Here, the court so consolidates Oman's motion with the trial on the merits. The court finds that so doing promotes judicial economy, reduces expense to the parties, and furthers speedy resolution of this dispute. *See* USCIT R. 1 (stating that the court's rules are to be "construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding").

### B

On the merits, Oman asserts three separate and independent theories challenging Commerce's decision to apply facts otherwise available with an adverse inference. *First*, the Department abused its discretion in denying Oman a retroactive extension of time in these circumstances. *Second*, even if the Department properly refused to grant Oman a retroactive extension, the Department abused its discretion in applying

### PUBLIC VERSION

an adverse inference. *Finally*, even if the Department properly applied an adverse inference, the Department abused its discretion in selecting such a high rate (154.33 percent). The court easily agrees with Oman as to each of its theories; this is not a close case.

1

Oman argues that in denying it a retroactive extension, the Department abused its discretion for two reasons. The court considers each in turn.

a

Almost ten years ago, buried in a response to a party's comment made during rulemaking, Commerce casually revealed that it grants virtually automatic 15½-hour[8] extensions for completion of filings:

> Parties should be aware that the likelihood of the Department granting an extension will decrease the closer the extension request is filed to the applicable time limit because the Department must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an

---

[8] As a technical matter, the automatic extension is actually a *minimum* 15½-hour extension due to the Department's reference to "the next work day." A party with a deadline of 5:00 p.m. on an ordinary Friday, for example, would receive an extension to 8:30 a.m. the following Monday, and a party whose deadline falls on the Friday before a holiday weekend would receive an extension to Tuesday. Here, however, the deadline was on a Monday.

**PUBLIC VERSION**

extension of a time limit if they have not re-
ceived a response from the Department. *For sub-
missions that are due at 5:00 p.m., if the Depart-
ment is not able to notify the party requesting the
extension of the disposition of the request by 5:00
p.m., then the submission would be due by the
opening of business (8:30 a.m.) on the next work
day.*

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,792
(Dep't Commerce Sept. 20, 2013) (emphasis added).
This offhand comment response—which has never
been codified through a regulation or otherwise rea-
sonably communicated to the bar—means that a party
in Oman's situation could (and unquestionably should)
have a boilerplate request for an extension ready to file
at 4:55 p.m. if a required filing encounters technical
difficulties of the type that Oman claims to have suf-
fered here. In the real world, such a last-minute exten-
sion request is virtually certain to obtain at least a
15½-hour extension for completing a filing.[9]

---

[9] Counsel for the government argued at the hearing that
the extension is not automatic because Commerce could
deny it, but when pressed by the court she conceded that it
would be very unlikely that Commerce would be able to
deny such a last-minute extension request prior to the 5:00
p.m. cutoff. ECF 83, at 275:7–276:8. The Department's
rulemaking comment response unambiguously states that
if Commerce does not rule on the extension request by 5:00
p.m., the deadline bumps to 8:30 a.m. the next work day—
thus making the extension essentially automatic in

**PUBLIC VERSION**

The court finds that because the Department has not codified its practice or otherwise provided clear notice to the bar that this virtually automatic 15½-hour extension is available, it is an abuse of discretion for Commerce to require a showing of "extraordinary circumstances" to support a retroactive extension request in the narrow circumstance where, as here, the filing is completed after 5:00 p.m. but prior to 8:30 a.m. the following work day—that is, when the filing is completed within the automatic window that Commerce's rulemaking comment response authorizes.[10]

---

practice because a ruling at 5:01 p.m. would be too late to prevent the extension from taking effect.

[10] The court emphasizes that Oman's completion of its filing within the 15½-hour window is essential to Part III.B.1.a of this decision and distinguishes this case from matters such as *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346 (CIT 2022), *appeal filed*, No. 22-2024 (Fed. Cir. Sept. 14, 2022), where counsel filed an extension request in time to get the "automatic extension" but then failed to complete the substantive filing by 8:30 a.m., and *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), in which the Federal Circuit found that Commerce was justified in excluding responses filed *ten days* after the deadline when the submitting party submitted an untimely request for extension and provided no explanation for why the party had not timely filed a request. The court expresses no view on whether the Department's failure to grant an extension in these circumstances would be an abuse of discretion if Commerce had clearly put the bar on notice of its last-minute extension policy through codification in a regulation or some other method reasonably calculated to provide notice to the bar. *See Celik*

**PUBLIC VERSION**

b

Oman also argues that the Department has a "policy of leniency" for filing errors, ECF 38-1, at 30, and erred by failing to explain its departure from past practice in this proceeding. Oman points to this statement by Commerce in another proceeding:

> . . . Commerce's *practice* is to allow a law firm that misses a filing deadline one opportunity to submit the untimely information where [the] law firm failed to: 1) file a complete submission before the specified hour on the date of the deadline; 2) timely file the public version of the response; or 3) respond on the date of the deadline, but promptly contacted Commerce. We also note that Commerce allows a law firm a second opportunity to submit the untimely information only if that law firm has: 1) not previously been afforded such an opportunity in a past segment of any proceeding; and 2) identified the steps it

---

*Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1361 (CIT 2022) ("[I]t is not reasonable for the court to expect a filer to be on notice of, or to allow a litigant to be prejudiced by, a substantive regulatory provision buried within preamble language, especially a provision that was published in the Federal Register [approximately eight and a half] years before the due date of a filing and never issued as a regulation or rule."). *Celik Halat* issued on February 15, 2022—the day after the missed deadline in this case. At argument, counsel represented that Oman was unaware of Commerce's automatic extension policy until the court "unearthed it" in *Celik Halat*. ECF 83, at 248–51.

## PUBLIC VERSION

has taken to avoid untimely filings in the future. This practice is grounded in 19 CFR 351.301(a) . . . .

. . . . Pursuant to the practice described above, we previously accepted Hyundai Steel's narrative response because we determined that the law firm representing Hyundai Steel was eligible to receive a second opportunity. [Commerce then discovered it had accepted untimely information from that firm in a different matter two and a half years earlier.] It is inconsistent with Commerce's practice to allow the law firm another opportunity to file untimely information in this administrative review. . . .

. . . . As a result, pursuant to our regulations and practice, [the Department rejected the untimely filing and removed it from the record].

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, Dep't No. A-580-878, Commerce Letter to Respondent's Counsel at 2–3 (Aug. 3, 2018) (emphasis added and footnote references omitted).

There is no dispute that Oman's counsel is eligible for leniency under the "practice" quoted above. The record shows that Oman brought the language to Commerce's attention and asked it to apply that "practice" here. *See* ECF 38-3, at 234–41; *see also id.* at 261. The Department, astonishingly, responded that it "does not have an 'established' practice of leniency for first-time offenders for late submissions." *Id.* at 269.

### PUBLIC VERSION

Commerce's response disregards its own prior statements and therefore constitutes an abuse of discretion (at best) or arbitrary and capricious action (at worst). The Department said, *five times*, that it has a "practice" of allowing a law firm one tardy filing—a "one-bite rule," as it were.[11] This court will hold Commerce to its stated practice. *Cf. NLRB v. Wash. Star Co.*, 732 F.2d 974, 977 (D.C. Cir. 1984) (per curiam) ("The present sometimes-yes, sometimes-no, sometimes-maybe policy of [enforcing] due dates cannot, however, be squared with our obligation to preclude arbitrary and capricious management of the [agency]'s mandate."); *see also Cappadora v. Celebrezze*, 356 F.2d 1, 6 (2d Cir. 1966) (Friendly, J.) ("[O]nce appropriate rules have been established, the discretion conferred in day to day administration cannot have been assumed to extend to unreasonable deviation from such rules on an *ad hoc* basis at the whim of the [agency].").

\*   \*   \*

Under these circumstances, Commerce abused its discretion by not granting Oman a retroactive

---

[11] At common law, a plaintiff seeking damages for a dog bite "must prove that the defendant knew about the dog's vicious propensities, a scienter requirement commonly referred to as the 'one-bite rule.'" *Carreiro v. Tobin*, 66 A.3d 820, 822–23 (R.I. 2013) (quoting *DuBois v. Quilitzsch*, 21 A.3d 375, 380 (R.I. 2011)); *cf. McLaughlin v. Union Oil Co. of Cal.*, 869 F.2d 1039, 1045 (7th Cir. 1989) (Posner, J.) ("There is no 'one explosion' rule in OSHA cases comparable to the fabled 'one bite' rule of tort liability for injury inflicted by a house pet.").

**PUBLIC VERSION**

extension. That, in turn, means the Department's invocation of facts otherwise available here was unlawful—necessary information was *not* missing from the record, 19 U.S.C. § 1677e(a)(1), nor did Oman "fail[ ] to provide such information by the deadline[ ] for submission," *id.* § 1677e(a)(2)(B).

Because the court finds Commerce's resort to facts otherwise available unlawful, the court necessarily finds the same as to the use of an adverse inference. Proper invocation of facts otherwise available is a statutory prerequisite to use of an adverse inference. *See id.* § 1677e(b)(1)(A) (permitting the Department to "use an inference that is adverse to the interests of that party *in selecting from among the facts otherwise available*") (emphasis added).

2

Even if Commerce did not abuse its discretion in denying an extension of time to Oman and therefore properly applied facts otherwise available because of the company's late filing, *see id.* § 1677e(a)(2)(B), the court finds that Commerce abused its discretion in applying an adverse inference.

When the Department "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," *id.* § 1677e(b)(1), the Tariff Act permits (but does not require) Commerce to "use an inference that is adverse to the interests of that party in selecting from the facts otherwise available," *id.* § 1677e(b)(1)(A). On the one

### PUBLIC VERSION

hand, "the standard does not require perfection and recognizes that mistakes sometimes occur," but on the other, "it does not condone inattentiveness [or] carelessness . . . ." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* at 1383. "Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id.* at 1382. Where "Commerce made no such examination," the Federal Circuit found invocation of an adverse inference to be unsupported by substantial evidence on the record. *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022).

Here, the extent of the Department's justification for applying an adverse inference consisted of a single clause within a single sentence: "Additionally, pursuant to section 776(b) of the Act [i.e., 19 U.S.C. § 1677e(b)], because Oman Fasteners failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines, we are applying an adverse inference when selecting from the facts available." ECF 38-3, at 25. That sentence tells the court nothing about *why* the Department concluded that Oman failed to cooperate to the best of its ability by missing a filing deadline by 16 minutes.

### PUBLIC VERSION

Agency action is improper where the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 423 U.S. 29, 43 (1983). Here, Oman told Commerce that the ACCESS system initially notified counsel that his filings *met* the system's requirements, yet after some delay the system then unexpectedly rejected them. The Department did not address Oman's assertion that the ACCESS system's performance contributed to the late filing.

Beyond failing to address Oman's contention that the company was not wholly at fault, Commerce's application of an adverse inference is an abuse of discretion for the additional reason that the Department provided no explanation justifying its conclusion that a 16-minute filing delay is a failure to cooperate. Commerce's *ipse dixit* here is not enough. *See City of Miami, Okla. v. Fed. Energy Regulatory Comm'n*, 22 F.4th 1039, 1042, 1043 (D.C. Cir. 2022) (chiding agency for *ipse dixit* explanation and failure to analyze evidence and finding "[t]hat is hardly acceptable evaluation of the evidence"); *State Farm*, 463 U.S. at 48 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . .").

### 3

Finally, even if Commerce did not abuse its discretion by refusing to grant a retroactive extension to Oman, and even if the Department did not abuse its discretion by applying an adverse inference in

**PUBLIC VERSION**

selecting from facts otherwise available, the court finds that Commerce abused its discretion by selecting the punitive 154.33 percent rate. "That the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (CIT 2018). Section "1677e(d)(2) contemplates the selection of the highest rate when the situation merits the highest rate." *Id.* at 1350. If Commerce fails to reasonably explain why its chosen rate was appropriate, the court must find it inappropriate. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019).

Here, the Department simply stated that 154.33 percent "is a rate on the record *which would confer an adverse inference* and induce cooperation." ECF 38-3, at 30 (emphasis added). That is not an explanation. It amounts to, "We choose this as the adverse rate because it's crushing." But the Federal Circuit has noted that while "Commerce is at liberty to exercise its judgment and select a rate it finds appropriate to deter non-compliance, there is an extremely large range of rates between 1.43% and 126.44%." *BMW*, 926 F.3d at 1302. The same is true here, except the relevant range is even greater. In past administrative reviews, the highest rate that Oman received was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't

Ct. No. 22-00348                                    Page 23
                    **PUBLIC VERSION**

Commerce Nov. 29, 2021),[12] yet Commerce inexplica-
bly opted for a 154.33 percent rate this time. As the
Federal Circuit has repeatedly admonished the De-
partment, an adverse inference rate cannot be puni-
tive or aberrational and must "reflect[ ] the serious-
ness of the non-cooperating party's misconduct."
*BMW*, 926 F.3d at 1301. Commerce made no effort to
justify the draconian sanction it imposed here.

                        \*    \*    \*

---

[12] *See also Certain Steel Nails from the Sultanate of Oman:
Final Results of Antidumping Duty Administrative Review;
2014–2016*, 83 Fed. Reg. 4030, 4031 (Dep't Commerce Jan.
29, 2018) (0.63 percent); *Certain Steel Nails from the Sul-
tanate of Oman: Final Results of Antidumping Duty Ad-
ministrative Review; 2016–2017*, 83 Fed. Reg. 58,231,
58,232 (Dep't Commerce Nov. 19, 2018) (0.00 percent); *Cer-
tain Steel Nails from the Sultanate of Oman: Final Results
of Antidumping Duty Administrative Review; 2017–2018*,
84 Fed. Reg. 71,372, 71,372 (Dep't Commerce Dec. 27,
2019) (also 0.00 percent); and *Certain Steel Nails from the
Sultanate of Oman: Final Results of Antidumping Duty Ad-
ministrative Review; 2018–2019*, 86 Fed. Reg. 14,309,
14,310 (Dep't Commerce Mar. 15, 2021) (also 0.00 percent).
The highest margin Oman received was in the original an-
tidumping order, *see Certain Steel Nails from the Republic
of Korea, the Sultanate of Oman, Taiwan, and the Socialist
Republic of Vietnam: Antidumping Duty Orders*, 80 Fed.
Reg. 39,994, 39,996 (Dep't Commerce July 13, 2015) (9.10
percent), although Commerce reduced that rate to 4.22 per-
cent after multiple remands from this court, *see Mid Con-
tinent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d
1349, 1353 (CIT 2022), *appeal filed*, No. 23-1039 (Fed. Cir.
Oct. 14, 2022).

**PUBLIC VERSION**

For the reasons outlined above, the court concludes that Oman is entitled to judgment on the agency record. *See* USCIT R. 56.2.

IV

After a grant of judgment on the agency record, relief as of right is limited to a remand for further proceedings. *See* 19 U.S.C. § 1516a(c)(3) (authorizing the court to remand to Commerce "for disposition consistent with the" court's final decision). Oman, however, also seeks extraordinary relief in the form of an injunction enjoining the government from collecting cash deposits at a 154.33 percent rate pending further order of the court.

After prevailing on the merits of a cause of action created by Congress, and absent statutory direction to the contrary, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (stating that "Congress may intervene and guide or control the exercise of the courts' [equitable] discretion, but we do not lightly assume that Congress has intended to depart from established principles") (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), a plaintiff seeking permanent injunctive relief must demonstrate

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

**PUBLIC VERSION**

public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[13] As nothing in the Tariff Act otherwise suggests an intent by Congress to depart from ordinary equitable principles in this context of a request to enjoin the collection of cash deposits, the court considers whether Oman has satisfied the three *eBay* requirements in dispute.[14]

### A

When a plaintiff demonstrates "a viable threat of serious harm which cannot be undone," *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (emphasis removed), such harm, economic or otherwise, can constitute irreparable injury for purposes of injunctive relief. For example, judicial relief "may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy." *J.*

---

[13] In the administrative law context, where a court must remand a successful challenge to agency action for further proceedings, "permanent" injunctive relief is something of a misnomer. Here, where the court has granted judgment on the agency record to Oman, the entry of injunctive relief is permanent only in the sense that it would remain in effect until the court sustains a final determination by Commerce.

[14] There is no dispute here that Oman has no other remedy at law against the government. Therefore, the company satisfies the second *eBay* requirement.

**PUBLIC VERSION**

*Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1377 (CIT 2020) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.)).

Oman's president and CEO, Steve Karaga, submitted a declaration in support of the company's motion and elaborated on that declaration in testimony in open court. In his testimony, he explained that Commerce's staggering increase in the duty rate requires the company to pick its poison: either shut down most of the business (to avoid paying cash deposits), fire most of the workforce, ruin customer relationships, and risk insolvency due to fixed costs exceeding revenue and/or [[                                        ]], or blithely continue business as usual for a few months (while paying the cash deposits that cannot be passed along to customers) until insolvency is reached. *Cf.* Ernest Hemingway, *The Sun Also Rises* 136 (1926) (" 'How did you go bankrupt?' Bill asked. 'Two ways,' Mike said. 'Gradually, then suddenly.' ").

1

As to shutting down most of the company's business to escape liability for cash deposits, the court finds that Mr. Karaga credibly identified at least four distinct kinds of ensuing irreparable injury, any one of which independently supports injunctive relief.

a. *Insolvency from running out of cash*

Mr. Karaga explained that more than [[          ]] of the company's revenue comes from U.S. market

**PUBLIC VERSION**

sales, ECF 83, at 61:15–22,[15] and more than [[
      ]] of the company's revenue comes from U.S. sales
of subject merchandise (steel nails subject to the anti-
dumping duty order),[16] *id.* at 58:22–59:5. The [[
      ]] figure represents between [[
            ]] of Oman's 2022 revenue. *Id.* at 62:15–
22. After nails, the company's second-largest product
consists of steel staples that represent [[              ]]
of its 2022 sales, or approximately [[
      ]]. *Id.* at 62:23–63:8. In his testimony, Mr. Ka-
raga referred to an exhibit (ECF 36-2, at 17) that
showed Oman's projected 2022 revenue through De-
cember 19 as [[                  ]]. ECF 83, at 63:9–64:4.

   Mr. Karaga stated that because Oman cannot af-
ford (as discussed further below) to pay cash deposits
for the 154.33 percent antidumping duties, *id.* at
65:23–66:9, the company has discontinued shipments
of nails to the United States,[17] which he said would
cause the company's sales revenue to drop to approxi-
mately [[            ]] of the company's 2022 revenue,
*id.* at 64:5–65:19. He noted that the company's
[[         ]] dropped from [[              ]] to [[
            ]] in November 2023, that [[              ]]
increased in the following month, and that he expected

---

[15] Citations to ECF 83 refer to the sealed hearing tran-
script.

[16] The remainder of this opinion uses the word "nails" in-
stead of the statutory term "subject merchandise."

[17] Oman has continued shipments of staples not subject to
the antidumping duty order. *Id.* at 76:9–16.

**PUBLIC VERSION**

January 2023 forward figures to show [[

]]. *Id.* at 83:3–23.

Asked about the government and Mid Continent's assertions that Oman can make up lost revenue from not shipping nails by selling other products, Mr. Karaga noted that the company's profit and loss statement shows that there was "[[

]]," i.e., at the same time the company stopped shipping nails. *Id.* at 83:24–84:17. He explained that a major reason for the [[       ]] is that [[

]]. *Id.* at 84:22–86:7. He also explained that "[[

]]," such that it would be implausible to suggest Oman could make up for lost sales of nails by selling other products. *Id.* at 86:8–21.[18]

---

[18] Asked whether the company can make up for the lost U.S. sales by selling to some other market, Mr. Karaga testified that other markets make up [[

]]. *Id.* at 125:14–126:7. He testified about the company's efforts to develop business in other countries but stated that Oman has never been able to develop a single market representing more than [[

]], in part because of [[

]] and in part because of heavy competition from other companies subject to U.S. antidumping orders. *Id.* at 126:11–129:9.

**PUBLIC VERSION**

Mr. Karaga testified extensively about the company's assets and the significance of lines of credit the company has with three Omani banks, including whether [[

]]. *Id.* at 112:16–116:25. [[

]] *Id.* at 111:2–13. He explained that regardless of whether [[

]],[19] the company faces imminent insolvency. *Id.* at 160:19–163:7. He stated that the company had [[          ]] of accessible cash in bank accounts as of January 2023, but that it is obligated to pay [[          ]] in the first quarter to [[

]],[20] [[          ]] for a tax payment due no later than March 31, and $22 million in Section 232 steel duties owed to the U.S. government. *Id.* at 211:25–214:9; *see also* ECF 79 (sealed demonstrative exhibit outlining those figures). Simple mathematics shows that these liabilities will exhaust the accessible cash by the end of March if [[

]]. Mr. Karaga testified that he is

---

[19] Mr. Karaga acknowledged that [[

]], but he also testified that the company must [[

]]. *Id.* at 170:21–171:13.

[20] Mr. Karaga said this figure represents amounts [[

]] and does not [[

]]. *Id.* at 222:8–223:9.

**PUBLIC VERSION**

certain that [[

                     ]], the company will not be able to gen-
erate enough profits to cover expenses and existing ob-
ligations, such as land leases and salaries, ECF 83, at
160:19–163:7, and he also testified that the company
cannot pay its fixed costs based on the minimal reve-
nue left after halting imports of nails, *id.* at 106:22–
108:14.

   The court finds that Oman will be insolvent by the
end of March 2023 [[

              ]] because the company will run out of
cash due to the dramatic loss of revenue from sales of
nails.[21] This looming insolvency constitutes irrepara-
ble injury. *J. Conrad*, 457 F. Supp. 3d at 1377.

   b. *Insolvency through default with lenders*

   Mr. Karaga testified that he has been advised by
the company's finance manager that the company is
[[

      ]]. *Id.* at 112:16–115:25. The court finds that Oman
is [[                                               ]].
For example, the  [[




                                                 ]]"

---

[21] Mr. Karaga also explained that the company has [[


      ]]. *Id.* at 111:14–112:15.

**PUBLIC VERSION**

ECF 36-2, at 47.[22] That is exactly what Oman has done—it has suspended most of its business because it can't pay the cash deposits.

Mr. Karaga testified that if the banks do invoke the default provisions, "[w]e would become immediately insolvent. We wouldn't be able to meet any of our obligations." *Id.* at 116:6–12.[23] The court finds that Oman is at immediate risk of insolvency because it is [[

                        ]]. Such injury is irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

---

[22] Oman's two other credit facilities have similar [[        ]] provisions. *See* ECF 36-2, at 69 ([[


                        ]]); *id.* at 82 ([[



                        ]]).

[23] Asked whether the company has attempted to obtain additional credit from other banks, he replied that it would be ridiculous to try because any bank would ask for the company's financial records; he further explained that [[



                        ]]. *Id.* at 117:7–119:23. The court finds Mr. Karaga's answer convincing.

**PUBLIC VERSION**

### c. *Damage to customer relationships*

Mr. Karaga explained that Oman faces the imminent loss of its customer base if it cannot resume shipments of nails to the United States. More than [[

]] of the company's business comes from [[

]]. ECF 83, at 89:9–19. Mr. Karaga testified that the customers whose letters and declarations the company submitted as part of the evidentiary record represent [[                    ]] of the company's business, and that they have advised him that [[                                    ]] in view of Oman's ceasing shipments. *Id.* at 94:10–96:20. "[[

]]" *Id.* at 98:23–99:7. He also explained that while Oman [[

]], *id.* at 104:15–105:17, competing companies [[                                    ]] that would pose a significant obstacle to Oman being able to win back lost business. *Id.* at 178:2–22.

The court finds that the injury to Oman's customer relationships from having to cease importing nails is irreparable. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[L]oss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.") (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008), and *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382–83 (Fed. Cir. 2006)).

**PUBLIC VERSION**

d.  *Termination of employees*

Mr. Karaga testified that his company has terminated [[              ]] to date and is preparing to terminate more. ECF 83, at 71:4–73:15. While the [[

]], he does not know whether [[

]] *Id.* Hiring new employees is not a straightforward matter because it requires visa applications, which typically takes a minimum of 30 days because the Omani government awards visas in batches. *Id.* at 207:6–208:6.

Moreover, Mr. Karaga testified that if the company doesn't receive relief from the court, it will certainly terminate [[              ]] more employees. *Id.* at 73:7–17. If Oman proceeds to a round of layoffs involving [[                          ]], Mr. Karaga estimates that it would take one or two years to replace them. *Id.* at 205:16–206:5.

The court finds that the disruption to Oman's business resulting from the previous layoffs and the risk of further such layoffs constitutes irreparable injury. *See Std. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515–16 (Fed. Cir. 1990) (employee layoffs are irreparable injury); *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1010–11 (Fed. Cir. 2009) (same).

**PUBLIC VERSION**

2

Instead of halting most of the company's imports (and thus most of the company's business), in theory Oman has another option: Mr. Karaga testified about a hypothetical in which his company continues to import nails into the United States, which would require paying the 154.33 percent cash deposits. He explained that Oman is the importer of record for its own products, which makes the company directly responsible for paying cash deposits at whatever dumping margin Commerce assigns. ECF 83, at 66:10–17. Asked whether Oman has the financial resources to pay the deposits, he replied, "The Company does not." *Id.* at 66:7–9. Mr. Karaga testified that the company has not determined what the precise annual cost of the cash deposits would be based on historical sales of nails, but he estimated it to be "[[

]]" based on the 2022 entry value of nails multiplied by 154 percent. *Id.* at 66:18–67:6. The financial data Mr. Karaga used were provided by the company's finance manager, "[[


]]." *Id.* at 67:7–17.

Mr. Karaga asked the financial manager to project the amount of time for which Oman could afford to pay the 154.33 percent duty if the company continued importing nails. He testified that "we would run out of cash in [[                              ]]. At this point in time, after looking at it again that would be in [[

]] we would run out of cash." *Id.* at

**PUBLIC VERSION**

68:10–22. The reason he gave was that "[o]ur cash would be completely consumed by cash deposits for the 154 percent dumping margin." *Id*. at 68:23–69:3. Mr. Karaga testified about a cash flow projection submitted as Exhibit D in support of his declaration (ECF 36-2, at 24–25), which he explained was "[[


]]." ECF 83, at 137:23–139:8. He later reiterated that the document "is a simulation created for the purpose of demonstrating the cash burn rate if we continued to sell subject merchandise and posted deposits." *Id*. at 159:4–14. The exhibit shows Oman's opening cash balance on [[
]] and projects that the amount, again in the hypothetical scenario in which the company continues to import nails, will decline to [[
]]. ECF 36-2, at 24–25. Mr. Karaga testified that those figures reflect [[


]].[24] ECF 83, at 140:2–141:25.

Asked what effect the deposits would have on the company's sales if it just raised prices to compensate

---

[24] Mr. Karaga testified that the only asset the company can access to fund its ongoing operations is [[     ]]; he specifically said that the company cannot use [[
]],
nor can the company use [[


]]. ECF 83, at 215:16–219:13.

**PUBLIC VERSION**

for the duties, Mr. Karaga referred to Oman's previous price adjustments in response to antidumping duties. The company's antidumping duty increased between 2015 and 2017 and, in response, Oman raised prices for nails and [[

                              ]] *Id.* at 119:24–120:21. In 2018, the duty decreased substantially; in response the company lowered prices by about [[

                    ]]. *Id.* at 120:22–121:21. Mr. Karaga said the company's takeaway from these experiences is that "nails are a commodity business" and "price is . . . a critical factor." *Id.* at 121:22–122:4. The company provided multiple declarations from customers stating that if Oman [[

                    ]]. *See* ECF 63-1, at 137–60. Mr. Karaga stated that he felt foolish having to ask the customers for these declarations because they state the obvious to anyone familiar with the industry. *See* ECF 83, at 95:9–12 ([[

            ]]).

The court finds that simply paying cash deposits at the 154.33 percent rate set by Commerce is not a viable option for Oman. If the company pays the cash deposits without raising its prices, it will run out of money no later than April. If the company raises its prices to compensate for the cash deposit payments, it will lose its customers for these price-sensitive commodity products, and the company will go insolvent

even sooner because of lost revenue. These harms are irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

## B

To grant permanent injunctive relief, the court must consider "the balance of hardships" between Oman and the government. *eBay*, 547 U.S. at 391. That balance is lopsidedly in Oman's favor. Absent injunctive relief, the company faces catastrophe. The harm to the government from granting such relief, in contrast, is minimal to non-existent, because it will receive no revenue from Oman if the company goes bankrupt.

## C

The final *eBay* factor in dispute is whether Oman has shown "that the public interest would not be disserved by a permanent injunction." 547 U.S. at 391. Oman argues that the public interest is served by ensuring that Commerce "compl[ies] with the law, and interpret[s] and appl[ies] trade statutes uniformly and fairly." ECF 38-1, at 63 (quoting *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010)).

The government responds that the public interest is reflected in the balance struck in the antidumping statute, which authorizes injunctive relief against liquidation of entries covered by a challenged determination. *See* ECF 48, at 23–25 (citing 19 U.S.C. § 1516a(c)(2)). The statute, however, makes no provision for such relief against cash deposit requirements. *Id*. The government contends that this balance

**PUBLIC VERSION**

protects an importer's interest in ultimately recouping cash deposit overpayments while also protecting the government's interest in "collecting the money it is owed for any entries made during that period." *Id.* at 25. The government further contends the statute's remedial purposes will be undermined if it cannot collect cash deposits on an interim basis because the importer might be unable to pay its ultimate liability. *Id.*

The court, however, has determined on the merits that the 154.33 percent duty rate set by Commerce is unlawful. Therefore, the government has no legitimate interest in collecting cash deposits at that rate. Enjoining such collection cannot possibly undermine the statute's remedial purposes, because Oman has no liability to pay 154.33 percent duties. Injunctive relief here will not disserve the public interest.

\*     \*     \*

In sum, Oman has demonstrated that it will suffer irreparable injury in the absence of injunctive relief, that the balance of the hardships is in its favor, and that the public interest will not be disserved by such relief. As there is no dispute that Oman lacks any remedy at law, the company satisfies the *eBay* requirements for permanent injunctive relief.

## Conclusion

For the reasons provided above, the court grants judgment on the agency record in favor of Oman and enjoins Defendant from collecting cash deposits at the

**PUBLIC VERSION**

punitive rate set by Commerce. A separate order will
enter. *See* USCIT R. 58(a).

Dated: February 15, 2023     /s/ *M. Miller Baker*
          New York, New York   M. Miller Baker, Judge

# EXHIBIT B

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMAN FASTENERS, LLC, | |
|     *Plaintiff,* | Ct. No. 22-00348 |
| v. | |
| UNITED STATES, | Before: M. Miller Baker, Judge |
|     *Defendant,* | |
| and | |
| MID CONTINENT STEEL & WIRE, INC., | |
|     *Defendant-Intervenor.* | |

## ORDER

For the reasons stated in Slip Opinion 23-17 (ECF 90), filed today, the court hereby **ORDERS** as follows:

1.    Under USCIT Rule 65(a)(2), the court consolidates the proceedings on Plaintiff Oman Fasteners, LLC (Oman)'s motion for a preliminary injunction (ECF 18 and 36, confidential; ECF 15 and 38, public) with trial on the merits and thereby treats Plaintiff's motion as a USCIT Rule 56.2 motion for judgment on the agency record.

2.    The court **GRANTS** Plaintiff's motion for judgment on the agency record.

3.    The court **REMANDS** this case to the Department of Commerce, and **ORDERS** that on remand the Department must place both the business proprietary and public versions of Oman's supplemental section C questionnaire response on the record. The court **FURTHER ORDERS** that Commerce

shall then consider that supplemental section C response for purposes of calculating Oman's rate.

4.    Defendant the United States, as well as all its officers and agencies, is hereby **ENJOINED** from taking any action to enforce, implement, or execute the Department's *Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 78,639 (Dec. 22, 2022), in *Certain Steel Nails from the Sultanate of Oman*, Case No. A-523-808 (*2022 Final Results*).

5.    Upon entry into the United States on and after December 22, 2022, of subject merchandise produced by Oman, Defendant, through its agency U.S. Customs and Border Protection (Customs), is specifically **ENJOINED** from collecting estimated antidumping duty case deposits on such merchandise equal to the 154.33 percent dumping margin applied to Oman by Commerce in its *2022 Final Results.*

6.    Upon entry into the United States on and after December 22, 2022, of subject merchandise produced by Oman, Defendant, through its agent Customs, is **ENJOINED** to continue to collect estimated antidumping duty cash deposits equal to 1.65 percent (the cash deposit rate applicable to Oman Fasteners set in *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't Commerce Nov. 29, 2021)).

7.    The foregoing injunction shall remain in effect until further order of the court.

8.    Within 120 days of the date of this order, Commerce must file a remand determination that complies with this order and with Slip Opinion 23-17.

9.    Within 14 days after the Department files the remand determination, the parties are to submit a joint status report with their recommendation on how this case should proceed, including a proposed briefing schedule should one be necessary.[1]

Dated:    February 15, 2023              /s/ *M. Miller Baker*
          New York, New York             M. Miller Baker, Judge

---

[1] Any proposed scheduling order must advise the court of which appendix preparation method the parties choose. *See* https://www.cit.uscourts.gov/sites/cit/files/Joint%20Appendix%20Preparation%20in%20Cases%20Assigned%20to%20Judge%20Baker.pdf.

# EXHIBIT C



700 13th Street, NW
Suite 800
Washington, D.C. 20005-3960

+1.202.654.6200
+1.202.654.6211
PerkinsCoie.com

March 30, 2022

Michael P. House
MHouse@perkinscoie.com
D.  (202) 654-6288
F.  (202) 654-9667

**PUBLIC DOCUMENT**
Case No.: A-523-808
Total Pages:
Admin Rev. (§ 751) 7/1/20-6/30/21
AD/CVD Operations, Office 4

**BY ACCESS**

Secretary of Commerce
Attn:  Import Administration
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

**Re:     Certain Steel Nails from Oman; Sixth Review;**
    **<u>Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration</u>**

Dear Madam Secretary:

On behalf of Oman Fasteners LLC ("Oman Fasteners"), we hereby reply to petitioner's

letter in opposition[1] to Oman Fastener's letter[2] requesting that that the Department reconsider its

---

[1] Letter from Greenberg Traurig LLP to Sec'y Commerce re: Certain Steel Nails from Oman, *Opposition to Oman Fasteners' Request for Reconsideration* (March 28, 2022) ("Petitioner's Opposition").

[2] Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman, *Request for Reconsideration and Out-of-Time Extension Request* (March 24, 2022) ("Request for Reconsideration").

114198.0002\156356800
Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 2

memorandum rejecting Oman Fasteners' February 14, 2022 Supplemental Section C Response
as untimely.[3]

At the outset, undersigned counsel reiterate that they are profoundly apologetic for the
inconvenience caused to the Department by failing to ensure that all the electronic data files
accompanying Oman Fasteners' Supplemental Section C Response were confirmed in ACCESS
before the 5:00pm deadline, and failing to recognize the importance of immediately requesting
an extension with respect to those electronic data files. Petitioner's Opposition, however,
misconstrues the Department's regulations and relevant precedent in an attempt to achieve a
windfall victory against Oman Fasteners for inadvertent lapses by counsel which in no way
reflect Oman Fasteners' unwavering commitment over the past eight years to full cooperation
with the Department in this proceeding and which ultimately did not prejudice the petitioner or
the Department in the conduct of this current administrative review.

As set forth below, undersigned counsel have taken steps to ensure that those lapses are
never repeated, either in this proceeding or any other in which undersigned counsel appear. In
light of all the circumstances present here, the Department should exercise its discretion to
reconsider its March 22, 2022 rejection memorandum and permit the re-filing of the electronic
data files that accompany Oman Fasteners' Supplemental Section C Response, along with the
PDF version of that response (a complete version of which had been timely filed prior to the
5:00pm deadline).

---

[3] Memorandum from Dakota Potts, U.S. Department of Commerce, to File, Rejection of Submission (March 22, 2022).

114198.0002\156356800
Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 3

\*       \*       \*

As expressed in our letter of March 24, 2022, undersigned counsel take the Department's
deadlines very seriously and deeply regret any inconvenience or disruption to the Department
that may have been caused by the late submission of certain electronic data files that
accompanied Oman Fasteners' Supplemental Section C Response—including the need for the
Department to now devote resources to the question of those late submissions. As noted in our
March 24 letter, counsel have never filed a submission on behalf of Oman Fasteners out of time
in this proceeding—over the course of eight years covering the original investigation and six
separate administrative reviews. This is because undersigned counsel have had procedures in
place to make sure that any filings are finalized and provided to the person responsible for
effecting submission with sufficient time to allow for the submission process to be completed
before 5:00pm or other applicable deadline. Pursuant to those procedures, and based on
extensive experience with making submissions via the Department's ACCESS system, counsel
in good faith believed that allowing one hour and 20 minutes for the ACCESS prescreening and
filing process would be more than sufficient to complete submission for a filing of the
complexity of Oman Fasteners' Supplemental C Response.[4] Unfortunately, on this one occasion,
counsel's expectations regarding the time required to submit all the accompanying electronic
data files proved incorrect.

---

[4] *See* Request for Reconsideration (March 24, 2022) at 6-7.

114198.0002\156356800

Perkins Coie LLP

Secretary of Commerce
March 30, 2022
Page 4

Precisely because undersigned counsel have never been in this situation before, and because counsel understood that the electronic data files in question were primarily back-up Excel files that duplicated the data already timely filed in PDF form, they unfortunately failed to appreciate the need to immediately notify the Department regarding the late-filed electronic files and include a request for leave to submit these accompanying electronic data files out of time. Petitioner seeks to ascribe sinister motives for that failure, proposing that "Oman Fasteners . . . hope{d} that the Department officials would not notice . . . , illustrat{ing} bad faith."[5] Nothing could be further from the truth. Undersigned counsel wrongly and regrettably assumed that because the files submitted after 5:00pm were merely native electronic files that were duplicative of, and provided as additional support for, the timely-submitted Supplemental Section C Response in PDF format (which included both the complete narrative response and all printed exhibits thereto), the submission of the additional electronic data files shortly after 5:00pm was not material.[6] There was no bad faith, or indeed strategic consideration of any kind, in undersigned counsel's failure to immediately notify the Department. Moreover, because counsel failed to appreciate the materiality of the late submission of certain of the electronic data files,

---

[5] Petitioner's Opposition at 5.

[6] Contrary to petitioner's claim, it is not "well-understood" that the Department considers back-up Excel files a mandatory part of a supplemental questionnaire response. Petitioner Opposition at 3. Undersigned counsel's experience in this investigation is that the Department, in its Supplemental Questionnaires, sometimes specifically requested back-up electronic Excel files and sometimes did not. The record in this proceeding, Case No. A-523-808, shows that the Department specifically requested back-up electronic Excel files in 10 out of a total 27 Supplemental Questionnaires issued to Oman Fasteners. The Department's Section C Supplemental Questionnaire at issue here did not request back-up electronic Excel files, but we endeavored to submit them anyway.

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 5

Oman Fasteners, as client and respondent in this administrative review, was not in a position to make any decision as to whether additional action was necessary.

Undersigned counsel have taken corrective steps to ensure that the lapses described above are never repeated. First, counsel have revised their expectations regarding how long prior to the submission deadline a filing must be finalized and provided to the person responsible for effecting submission via ACCESS, particularly when electronic Excel data files are involved. As a result, counsel will initiate the ACCESS submission process for any future filing of similar complexity no later than three hours prior to the submission deadline. Second, counsel is taking steps to train additional individuals on the ACCESS submission process, so that in the event of unforeseen difficulties there are always additional persons with the availability and ability to help complete the submission on time. Counsel will ensure that there is at least one such trained person on stand-by for every future substantive submission to the Department. Finally, in the *extremely* unlikely event that, despite undersigned counsel's improved ACCESS submission process, counsel is unable to finish submission of a filing and all attachments thereto, including back-up electronic Excel files, prior to the applicable deadline, counsel will ensure that it immediately alerts the Department of any technical difficulties encountered during an attempt to file a submission via ACCESS, in accordance with 19 CFR 351.303(b)(2)(ii)(C), or file a written emergency extension request at ACCESS before 5:00pm deadline to request leave to file the submission out of time, in accordance with 19 C.F.R 351.302(c).

Filed By: mhouse@perkinscoie.com, Filed Date: 3/30/22 1:44 PM, Submission Status: Approved

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 6

Petitioner's suggestions in its Opposition that the Department's regulations require

rejection of our Request for Reconsideration, or that the Department should exercise its

discretion to deny the request, are incorrect and inconsistent with the Department's prior

practice. As noted in the Request for Reconsideration, pursuant to 19 C.F.R. § 351.302 the

Department has treated similar situations involving various clerical difficulties as an

extraordinary circumstance warranting relief from strict application of the Department's timing

regulations, including in circumstances reflecting more egregious omissions by the party or

counsel involved than undersigned counsel's submission of certain electronic data files shortly

after the 5:00pm deadline. For example, in *Ripe Olives from Spain*, the Department granted

respondent an opportunity to refile multiple major exhibits which were inadvertently omitted

from the initial "bracketing not final" submission, even though those exhibits were not filed until

the following business day.[7] In an even more extreme case, in *Large Vertical Shaft Engines from

China*[8] it was the Department's own review of the record that uncovered that certain exhibits

were missing from petitioner's surrogate value submission. Petitioner never notified the

---

[7] *Ripe Olives from Spain,* Case No. A-469-817, Department Memorandum to the File, Re: 2019-2020
Administrative Review of the Antidumping Duty Order on Ripe Olives from Spain: Telephone Conversation with
Respondent Counsel (January 27, 2022) (The Department in this memo instructs that the respondent separately
submit the consolidated PDF containing missing exhibits on January 27, 2021, which was five days later after the
original deadline for these exhibits.); *see also* Letter from Department to Curtis, Mallet-Prevost, Colt & Mosle LLP,
Re: Errata to Agro Sevilla's Section D Response, *Ripe Olives from Spain* (08/01/2019 – 07/31/2020) (January 25,
2021).

[8] *Large Vertical Shaft Engines from China,* Case No. A-570-119, Department Memorandum to the File,
Antidumping Duty Investigation of Certain Vertical Shaft Engines between 225cc and 999cc, and Parts Thereof
from the People's Republic of China: Petitioner's Information on Surrogate Values (July 7, 2020).

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 7

Department of such missing exhibits or requested an extension. Nevertheless, the Department itself chose to notify petitioner of the missing information and granted an opportunity to refile the missing exhibits.[9] And in *Small Vertical Shaft Engines from China*, the Department notified petitioner that petitioner had failed to file its scope rebuttal comments in the parallel CVD proceeding and granted counsel an opportunity to remedy its error by completing its filing on extended deadline to refile, without any request for extension filed by petitioner.[10]

Moreover, the Department has exercised its discretion to allow the refiling of untimely submissions when the agency determined that "good cause" existed based on respondent's demonstrated good faith in complying with the Department's investigation, even when the responsible party did not immediately submit a request for leave. For example, in *Solid Urea from the Russian Federation*,[11] counsel did not properly file the manual hard copy exhibits at the Department APO/Docket Unit until three days after the deadline and did not notify the Department of any difficulty in filing. The Department, nevertheless, recognized the untimely

---

[9] *Id*. The Department in its memo provided petitioner an opportunity to refile the missing exhibits in its original surrogate value submission. The attachment to the Department's memo shows that the official emailed the petitioner's counsel explaining that based on the agency's own review, the Department identified several missing exhibits, was notifying the petitioner accordingly and granted petitioner the opportunity to refile those otherwise untimely exhibits.

[10] *Small Vertical Shaft Engines from China,* Case No. A-570-124, Department Memorandum to the File, Antidumping and Countervailing Duty Investigations of Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China (May 22, 2020). The Department indicated in its memo that the agency's official actively reached out to petitioner's counsel by phone and explained to petitioner's counsel regarding his mistake. The Department official, without any prior request from petitioner, instructed counsel to file the untimely scope rebuttal comments in the CVD proceeding on an extended deadline.

[11] *Solid Urea from the Russian Federation,* Case No. A-821-801, Department Letter to MCC EuroChem (November 14, 2013).

114198.0002\156356800

Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 8

filing was caused by counsel's procedural errors, while also fully recognizing that the

respondent's own good faith efforts in complying with the Department's requests for information

constituted "good cause" under the applicable regulation.[12] The Department, under those

circumstances, granted the opportunity to refile the missing exhibits, which were filed on the

record two weeks after the original deadline.

Almost exactly a year later, the same counsel, on behalf of the same respondent, was

unable to complete submission of all exhibits to a filing until ten minutes after the 5:00pm

deadline. Counsel notified the Department of technical difficulties via email approximately two

hours after the deadline had passed but did not place the notification on the record or seek leave

for the late submission at that time.[13] Nevertheless, after an *ex parte* meeting with counsel where

"Department officials discussed {the law firm's} history of late filings with {lead counsel} and

stressed the need to adhere strictly to submission deadlines," the Department reversed its

decision and accepted the submission in full.[14]

Furthermore, in yet other cases the Department, in recognizing the law firm's efforts and

procedures to prevent any missed deadlines in the future, has exercised its discretion to accept

untimely filed submissions. For example, in *Narrow Woven Ribbons with Woven Selvedge from*

---

[12] *Id*.

[13] *Solid Urea from the Russian Federation,* Case No. A-821-801, Department Letter to MCC EuroChem (November 13, 2014).

[14] *Solid Urea from the Russian Federation,* Case No. A-821-801, Department Memorandum to File (November 24, 2014).

Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 9

*Taiwan*, counsel attempted to file an extension request for its Section D response,[15] but due to clerical error filed an extension request for only Sections B and C. Counsel belatedly realized the error and later filed an untimely extension request for Section D six days after the Section D response due date. While the Department initially denied the extension request, it reconsidered its ruling and permitted the refiling, specifically recognizing the firm's efforts to have new procedures in place to prevent missed deadlines.[16] The late filing of respondent's Section D response permitted by the Department was one month after the initial deadline.[17]

In the instant case, Oman Fasteners' electronic data files, supplements that accompanied the timely-filed PDF submission of the complete Supplemental Section C Response, were filed only 16 minutes after the 5:00pm deadline. As detailed in our Request for Reconsideration, the entire Supplemental Section C Response, in PDF format, had been timely filed well prior to 5:00pm.[18] As discussed above, undersigned counsel regrettably failed to appreciate that the Department would deem the entire submission untimely, and therefore failed to immediately request leave to submit out of time. Nevertheless, and unlike in several of the cases cited herein, undersigned counsel's omissions did not deprive the Department of any necessary information or significantly delay the Department's consideration of Oman Fasteners' filing. Based on the

---

[15] Department Letter to Akin Gump Strauss Hauer & Feld LLP, *Narrow Woven Ribbons with Woven Selvedge from Taiwan:* 2013-2014 Antidumping Duty Administrative Review (February 27, 2015).

[16] *Id.*

[17] *Id.*

[18] *See* Request for Reconsideration at 7-8.

Filed By: mhouse@perkinscoie.com, Filed Date: 3/30/22 1:44 PM, Submission Status: Approved

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 10

Department's precedents in similar cases and in more egregious cases, we respectfully request that the Department reconsider its decision and grant Oman Fasteners an opportunity to refile the electronic data files that accompanied its February 14, 2022 Supplemental Section C Response, along with the timely-filed PDF version of that submission.

We believe that good cause exists for the Department to exercise its lawful discretion to provide the requested relief. At a minimum, the Department should retain (or reinstate) on the record all of the documents that were timely submitted before the 5:00pm deadline, and separately provide Oman Fasteners with an opportunity to re-submit those electronic data files that were recorded in ACCESS as submitted after 5:00pm. The Department's regulations do not require the agency to reject the entire submission when it contains untimely filed portions and when doing so would impose a much more punitive penalty (outright rejection) than if Oman Fasteners had simply failed to submit those parts at all. In recent cases the Department has recognized this: it has allowed the timely-submitted portions of filings that straddled the deadline to remain on the record. For example, in *Ripe Olives from Spain*, instead of removing the entire submission from the record, the Department first (1) requested that the respondent resubmit the final BPI and public versions that mirrored the BNF submission, i.e., included no exhibits that were inadvertently omitted before; and (2) instructed the respondent to refile separately only those missing exhibits.[19] In *Small Vertical Shaft Engines from China*, when the Department was

---

[19] Department Memorandum to the File, Re: 2019-2020 Administrative Review of the Antidumping Duty Order on Ripe Olives from Spain: Telephone Conversation with Respondent Counsel (January 27, 2022).

Secretary of Commerce
March 30, 2022
Page 11

informed that the respondent's BNF submission inadvertently omitted a portion of the exhibits,

the agency instructed the respondent to refile the BPI version that mirrored the BNF

submission.[20] In all of these cases, notwithstanding the fact that the Department initially rejected

the untimely filed exhibit, the Department retained on the record all the portions of submissions

that were timely filed.

Finally, it would be grossly unjust to impose such a harsh penalty on Oman Fasteners for

the inadvertence of its counsel, especially when that inadvertence did not prejudice either the

Department's ability to conduct this review in a timely and orderly fashion, or petitioner's ability

to fully participate in the review. As discussed above, Oman Fasteners bears no responsibility for

the unintentional submission of certain electronic data files after the 5:00pm deadline. Moreover,

throughout the multi-year history of this proceeding, beginning with the original investigation

initiated in 2014 and over the course of six consecutive administrative reviews, Oman Fasteners

has been unfailingly diligent in cooperating with the Department at every stage, always

providing thorough answers to each Department request for information, including numerous

supplemental requests for information. Not once has Oman Fasteners failed to file its responses

to the Department's requests for information in a timely manner, and never has Oman Fasteners

impeded the Department's proceeding, even inadvertently. Oman Fasteners has consistently

---

[20] Department Letter to Zhongshen Companies, *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China*: Rejection of In Lieu of On-Site Verification Questionnaire Response (January 14, 2021).

114198.0002\156356800

Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 12

cooperated with the Department to the best of their ability, without exception, over the long

course of this case.

　　　Furthermore, the Department was not impeded in any way in proceeding to analyze

Oman Fasteners' response in this review for purposes of the Department's determination. As

detailed in Oman Fasteners March 24 request, the complete printed version of Oman Fasteners'

Supplemental Section C Response (i.e., the PDF files containing the narrative response and

exhibits) was timely filed with the Department in ACCESS prior to the 5:00pm deadline on

February 14, 2022.  The Department had in its hands Oman Fasteners' complete Supplemental

Section C Response (complete narrative and exhibits in PDF) prior to the 5:00pm deadline on

February 14, 2022.  The electronic data files for which filing was completed after 5:00pm were

in the Department's hands within a few minutes after 5:00pm (starting at 5:02pm and concluding

at 5:16pm with the last two electronic data files).[21] Accordingly, the Department had the

complete printed response by 5:00 to begin its review. Thus, Oman Fasteners can in no way be

considered to have impeded the Department's ability to analyze the requested data on a timely

basis.  Furthermore, as detailed in our Request for Reconsideration, all but one of the several

electronic data files for which ACCESS filing was not completed prior to 5:00pm were back-up

Excel data files that duplicated the data already timely filed in PDF form prior to 5:00pm.[22]

---

[21] *See* Request for Reconsideration at 7-12.

[22] *See* Request for Reconsideration at 9-10.

114198.0002\156356800

Perkins Coie LLP

Secretary of Commerce
March 30, 2022
Page 13

Moreover, petitioner's counsel was not prejudiced because the final Business Proprietary

(BPI) and public versions of the Supplemental Section C Response were properly filed before

5:00pm on February 15, 2022 under the Department's one-day lag rule. Under the temporary

COVID-19 service procedures, counsel for petitioner was duly served with these final BPI and

public versions through the Department's ACCESS system in which BPI filings are released to

persons authorized under the APO and received access to the response under the same schedule

as if the several electronic data files were not filed after 5:00pm. Indeed, petitioner's counsel

later sought and received from the Department an extension of time in which to comment on

Oman Fasteners' Supplemental Section C Response. Petitioner subsequently filed its substantive

comments on Oman Fasteners' Supplemental C Response on March 4, 2022, nearly three weeks

ago.

As counsel for Oman Fasteners, we sincerely regret the inconvenience caused by our

failure to submit all the electronic data files accompanying Oman Fasteners' Supplemental

Section C Response before the 5:00pm deadline. We assure the Department that we have taken

all necessary steps to make sure that this issue—a first in the eight-year history of this

proceeding—will never recur. We respectfully submit that, given the particular circumstances of

this case, it is appropriate and consistent with the Department's recent precedent for the

Department to exercise its lawful discretion to grant Oman Fasteners the requested relief. It

would be fundamentally unfair to subject Oman Fasteners to an unjust and punitive result for this

Perkins Coie LLP

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Secretary of Commerce
March 30, 2022
Page 14

omission, especially given the lack of prejudice to the Department or petitioner. As the U.S.

Court of International Trade stated recently in nearly identical circumstances:

> Commerce imposed a grossly disproportionate penalty for what essentially
> was a minor technical violation that had no discernible effect on the investigation.
> While Commerce has the authority to establish and enforce its own regulations, it
> is not free to apply its "extraordinary circumstance" rule in so harsh a way as to
> produce an unjust and punitive result.[23]

*    *    *

As noted in our March 24 Request for Reconsideration, we respectfully request the

opportunity to meet with the Department regarding this matter.

We greatly appreciate the Department's careful, reasoned and fair consideration of this

matter. Please contact us if you have any questions.

Respectfully submitted,

/s/ Michael P. House

Michael P. House
Andrew Caridas
Shuaiqi Yuan
Caroline D. Bisk
Sandra C. Wright, Trade Analyst

---

[23] *Celik Halat Ve Tel Sanayi A.S. v. United States*, Court No. 21-00045, Slip Op. 22-12 (CIT Feb. 15, 2022) at
30-31 (holding that Commerce abused its discretion in rejecting an entire response due to the late filing of an exhibit
21 minutes after the 5:00pm deadline, since that had "no discernable effect on the investigation").

Filed By: mhouse@perkinscoie.com, Filed Date: 3/30/22 1:44 PM, Submission Status: Approved

Barcode:4227100-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

## COMPANY CERTIFICATION

I, Steve Karaga, President, currently employed by Oman Fasteners LLC ("Oman Fasteners"),
certify that I prepared or otherwise supervised the preparation of the attached submission of
Oman Fasteners' Reply to Petitioner's Opposition to Oman Fasteners' Request for
Reconsideration pursuant to the 7/1/20-6/30/21 administrative review of the antidumping duty
order on *Certain Steel Nails from Oman*; Case No. A-523-808.  I certify that the public
information and any business proprietary information of Oman Fasteners contained in this
submission is accurate and complete to the best of my knowledge. I am aware that the
information contained in this submission may be subject to verification or corroboration (as
appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but
not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and
willfully make material false statements to the U.S. Government. In addition, I am aware that,
even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S.
Department of Commerce may preserve this submission, including a business proprietary
submission, for purposes of determining the accuracy of this certification. I certify that a copy of
this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____MARCH 30, 2022_____

114198.0002\156355200

## <u>REPRESENTATIVE CERTIFICATION</u>

    I, Michael P. House, with Perkins Coie LLP, counsel to Oman Fasteners LLC ("Oman Fasteners"), certify that I have read the attached submission of Oman Fasteners' Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration, pursuant to the 7/1/20 - 6/30/21 administrative review of the antidumping duty order on *Certain Steel Nails from Oman*; Case No. A-523-808. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature:      /s/ Michael P. House

Date:      March 30, 2022

## <u>PUBLIC CERTIFICATE OF SERVICE</u>

**Certain Steel Nails from Oman (A-523-808)**
**6th Administrative Review (7/1/20-6/30/21)**

I hereby certify that on March 30, 2022, I caused copies of the annexed submission to be served on the following party via electronic mail, unless indicated otherwise.

Rosa S. Jeong, Esq.
Greenberg Traurig, LLP
2101 L Street NW
Suite 1000
Washington, DC 20037
jeongr@gtlaw.com

/s/ Michael P. House
_____
Michael P. House

154461801.1

# EXHIBIT D

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
Administrative Review
POR: 7/1/2020 – 6/30/2021
**Public Document**
E&C/IV:  DP

March 22, 2022

Oman Fasteners LLC
c/o Michael P. House
Perkins Coie LLP
700 13th St, NW
Suite 600
Washington, D.C. 20005

Re:    Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails from
       Oman; 2020-2021:  Extension of Deadline to Submit Response to Section D
       Supplemental Questionnaire

Dear Mr. House:

This letter concerns your client's, Oman Fasteners, LLC (Oman Fasteners), February 14, 2022,
section C supplemental questionnaire response[1] to the Department of Commerce's (Commerce)
January 24, 2022, section C supplemental antidumping duty (AD) questionnaire in the above
proceeding.  Commerce has reviewed the submission and determined that it was untimely filed,
and therefore, we are rejecting it from the record.

On January 24, 2022, Commerce released its section C supplemental questionnaire with a
deadline for Oman Fasteners to submit its response no later than February 3, 2022.[2]  Following
two requests by Oman Fasteners,[3] Commerce extended the deadline for Oman Fasteners to
submit its response until no later than 5:00 p.m. EST on February 14, 2022.[4]  On February 14,
2022, Commerce received Oman Fasteners section C supplemental questionnaire response
between 4:41 p.m. eastern standard time (EST) and 5:16 p.m. EST.  *See* Attachment 1.
Commerce received no notification by Oman Fasteners of filing difficulties or an additional
request for extension of the deadline.  Under 19 CFR 351.303(b)(1), "An electronically filed
document must be received successfully *in its entirety* by the Department's electronic records

---

[1] *See* Oman Fasteners' Letter, "Certain Steel Nails from Oman; 6th Administrative Review Oman Fasteners
Supplemental Section C Response," dated February 14, 2022 (Section C Supplemental Questionnaire Response).
[2] *See* Commerce's Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C
Supplemental Questionnaire," dated January 24, 2022.
[3] *See* Oman Fasteners' Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman:
Section C Supplemental Questionnaire," dated February 1, 2022; *see also* Oman Fasteners' Letter, "Antidumping
Duty Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire," dated
February 9, 2022.
[4] *See* Commerce's Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C
Supplemental Questionnaire," dated February 2, 2022; *see also* Commerce's Letter, "Antidumping Duty
Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire," dated February
9, 2022 (Second Extension Letter).

system, ACCESS, by 5 p.m. Eastern Time on the due date" (emphasis added). Because Oman Fasteners' section C supplemental questionnaire response was not filed in its entirety by 5:00 p.m. EST on the deadline set in the Second Extension Letter, we find the submission untimely filed. Pursuant to 19 CFR 351.302(d)(i), Commerce will not consider or retain in the official record of the proceeding untimely filed factual information, written argument, or other material that Commerce rejects. Therefore, we are rejecting Oman Fasteners' untimely filed section C supplemental questionnaire response from the record of the above proceeding.

If you have any questions about this matter, please contact Dakota Potts at (202) 482-0223.

Sincerely,

Robert Bolling
Program Manager, Office IV
Enforcement & Compliance

2

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Response By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 4:41:43 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 4:41:32 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 07/01/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Response
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-01 - Oman Fasteners Supp C Narrative & Ex 1-3 - 1_Oman Fasteners Supp C response narr & Ex 1-3_BNF_p.pdf (108)
4212208-02 - Oman Fasteners Supp C Ex 4-9 - 2_Oman Fasteners Supp C response Ex 4-9_BNF.pdf (43)
4212208-03 - Oman Fasteners Supp C Ex 10-16 - 3_Oman Fasteners Supp C response Ex 10-16_BNF.pdf (43)
4212208-04 - Oman Fasteners Supp C Ex 17-22 - 4_Oman Fasteners Supp C response Ex 17-22_BNF_p.pdf (59)
4212208-05 - Oman Fasteners Supp C Ex 23-24 - 5_Oman Fasteners Supp C response Ex 23-24_BNF_p.pdf (244)
Comments:

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

View all documents for this Submission: <u>Link</u>

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Response By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 4:46:27 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 4:46:16 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Response
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-06 - Oman Fasteners Supp C Ex 25-27 - 6_Oman Fasteners Supp C response Ex 25-27_BNF_p.pdf (9)
4212208-07 - Oman Fasteners Supp C Ex 28-30 - 7_Oman Fasteners Supp C response Ex 28-30_BNF_p.pdf (26)
4212208-08 - Oman Fasteners Supp C Ex 31 - 8_Oman Fasteners Supp C response Ex 31_BNF_p.pdf (2)
Comments:

View all documents for this Submission: **Link**

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Data By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 4:50:29 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 4:50:23 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Data
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-09 - Oman Fasteners Supp C Exh S2-1 - Exhibit S2-1 Reconciliation of C-3 to C-13.xlsx (0)
4212208-10 - Oman Fasteners Supp C Exh S2-2 - Exhibit S2-2 Supporting Worksheet for Reconciliation Adjustment Items.xlsx (0)
4212208-11 - Oman Fasteners Supp C Exh S-4 - Exhibit S2-4-1 Freight Revenue Details.xlsx (0)
4212208-12 - Oman Fasteners Supp C Exh S2-5 - Exhibit S2-5 Subject Merchandise Sold to Third Countries.xlsx (0)
4212208-13 - Oman Fasteners Supp C Exh S2-6 - Exhibit S2-6 Revised Exhibit A-1_QV to include all 3C sales.xlsx (0)
Comments:

Filed By: Dakota Potts, Filed Date: 3/22/22 2:02 PM, Submission Status: Approved

View all documents for this Submission: Link

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Data By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 4:58:21 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 4:58:13 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Data
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-14 - Oman Fasteners Supp C Exh S2-7 - Exhibit S2-7 Demonstration of Total Sales.xlsx (0)
4212208-15 - Oman Fasteners Supp C Exh S2-9 - Exhibit S2-9_rev All Sales Reconciliation for quantities.xlsx (0)
4212208-16 - Oman Fasteners Supp C Exh S2-10 - Exhibit S2-10-1 CONNUM Characteristics Summary.xlsx (0)
4212208-17 - Oman Fasteners Supp C Exh S2-13 - Exhibit S2-13 Breakdown of U.S. Sales Listing by Nail Type.xlsx (0)
4212208-18 - Oman Fasteners Supp C Exh S2-14 - Exhibit S2-14-1 Container Weight and Number .xlsx (0)
Comments:

View all documents for this Submission: Link

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Data By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 5:02:15 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 5:02:10 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Data
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-19 - Oman Fasteners Supp C Exh S2-15 - Exhibit S2-15 Breakdown for CONCOUNTU.xlsx (0)
4212208-20 - Oman Fasteners Supp C Exh S2-16 - Exhibit S2-16 Nail Weight Calculation for Selected Samples.xlsx (0)
4212208-21 - Oman Fasteners Supp C Exh S2-17 - Exhibit S2-17-1 Calculation of W.A. Payment Dates.xlsx (0)
4212208-22 - Oman Fasteners Supp C Exh S2-19 - Exhibit S2-19-1 Billing Adjustment Allocation for Two Selected Samples.xlsx (0)
4212208-23 - Oman Fasteners Supp C Exh S2-20 - Exhibit S2-20 Allocation of Billing Adjustment for the Selected Invoice.xlsx (0)
Comments:

View all documents for this Submission: Link

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Data By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 5:08:43 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 5:08:37 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Data
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-24 - Oman Fasteners Supp C Exh S2-21-1 - Exhibit S2-21-1 Reconciliation of Rebate Allocation.xlsx (0)
4212208-25 - Oman Fasteners Supp C Exh S2-21-1 - Exhibit S2-21-2 AR5 Ex C-8-Billing Adjustment.xlsx (0)
4212208-26 - Oman Fasteners Supp C Exh S2-22 - Exhibit S2-22 Rec of Total Billing Adj and Rebates.xlsx (0)
4212208-27 - Oman Fasteners Supp C Exh S2-23 - Exhibit S2-23 Movement Expenses Explanations.xlsx (0)
4212208-28 - Oman Fasteners Supp C Exh S2-24 - Exhibit S2-24-1 Calculation Worksheet of Movement Exp.xlsx (0)
Comments:

View all documents for this Submission: Link

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Response By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 5:14:06 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 5:13:58 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Response
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-29 - Oman Fasteners Supp C Exh S2-26 - Exhibit S2-26 Inventory Turnover Calculation.xlsx (0)
4212208-30 - Oman Fasteners Supp C Exh S2-27 - Exhibit S2-27 PackingElectricity.xlsx (0)
4212208-31 - Oman Fasteners Supp C Exh S2-28 - Exhibit S2-28-1 Supporting Calculation for Packing-Part 1.xlsx (0)
4212208-32 - Oman Fasteners Supp C Exh S2-29 - Exhibit S2-29-1 Supporting Calculation for Selected Entries.xlsx (0)
4212208-33 - Oman Fasteners Supp C Exh S2-30 - Exhibit S2-30_REV Correction of Two Invoices.xlsx (0)
Comments:

View all documents for this Submission: **Link**

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

| | |
|---|---|
| **From:** | access@trade.gov |
| **To:** | Dakota Potts; Robert Bolling |
| **Subject:** | Electronic Submission Confirmation A-523-808 REV - Admin Review Data By Perkins Coie, LLP for Oman Fasteners |
| **Date:** | Monday, February 14, 2022 5:16:18 PM |

Hello Michael P. House,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 4212208

**Submitter Info**
Filed On Behalf Of (collective entity): Oman Fasteners
Filed By: mhouse@perkinscoie.com
Firm/Organization Name: Perkins Coie, LLP
Filed Date-Time Stamp: 2/14/2022 5:16:12 PM

**Case & Segment Info**
Case Number: A-523-808
Case Title: Steel Nails From Oman
Case Segment: REV - Admin Review
Segment Begin Date: 7/1/2020
Segment End Date: 6/30/2021

**Document Info**
Security Classification: BPI Document – May Be Released Under APO
Document Type: Data
Manual Submission: No
Bracketing Not Final/1 Day Lag Filing: **Yes**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Barcode - Document Title - Document (Page Count):
4212208-34 - Oman Fasteners Supp C Exh S2-31 - Exhibit S2-31_rev Revised Movement .xlsx (0)
4212208-35 - Oman Fasteners Supp C Exh S2-11 U.S. Sales Listing SAS File - omfaus02.sas7bdat (0)
Comments:

View all documents for this Submission: **Link**

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202) 482-3150 for assistance.

Thank You!

Barcode:4224090-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

Barcode:4233483-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
Administrative Review
POR: 7/1/2020-6/30/2021
**Public Document**
E&C/IV: DP

April 20, 2022

Oman Fasteners LLC
c/o Michael P. House
Perkins Coie LLP
700 13th St, NW
Suite 600
Washington, D.C. 20005

Re:    Certain Steel Nails from the Sultanate of Oman: Rejection of Untimely Submission from
       Oman Fasteners LLC

Dear Mr. House:

This letter concerns the March 24, 2022,[1] request by your client, Oman Fasteners LLC (Oman
Fasteners) to reconsider the rejection and to grant an untimely extension of Oman Fasteners'
section C supplemental questionnaire response (the section C supplemental response) which was
submitted in response to the Department of Commerce (Commerce) January 24, 2022 section C
supplemental questionnaire.[2]   Commerce has considered Oman Fasteners' requests; however, we
have determined to continue to reject Oman Fasteners' late section C supplemental response and
not grant an untimely extension, for the reasons set forth below.

Commerce rejected the late section C supplemental response from the record on March 22, 2022[3]
because, following two granted extensions,[4] the submission was not filed *in its entirety* by 5:00
p.m. EST on February 14, 2022.[5]   Under 19 CFR 351.303(b)(1), "An electronically filed
document must be received successfully *in its entirety* by the Department's electronic records
system, ACCESS, by 5 p.m. Eastern Time on the due date" (emphasis added).

---

[1] *See* Oman Fasteners' Letter, "Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request," dated March 24, 2022 (Request for Reconsideration).
[2] *See* Commerce's Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire," dated January 24, 2022 (Section C Supplemental Questionnaire).
[3] *See* Commerce's Letter, "Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails from Oman; 2020-2021: Extension of Deadline to Submit Response to Section D Supplemental Questionnaire," dated March 22, 2022 (Rejection Letter).
[4] See Oman Fasteners' Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire," dated February 1, 2022; see also Oman Fasteners' Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire," dated February 9, 2022 (Second Extension Letter).  The second extension letter extended the deadline to no later than 5:00 p.m. EST on February 14, 2022.
[5] *See* Rejection Letter at 2.

INTERNATIONAL
**TRADE**
ADMINISTRATION

Section 351.302(c) of Commerce's regulations provides that an interested party must request an extension of time to file a document with Commerce before the applicable deadline expires. Commerce will not consider an untimely filed extension request unless the party demonstrates that an extraordinary circumstance exists. According to 19 CFR 351.302(c)(2), an extraordinary circumstance is an "unexpected event that: (i) could not have been prevented if reasonable measures had been taken; and (ii) precludes a party or its representative from timely filing an extension request through all reasonable means." Examples of extraordinary circumstances include a natural disaster, riot, war, *force majeure*, or medical emergency. Examples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due.[6] The party requesting the extension bears the responsibility of demonstrating that extraordinary circumstances existed.

In its request for reconsideration and untimely request for an extension of time to submit its section C supplemental questionnaire response, Oman Fasteners did not demonstrate extraordinary circumstances. In the request for reconsideration, Oman Fasteners states that counsel began prescreening documents for upload at 3:41 p.m. EST on February 14th, less than 1.5 hours before the 5:00 p.m. deadline.[7] Oman Fasteners argues that previous submissions indicated 1.5 hours for submission was more than adequate,[8] but Oman Fasteners' counsel encountered "technical issues" with Commerce's ACCESS system which precluded timely submission.[9] Oman Fasteners explains that "in the actual filing of the documents in ACCESS that began at 4:10 p.m., the Department's system identified certain 'unauthorized comment type(s)' technical issues that had not been flagged by ACCESS in the check file screening process," amounting to an unexpected delay and requiring time to correct and resubmit.[10] Additionally, Oman Fasteners' assertion that certain prior filings took a particular amount of time is not relevant. Prior filing times do not guarantee a given submission will require a specific length of time to file, and simply because filing on ACCESS had taken less time in previous cases does not constitute an extraordinary circumstance. Your request for reconsideration did not explain any extraordinary circumstances which precluded Oman Fasteners from communicating technical issues to Commerce, nor did anyone contact Commerce personnel or request an extension of time. Following the technical issues described above, which the request for reconsideration explains were resolved by 4:46 p.m. EST,[11] counsel to Oman Fasteners did not notify Commerce personnel of the situation or submit a request for additional time.

---

[6] *See Extension of Time Limits,* 78 FR 57790, 57793 (September 20, 2013).
[7] *See* Request for Reconsideration at 6.
[8] *Id.* at 6-7.
[9] *See* Request for Reconsideration at 7.
[10] *Id.* at 7-8.
[11] *Id.* at 8.

2

Barcode:4233483-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

The request for reconsideration also notes that, while the full narrative response and exhibits were submitted before 5:00 p.m. EST in PDF format, the only late submissions were *voluntary* excel back-up versions of 16 Exhibits (emphasis added).[12]  We disagree with Oman Fasteners' assertion that excel versions of exhibits are voluntary.  Specifically, the initial questionnaire, issued to Oman Fasteners on October 14, 2021, clearly instructed Oman Fasteners to "submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your U.S. sales lists,"[13] the initial questionnaire instructions would continue to apply to the section C supplemental questionnaire as *supplemental* to the initial questionnaire.

Moreover, the U.S. sales SAS database, which was explicitly requested in question 37 of the section C supplemental questionnaire, was not timely submitted.[14]  As Oman Fasteners points out, the section C supplemental questionnaire was "exceptionally lengthy" including "37 separately numbered questions, plus additional sub-questions" requesting data and revisions to data on a "wide variety of subjects including quantity and value information, U.S. sales reconciliations, control numbers, physical characteristics, weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, {and} entered value."[15]  The breadth of information, revision, and clarification which Commerce requested in the section C supplemental questionnaire testifies to the importance of a revised U.S. sales database on the record, in order to calculate an accurate margin for Oman Fasteners.  However, Oman Fasteners submitted the U.S. sales database late, at 5:16 p.m. EST.[16]

Oman Fasteners then argues that the relief requested in the request for reconsideration would not prejudice or harm Commerce or any parties to the proceeding.[17]  However, Commerce rejects submissions which are untimely filed and does not bear the burden of demonstrating it or an interested party was impeded or prejudiced by a late submission to justify its rejection.  Commerce must maintain its deadlines to administer its statutory mandate.  Oman Fasteners was fully cognizant of the 5:00 p.m. EST deadline from the original questionnaire, which states that "{a}n electronically filed document must be received successfully in its entirety by ACCESS by 5 p.m. Eastern Time (ET) on the due date,"[18] and in the second extension letter, which set the deadline as "no later than close of business (*i.e.*, 5 p.m. Eastern Standard Time) on February 14, 2022."[19]  Furthermore, in the section C supplemental questionnaire, Oman Fasteners was on notice that "Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be returned to you."[20]  Additionally, as stated above, under 19 CFR 351.303(b)(1), "An electronically filed document *must* be received successfully *in its entirety* by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time on the due date" (emphasis added).

---

[12] *Id.* at 8-9.
[13] *See* Questionnaire, dated October 14, 2021, at C-1 (Questionnaire).
[14] *See* Section C Supplemental Questionnaire at question 37.
[15] *See* Request for Reconsideration at 4.
[16] *See* Rejection Letter at Attachment 1.
[17] *See* Request for Reconsideration at 12.
[18] *See* Questionnaire at G-2.
[19] *See* Second Extension Letter at 1.
[20] *See* Section C Supplemental Questionnaire at 2.

3

Commerce's ability to manage its proceedings and administer its statutory mandate would be impeded if Commerce were required to demonstrate harm caused by every occurrence of a late submission. Therefore, based on our above explanation, we are denying Oman Fasteners request for reconsideration and request for an untimely extension to submit the section C supplemental response. Accordingly, we continue to not retain on the record of this proceeding the late section C supplemental response.

If you have any questions about this matter, please contact Dakota Potts at (202) 482-0223.

Sincerely,

Abdelali Elouaradia
Director, Office IV
Enforcement & Compliance

4

Barcode:4244264-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
Administrative Review
POR: 7/1/2020-6/30/2021
**Public Document**
E&C/IV: DP

May 20, 2022

Oman Fasteners LLC
c/o Michael P. House
Perkins Coie LLP
700 13th St, NW
Suite 600
Washington, D.C. 20005

Re:    Certain Steel Nails from the Sultanate of Oman: Rejection of Untimely Submission from
Oman Fasteners LLC

Dear Mr. House:

This letter concerns the April 22, 2022,[1] request by your client, Oman Fasteners LLC (Oman
Fasteners) for leave to resubmit its section C supplemental questionnaire response (the section C
supplemental response) which was submitted in response to the Department of Commerce
(Commerce) January 24, 2022, section C supplemental questionnaire.[2]  On March 22, 2022,[3]
Commerce rejected the Section C supplemental response as untimely, and on April 20, 2022,[4]
Commerce denied Oman Fasteners' request for an untimely extension and for reconsideration of
the rejection.  Commerce has considered Oman Fasteners' April 22nd request; however, we have
determined to deny Oman Fasteners' request to resubmit the late section C supplemental
response, for the reasons outlined below.

In our March 22nd rejection letter to Oman Fasteners, we made clear our rejection of Oman
Fasteners section C supplemental response from the record was because its section C
supplemental response was not submitted in its entirety by the deadline.  As explained in the
rejection letter, Commerce's regulations state that "an electronically filed document must be
received successfully *in its entirety* by the Department's electronic records system, ACCESS, by
5 p.m. Eastern Time on the due date" (emphasis added).[5]  Oman Fasteners requested that we
reconsider our rejection of the late section C supplemental response and grant a retroactive
extension of the deadline, but on April 20, 2022, we continued to reject the late section C

---

[1] *See* Oman Fasteners' Letter, "Certain Steel Nails from Oman, 2020-2021 Administrative Review: Oman Fasteners'
Request for Leave to Submit Supplemental Section C Response," dated April 22, 2022 (Request to Resubmit).
[2] *See* Commerce's Letter, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C
Supplemental Questionnaire," dated January 24, 2022 (Section C Supplemental Questionnaire).
[3] *See* Oman Fasteners' Letter, "Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails
from Oman; 2020-2021: Extension of Deadline to Submit Response to Section D Supplemental Questionnaire,"
dated March 22, 2022 (Rejection Letter).
[4] *See* Oman Fasteners' Letter, "Certain Steel Nails from the Sultanate of Oman: Rejection of Untimely Submission
from Oman Fasteners LLC," dated April 20, 2022 (Reconsideration Denial Letter)
[5] *See* 19 CFR 351.303(b)(1).

INTERNATIONAL
TRADE
ADMINISTRATION

supplemental response and denied the extension request because Oman Fasteners failed to demonstrate that extraordinary circumstances exist.  Untimely extension requests are granted only upon demonstration that extraordinary circumstances exist.[6]  Oman Fasteners finished uploading the section C supplemental response after the 5:00 p.m. deadline, and its explanation of the untimely extension request did not include any discussion of extraordinary circumstances which precluded counsel to Oman Fasteners from notifying Commerce of technical difficulties or from timely submitting the section C supplemental response.  Section 351.302(c) of Commerce's regulations states that "an untimely filed extension request will not be considered *unless the party demonstrates that an extraordinary circumstance exists*" (emphasis added).  Oman Fasteners' April 22nd letter provides no new information demonstrating that extraordinary circumstances exist in this case.  The fact that this is counsel's first such offense is not an extraordinary circumstance, nor is this a criterion under Commerce's regulations.

Oman Fasteners cites to several cases where Commerce provided parties the opportunity to rectify erroneous or late submissions, arguing that Commerce has an "established" practice of leniency on first-time offenders of the time limit.  However, Commerce does not have an "established" practice of leniency for first-time offenders for late submissions.  Regarding the cases Oman Fasteners points to for example: in the *Investigation of Large Vertical Shaft Engines from China*, the late submission in question was the petitioner's surrogate value submission, which the petitioner is not under an affirmative obligation to submit but does so to assist Commerce's analysis.  In the *2019-2020 Administrative Review of Ripe Olives from Spain*, the late-filing party quickly alerted Commerce of its error, which Oman Fasteners did not do.  In the *Investigation of Certain Softwood Lumber Products from Canada*, the late-filing party notified Commerce of filing difficulties three minutes before the 5:00 p.m. deadline, an important, distinguishing action which Oman Fasteners did not do.  In the *CVD Investigation of Certain Fine Denier Polyester Staple Fiber from India*, the party erroneously (but timely) uploaded its response to a Commerce inquiry to the website for the USITC, a unique situation that is not present in this case.  In the *2017-2018 Administrative Review of Certain Polyethylene Terephthalate Resin from the Sultanate of Oman*, the party failed to upload an accompanying public version of its submission to the otherwise timely filed business proprietary version.

Oman Fasteners failed to submit the section C supplemental response in its entirety by the 5:00 p.m. deadline, failed to seek a timely extension of the deadline, and has not demonstrated the existence of extraordinary circumstances, as defined by 19 CFR 351.302(c)(2), which would retroactively permit extension of the applicable deadline.  Oman Fasteners' April 22nd letter requesting leave to resubmit the late section C supplemental response did not provide any new information that extraordinary circumstances exist.  As such, Oman Fasteners has not satisfied the criteria for Commerce to retroactively extend the deadline to file the submission at issue. 19 CFR 351.302(d) specifies that Commerce "will not consider or retain the official record of the proceeding: (i) untimely filed factual information, written argument, or other material that the Secretary rejects."  Accordingly, we are denying Oman Fasteners request for an extension to resubmit the section C supplemental response.

---

[6] *See* 351.302(c).

Barcode:4244264-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

If you have any questions about this matter, please contact Dakota Potts at (202) 482-0223.

Sincerely,

Robert Bolling
Acting Office Director
AD/CVD Operations, Office IV

# EXHIBIT E

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

OMAN FASTENERS, LLC,

           Plaintiff,

v.

UNITED STATES,

           Defendant.

</td>
<td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td>
<td>

Court No. 22-00348

</td>
</tr>
</table>

## COMPLAINT

Oman Fasteners, LLC ("Oman Fasteners" or "Plaintiff"), by and through its attorneys, brings this civil action, alleging the following:

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1.    Oman Fasteners brings this action to contest the final results of review issued by the United States Department of Commerce ("Commerce") in its sixth administrative review ("Sixth Review") of the antidumping order on *Certain Steel Nails from the Sultanate of Oman*, covering the period July 1, 2020 through June 30, 2021. *See Certain Steel Nails from the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dec. 22, 2022) ("Final Results") and accompanying Issues and Decision Memorandum dated December 16, 2022 ("IDM").

## JURISDICTION

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this is an action commenced under Section 516A(a)(2)(A)(i)(I) and (B)(iii) of the Tariff Act of 1930 ("Act"), *as amended*, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii).

3.      This Court also has jurisdiction under 28 U.S.C. § 2643(c)(1) to "order any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition."

## STANDING

4.      Oman Fasteners is a foreign producer, exporter, and U.S. importer of certain steel nails from Oman and is an interested party within the meaning of 19 U.S.C. § 1677(9)(A) and as defined in 19 C.F.R. § 351.102(b)(29)(i) and (ii). Oman Fasteners participated in the Sixth Review that resulted in the contested Final Results. Therefore, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

5.      On December 22, 2022, Commerce published in the *Federal Register* the contested Final Results of the Sixth Review. Plaintiff has filed concurrently herewith, on December 23, 2022, a Summons with this Court commencing this action, which is within thirty days after *Federal Register* publication of the contested Final Results. This Complaint is being filed concurrently with the Summons. Therefore, this action is timely pursuant to Section 516A(a)(2)(A)(1) of the Act, 19 U.S.C. § 1516a(a)(2)(A)(i), and pursuant to Rules 3(a)(2) and 6(a) of this Court.

## STATEMENT OF FACTS

6.      On July 13, 2015, Commerce published an antidumping duty order on certain steel nails from Oman and from certain other countries. *Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed.

Reg. 39,994 (July 13, 2015) (the "Order"). Commerce's Order assigned a dumping margin of 9.10% on imports of subject steel nails from Oman Fasteners.

7.  Commerce later revised this rate downward to 4.22%, following Oman Fasteners' appeals of the Order to this Court and the United States Court of Appeals for the Federal Circuit. *See* Department of Commerce Final Results of Redetermination Pursuant to Court Remand, *Mid Continent Steel & Wire Inc. v. United States*, Consol. Court No. 15-00214 (Apr. 14, 2022).

8.  Subsequent to the Order, and pursuant to the statute and the requests of interested parties, Commerce conducted five consecutive annual administrative reviews of Oman Fasteners' imports subject to the Order, which collectively covered the period December 29, 2014, through June 30, 2020. In each of these five administrative reviews, Commerce determined, based on the record of sales and cost data concerning Oman Fasteners' sale of products in the U.S. market, that the margin of dumping on Oman Fasteners' imports was 0.56%, 0.00%, 0.00%, 0.00% and 1.65%, respectively. *Certain Steel Nails from the Sultanate of Oman*, 83 Fed. Reg. 4030 (Jan. 29, 2018); 83 Fed. Reg. 58,231 (Nov. 19, 2018); 84 Fed. Reg. 71,372 (Dec. 27, 2019); 86 Fed. Reg. 14,309 (Mar. 15, 2020), and 86 Fed. Reg. 67,690 (Nov. 29, 2021).

9.  Commerce based its dumping margin calculations in each of these five administrative reviews on the sales and cost of production information submitted by Oman Fasteners, in response to multiple Commerce questionnaires, which information Commerce found to be credible, accurate, and reliable.

10. On September 7, 2021, pursuant to requests by Oman Fasteners and petitioner Mid Continent Steel & Wire, Inc. (Mid Continent), Commerce initiated the Sixth Review, covering the period July 1, 2020, through June 30, 2021. 86 Fed. Reg. 43,240 (Sept. 7, 2021).

11.     Commerce issued its Sixth Review antidumping questionnaire to Oman Fasteners on October 14, 2021. Between November 12, 2021, and December 13, 2021, Oman Fasteners timely responded to the applicable Sections A, C, and D of the questionnaire.

12.     Between December 3, 2021, and February 4, 2022, Commerce issued supplemental questionnaires to Oman Fasteners regarding its initial responses to Sections A and D. Between December 20, 2021, and February 25, 2022, Oman Fasteners submitted timely responses to these supplemental questionnaires.

13.     During this period, Commerce also set a deadline of February 7, 2022, for Oman Fasteners to submit factual information relevant to Commerce's calculation of constructed value profit and indirect selling expenses, and a deadline of February 14, 2022, for Oman Fasteners' rebuttal comments on those topics.  Oman Fasteners timely submitted its extensive factual information response and rebuttal comments on February 7 and February 14, 2022, respectively.

14.     During this same period, on January 24, 2022, Commerce also issued a supplemental Section C questionnaire to Oman Fasteners. The supplemental Section C questionnaire was extensive, containing 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database. Commerce gave Oman Fasteners only 10 calendar days—until February 3, 2022—to respond.

15.     Oman Fasteners requested an extension until Monday, February 14, 2022. It explained that the supplemental questionnaire was voluminous, and the company was also "focused on preparing the CV profit submission { } due in th{e same} proceeding on February 7, 2022." Moreover, Oman Fasteners' accounting and sales departments were also hard pressed due to their involvement in its "quarterly {value added tax} return submission," and because "Oman Fasteners' Finance Manager tested positive for COVID on January 22 {and had} been in quarantine for 10 days while another accountant ha{d} been on annual leave since January 20."

16.     Commerce granted Oman Fasteners' request only in part, providing an extension until Thursday, February 10, 2022.

17.     The day before the new deadline, Oman Fasteners sought a second extension, again until February 14. Oman Fasteners reiterated the prior reasons necessitating the extension, noting that it had been "focused on preparing the CV profit submission and rebuttal, due on February 7 and 14, 2022, respectively." *Id.*

18.     Commerce granted Oman Fastener's modest extension request but stated that it "does not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Thus, Oman Fasteners' Supplemental Section C Response was due at 5:00 pm Eastern Time on February 14, 2022.

19.     Given the multiple competing and overlapping deadlines that Commerce imposed, and the extraordinarily quick turnaround times Commerce demanded, Oman Fasteners and its counsel faced enormous challenges in preparing the Supplemental Section C Response. Nevertheless, Oman Fasteners was able to provide its counsel with the last of the necessary documents by late in the morning on February 14, and counsel was able to format the CV Profit Rebuttal and Supplemental Section C Response in the manner required by Commerce by late that

afternoon. Due to limitations of Commerce's ACCESS filing system, each submission consisted of numerous separate electronic files.

20.     Counsel successfully uploaded the four component pieces of the CV Profit Rebuttal to ACCESS at 3:32 pm, 3:35 pm, 3:40 pm, and 3:43 pm. Counsel commenced the process of filing the Supplemental Section C Response at 3:41 pm by pre-screening the planned electronic files for submission using the ACCESS "check file" feature. The ACCESS check file system found no issues with the electronic files, suggesting that the remainder of the filing process should proceed without delay.

21.     At approximately 4:10 pm—50 minutes before the deadline set by Commerce— counsel began uploading the Supplemental Section C Response files to ACCESS.

22.     Counsel believed in good faith, based on personal experience in this and many other Commerce proceedings, that 50 minutes would be more than enough time for the files to upload to ACCESS. In particular, counsel's experience in filing similar responses to comparable Commerce questionnaires in the Sixth Review and immediately prior segments of the proceeding indicated that 50 minutes should have been more than sufficient. Counsel's ACCESS filing of comparable questionnaire responses in the Sixth Review and in the prior segment of this case usually required between 9-12 minutes, with the longest taking 32 minutes.

23.     In this instance, however, ACCESS unexpectedly and inexplicably took much longer to receive the files. At 4:18 pm—approximately eight minutes after counsel submitted the first set of files for upload—counsel unexpectedly received an e-mail from the ACCESS system showing the system's rejection of the first set of five documents due to "Unauthorized Comment Type(s) found in document." Counsel tried again, and, at 4:27 pm, unexpectedly received another rejection notice for the first five pieces of the Supplemental Section C Response.

24.     These ACCESS rejection messages were surprising for two reasons. First, the documents had been pre-screened in ACCESS using the "check file" system to ensure that no technical issues existed in the files, and the documents had "passed" that screening—an apparent technical failure by Commerce's system. Second, it took ACCESS approximately 17 minutes for ACCESS to deliver these error messages, effectively wasting 17 minutes before informing counsel that it had not accepted the upload.

25.     After re-reformatting the filings (which, again, had been pre-screened and pre-approved by ACCESS), counsel for Oman Fasteners successfully filed the Supplemental Section C Response narrative and all supporting PDF exhibits at 4:41 pm and 4:46 pm.

26.     Counsel then immediately continued uploading additional files, all but one of which were copies in native Excel format of the PDF exhibits that counsel had previously uploaded successfully in PDF form by 4:46 pm.

27.     Despite the ACCESS system's relatively reliable track record with prior filings, ACCESS dragged in this instance, such that the final piece of the filing—a revised version of the U.S. sales SAS database, reflecting limited revisions to the reported U.S. sales data that was described in the timely-submitted portions of the Supplemental Section C Response—was not accepted by ACCESS until 5:16 pm.

28.     This 16-minute delay resulting from ACCESS's inexplicably slow uploading of files was less time than the approximately 17 minutes that ACCESS had wasted—from 4:10 pm to 4:27 pm—in twice rejecting the attempted upload that the "check file" system had determined would be accepted.

29.     Counsel did not know—and could not have known—until immediately before 5:00 pm that ACCESS would delay the uploading process for certain files until after 5:00 pm.

Again, Oman Fasteners' complete initial Section C Response, filed on December 9, 2021, including all exhibits and the SAS sales database file, had uploaded to ACCESS in only 9 minutes, so the system's glitchy and sluggish behavior from 4:10 pm until after 5:00 pm on February 14, 2022, was unusual. Even if counsel could have predicted that ACCESS would behave in this unexpected manner, Commerce already had warned counsel, in granting the extension until February 14, that Commerce "[did] not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Counsel thus reasonably believed that that attempting to obtain an additional extension would only delay things further, and that the best course of action instead was continuing the effort to file before the 5:00 pm deadline.

30.     In sum, by 4:46 pm on February 14, 2022, Commerce had received Oman Fasteners' complete Supplemental Section C Response in PDF form, together with all PDF exhibits. Commerce received certain native Excel files that duplicated the information in the PDF exhibits, as well as a revised SAS database file that reflected data revisions detailed in the PDF exhibits, by 5:16 pm on February 14, 2022.

31.     Oman Fasteners' 16-minute partial filing delay had no impact whatsoever on Commerce or anyone else involved with this proceeding.

32.     Because the Supplemental Section C Response that Oman Fasteners submitted on February 14, 2022, was in "bracketing not final" form, the final business-proprietary and public versions were timely filed via ACCESS the next day, pursuant to Commerce's "one-day lag rule." Those final versions were then served on Mid Continent via ACCESS and email. Mid Continent sought and received an extension of time in which to comment on the Supplemental Section C Response, and filed subsequently filed its substantive comments on March 4, 2022.

33. Mid Continent did not raise any claim of prejudice resulting from the 16-minute delay in Oman Fasteners' filing of the last electronic data file on February 14, 2022. Nor could Mid Continent have asserted any claim of prejudice in good faith, given that it was timely served—through the ACCESS system—with the final business proprietary version of Oman Fasteners' Supplemental Section C Response on the next business day after the initial filing.

34. For over five weeks, Commerce gave no indication to Oman Fasteners or its counsel that Commerce had any concerns regarding Oman Fasteners' February 14 filing of the Supplemental Section C response. Then on March 22, 2022, Commerce abruptly rejected the entire Supplemental Section C Response and removed it from the record of the review. Commerce's stated reason what that it had "received Oman Fasteners' Section C supplemental questionnaire response between 4:41 p.m. eastern standard time (EST) and 5:16 p.m. EST." Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Extension of Deadline to Submit Response to Section D Supplemental Questionnaire {sic}* (March 22, 2022) (Commerce's letter erroneously refers to the Section D Supplemental Questionnaire extension request in the subject line.)

35. On March 24, 2022, Oman Fasteners requested reconsideration of Commerce's rejection of its Supplemental Section C Response and asked, alternatively, for an extension of time to submit it. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Request for Reconsideration and Out-of-Time Extension Request* (March 23, 2022).

36. Oman Fasteners thereafter submitted four additional letters to Commerce asking Commerce to either reconsider the initial rejection or else permit Oman Fasteners to resubmit either the entire Supplemental Section C Response or at least the parts of the response that had been timely filed before the 5:00 pm deadline. Oman Fasteners Letter to Commerce (A-523-808;

POR: 7/1/2020-6/30/2021), *Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration* (March 30, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Request for Leave to Submit Supplemental Section C Response* (April 22, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Response to Mid Continent's May 2, 2022 Letter* (May 4, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Request for Reconsideration Regarding Leave to Submit Supplemental Section C Response* (May 24, 2022).

37.     Oman Fasteners also requested and participated in an *ex parte* teleconference with Commerce regarding the same issues on April 28, 2022. Commerce Memorandum to File (A-523-808; POR: 7/1/2020-6/30/2021), *Teleconference Call with Counsel to Oman Fasteners LLC* (April 29, 2022) (Commerce's memorandum of the teleconference erroneously identifies the date as "May 28, 2022").

38.     Oman Fasteners demonstrated in these submissions that (i) Commerce's unwarranted rejection of the Supplemental Section C Response was inconsistent with controlling court precedents and prior Commerce practice; (ii) Commerce should permit the re-filing of the entire Supplemental Section C Response, particularly given that the 16-minute delay in Commerce's receipt of certain electronic data files, which reflected data already timely filed in PDF form before 5:00 pm on the day of filing, had no discernable impact on Commerce's ability to conduct the review nor caused any prejudice to anyone; and (iii) Commerce has no lawful basis to draw an adverse inference against Oman Fasteners because the Sixth Review record, as well as the entire history of the Oman Nails proceeding, demonstrates that Oman Fasteners had

devoted its utmost efforts to fully cooperating in Commerce's investigation and responding to every request for information by Commerce.

39. Commerce refused to reconsider its initial rejection on the ground that it determined that Oman Fasteners failed to show "extraordinary circumstances" justifying consideration of an extension request filed after the applicable time limit expired. In addition, Commerce refused to grant Oman Fasteners leave to resubmit any portion of its Supplemental Section C Response. Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Rejection of Untimely Submission from Oman Fasteners LLC* (April 20, 2022); Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Rejection of Untimely Submission from Oman Fasteners LLC* (May 20, 2022).

40. Oman Fasteners reiterated its position in written comments filed on June 2, 2022, prior to Commerce's Preliminary Results determination. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners' Pre-Preliminary Comments* (June 2, 2022).

41. Oman Fasteners also argued in its Pre-Preliminary Comments that, under applicable decisions of this Court and the Court of Appeals, to the extent that Commerce chose to rely on other facts available to determine Oman Fasteners' dumping margin in the Sixth Review—and whether or not Commerce determined to apply an adverse inference—it would be grossly punitive and unlawful to apply the original (and entirely discredited) 154.33% dumping margin alleged by Mid Continent in its 2014 petition. Instead, if Commerce felt compelled to resort to alternative facts, Commerce's calculated dumping margin for Oman Fasteners in the immediately prior (fifth) administrative review—which was based on Oman Fasteners' actual sales and cost data that Commerce had found to be entirely credible and reliable—was the best

source of other facts available, given its recency, specificity to Oman Fasteners, and consistency with Oman Fasteners' overall history of very low dumping margins.

42. On July 6, 2022, Commerce issued its Preliminary Results, subsequently published in the Federal Register on July 20, 2022. *Certain Steel Nails from the Sultanate of Oman,* 87 Fed. Reg. 43240 (July 20, 2022). Commerce preliminarily assigned a 154.33% dumping margin for Oman Fasteners on the basis of total "adverse facts available" At the same time, Commerce preliminarily selected a 9.10% dumping margin for all other Omani companies based on the prior "all others" rate.

43. Commerce rejected each of Oman Fasteners' arguments. In its Preliminary Determination Memorandum, Commerce continued to exclude from the record the entirety of Oman Fasteners' Supplemental Section C Response on the basis that Oman Fasteners had not shown "extraordinary circumstances" justifying the 16-minute filing delay, which Commerce believed necessitated Commerce's use of "facts otherwise available" to determine Oman Fasteners' preliminary dumping margin. Commerce also preliminarily applied an adverse inference against Oman Fasteners in the selection of facts otherwise available, because it concluded that "Oman Fasteners failed to act to the best of its ability to comply with Commerce's request for information by not providing the requested information by the deadline for submission of that information." Preliminary Decision Memorandum at 11.

44. As a result, Commerce assigned the highest dumping margin alleged in the 2014 petition, i.e., 154.33%, as the dumping margin for Oman Fasteners. Commerce also concluded that it need not corroborate this adverse-facts-available rate, as required by statute, because it had applied the rate to a different mandatory respondent that had wholly failed to cooperate, and refused to participate entirely, in the first and second reviews.

12

45.     At the same time, however, in determining the rate applicable to all other

potential Omani exporters of subject steel nails, Commerce determined that the punitive margin

it had assigned to Oman Fasteners was not reasonably reflective of the non-selected companies'

potential dumping margins during the period of review, because, according to Commerce, "{i}n

the four most recent administrative reviews of the Order, Commerce calculated margins for the

mandatory respondents ranging from zero to 1.65%," and, "{m}oreover, the all-others rate in

those reviews continued to be the 9.10% rate calculated in the investigation." Preliminary

Decision Memorandum at 13.

46.     Commerce neglected to note that there was only one "mandatory respondent" for

which it had calculated actual dumping margins of zero to 1.65% in the prior reviews, and that

respondent was Oman Fasteners. Commerce also neglected to note that it had revised downward

the 9.10% investigation rate to 4.22%, based on remand instructions from this Court.

47.     On August 5, 2022, in light of the severe and irreparable harm that Oman

Fasteners was certain to suffer if Commerce's Preliminary Results were made final and

implemented, Oman Fasteners requested that Commerce (i) immediately fully extend the

deadline for the final results of the review so as to eliminate uncertainty regarding the effective

date of the final results; and (2) commit to postpone the effective date of any new cash deposit

rate until Oman Fasteners has an opportunity to seek review of Commerce's final results in this

Court, in the event that Commerce, in its final results, were to continue to assign a punitive and

aberrational 154.33% rate to Oman Fasteners. Oman Fasteners Letter to Commerce (A-523-808;

POR: 7/1/2020-6/30/2021), *Oman Fasteners' Request for Postponement* (Aug. 5, 2022).

48.     In its August 5 letter, Oman Fasteners detailed the severe and irreparable harm

that Commerce's punitive rate would have on its business operations, as well as the profound

negative impact such a determination would have on critical sectors of the U.S. economy that depend on Oman Fasteners to supply steel nails, including the U.S. residential construction, light-commercial construction, and shipping-pallet industries.

49.     Oman Fasteners also emphasized that Commerce has the authority, pursuant to Section 705 of the Administrative Procedure Act ("APA"), to postpone the effect of its final results in an antidumping administrative review, including the implementation of a punitive and economically prohibitive cash deposit rate, to prevent irreparable harm or other manifest injustice. The APA provides that "{w}hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. § 705. Oman Fasteners pointed out that the federal courts have held that the authority to postpone under Section 705 of the APA extends to any action that an agency may take.

50.     Oman Fasteners received no response from Commerce to its August 5 letter. Oman Fasteners renewed its request by letter submitted on September 7, 2022. Commerce eventually responded to Oman Fasteners on September 27, 2022, rejecting Oman Fasteners' requests and stating that "{i}t is Commerce's practice to issue cash-deposit instructions by no later than five business days after the publication of the final results of a proceeding." Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Denial of Extension of Deadline for Final Results and Cash Deposit Instructions Deadline* (Sept. 27, 2022).

51.     Separately, in accordance with Commerce's regulations, Oman Fasteners submitted its Case Brief to Commerce on August 23, 2022. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners' Case Brief* (Aug. 23, 2022). Therein, Oman Fasteners argued the following:

- Oman Fasteners' sixteen-minute delay in uploading the final exhibit to the Supplemental Section C Response was understandable and excusable, especially

in light of the unusual technical problems in the ACCESS filing system that Oman Fasteners' counsel faced in uploading that final electronic exhibit the Supplemental Section C Response.

- Oman Fasteners' 16-minute delay in uploading the final electronic data file exhibits to the Supplemental Section C Response had no impact on, and did not prejudice, Commerce, Mid Continent, or anyone else involved in the review.

- Oman Fasteners was entitled to leniency under Commerce's long-standing practice of extending grace for first-time mistakes in a proceeding.

- At minimum, Commerce must allow Oman Fasteners to submit the portions of its Supplemental Section C Response that were successfully uploaded prior to the 5:00pm deadline, which provided Commerce with all the factual information responsive to its supplemental Section C questionnaire.

- Even a missing supplemental Section C Response could not support Commerce's refusal to calculate a dumping margin, because the questionnaire contained questions and requests for clarification regarding Oman Fasteners' Section C data that were virtually identical to the questions and requests for clarifications previously asked by Commerce and answered by Oman Fasteners.

- Commerce had no legal authority to draw any adverse inference against Oman Fasteners, which cooperated to the best of its ability with Commerce's investigation, because the "best of its ability" standard does not require perfection and recognizes that mistakes sometimes occur.

- To the extent Commerce nevertheless decided to rely on adverse facts available, given the very minor delay by Oman Fasteners, its sterling prior history of cooperation, and Oman Fasteners' prior history of zero and near-zero dumping margins, Commerce should select Oman Fasteners' most recent calculated dumping margin—1.65% in the fifth review—or at most the highest calculated margin in this proceeding—Oman Fasteners' original investigation margin of 4.22%—as the adverse facts available rate.

- Commerce's preliminary selection of the 153.44% petition-based adverse facts available rate was unjustifiably punitive and unlawful, because that margin was concocted by petitioner based on a variety of unfounded guesses and suppositions and was thoroughly discredited by Commerce's actual calculation of Oman Fasteners' dumping margin as 4.22% in the original 2014-2015 investigation.

52.    On December 16, 2022, Commerce issued its Final Results, subsequently published in the Federal Register on December 22, 2022. *Certain Steel Nails from the Sultanate*

*of Oman*, 87 Fed. Reg. 78,639 (Dec. 22, 2022). Commerce made no changes to its Preliminary Results. Commerce rejected each of Oman Fasteners' arguments and continued to assign a final dumping margin of 154.33% to Oman Fasteners on the basis of total adverse facts available.

53. Commerce stated in its Final Results that it will issue instructions to Customs and Border Protection ("CBP") to assess this rate on imports covered by the review and will direct CBP to begin collection of cash deposits of estimated antidumping duties on imports from Oman Fasteners at the rate of 154.33%, effective with merchandise entered on or after the date of Federal Register publication. 87 Fed. Reg. at 78,640.

54. As in the Preliminary Results, in the Final Results Commerce assigned a dumping margin rate of 9.10%—the actual dumping margin calculated by Commerce for Oman Fasteners in the original investigation (and later corrected to 4.22%)—to "all other" potential Omani exporters of subject steel nails. 87 Fed. Reg. at 78,640.

## STATEMENT OF CLAIMS

### COUNT I

55. The allegations of paragraphs 1-53 are incorporated herein by reference.

56. This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

57. Commerce's decision to reject Oman Fasteners' entire Supplemental Section C Response based on its counsel's submission of certain exhibits thereto 16 minutes after the deadline was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## **COUNT II**

58.     The allegations of paragraphs 1-53 are incorporated herein by reference.

59.     This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

60.     Commerce's decision to apply an adverse inference against Oman Fasteners based on its counsel's submission of certain exhibits to the Supplemental Section C Response until 16 minutes after the deadline—despite Oman Fasteners' otherwise stellar record of cooperation with Commerce's investigation across the eight-year history of *Oman Nails,* and despite no discernable impact on Commerce's ability to conduct the review—was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## **COUNT III**

61.     The allegations of paragraphs 1-53 are incorporated herein by reference.

62.     This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

63.     Commerce's decision to select the wholly discredited and punitive 154.33% petition rate for Oman Fasteners—despite no discernable impact on Commerce's ability to conduct the review and despite Oman Fasteners' exemplary record of cooperation with Commerce and consistent record of zero or low single-digit dumping margins—was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## COUNT IV

64.     The allegations of paragraphs 1-53 are incorporated herein by reference.

65.     This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

66.     Commerce's refusal to postpone the implementation of a punitive and economically prohibitive 154.33% cash deposit rate, in light of the immediate and substantial irreparable harm that imposition of such rate will cause Oman Fasteners and important sectors of the U.S. economy that depend on supply from Oman Fasteners, was an abuse of Commerce's discretion under Section 705 of the Administrative Procedure Act, 5 U.S.C. § 705, and was otherwise arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Oman Fasteners respectfully requests that this Court:

(a)    enter judgment in favor of Plaintiff on its claims as set forth in Counts I, II, III, and IV above;

(b)    hold that Commerce's Final Results are arbitrary and capricious, unsupported by substantial evidence, and contrary to law;

(c)    remand this case to Commerce for a re-determination of Oman Fasteners' dumping margin consistent with the holding of this Court; and

(d)    grant such other and additional relief in law and equity as the Court may deem just and proper.

Dated: December 23, 2022

/s/ Michael P. House
Michael P. House
Michael R. Huston
Andrew Caridas
**Perkins Coie LLP**
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6288
mhouse@perkinscoie.com

*Counsel to Oman Fasteners, LLC*

# EXHIBIT F

# DEPARTMENT OF COMMERCE

## International Trade Administration

**Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; Procedures for Importation of Supplies for Use in Emergency Relief Work**

The Department of Commerce will submit the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995, on or after the date of publication of this notice. We invite the general public and other Federal agencies to comment on proposed, and continuing information collections, which helps us assess the impact of our information collection requirements and minimize the public's reporting burden. Public comments were previously requested via the **Federal Register** on May 6, 2022, during a 60-day comment period. This notice allows for an additional 30 days for public comments.

*Agency:* International Trade Administration, Department of Commerce.

*Title:* Procedures for Importation of Supplies for Use in Emergency Relief Work.

*Form Number(s):* N/A.

*OMB Control Number:* 0625–0256.

*Type of Request:* Regular Submission.

*Number of Respondents:* 1.

*Average Hours per Response:* 15.

*Burden Hours:* 15.

*Needs and Uses:* The regulations (19 CFR 358.101–104) provide procedures for requesting the Secretary of Commerce to permit the importation of supplies, such as food, clothing, medical, surgical, and other supplies, for use in emergency relief work free of antidumping and countervailing duties.

*Affected Public:* Business or other for-profit organizations.

*Frequency:* Varies.

*Respondent's Obligation:* Voluntary.

*Legal Authority:* 19 U.S.C 1318(a).

This information collection request may be viewed at *www.reginfo.gov.* Follow the instructions to view the Department of Commerce collections currently under review by OMB.

Written comments and recommendations for the proposed information collection should be submitted within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain* . Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function and entering either the title of the collection or the OMB Control Number 0625–0256.

**Sheleen Dumas,**
*Department PRA Clearance Officer, Office of the Chief Information Officer, Commerce Department.*

[FR Doc. 2022–15467 Filed 7–19–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Admintration

**[A–523–808]**

**Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) is conducting an administrative review of the antidumping duty order on certain steel nails (steel nails) from the Sultanate of Oman (Oman). This review covers 15 exporters and producers from Oman. We have preliminarily assigned the sole mandatory respondent, Oman Fasteners LLC (Oman Fasteners), an antidumping duty margin based on the application of adverse facts available for the period of review (POR) July 1, 2020, through June 30, 2021. In addition, we preliminarily find that Astrotech Steels Private Ltd. (Astrotech); Geekay Wires Ltd. (Geekay); and Trinity Steel Pvt. Ltd. (Trinity) had no shipments during the POR. Interested parties are invited to comment on these preliminary results.

**DATES:** Applicable July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dakota Potts, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0223.

**SUPPLEMENTARY INFORMATION:**

## Background

On July 13, 2015, Commerce published the antidumping duty order on steel nails from Oman.[1] On July 1, 2021, we published a notice of opportunity to request an administrative

review of the *Order*.[2] On September 7, 2021, based on timely requests for an administrative review, Commerce published a notice of initiation of the administrative review.[3] Commerce initiated this administrative review covering the following 15 companies: Airlift Trans Oceanic Pvt. Ltd.; Al Kiyumi Global LLC; Al Sarah Building Materials LLC; Astrotech; CL Synergy (Pvt) Ltd.; Geekay; Gulf Steel Manufacturers LLC; Modern Factory For Metal Products; Oman Fasteners LLC; Omega Global Uluslararasi Tasimacilik Lojistik Ticaret Ltd Sti.; Overseas International Steel Industry, LLC; Swift Freight India Private Ltd.; Trinity; Universal Freight Services LLC; and WWL Indian Private Ltd.[4] Commerce selected Oman Fasteners as the sole mandatory respondent for individual examination in this review.[5]

On March 30, 2022, Commerce extended the time limit for completing the preliminary results of this review, until June 1, 2022.[6] On May 25, 2022, Commerce extended the time limit for completing the preliminary results by an additional 30 days, until July 1, 2022.[7]

For a complete description of the events since the initiation of this review, *see* the Preliminary Decision Memorandum.[8] A list of the topics included in the Preliminary Decision Memorandum is included as the appendix to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Preliminary Decision

---

[1] *See Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders,* 80 FR 39994 (July 13, 2015) (*Order*).

[2] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 86 FR 35065 (July 1, 2021) (*Opportunity Notice*).

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86 FR 50034 (September 7, 2021).

[4] *Id.*

[5] *See* Memorandum, "Antidumping Duty Administrative Review of Steel Nails from the Sultanate of Oman: Selection of Respondent for Individual Review," dated October 13, 2021.

[6] *See* Memorandum, "Certain Steel Nails from the Sultanate of Oman: Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated March 30, 2022.

[7] *See* Memorandum, "Certain Steel Nails from the Sultanate of Oman: Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated May 25, 2022.

[8] *See* Memorandum, "Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Certain Steel Nails from the Sultanate of Oman; 2020–2021," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

## Scope of the Order

The merchandise covered by the scope of this *Order* is steel nails from Oman. A complete description of the scope of the *Order* is contained in the Preliminary Decision Memorandum.[9]

## Preliminary Determination of No Shipments

Based upon the no-shipment certifications received by Commerce, and our review of the U.S. Customs and Border Protection (CBP) data, we preliminary find that Astrotech, Geekay, and Trinity had no shipments during the POR. CBP did not have any information to contradict the claims of no shipments during the POR. Consistent with Commerce's practice, we will not rescind the review with respect to Astrotech, Geekay, and Trinity in these preliminary results, but rather will complete the review and issue appropriate liquidation instructions to CBP based on the final results.[10] For additional information regarding this determination, *see* the Preliminary Decision Memorandum.

## Application of Facts Available with Adverse Inferences

Pursuant to section 776(a)–(b) of the Tariff Act of 1930, as amended (the Act), Commerce is preliminarily relying upon total adverse facts available (AFA) to determine a weighted-average dumping margin for Oman Fasteners in this review. Commerce preliminary finds that necessary information is not available on the record, and that Oman Fasteners failed to provide the requested information by the deadlines established by Commerce and significantly impeded the proceeding, warranting a determination on the basis of facts available under section 776(a) of the Act. Further, Commerce preliminarily determines that Oman Fasteners failed to cooperate to the best of its ability in complying with Commerce's request for information, thus warranting use of an adverse inference in selecting from among the facts otherwise available, in accordance with section 776(b) of the Act. For a full description of the methodology

underlying our conclusions regarding the application of AFA, *see* the Preliminary Decision Memorandum.

## Rate for Non-Selected Companies

In accordance with the U.S. Court of Appeals for the Federal Circuit's decision in *Albermarle,*[11] we are applying a rate based on the all-others rate applied in prior segments of this proceeding (*i.e.,* 9.10 percent) to the eleven companies not selected for individual examination. In this review, we find this rate is reasonably reflective of the non-selected companies' potential dumping margins, and thus, it is appropriate to apply this rate to the non-selected companies, under section 735(c)(5)(B) of the Act. For a detailed discussion, *see* the Preliminary Decision Memorandum.

## Preliminary Results of Review

Commerce preliminary determines that the following estimated weighted-average dumping margins exist for the period July 1, 2020, through June 30, 2021:

| Exporter/producer | Weighted-average dumping margin (percent) |
| --- | --- |
| Oman Fasteners LLC ................. | [12] 154.33 |
| Non-Selected Companies [13] ....... | 9.10 |

## Disclosure and Public Comment

Normally, Commerce discloses to interested parties the calculations performed in connection with preliminary results within five days after the date of public announcement or publication of this notice. However, because Commerce preliminarily applied a rate based entirely on AFA to the sole mandatory respondent under review in accordance with section 776 of the Act, there are no calculations to disclose.

Pursuant to 19 CFR 351.309(c), interested parties may submit case briefs no later than 30 days after the date of publication of this notice. Rebuttal

briefs, limited to issues raised in the case briefs, may be filed no later than seven days after the date for filing case briefs.[14] Parties that submit case or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) a statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[15] Note that Commerce has temporarily modified certain portions of its requirements for serving documents containing business proprietary information, until further notice.[16]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, filed electronically via ACCESS within 30 days of the date of publication of this notice. Requests should contain: (1) the party's name, address, and telephone number; (2) the number of participants; (3) whether any participant is a foreign national; and (4) a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date. An electronically-filed hearing request must be received successfully in its entirety by ACCESS by 5:00 p.m. Eastern Time on the established deadline.

Commerce intends to issue the final results of this administrative review, including the results of its analysis of issues raised in the case briefs, no later than 120 days after the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Act, unless otherwise extended.

## Assessment Rates

Upon issuance of the final results of this administrative review, Commerce shall determine, and CBP shall assess, antidumping duties on all appropriate entries covered by this review.[17] The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by this review and for future deposits of estimated duties, where applicable.[18]

---

[9] *Id.*

[10] *See Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019,* 85 FR 74673 (November 23, 2020), unchanged in *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from Taiwan: Final Results of Antidumping Duty Administrative Review; 2018–2019,* 86 FR 14311 (March 15, 2021).

[11] *See Albemarle Corp.* v. *United States,* 821 F.3d 1345 (Fed. Cir. 2016) (*Albemarle*).

[12] Based on total AFA. For a full description of the methodology underlying our conclusions regarding the application of AFA, *see* the Preliminary Decision Memorandum.

[13] The eleven non-selected companies are: Airlift Trans Oceanic Pvt. Ltd.; Al Kiyumi Global LLC; Al Sarah Building Materials LLC; CL Synergy (Pvt) Ltd.; Gulf Steel Manufacturers LLC; Modern Factory For Metal Products; Omega Global Uluslararasi Tasimacilik Lojistik Ticaret Ltd Sti.; Overseas International Steel Industry, LLC; Swift Freight India Private Ltd.; Universal Freight Services LLC; and WWL Indian Private Ltd.

[14] *See* 19 CFR 351.309(d).

[15] *See* 19 CFR 351.309(c) and (d); *see also* 19 CFR 351.303 (for general filing requirements).

[16] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

[17] *See* 19 CFR 351.212(b)(1).

[18] *See* section 751(a)(2)(C) of the Act.

In accordance with Commerce's "automatic assessment" practice, for entries of subject merchandise during the POR produced by Oman Fasteners for which the company did not know that the merchandise was destined for the United States, we will instruct CBP to liquidate those entries at the all-others rate if there is no rate for the intermediate company(ies) involved in the transaction.[19]

Should we continue to apply facts available with an adverse inference to Oman Fasteners in the final results, we will instruct CBP to apply an assessment rate equal to the dumping margin of 154.33 percent, as indicated above, to all entries produced and/or exported by Oman Fasteners. The assessment rate for antidumping duties for each of the companies not selected for individual examination will be equal to the weighted-average dumping margin identified in the final results of review. We intend to issue instructions to CBP no earlier than 35 days after the publication date of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.*, within 90 days of publication).

**Cash Deposit Requirements**

The following cash deposit requirements will be effective upon publication in the **Federal Register** of the notice of final results of this administrative review for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication, as provided by section 751(a)(2)(C) of the Act: (1) the cash deposit rate for the companies listed in the final results of this review will be equal to the weighted-average dumping margin established in the final results of this administrative review; (2) for merchandise exported by producers or exporters not covered in this review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently-completed segment of this proceeding in which they were reviewed; (3) if the exporter is not a firm covered in this review, a prior review, or the original investigation, but the producer is, then the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the merchandise; (4) the cash deposit rate for all other producers or exporters will continue to be 9.10 percent, the all-others rate established in the less-than-fair-value investigation.[20] The cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during the POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

**Notification to Interested Parties**

Commerce is issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act and 19 CFR 351.221(b)(4).

Dated: July 1, 2022.

**Ryan Majerus,**

*Deputy Assistant Secretary for Policy and Negotiations.*

**Appendix**

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the *Order*
IV. Preliminary Determination of No Shipments
V. Application of Facts Available and Use of Adverse Inferences
VI. Rate for Non-Selected Companies
VII. Recommendation

[FR Doc. 2022–15487 Filed 7–19–22; 8:45 am]

**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

**International Trade Administration**

**Initiation of Antidumping and Countervailing Duty Administrative Reviews; Amendment of Notice**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) is amending the notice of initiation of administrative reviews of antidumping duty (AD) and countervailing duty (CVD) orders with January 2021 anniversary dates to include a company that was inadvertently omitted from the AD administrative review of softwood lumber from Canada.

**DATES:** Applicable July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230, telephone: (202) 482–2769.

**SUPPLEMENTARY INFORMATION:**

**Correction**

On March 4, 2021, Commerce published a notice of initiation of administrative reviews of AD and CVD orders with January 2021 anniversary dates.[1] Commerce inadvertently omitted from the *Initiation Notice* the initiation of a company from the administrative review of the AD order on softwood lumber from Canada. Commerce is hereby amending the *Initiation Notice* to initiate the request for review of the following company:

| AD proceedings | Period to be reviewed |
|---|---|
| Canada: Softwood Lumber, A–122–857 .............................................................................................................................. Comox Valley Shakes (2019) Ltd. | 1/1/20–12/31/20 |

[19] For a full description of this practice, *see Antidumping and Countervailing Duty Proceedings:*

*Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[20] *See Order.*

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86 FR 12599 (March 4, 2021) (*Initiation Notice*).

# EXHIBIT G

Board for its facility within FTZ 35, in Sellersville, Pennsylvania.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (87 FR 52505–52506, August 26, 2022). On December 19, 2022, the applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: December 19, 2022.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2022–27836 Filed 12–21–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[A–523–808]**

**Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020–2021**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that certain steel nails from the Sultanate of Oman (Oman) were sold in the United States at less than normal value (NV) during the period of review (POR), July 1, 2020, through June 30, 2021.

**DATES:** Applicable December 22, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dakota Potts, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0223.

**SUPPLEMENTARY INFORMATION:**

## Background

On July 20, 2022, Commerce published the *Preliminary Results* of the 2020–2021 administrative review of the antidumping duty order on steel nails from Oman.[1] For a history of events that have occurred since the *Preliminary*

*Results, see* the Issues and Decision Memorandum.[2]

## Scope of the Order

The merchandise covered by the antidumping duty order is certain steel nails. For a complete description of the scope of the order, *see* the Issues and Decision Memorandum.

## Analysis of Comments Received

Commerce addressed all issues raised in the case and rebuttal briefs in the Issues and Decision Memorandum. These issues are identified in the appendix to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://enforcement.trade.gov/frn/index.html.*

## Changes Since the *Preliminary Results*

Based on our analysis of the comments received, we have made no change to the margin applied to Oman Fasteners LLC (Oman Fasteners) in the *Preliminary Results.* We have assigned the same margin as the total adverse facts available (AFA) rate for these final results.[3]

## Use of Adverse Facts Available

We continue to find that the application of total AFA, pursuant to sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act), is warranted in determining Oman Fasteners' dumping margin because it failed to timely submit information regarding its sales to the United States.[4] Therefore, as in the *Preliminary Results,* as AFA, we assigned Oman Fasteners a dumping margin of 154.33 percent. *See* the Issues and Decision Memorandum for further discussion.[5]

Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.[6] Because the 154.33 percent rate was applied in a separate segment of this proceeding, Commerce

does not need to corroborate the rate in this review.

## Rates for Companies Not Selected for Individual Examination

The statute and Commerce's regulations do not address the establishment of a rate to be applied to individual companies not selected for examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for companies which we did not examine in an administrative review. When the rates for individually examined companies are all zero, *de minimis,* or based entirely on facts available, section 735(c)(5)(B) of the Act provides that Commerce may use "any reasonable method" to establish the all-others rate. We based the dumping margin entirely on AFA for the sole mandatory respondent, Oman Fasteners. Therefore, we assigned the companies not selected for examination the all-others rate applied in prior segments of this proceeding (*i.e.,* 9.10 percent),[7] consistent with the guidance in section 735(c)(5)(B) of the Act.

## Final Results of Review

Commerce determines that the following weighted-average dumping margins exist for the period July 1, 2020, through June 30, 2021:

| Manufacturer/exporter | Weighted-average dumping margin (percent) |
| --- | --- |
| Oman Fasteners LLC ................. | [8] 154.33 |
| Non-Selected Companies ........... | 9.10 |

[8] Based on total AFA. For a full description of the methodology underlying our conclusions regarding the application of AFA, *see* the Issues and Decision Memorandum.

**BILLING CODE 3510–DS–P**

## Disclosure

Normally, Commerce will disclose the calculations performed in connection with the final results of review to parties to the proceeding in accordance with 19 CFR 351.224(b). However, as there were no margin calculations performed in the instant review, there are no calculations

---

[1] *See Certain Steel Nails from the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021,* 87 FR 43240 (July 20, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the 2020–2021 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *Id.* at Comment 3.

[4] *Id.* at Comments 1 and 2.

[5] *Id.* at Comment 3.

[6] *See* section 776(c)(2) of the Act.

[7] This rate is derived in the final determination of the underlying investigation in this proceeding. *See Certain Steel Nails from the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value,* 80 FR 28972 (May 20, 2015) (*Steel Nails from Oman Final Determination*).

to disclose for the final results of this review.

## Assessment Rate

Pursuant to section 751(a)(2)(C) of the Act, Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries covered by this review. Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

In accordance with Commerce's "automatic assessment" practice, for entries of subject merchandise that entered the United States during the POR that were produced by Oman Fasteners for which the respondent did not know that its merchandise was destined to the United States, Commerce will instruct CBP to liquidate unreviewed entries at the all-others rate of 9.10 percent,[9] if there is no rate for the intermediate company(ies) involved in the transaction.[10]

Because we are applying total AFA to Oman Fasteners, we will instruct CBP to apply an assessment rate to all entries Oman Fasteners produced and/or exported equal to the dumping margin indicated above in the "Final Results of Review." Further, the assessment rate for antidumping duties for each of the companies not selected for individual examination will be equal to the weighted-average dumping margin identified above in the "Final Results of Review."

## Cash Deposit Requirements

The following cash deposit requirements will be effective upon publication of the notice of the final results of this administrative review for all shipments of steel nails from Oman entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results in the **Federal Register**, as provided by section 751(a)(2)(C) of the Act: (1) for the companies covered by this review, the cash deposit rate will be the rates listed above in the section "Final Results of Review"; (2) for merchandise not covered in this review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published in a completed segment for the most recent period of review; (3) if the exporter is not a firm covered in this review, a prior review, or in the original investigation, but the producer is, the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the merchandise; and (4) the cash deposit rate for all other producers or exporters will continue to be 9.10 percent, the all-others rate established in the investigation.[11] These cash deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

## Administrative Protective Order

This notice also serves as a reminder to parties subject to an administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

## Notification to Interested Parties

Commerce is issuing and publishing these final results in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(5).

Dated: December 16, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

## List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the *Order*
IV. Discussion of the Issues

Comment 1: Whether to Accept/Add the Rejected Response to the Record
Comment 2: Whether to Apply Adverse Facts Available (AFA)
Comment 3: Which Rate to Apply as AFA
V. Recommendation

[FR Doc. 2022–27904 Filed 12–21–22; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[A–570–104]**

**Alloy and Certain Carbon Steel Threaded Rod From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Rescission of Administrative Review, in Part; 2021–2022**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily finds that Ningbo Dongxin High-Strength Nut Co., Ltd. (Ningbo Dongxin), is not eligible for a separate rate. The period of review (POR) is April 1, 2021, through March 31, 2022. Commerce is also rescinding the review with respect to Ningbo Zhongjiang High Strength Bolts Co., Ltd. (Zhongjiang Bolts). Interested parties are invited to comment on these preliminary results of review.

**DATES:** Applicable December 22, 2022.

**FOR FURTHER INFORMATION CONTACT:** Allison Hollander or Bryan Hansen, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2805 or (202) 482–3683, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On April 21, 2020, Commerce published in the **Federal Register** the antidumping duty (AD) order on alloy and certain carbon steel threaded rod (threaded rod) from the People's Republic of China (China).[1] On April 1, 2022, Commerce published in the **Federal Register** a notice of opportunity to request an administrative review of

---

[9] *See Steel Nails from Oman Final Determination.*

[10] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[11] *See Investigation Final Determination.*

[1] *See Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Antidumping Duty Order,* 85 FR 19929 (April 9, 2020) (*Order*).

# EXHIBIT H

argument presentations will be limited to issues raised in the briefs. If a request for a hearing is made, the Department intends to hold the hearing at the U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230, at a date and time to be determined.[14] Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

All submissions, with limited exceptions, must be filed electronically using ACCESS. An electronically filed document must be received successfully in its entirety by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time (ET) on the due date. Documents excepted from the electronic submission requirements must be filed manually (*i.e.,* in paper form) with the APO/Dockets Unit in Room 18022, and stamped with the date and time of receipt by 5 p.m. ET on the due date.[15]

The Department intends to issue the final results of this administrative review, which will include the results of its analysis of issues raised in any briefs received, no later than 90 days after the date these preliminary results of review are issued, pursuant to section 751(a)(2)(B) of the Act.

### Assessment Rates

If the Department proceeds to a final rescission of this administrative review, the assessment rate to which Mutlu's shipments will be subject will not be affected by this review. If the Department does not proceed to a final rescission of this administrative review, pursuant to 19 CFR 351.212(b)(1), we will calculate importer-specific (or customer-specific) assessment rates based on the final results of this review.

### Cash Deposit Requirements

If the Department proceeds to a final rescission of this administrative review, Mutlu's cash deposit rate will continue to be the all-others rate. If the Department issues final results for this administrative review, the Department will instruct CBP to collect cash deposits, effective upon the publication of the final results, at the rates established therein.

### Notification to Importers

This notice also serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate

regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

We are issuing and publishing these results in accordance with sections 751(a)(2)(B) and 777(i)(1) of the Act.

Dated: July 31, 2017.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

### Appendix I

### List of Sections in the Preliminary Decision Memorandum

1. Summary
2. Background
3. Scope of the Order
4. Discussion of the Methodology
5. Conclusion

[FR Doc. 2017–16577 Filed 8–4–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–523–808]

### Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014–2016

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) is conducting an administrative review of the antidumping duty (AD) order on certain steel nails (nails) from the Sultanate of Oman (Oman). The period of review (POR) is December 29, 2014, through June 30, 2016. This administrative review covers two exporters of the subject merchandise, both of which were selected as mandatory respondents, Oman Fasteners LLC (Oman Fasteners) and Overseas International Steel Industry LLC (OISI). The Department preliminarily determines Oman Fasteners and OISI made sales of subject merchandise at less than normal value during the POR. Additionally, we are rescinding this administrative review, in part, with

respect to 12 companies, based on the timely withdrawal of Mid Continent Steel & Wire, Inc.'s (the petitioner) request for administrative review. Interested parties are invited to comment on these preliminary results.

**DATES:** Applicable August 7, 2017.

**FOR FURTHER INFORMATION CONTACT:** Lilit Astvatsatrian or Thomas Martin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–6412 or (202) 482–3936, respectively.

**SUPPLEMENTARY INFORMATION:** On July 13, 2015, the Department published in the **Federal Register** an AD order on nails from Oman.[1] On July 5, 2016, the Department notified interested parties of the opportunity to request an administrative review of orders, findings, or suspended investigations with anniversaries in July 2016, including the AD order on nails from Oman. The Department received timely requests from Oman Fasteners, OISI, and the petitioner to conduct an administrative review of certain exporters covering the POR. On September 12, 2016, the Department published a notice initiating an AD administrative review of nails from Oman covering 15 companies for the POR.[2]

In the *Initiation Notice,* the Department indicated that, in the event that we would limit the respondents selected for individual examination in accordance with section 777A(c)(2) of the Tariff Act of 1930, as amended (the Act), we would select mandatory respondents for individual examination based upon U.S. Customs and Border Protection (CBP) entry data.[3] On November 9, 2016, after considering the large number of potential producers/exporters involved in this administrative review, and the resources available to the Department, we determined that it was not practicable to examine all exporters/producers of subject merchandise for which a review was requested.[4] As a result, pursuant to

---

[14] *See* 19 CFR 351.310(d).

[15] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011).

---

[1] *See Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders,* 80 FR 39994 (July 13, 2015) (*Order*).

[2] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 81 FR 62720 (September 12, 2016) (*Initiation Notice*).

[3] *See Initiation Notice,* 81 FR at 62720.

[4] *See* Memorandum entitled, "Respondent Selection in the first Antidumping Duty Administrative Review of Certain Steel Nails from Oman," dated November 9, 2016 (Respondent Selection Memorandum).

section 777A(c)(2)(B) of the Act, we determined that we could reasonably individually examine only the two largest producers/exporters of nails from Oman by U.S. entry volume during the POR (*i.e.,* Oman Fasteners and OISI).[5] Accordingly, we issued the AD questionnaire to these companies, Oman Fasteners and OISI, the two mandatory respondents.[6] On December 12, 2016, the petitioner timely withdrew its request for administrative review, pursuant to 19 CFR 351.213(d)(1), of all the producers and exporters except for Oman Fasteners, OISI, and Overseas Distribution Services Inc. (ODS).[7]

On March 23, 2017, the Department extended the preliminary results in this review to no later than July 31, 2017.[8]

## Partial Rescission of Administrative Review

The Department received timely requests to conduct an administrative review of certain exporters covering the POR. Because the petitioner timely withdrew its requests for review of all of the companies listed in the *Initiation Notice,* with the exception of Oman Fasteners, OISI, and ODS, we are rescinding the administrative review with respect to those 12 companies, pursuant to 19 351.213(d)(1). The Department has rescinded the administrative review with respect to the remaining 12 companies on which we initiated this review pursuant to 19 CFR 351.213(d)(1).[9] Accordingly, the remaining companies subject to the instant review are: Oman Fasteners, OISI, and ODS.

## Scope of the Order

The merchandise covered by this order is nails having a nominal shaft length not exceeding 12 inches.[10] Merchandise covered by the order is

[5] *See* Respondent Selection Memorandum.

[6] *See* Department Letter, "Administrative Review of Certain Steel Nails from Oman: Antidumping Duty Questionnaire," dated November 9, 2016.

[7] *See* Letter from the petitioner, "Certain Steel Nails from Oman: Withdrawal of Request for Administrative Review, dated December 12, 2016.

[8] *See* Memorandum, "Certain Steel Nails from the Sultanate of Oman: Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated March 23, 2017.

[9] Astrotech Steels Private Ltd, Consolidated Shipping services LLC, Damco India Private Ltd., Flyjac Logistics Private Ltd., International Maritime & Aviation LLC, Liladhar Pasoo India Logistics Private Ltd., Ivk Manuport Logistics LLC, Raajratna Metal Industries Ltd., Shanxi Tianli Industries Co. Ltd., Swift Freight India Private Ltd., United Building Material Factory, Uniworld Logistics Pvt Ltd.

[10] The shaft length of certain steel nails with flat heads or parallel shoulders under the head shall be measured from under the head or shoulder to the tip of the point. The shaft length of all other certain steel nails shall be measured overall.

currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7317.00.55.02, 7317.00.55.03, 7317.00.55.05, 7317.00.55.07, 7317.00.55.08, 7317.00.55.11, 7317.00.55.18, 7317.00.55.19, 7317.00.55.20, 7317.00.55.30, 7317.00.55.40, 7317.00.55.50, 7317.00.55.60, 7317.00.55.70, 7317.00.55.80, 7317.00.55.90, 7317.00.65.30, 7317.00.65.60 and 7317.00.75.00. Nails subject to this order may also be classified under HTSUS subheadings 7907.00.60.00, 8206.00.00.00 or other HTSUS subheadings. While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this order is dispositive. For a complete description of the scope of the order, *see* the Preliminary Decision Memorandum.[11]

## Methodology

The Department is conducting this review in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act). Export price and constructed export price are calculated in accordance with section 772 of the Act. Normal value is calculated in accordance with section 773 of the Act.

For a full description of the methodology underlying our conclusions, *see* the Preliminary Decision Memorandum.[12] A list of topics included in the Preliminary Decision Memorandum is included as an Appendix to this notice.

## Adverse Facts Available

Section 776(a) of the Act provides that the Department shall, subject to section 782(d) of the Act, use "facts otherwise available" if: (1) Necessary information is not on the record; or (2) an interested party or any other person: (A) Withholds information that has been requested; (B) fails to provide

[11] *See* Memorandum, "Decision Memorandum for Preliminary Results of the 2014–2016 Antidumping Duty Administrative Review of Certain Steel Nails from the Sultanate of Oman," dated concurrently with, and hereby adopted by this notice (Preliminary Decision Memorandum). The Preliminary Decision Memorandum is a public document and is on file electronically *via* Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov* and available to all parties in the Central Records Unit, room B8024 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly on the Internet at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Preliminary Decision Memorandum are identical in content.

[12] *See* Preliminary Decision Memorandum.

information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act provides that the Department may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information (*i.e.,* adverse facts available, or AFA). In doing so, and under the Trade Preferences Extension Act of 2015 (TPEA), the Department is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information. Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the less than fair value investigation, a previous administrative review, or other information placed on the record.

Section 776(c) of the Act provides that, in general, when the Department relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise. However, the Department is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

Under section 776(d) of the Act, the Department may use any dumping margin from any segment of a proceeding under an AD order when applying an adverse inference, including the highest of such margins. The TPEA also makes clear that when selecting an AFA margin, the Department is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.

In accordance with section 776 of the Act, the Department preliminarily determines that the application of facts

available is warranted for OISI because OISI has not provided the necessary information on the record, pursuant to section 776(a)(1) of the Act. Specifically, OISI reported that ODS was its affiliate in the United Arab Emirates, but failed to provide adequate information regarding its relationship with ODS. OISI also failed to provide adequate information regarding its U.S. sales data, such that the Department could not use the data in its calculations. Furthermore, OISI has withheld requested information, failed to provide such information in the form and manner required, impeded this review, and reported information that could not be verified, the use of facts available for the preliminary results is warranted, pursuant to sections 776(a)(2)(A), (B), (C), and (D) of the Act. For a full discussion, *see* the Preliminary Decision Memorandum.

Furthermore, by withholding requested information, failing to provide such information in the manner and form required, impeding this review, and reporting information that could not be verified, OISI failed to cooperate with the Department by not acting to the best of its ability to comply with a request for information by the Department, pursuant to section 776(b)(1) of the Act. Accordingly, we preliminarily determine to apply adverse facts available (AFA) to OISI, in accordance with sections 776(a) and (b) of the Act and 19 CFR 351.308. Record information indicates that OISI and ODS are affiliated and may meet our criteria for collapsing, due to OISI's reported shared ownership and intertwined operations with ODS. Because OISI did not answer our supplemental questionnaire, we do not have all of the information we need on the record in order to conduct a collapsing analysis. Accordingly, we have applied an adverse inference to the factual information on the record, and have, as AFA, collapsed OISI and ODS into a single entity. Furthermore, as we do not have adequate information on the record to calculate a margin for OISI, we have calculated its margin based on total AFA. Specifically, we are applying a rate of 154.33 percent, which was calculated by Petitioner in the petition in this investigation.[13] We have corroborated this rate with information obtained in the course of this administrative review, consistent with section 776(c)(1) of the Act. For further discussion, *see* the Preliminary Decision Memorandum.

**Preliminary Results of Review**

As a result of this review, we preliminarily determine the following weighted-average dumping margins for the period December 29, 2014 through June 30, 2016:

| Exporter/producer | Weighted-average dumping margins (percent) |
|---|---|
| Oman Fasteners LLC ................. | 99.88 |
| Overseas International Steel Industry LLC/Overseas Distribution Services Inc[14] .................. | 154.33 |

**Assessment Rates**

Upon completion of the administrative review, the Department shall determine, and CBP shall assess, antidumping duties on all appropriate entries. The Department intends to issue assessment instructions to CBP 15 days after the date of publication of the final results of this review.

For any individually examined respondents whose weighted-average dumping margin is above *de minimis* (*i.e.*, 0.50 percent), we will calculate importer-specific *ad valorem* duty assessment rates based on the ratio of the total amount of dumping calculated for the importer's examined sales to the total entered value of those same sales in accordance with 19 CFR 351.212(b)(1).[15] For entries of subject merchandise during the POR produced by each respondent for which it did not know its merchandise was destined for the United States, we will instruct CBP to liquidate un-reviewed entries at the all-others rate if there is no rate for the intermediate company involved in the transaction.[16] We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific assessment rate calculated in the final results of this review is above *de minimis*. Where either the respondent's weighted-average dumping margin is zero or *de minimis*, or an importer-specific assessment rate is zero or *de minimis*, we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

For the twelve companies for which this review is rescinded, antidumping duties will be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawn from warehouse, for consumption, in accordance with 19 CFR 351.212(c)(1)(i). The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of this notice. The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by the final results of this review and for future deposits of estimated duties, where applicable.

**Cash Deposit Requirement**

The following deposit requirements will be effective upon publication of the notice of the final results of administrative review for all shipments of nails from Oman entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for the companies under review will be the rate established in the final results of this review (except, if the rate is zero or *de minimis*, no cash deposit will be required); (2) for merchandise exported by manufacturers or exporters not covered in this review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment of this proceeding in which the manufacturer or exporter participated; (3) if the exporter is not a firm covered in this review, a prior review, or the less-than-fair-value investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recently completed segment of the proceeding for the manufacturer of the merchandise; and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 9.10 percent *ad valorem*, the all-others rate established in the less-than-fair value investigation.[17]

---

[13] Letter from the Department, ''Certain Steel Nails India, the Republic of Korea, the Sultanate of Oman, Malaysia, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam,'' dated May 29, 2014 (Petition). *See also* section 776(b)(2)(A) (stating that the petition is a potential source of information for the application of adverse facts available).

[14] ODS was initially a non-selected respondent subject to this administrative review; however, because we have, as AFA, collapsed ODS with mandatory respondent OISI, we are assigning both the same AFA margin.

[15] In these preliminary results, the Department applied the assessment rate calculation methodology adopted in *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings: Final Modification*, 77 FR 8101 (February 14, 2012).

[16] *See Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 FR 23954 (May 6, 2003).

[17] *See Certain Steel Nails from the Republic of Oman: Final Determination of Sales at Less Than Fair Value*, 80 FR 28955 (May 20, 2015).

**Disclosure and Public Comment**

The Department intends to disclose the calculations used in our analysis to interested parties in this review within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b). Interested parties are invited to comment on the preliminary results of this review. Pursuant to 19 CFR 351.309(c)(1)(ii), interested parties may submit case briefs no later than 30 days after the date of publication of this notice. Rebuttal briefs, limited to issues raised in the case briefs, may be filed no later than five days after the time limit for filing case briefs.[18] Parties who submit case briefs or rebuttal briefs in this proceeding are requested to submit with each brief: (1) A statement of the issue, (2) a brief summary of the argument, and (3) a table of authorities.[19] Executive summaries should be limited to five pages total, including footnotes.[20] Case and rebuttal briefs should be filed using ACCESS.[21]

Pursuant to 19 CFR 351.310(c), any interested party may request a hearing within 30 days of the publication of this notice in the **Federal Register**. If a hearing is requested, the Department will notify interested parties of the hearing schedule. Interested parties who wish to request a hearing, or to participate if one is requested, must submit a written request to the Assistant Secretary for Enforcement and Compliance, filed electronically *via* ACCESS within 30 days after the date of publication of this notice. Requests should contain: (1) The party's name, address, and telephone number; (2) the number of participants; and (3) a list of the issues to be discussed. Issues raised in the hearing will be limited to those raised in the respective case and rebuttal briefs.

We intend to issue the final results of this administrative review, including the results of our analysis of issues raised by the parties in the written comments, within 120 days of publication of these preliminary results in the **Federal Register**, unless otherwise extended.[22]

**Notification to Importers**

This notice also serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review

period. Failure to comply with this requirement could result in the Department's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

These preliminary results and partial rescission of administrative review are issued and published in accordance with sections 751(a)(1) and 777(i)(1) of the Act and 19 CFR 351.213(h)(1).

Dated: July 31, 2017.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Affiliation
V. Use of Facts Otherwise Available and Adverse Interferences
VI. Discussion of the Methodology
VII. Recommendation

[FR Doc. 2017–16497 Filed 8–4–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–557–816]**

**Certain Steel Nails From Malaysia: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2014–2016**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) is conducting an administrative review of the antidumping duty order on certain steel nails from Malaysia. The period of review covers December 29, 2014, through June 30, 2016. The review covers three producers/exporters of the subject merchandise. We preliminarily determine that sales of subject merchandise by the collapsed entities Inmax and Region, both of which were selected for individual examination, were made at less than normal value during the period of review. We are rescinding the review with respect to 16 companies for which the request for review was timely withdrawn. Interested parties are invited to comment on these preliminary results.

**DATES:** Applicable August 7, 2017.

**FOR FURTHER INFORMATION CONTACT:** Edythe Artman or Madeline Heeren, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3931 or (202) 482–9179, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

These preliminary results of review are made in accordance with section 751 of the Tariff Act of 1930, as amended (the Act). On September 12, 2016, the Department published the notice of initiation for the administrative review.[1] For a complete description of the events that followed the initiation of the review, *see* the Preliminary Decision Memorandum.[2] A list of topics included in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically *via* Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov* and to all parties in the Central Records Unit, located in Room B8094 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and the electronic versions of the Preliminary Decision Memorandum are identical in content.

**Scope of the Order**

The products covered by the scope of the order are certain steel nails from Malaysia. For a complete description of the scope, *see* Appendix I of this notice.

**Partial Rescission of Administrative Review**

In the *Initiation Notice,* we initiated a review of 19 companies. However, the petitioner, Mid Continent Steel & Wire, Inc., withdrew its request for review of 16 of the companies on December 12, 2016. No other parties had requested a review of these companies. Thus, in response to the petitioner's timely filed withdrawal request and pursuant to 19

---

[18] *See* 19 CFR 351.309(d)(1).

[19] *See* 19 CFR 351.309(c)(2) and (d)(2).

[20] *Id.*

[21] *See* 19 CFR 351.303.

[22] *See* section 751(a)(3)(A) of the Act.

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 81 FR 62720 (September 12, 2016) (*Initiation Notice*).

[2] *See* Memorandum, ''Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review and Intent to Rescind in Part: Certain Steel Nails from Malaysia; 2014–2016'', dated concurrently with this notice.



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
AR: 12/29/2014 – 6/30/16
Public Document
EC/OIV: MC/LA

July 31, 2017

MEMORANDUM TO:        Gary Taverman
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations,
  performing the non-exclusive functions and duties of the
Assistant Secretary for Enforcement and Compliance

FROM:        Abdelali Elouaradia
Director, Office IV
  for Antidumping and Countervailing Duty Operations

SUBJECT:        Decision Memorandum for Preliminary Results of the 2014-2016
Antidumping Duty Administrative Review of Certain Steel Nails
from the Sultanate of Oman

---

## I.    SUMMARY

The Department of Commerce (the Department) is conducting an administrative review of the antidumping duty (AD) order on certain steel nails (nails) from the Sultanate of Oman (Oman), in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act).  The period of review (POR) is December 29, 2014, through June 30, 2016.  The administrative review covers two mandatory respondents, Oman Fasteners LLC (Oman Fasteners) and Overseas International Steel Industry LLC (OISI).  We preliminarily determine that Oman Fasteners and OISI made sales of subject merchandise at prices below normal value (NV) during the POR.

## II.    BACKGROUND

On July 13, 2015, the Department published in the *Federal Register* an AD order on nails from Oman.[1]  On July 5, 2016, the Department published in the *Federal Register* a notice of opportunity to request an administrative review of the AD order on nails from Oman.[2]  On July 27, 2016, the Department received a request from Oman Fasteners to conduct an administrative

---

[1] *See Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam:  Antidumping Duty Orders*, 80 FR 39994 (July 13, 2015).
[2] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 81 FR 43584 (July 5, 2016).

review of its exports.[3]  On July 28, 2016, the Department received a request from OISI to conduct an administrative review of its exports.[4]  On August 1, 2016, the Department received a request from Mid Continent Steel & Wire, Inc. (the petitioner) for the Department to conduct an administrative review of 15 companies,[5] including Oman Fasteners and OISI.[6]

On September 12, 2016, based on timely requests for administrative reviews, the Department initiated an AD administrative review of the 15 companies.[7]  In the *Initiation Notice*, the Department indicated that, in the event that we would limit the respondents selected for individual examination in accordance with section 777A(c)(2) of the Act, we would select mandatory respondents based on U.S. Customers and Border Protection (CBP) entry data.[8]

On October 19, 2016,[9] the Department placed on the record CBP data for U.S. imports classified under the Harmonized Tariff Schedule of the United States (HTSUS) items identified in the scope of the AD duty order on nails from Oman.[10]  At that time, the Department invited interested parties to submit comments regarding the CBP data for use in respondent selection.[11]

---

[3] *See* Letter from Oman Fasteners to the Department, regarding, "Certain Steel Nails from Oman; First Review; Oman Fasteners' Request for Review," dated July 27, 2016.

[4] *See* Letter from OISI to the Department, regarding, "Certain Steel Nails from the Sultanate of Oman 1st Administrative Review: Request for Administrative Review," dated July 28, 2016.

[5] *See* Letter from Petitioner to the Department, regarding, "Certain Steel Nails from Oman: Request for Administrative Reviews," dated August 1, 2016.

[6] The following producers or exporters of subject merchandise were listed: Astrotech Steels Private Ltd, Consolidated Shipping services LLC, Damco India Private Ltd., Flyjac Logistics Private Ltd., International Maritime & Aviation LLC, Liladhar Pasoo India Logistics Private Ltd., Ivk Manuport Logistics LLC, Oman Fasteners LLC, Overseas Distribution Services Inc., Overseas International Steel Industry, LLC, Raajratna Metal Industries Ltd., Shanxi Tianli Industries Co. Ltd., Swift Freight India Private Ltd., United Building Material Factory, Uniworld Logistics Pvt Ltd.

[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 FR 62720 (September 12, 2016) (*Initiation Notice*).

[8] *See Initiation Notice*, 81 FR at 62720.

[9] *See* Memorandum to the File from Thomas Martin, Office IV, AD/CVD Operations, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Second Release of Customs and Border Protection Data" (October 19, 2016) ("Second CBP Data Release")

[10] The Department released CBP data and solicited comments thereon on September 22, 2016, but the search parameters of its data query contained an inadvertent error that affected the CBP entry data that we obtained.  *See* Memorandum to the File from Drew Jackson, Office 4, AD/CVD Operations, "Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Release of Customs and Border Protection Data," (September 22, 2016). Interested parties filed comments noting that the CBP entry data appeared incomplete.  *See* Letter from OISI to the Department, regarding, "Re: Certain Steel Nails from the Sultanate of Oman: Comments on CBP Data and Respondent Selection," dated September 29, 2016; Letter from Oman Fasteners to the Department, regarding, "Re: Certain Steel Nails from Oman; 1st Administrative Review Comments on CBP Data for Purposes of Respondent Selection," dated September 28, 2016.  For this reason, we performed a second CBP data query with corrected search parameters and released the corrected CBP entry data on October 19, 2016.

[11] *See* Second CBP Data Release.

The Department received two comments from interested parties regarding respondent selection: one from the petitioner,[12] and one from Oman Fasteners.[13]

On November 9, 2016, after considering the large number of potential producers/exporters involved in this administrative review, and the resources available to the Department, we determined that it was not practicable to examine all exporters/producers of subject merchandise for which a review was requested.[14]  As a result, pursuant to section 777A(c)(2)(B) of the Act, we determined that we could reasonably individually examine only the two largest producers/exporters of nails from Oman by U.S. entry volume during the POR (*i.e.*, Oman Fasteners and OISI).[15]  Accordingly, we issued the AD questionnaire to Oman Fasteners and OISI, the two mandatory respondents.[16]  On December 12, 2016, the petitioner timely withdrew its request for administrative reviews pursuant to 19 CFR 351.213(d)(1) of all the producers and exporters except for Oman Fasteners, OISI, and Overseas Distribution Services Inc. (ODS).[17]

From February 2017 to June 2017, the Department issued supplemental questionnaires to Oman Fasteners and OISI. The Department received timely responses from Oman Fasteners from March 2017 to June 2017, but received no responses to the supplemental questionnaires from OISI.  On March 23, 2017, the Department extended the preliminary results in this review to no later than July 31, 2017.[18]

## III.    SCOPE OF THE ORDER

The merchandise covered by this order is certain steel nails having a nominal shaft length not exceeding 12 inches.[19]  Certain steel nails include, but are not limited to, nails made from round wire and nails that are cut from flat-rolled steel.  Certain steel nails may be of one piece construction or constructed of two or more pieces.  Certain steel nails may be produced from any type of steel, and may have any type of surface finish, head type, shank, point type and shaft diameter.  Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, including but not limited to electroplating or hot dipping one or more times), phosphate, cement, and paint. Certain steel nails may have one or more surface finishes.  Head styles include, but are not limited to, flat, projection, cupped, oval, brad, headless, double, countersunk, and sinker.  Shank

---

[12] *See* Letter from Petitioner to the Department, regarding, "Certain Steel Nails from Oman: Comments on Respondent Selection Based on Revised CBP Data," dated October 26, 2016 ("Petitioner's Comment on CBP Data").

[13] *See* Letter from Oman Fasteners to the Department, regarding, "Certain Steel Nails from Oman; 1st Administrative Review Comments on Second CBP Data Release for Purposes of Respondent Selection," dated October 26, 2016 ("Oman Fasteners' Comments on CBP Data").

[14] *See* Memorandum entitled, "Respondent Selection in the first Antidumping Duty Administrative Review of Certain Steel Nails from Oman," dated November 9, 2016 (Respondent Selection Memorandum).

[15] *See* Respondent Selection Memorandum.

[16] *See* Department Letter, "Administrative Review of Certain Steel Nails from Oman:  Antidumping Duty Questionnaire," dated November 9, 2016.

[17] *See* Letter from Petitioner, "Certain Steel Nails from Oman:  Withdrawal of Request for Administrative Review, dated December 12, 2016.

[18] *See* Memorandum, "Certain Steel Nails from the Sultanate of Oman:  Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review," dated March 23, 2017.

[19] The shaft length of certain steel nails with flat heads or parallel shoulders under the head shall be measured from under the head or shoulder to the tip of the point.  The shaft length of all other certain steel nails shall be measured overall.

styles include, but are not limited to, smooth, barbed, screw threaded, ring shank and fluted. Screw-threaded nails subject to this proceeding are driven using direct force and not by turning the nail using a tool that engages with the head.  Point styles include, but are not limited to, diamond, needle, chisel and blunt or no point.  Certain steel nails may be sold in bulk, or they may be collated in any manner using any material.

Excluded from the scope of the order are nails packaged in combination with one or more non-subject articles, if the total number of nails of all types, in aggregate regardless of size, is less than 25.  If packaged in combination with one or more non-subject articles, nails remain subject merchandise if the total number of nails of all types, in aggregate regardless of size, is equal to or greater than 25, unless otherwise excluded based on the other exclusions below.

Also excluded from the scope are nails with a nominal shaft length of one inch or less that are (a) a component of an unassembled article, (b) the total number of nails is sixty (60) or less, and (c) the imported unassembled article falls into one of the following eight groupings:  1) builders' joinery and carpentry of wood that are classifiable as windows, French-windows and their frames; 2) builders' joinery and carpentry of wood that are classifiable as doors and their frames and thresholds; 3) swivel seats with variable height adjustment; 4) seats that are convertible into beds (with the exception of those classifiable as garden seats or camping equipment); 5) seats of cane, osier, bamboo or similar materials; 6) other seats with wooden frames (with the exception of seats of a kind used for aircraft or motor vehicles); 7) furniture (other than seats) of wood (with the exception of i) medical, surgical, dental or veterinary furniture; and ii) barbers' chairs and similar chairs, having rotating as well as both reclining and elevating movements); or 8) furniture (other than seats) of materials other than wood, metal, or plastics (*e.g*., furniture of cane, osier, bamboo or similar materials).  The aforementioned imported unassembled articles are currently classified under the following HTSUS subheadings:  4418.10, 4418.20, 9401.30, 9401.40, 9401.51, 9401.59, 9401.61, 9401.69, 9403.30, 9403.40, 9403.50, 9403.60, 9403.81 or 9403.89.

Also excluded from the scope of the order are nails that meet the specifications of Type I, Style 20 nails as identified in Tables 29 through 33 of ASTM Standard F1667 (2013 revision). Also excluded from the scope of the order are nails suitable for use in powder-actuated hand tools, whether or not threaded, which are currently classified under HTSUS subheadings 7317.00.20.00 and 7317.00.30.00.

Also excluded from the scope of the order are nails having a case hardness greater than or equal to 50 on the Rockwell Hardness C scale (HRC), a carbon content greater than or equal to 0.5 percent, a round head, a secondary reduced-diameter raised head section, a centered shank, and a smooth symmetrical point, suitable for use in gas-actuated hand tools.

Also excluded from the scope of the order are corrugated nails.  A corrugated nail is made up of a small strip of corrugated steel with sharp points on one side.

Also excluded from the scope of the order are thumb tacks, which are currently classified under HTSUS subheading 7317.00.10.00.

Nails subject to the order are currently classified under HTSUS subheadings 7317.00.55.02, 7317.00.55.03, 7317.00.55.05, 7317.00.55.07, 7317.00.55.08, 7317.00.55.11, 7317.00.55.18, 7317.00.55.19, 7317.00.55.20, 7317.00.55.30, 7317.00.55.40, 7317.00.55.50, 7317.00.55.60, 7317.00.55.70, 7317.00.55.80, 7317.00.55.90, 7317.00.65.30, 7317.00.65.60 and 7317.00.75.00. Nails subject to the order also may be classified under HTSUS subheadings 7907.00.60.00, 8206.00.00.00 or other HTSUS subheadings.

While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.


## IV.    AFFILIATION

The petitioner alleges that Oman Fasteners is affiliated with its primary U.S. customer through a closer supplier relationship, and contends that the Department should conduct the antidumping analysis for Oman Fasteners on a constructed export price basis.  According to the petitioner, a close supplier relationship exists between Oman Fasteners and its customer such that the latter can control Oman Fasteners' production, pricing, and/or cost.  The Department examined the relationship between Oman Fasteners and this customer in the underlying investigation and found no affiliation between Oman Fasteners and its customer.[20]  This determination was sustained by the Court of International Trade (CIT).[21]  For the preliminary results, the Department finds that the facts have not changed between the investigation and this administrative review in a manner that would give the Department reason to change its determination of lack of affiliation in the *Final Determination.*  Due to the proprietary nature of this issue, *see* Affiliation Memorandum for a complete discussion of this issue.[22]

As discussed under "Use of Facts Otherwise Available and Adverse Inferences," OISI reported that it was affiliated with ODS in its initial questionnaire response, and that the two had overlapping ownership and intertwined operations.  However, OISI failed to respond to the Department's supplemental questionnaires regarding the relationship between the two companies.  Accordingly, for the reasons discussed in that section, we have preliminarily determined, as facts available with an adverse inference, that OISI and ODS are affiliated, pursuant to 19 CFR 351.102(b)(3).  Furthermore, for the reasons discussed in that section, we have preliminarily determined to collapse the two companies into a single entity, pursuant to 19 CFR 351.401(f).


## V.    USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

Section 776(a) of the Act provides that the Department shall, subject to section 782(d) of the Act, use the "facts otherwise available" if:  (1) necessary information is not on the record; or (2) an interested party or any other person: (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by

---

[20] *See Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value,* 80 FR 28972 (May 20, 2015), and accompanying IDM, at Comment 2, (*Final Determination*).

[21] *See Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295 (CIT 2017).

[22] For further discussion, *see* the Department's Memorandum re: Certain Steel Nails from the Sultanate of Oman: Affiliation Status of Oman Fasteners, LLC and Its U.S. Customer, dated July 31, 2017 (Affiliation Memo).

the Department, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act. Section 776(b) of the Act provides that the Department may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.

Section 776(b) of the Act provides that the Department may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. In doing so, and under the TPEA, the Department is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[23] Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the less than fair value investigation, a previous administrative review, or other information placed on the record.[24]

Section 776(c) of the Act provides that, in general, when the Department relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.[25] Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[26]

Under section 776(d) of the Act, the Department may use any dumping margin from any segment of a proceeding under an AD order when applying an adverse inference, including the highest of such margins. The TPEA also makes clear that when selecting an adverse facts available (AFA) margin, the Department is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[27]

<u>Application of AFA to OISI</u>

In response to section A of the original questionnaire, OISI reported that the same individual owned a majority of OISI and a large minority percentage of its affiliate in the United Arab Emirates (UAE), ODS.[28] Further, OISI reported that it operated exclusively as a toller for ODS.[29] Although OISI produced nails in Oman, ODS retained ownership of the raw materials

---

[23] *See* section 776(b)(1)(B) of the Act; TPEA, section 502(1)(B).
[24] *See also* 19 CFR 351.308(c).
[25] *See also* 19 CFR 351.308(d).
[26] *See* SAA at 870 (1994).
[27] *See* section 776(d)(1)-(2) of the Act; *See also* the Trade Preferences Extension Act of 2015 (TPEA), section 502(3).
[28] *See* Letter from OISI to the Department, Regarding "Steel Nails from the Sultanate of Oman: Response to Section A Questionnaire," dated December 12, 2016 (OISI Section A Response) at 10 and Exhibit A-3.
[29] *See* OISI Section A Response at 9, 13-14, 24.

and finished products.[30]  With the exception of shipping logistics, all top level OISI management and selling activity was located at ODS' headquarters.[31]  OISI's initial response to section A of the original questionnaire was deficient in several aspects, and on February 10, 2017, the Department issued a supplemental questionnaire regarding OISI's response to section A of the initial questionnaire.[32]  In the supplemental questionnaire, the Department requested further information regarding OISI's affiliation with ODS, the corporate and management structure of OISI and ODS,[33] and the intertwined operations between OISI and ODS, to enable the Department to determine whether OISI and ODS were affiliated under 19 CFR 351.102(b)(3) and should be collapsed under 19 CFR 351.401(f).[34]

Furthermore, OISI's initial response to section C of the original questionnaire was deficient in several aspects, such as regarding the correct date of sale;[35] the reconciliation of OISI's general ledger account balances to audited financial statements,[36] an explanation of how OISI can track nails it produces and those produced by ODS in its inventory;[37] an explanation of how OISI calculates the nominal weight of its products for reporting sales quantity on a kilogram basis;[38] and information regarding OISI's reported payment dates, freight expenses, indirect selling expenses, and packing expenses.[39]  Accordingly, the February 10, 2017, supplemental questionnaire also requested that OISI correct this information, which is necessary to determine whether OISI accounted for all of its U.S. market sales relating to the subject merchandise and to otherwise ensure the accuracy of the sales data provided.

On February 22, 2017, OISI submitted a request for an extension to file the company's section A and C supplemental questionnaire response, stating that "key personnel required to prepare the questionnaire have been out of office and not available to assist with its preparation."[40]  On February 22, 2017, for those reasons stated in OISI's February 22, 2017, request, the Department granted an extension for OISI to submits its section A and C supplemental questionnaire response, in part.[41]  On March 3, 2017, the Department granted another extension for OISI to submit its section A and C supplemental questionnaire response, because OISI was not served with the Department's previous letter granting an extension.[42]  The March 3, 2017 extension set

---

[30] *Id.*

[31] *See* OISI Section A Response at 8-10, 15.

[32] *See* Letter from the Department to OISI, Regarding "Administrative Review of the Antidumping Duty Order on Nails from the Oman: Supplemental Section A and C Questionnaire," dated February 13, 2017 (OISI Supplemental A and C).

[33] *Id.* at 3-4.

[34] *Id.* at 4-5.

[35] *Id.* at 5.

[36] *Id.* at 5-6.

[37] *Id.* at 6.

[38] *Id.*

[39] *Id.* at Section C, Questions 3-9.

[40] *See* Letter from OISI to the Department, Regarding "Section C Supplemental Extension Request," dated February 22, 2017.

[41] *See* Letter to OISI, "Antidumping Administrative Review of Certain Nails from Oman – Request for an Extension of Time to Submit Response to the Supplemental Section A and C Questionnaire," dated February 22, 2017.

[42] *See* Memorandum to the File, "Deadline for Response to February 13, 2017 Supplemental Questionnaire," dated March 3, 2017.

a deadline for OISI to submit its section A and C supplemental questionnaire response by March 8, 2017. OISI failed to submit a response either on or after March 8, 2017.

In accordance with section 776 of the Act, the Department preliminarily determines that the use of facts available is warranted with respect to OISI. When the Department determines that a questionnaire response is deficient, section 782(d) of the Act requires the Department to "inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency{.}" As discussed above, the Department afforded OISI an opportunity to remedy its initial questionnaire response by issuing a supplemental questionnaire, but the company did not provide any of the information requested by the Department in the supplemental questionnaire.

As discussed above, some record information indicates that OISI and ODS are affiliated within the meaning of 19 CFR 351.102(b)(3): management of both companies is intertwined, and OISI is exclusively a toller for ODS, such that that the relationship between the two may impact decisions concerning the production, pricing, or cost of the nails produced by OISI for ODS. Furthermore, some record information indicates that OISI and ODS have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities, and that there is a significant potential for OISI and ODS to manipulate price or production due to their common ownership, managers, and intertwined operations, within the meaning of 19 CFR 351.401(f). However, without the information sought in the February 10, 2017, supplemental questionnaire, the Department does not have enough information on the record to make either determination. Accordingly, pursuant to section 776(a)(1) of the Act, the Department preliminarily determines that necessary information is not on the record with regard to whether OISI and ODS are affiliated under 19 CFR 351.102(b)(3), or should be collapsed and treated as a single entity under 19 CFR 351.401(f). Additionally, because OISI did not respond to the Department's February 10, 2017, supplemental questionnaire, the Department preliminarily determines that OISI withheld information requested by the Department, failed to provide the supplemental information by the specified deadline even after the Department extended the deadline, and, thus significantly impeded the proceeding, pursuant to section 776(a)(2) of the Act. The Department has thus preliminarily determined to use facts available in reaching the affiliation and collapsing determinations under section 776(a) of the Act.

Furthermore, the Department preliminarily determines that the application of an adverse inference to its facts available determination is warranted under section 776(b)(1) of the Act. In failing to respond to the Department's supplemental questionnaire, OISI failed to cooperate by not acting to the best of its ability to comply with a request for information by the Department. Thus, as AFA, the Department has preliminarily determined that OISI and ODS are affiliated entities, pursuant to 19 CFR 351.102(b)(3), and that OISI and ODS are a single entity within the meaning of 19 CFR 351.401(f). Thus, the Department has preliminarily collapsed OISI with ODS, and are assigning the collapsed entities a single rate.

The Department also preliminarily determines that the single rate to be applied to the collapsed OISI entity must be based on facts available. As discussed above, without the information requested in the Department's February 10, 2017, supplemental questionnaire, the Department is

unable to determine whether OISI accounted for all of its U.S. market sales and expenses relating to the subject merchandise. Thus, the Department is unable to rely on OISI's submitted U.S. market sales. Because the necessary information to calculate a margin for OISI is not on the record, the use of facts available for the preliminary results of review is warranted, pursuant to section 776(a)(1) of the Act. Furthermore, because OISI has withheld requested information, failed to provide such information in the form and manner required, and impeded this review, the use of facts available for the preliminary results is warranted, pursuant to sections 776(a)(2)(A), (B), and (C) of the Act.

Furthermore, despite the request for additional information pursuant to 782(d) of the Act, OISI has failed to cooperate by not acting to the best of its ability to comply with a request for information from the Department, pursuant to section 776(b)(1) of the Act. Moreover, the Department preliminarily determines, pursuant to 782(e) of the Act, that the deficiencies in OISI's reported U.S. sales data are too extensive for the Department to reliably use the information in calculating a margin. Consequently, the Department has preliminarily determined that, in selecting from among the facts otherwise available, an adverse inference is warranted.[43] Accordingly, the Department is assigning to the collapsed OISI entity a margin based on AFA.

Corroboration of Information Used for OISI as Adverse Facts Available

Where the Department assigns a margin based on AFA because a respondent failed to cooperate by not acting to the best of its ability to timely comply with a request for information, section 776(b)(2) of the Act authorizes the Department to rely on information derived from the petition, a final determination, a previous administrative review, or other information placed on the record.[44] Under section 776(d) of the Act, the Department may use any dumping margin from any segment of a proceeding under an antidumping duty order when applying an adverse inference, including the highest of such margins.[45] The TPEA also makes clear that when selecting an AFA margin, the Department is not required to estimate what a dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged" commercial reality" of the interested party.[46] Further, section 776(c) of the Act requires that, to the extent practicable, the Department corroborate secondary information from independent sources that are reasonably at its disposal, except that the Department is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.[47]

We have preliminarily determined to apply, as AFA, a margin of 154.33 percent, which was alleged by the petitioner in the petition filed in this investigation.[48] In selecting a facts available margin, we sought a margin that is sufficiently adverse so as to effectuate the statutory purposes

---

[43] *See* section 776(b) of the Act.

[44] *See* section 776(b)(2) of the Act; *see also* SAA at 868-870; 19 CFR 351.308(c)(1) & (2).

[45] *See* section 776(d)(1)-(2) of the Act; TPEA, section 502(3).

[46] *See* section 776(d)(3) of the Act; TPEA section 502(3).

[47] *See* section 776(c)(2) of the Act; TPEA section 502(2).

[48] *See Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 79 FR 36019, 36023-36024 (June 25, 2014).

of the AFA rule, which is to induce respondents to provide the Department with complete and accurate information in a timely manner.[49]  Because the margin alleged in the petition is secondary information under section 776(c)(1) of the Act, in order to determine the probative value of the dumping margin alleged in the petition for assigning an AFA rate, we examined the information on the record.  We compared the petition dumping margin of 154.33 percent to the transaction-specific margins calculated for Oman Fasteners, which were not calculated using total AFA.  We preliminarily find that the 154.33 percent petition margin falls within the range of the highest transaction-specific margins calculated for Oman Fasteners, which appear to be non-aberrational sales in terms of transaction quantities or other such terms when compared with other sales in Oman Fasteners' database.[50]  Thus, in accordance with section 776(c)(1) of the Act, we have preliminarily corroborated the highest dumping margin contained in the petition, 154.33 percent, as AFA, using transaction-specific margins from the mandatory respondent Oman Fasteners.

## VI.    DISCUSSION OF THE METHODOLOGY

Normal Value Comparisons

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Oman Fasteners' sales of the subject merchandise from Oman to the United States were made at less than normal value (NV), the Department compared the export price (EP) to the NV as described in the "Export Price" and "Normal Value" sections of this memorandum.

### A.  Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), the Department calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs (*i.e.*, the average-to-average method) unless the Secretary determines that another method is appropriate in a particular situation.  In less-than-fair-value investigations, the Department examines whether to compare weighted-average NVs with the EPs of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern the Department's examination of this question in the context of administrative reviews, the Department nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in less-than-fair-value investigations.[51]

In recent investigations, the Department applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation

---

[49] *See* SAA at 870. *See also, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers from the Republic of Korea*, 77 FR 75988, 75990 (December 26, 2012).
[50] *See* Memorandum entitled, "2014-2016 Antidumping Duty Administrative Review of Certain Steel Nails from the Sultanate of Oman, Preliminary Results Analysis for Oman Fasteners LLC" dated concurrently with this memorandum (Oman Fasteners' Preliminary Analysis Memorandum) at 6.
[51] *See Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012) and the accompanying Issues and Decision Memorandum at comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286 (Ct. Int'l Trade 2014).

pursuant to 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[52]  The Department finds that the differential pricing analysis used in recent investigations may be instructive for purposes of examining whether to apply an alternative comparison method in this administrative review. The Department will continue to develop its approach in this area based on comments received in this and other proceedings, and on the Department's additional experience with addressing the potential masking of dumping that can occur when the Department uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these preliminary results examines whether there exists a pattern of EPs for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchaser, region and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (i.e., zip code or state code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POR based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region and time period, that the Department uses in making comparisons between EP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (i.e., weighted-average price) of a test group and the mean (i.e., weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium or large (0.2, 0.5 and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (i.e., 0.8) threshold.

---

[52] *See, e.g., Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair*, 78 FR 33351 (June 4, 2013); *Steel Concrete Reinforcing Bar From Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); or *Welded Line Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.,* the Cohen's *d* test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, the Department examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, the Department tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: 1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or 2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in these preliminary results, including arguments for modifying the group definitions used in this proceeding.

### B. *Results of the Differential Pricing Analysis*

For Oman Fasteners, based on the results of the differential pricing analysis, the Department preliminarily finds that 67.31 percent of the value of U.S. sales pass the Cohen's *d* test,[53] and confirms the existence of a pattern of prices that do not differ significantly among purchasers, regions, or time periods.[54] Thus, for these preliminary results, the Department is applying the average-to average method to all U.S. sales to calculate the weighted-average dumping margin for Oman Fasteners.

---

[53] *See* Oman Fasteners' Preliminary Analysis Memorandum at 2.

[54] We did conduct a differential pricing analysis for OISI because, as noted below, we applied adverse facts available to the company.

Product Comparisons

In accordance with section 771(16) of the Act, we considered all products produced and sold by Oman Fasteners in Oman during the POR that fit the description in the "Scope of the Order" section of the accompanying *Federal Register* notice to be foreign like products for purposes of determining NV for the subject merchandise sold in the United States.  Pursuant to 19 CFR 351.414(f)(3), we compared Oman Fasteners U.S. sales to foreign like product sales made in the home market, where appropriate.

Where there were no sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales, according to section 771(16)(A) of the Act, we compared U.S. sales to sales of the most similar foreign-like product made in the ordinary course of trade.  In making the product comparisons, we matched foreign-like products based on the physical characteristics reported by the respondents to the product sold in the United States.  In the order of importance, these physical characteristics are as follows:  nail form, product form, steel type, surface finish, diameter, shank length, collation material, head style, shank style, and heat treatment.

Date of Sale

Section 351.401(i) of the Department's regulations states that, in identifying the date of sale of the merchandise under consideration or foreign like product, the Department normally will use the date of invoice, as recorded in the exporters or producers records kept in the ordinary course of business.  However, the regulations permit the Department to use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[55]  The Department has a long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[56]

Oman Fasteners reported the sale invoice date as the date of sale for its U.S. sales.[57]  Oman Fasteners reported the sale invoice date because all material terms are set at the time of invoice.  Consistent with our practice, the Department has preliminary determined to use the invoice date as the date of sale.

---

[55] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[56] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand,* 69 FR 76918 (December 23, 2004), and accompanying Issues and Decision Memorandum at Comment 10; *see also Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany, 67 FR 35497* (May 20, 2002), and accompanying Issues and Decision Memorandum at Comment 2.

[57] *See* Oman Fasteners' section C questionnaire response, dated January 3, 2017, at 11

13

Export Price

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)." In accordance with section 772(a) of the Act, we used the EP methodology for Oman Fasteners because the merchandise under consideration was sold directly to the first unaffiliated purchaser in the United States before the date of importation by the producer or exporter of the merchandise under consideration outside the United States and the use of CEP was not otherwise warranted.[58]

We based EP on packed prices to the first unaffiliated customer for all sales destined for the United States. We based the starting price on the prices to unaffiliated purchasers in, or for exportation to, the United States. We made deductions from the starting price for movement expenses, where appropriate, in accordance with section 772(c)(2)(A) of the Act.[59]

Normal Value

    A. Comparison Market Viability

Section 773(a)(1) of the Act directs that NV be based on the price at which the foreign like product is sold in the comparison market, provided that the merchandise is sold in sufficient quantities (or value, if quantity is inappropriate) and that there is no particular market situation that prevents a proper comparison with the export price. Section 773(a)(1)(C) of the Act contemplates that quantities (or values) will normally be considered insufficient if they are less than five percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

In order to determine whether there was a sufficient volume of sales in the home market or in the third country to serve as a viable basis for calculating NV, we compared Oman Fasteners' volume of home-market and third-country sales of the foreign like product to the respective volume of U.S. sales of the subject merchandise in accordance with sections 773(a)(1)(B) and (C) of the Act. Oman Fasteners' aggregate volumes of sales of foreign like product in the home market or in third-country markets were not greater than five percent of the company's sales of subject merchandise to the United States. Therefore, Oman Fasteners' sales in the home market or in the third-country markets are not viable as comparison markets. Consequently, we based NV on constructed value (CV) for Oman Fasteners.

    B. Calculation of Normal Value Based on CV

In accordance with section 773(a)(4) of the Act, we used CV as the basis for NV because Oman Fasteners did not have a viable comparison market. We calculated CV in accordance with section 773(e) of the Act. We included the cost of materials and fabrication, selling, general and administrative (G&A) expenses, interest expenses, U.S. packing expenses, and profit in the calculation of CV. We relied on Oman Fasteners' submitted materials and fabrication costs,

---

[58] *Id.* at 9.
[59] For further discussion, *see* Oman Fasteners' Preliminary Analysis Memorandum.

G&A, interest expenses, and U.S. packing costs, except in instances where we determined that the information was not valued correctly, as described below. Based on our examination of the record evidence, Oman Fasteners did not appear to experience significant changes in the cost of manufacturing during the POR. Therefore, we followed our normal methodology of calculating an annual weighted-average cost.

Because Oman Fasteners does not have a viable home or third-country market, we are unable to calculate a CV profit ratio using the preferred method under section 773(e)(2)(A) of the Act, *i.e.*, based on the respondent's own home-market or third-country sales made in the ordinary course of trade. When the preferred method is unavailable, we must instead rely on one of the three alternatives outlined in sections 773(e)(2)(B)(i) through (iii) of the Act. Those alternatives are: (i) the use of the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale of merchandise that is in the same general category of products as the subject merchandise; (ii) the use of the weighted average of the actual amounts incurred and realized by exporters or producers (other than the respondent) that are subject to the investigation or review; or (iii) based on any other reasonable method, except that the amount for profit may not exceed the amount realized by exporters or producers (other than the respondent) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap").

Because Oman Fasteners manufactures only nails and did not sell any non-subject comparable merchandise in the home market during the POR, we are unable to calculate profit under section 773(e)(2)(B)(i), *i.e.*, based on sales of the same general category of product. Further, as Oman Fasteners is the only respondent in this review for which there will be a calculated margin, we are unable to calculate profit under 773(e)(2)(B)(ii), *i.e.*, based on the preferred method of averaging the profit ratios of the other exporters or producers being examined. Thus, we must calculate profit under section 773(e)(2)(B)(iii), *i.e.*, any other reasonable method.

We have considered ten possible options for CV profit under section 773(e)(2)(B)(iii) based on the information on the record of this investigation: (1) calendar year (CY) 2015 audited financial statements of Al Jazeera Steel Products Co. SAOG (Al Jazeera), a producer of steel bars and pipes in Oman;[60] (2) CY 2015 audited financial statements of Larsen & Toubro (Oman) LLC (Larsen & Toubro), a construction company executing projects in the oil and gas industries in Oman;[61] (3) CY 2015 audited financial statements of Hi-Tech Fastener Manufacturer (Thailand) Co., Ltd. (Hi-Tech), a producer of screws and rivets in Thailand;[62] (4) CY 2015 audited financial statements of Bangkok Fastening Co., Ltd. (Bangkok Fastening), a producer of fasteners, nails, wire rods, and various types of wires in Thailand;[63] (5) CY 2015 audited financial statements of VTPG-Stroymat OOD (VTPG), a producer of wire, nails, meshes, welded meshes, and armature

---

[60] *See* Oman Fasteners' Submission of Factual Information for CV Profit and Selling Expenses, dated March 6, 2017 at Exhibit 1.

[61] *Id* at Exhibit 2.

[62] *See* Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 10.

[63] *See* Oman Fasteners' Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 2.

in Bulgaria;[64] (6) CY 2015 audited financial statements of Special Wires and Nails AD Ruse (Special Wires), a producer of nails, drawing wires, meshes, and wire articles in Bulgaria;[65] (7) fiscal year (FY) 03/2015 audited financial statements of Astrotech Steels Pvt. Ltd. (Astrotech), a producer of plastic strip, wire coil, paper strip, and bulk nails in India;[66] (8) FY 03/2016 audited financial statements of Utech Fasten Pvt. Ltd. (Utech), a producer of pneumatic tools, industrial staplers, steel nails, coil nails, and varied other products in India;[67] (9) FY 03/2016 audited financial statements of H.D. Wires Pvt. Ltd. (HD Wires), a producer of galvanized wire, M.S. wires, weldmesh, hard drawn steel wire, and binding wire in India;[68] and (10) FY 03/2015 audited financial statements of Geekay Wires Pvt. Ltd. (Geekay), a producer of HTGS earth wire, stay wire, hot dip galvanized wire, and nails/fasteners in India.[69]

We acknowledge that each of these options has its limitations. The difficulty of this issue revolves around the conflict between the statutory preference that CV profit reflects the production and sale of merchandise in the market under consideration and the need for the profit to reasonably reflect the merchandise under investigation. We have analyzed these financial statements pursuant to the analysis established in *Pure Magnesium from Israel* and *CTVs from Malaysia*.[70] Pursuant to that analysis, we have considered: (1) the similarity between a potential surrogate's business operations and products and the products and operations of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of the customer base between a potential surrogate and the respondent.

We first discuss the similarity between a potential surrogate's business operations and products and the products and operations of the respondent, as well as the similarity of the customer base between a potential surrogate and the respondent.

First, with respect to each of the Omani companies, in the investigation of this proceeding, we found that Larsen & Toubro (a construction company executing projects in the oil and gas industries), and Al Jazeera (a producer of steel bars and pipes) did not produce or sell merchandise identical or comparable to the subject merchandise.[71] After reviewing the financial

---

[64] *See* Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 7.

[65] *See* Oman Fasteners' Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 3.

[66] *See* Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 2.

[67] *See* Oman Fasteners' Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 4.

[68] *Id* at Exhibit 5.

[69] *Id* at Exhibit 6.

[70] *See Notice of Final Determination of Sales at Less than Fair Value: Pure Magnesium from Israel*, 66 FR 49349 (Sept. 27, 2001) (*Pure Magnesium from Israel*) and accompanying Issues and Decision Memorandum at Comment 8; *Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 FR 20592 (April 16, 2004) (*CTVs from Malaysia*) and accompanying Issues and Decision Memorandum at Comment 26.

[71] *See Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 80 FR 28972 (May 20, 2015) and accompanying Issues and Decision Memorandum at Comment 1; *see also Final Results of Redetermination Pursuant to Court Order,* dated May 18, 2017 (issued pursuant to *Mid Continent Steel &*

16

statements of both companies on the record of the instant review, we preliminarily find that each company's business activities have not changed. Accordingly, we continue to determine that Al Jazeera and Larsen & Toubro do not produce merchandise in the same general category of merchandise as steel nails. We preliminarily find that, although Al Jazeera and Larsen & Toubro represent the profit of Omani companies, their business operations, production processes, and products are dissimilar to Oman Fasteners'. We further preliminarily find that the customer bases of Al Jazeera and Larsen & Toubro are dissimilar to Oman Fasteners' customer base.

Second, with respect to Hi-Tech, the Department has recently found that it is a producer of comparable merchandise to that of steel nails, and relied upon one of Hi-Tech's financial statements to calculate CV profit for Oman Fasteners in the course of the underlying investigation for this proceeding.[72] However, although Hi-Tech produces comparable merchandise, the record contains financial statements from producers of nails, and thus Hi-Tech's business operations, products, and customer base are not the most similar to those of Oman Fasteners in this proceeding.

Similarly, regarding HD Wires and Geekay, the principle business activity for each company is manufacturing wires which accounts for 99 percent and 99.32 percent, respectively, of each company's total turnover.[73] Although the record contains screen prints from HD Wires' website that suggest it offers nails for purchase, nothing in HD Wires' financial statements indicates that it produces nails. Thus, although HD Wires and Geekay may have similar business operations and production processes as Oman Fasteners, we preliminarily find that HD Wires and Geekay do not represent the profit experience of a predominant nail producer like Oman Fasteners to the same extent as the financial statement of Astrotech, a predominant nail producer (discussed below), on this record. Moreover, because HD Wires and Geekay are predominantly wire producers, we preliminarily find that these two companies do not represent the most similar customer base as compared to Oman Fasteners' customer base.

The record contains the financial statements of Bangkok Fastening, VPTG, Special Wires, and Utech; all of which produce nails along with a mixture of several other products. However, the record lacks information regarding Bangkok Fastening's, Special Wires's, and Utech's production of nails as a percentage of their business operations or total production. Accordingly, no evidence on the record indicates whether these companies are predominant producers of nails. Similarly, VPTG's financial statements indicate that approximately 16 percent of its production is nails.[74] Thus, although these four companies may have similar business operations and production processes as Oman Fasteners, we preliminarily find that these companies do not

---

*Wire, Inc. v. United States*, CIT No. 15-214, Slip Op. 17-05), available at
http://enforcement.trade.gov/remands/index.html.
[72] *See Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value,* 80 FR 28972 (May 20, 2015) and accompanying Issues and Decision Memorandum at Comment 1; *see also Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review,* 79 FR 19316 (April 8, 2014) and accompanying Issues and Decision Memorandum at Comment 2.
[73] *See* Oman Fasteners' Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibits 5 and 6.
[74] *See* Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 7.

represent the profit experience of an exclusive nail producer like Oman Fasteners to the same extent as the financial statement of Astrotech (discussed below) on this record.

In contrast, after reviewing the financial statements of Astrotech, the Department finds that Astrotech is an integrated producer of steel nails that does not produce or sell other products.[75] As such we find that Astrotech has the most similar business operations, production processes, and products as compared to Oman Fasteners, which also exclusively produces nails.  Moreover, because Astrotech exclusively produces nails, we preliminarily find that its customer base will be the most similar to that of Oman Fasteners.

Regarding the extent to which a potential surrogate has sales in the United States and the home market, Oman Fasteners asserts, based on third party export data from a port close to Astrotech, that approximately 84 percent of the value of Astrotech's revenue for 2016 is from sales of nails to the United States[76]  However, the data supporting Astrotech's percentage of exports to the United States is from CY 2016, whereas the financial statements are FY 2015.[77]  Therefore, the export data referenced by Oman Fasteners do not overlap with the financial information contained in Astrotech's FY 03/2015 financial statements.  The Department preliminarily determines that there is no information on the record regarding Astrotech's percentage of exports to the U.S. for FY 2015,[78] nor do the other financial statements indicate the percentage of each companies' exports to the United States during the period covered by the financial statement.

We have weighed the above considerations to select a reasonable source for CV profit data among the available options before us, and we have preliminarily determined to calculate CV profit using only Astrotech's financial statements, in accordance with section 773(e)(2)(B)(iii) of the Act.  However, we have been normally unable to calculate the amount normally realized by exporters or producers (other than the respondent) in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category as steel nails, because, as discussed above, we have preliminarily determined that the two Omani financial statements on our record are from companies whose business operations, production processes, and products are so dissimilar from those of Oman Fasteners that the Omani companies' products are not within the same general category of merchandise as steel nails.  Accordingly, the record does not contain information for calculating a profit cap.

Pursuant to section 776(a) of the Act, where necessary information is not on the record of a proceeding, the Department shall use facts otherwise available.  Accordingly, we have considered whether information on the record could be useable as a facts available profit cap. However, our analysis of the financial statements on our record leads us to conclude that, for the reasons discussed above, no financial statements on the record of this proceeding would better fulfill the purpose of the profit cap than the financial statements we have preliminarily

---

[75] See Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 2.
[76] See Oman Fasteners' Submission of Rebuttal Factual Information for CV Profit and Selling Expenses, dated April 13, 2017 at Exhibits 1 and 2.
[77] Id.
[78] See Petitioner's Submission of Factual Information for CV Profit and Selling Expenses, dated April 6, 2017 at Exhibit 2.

determined to use to calculate CV profit under any other reasonable method.  Therefore, because there is no other information available on the record, as facts available, we are preliminarily applying option (iii) of section 773(e)(2)(B) of the Act, without quantifying a facts available profit cap.

While Oman Fasteners asserts that the Department is required by the statute to calculate a profit cap, we note that the SAA makes clear that the Department may calculate CV profit without a profit cap, particularly, as is the case here, where there is no viable domestic market in the exporting country for merchandise that is in the same general category of products as the subject merchandise.  In numerous previous cases, the Department calculated CV profit under section 773(e)(2)(B)(iii) of the Act without quantifying the profit cap, as facts available.[79]  The legislative history indicates that Congress recognized that there may be instances where, due to a lack of data, the Department would need to use facts available and calculate a CV profit rate pursuant to section (iii) of the Act without quantifying a profit cap.[80]  With respect to this provision of the statute, Congress intended the profit cap to be:  (1) based on home market sales information of the same general category of products as the subject merchandise, (2) non-aberrational to the industry under consideration (*i.e.*, "the amount normally realized"), and (3) not based on the data of the respondent for which the Department is calculating CV.[81] Accordingly, we have examined the available data on the record and conclude that there is no information that would meet these standards.  As such, we are unable to calculate the profit normally realized by producers other than Oman Fasteners in connection with domestic market sales of merchandise in the same general category as the subject merchandise.  Consequently, in accordance with the statute, we have not quantified a profit cap in applying the statutory alternative to determine CV profit for Oman Fasteners.

Finally, With respect to indirect selling expenses, because Oman Fasteners does not have a viable home market or third-country market, the Department does not have comparison market selling expenses to use in its calculations, as directed by section 773(e) of the Act.  As an alternative, to calculate selling expenses the Department has used the same financial statements that it used to calculate CV profit (*i.e.*, only Astrotech's), in accordance with section 773(e)(2)(B)(iii) of the Act.[82]

## C.  Level of Trade

In accordance with section 773(a)(1)(B)(i) of the Act, to the extent practicable, we determine NV based on sales in the comparison market at the same level of trade (LOT) as the EP.[83]  The LOT for NV is based on the starting prices of sales in the home market or, when NV is based on CV,

---

[79] *See, e.g., SSPC from Belgium* at Comment 3; *Lined Paper from India*, and accompanying Issues and Decision Memorandum at Comment 3; and *Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 FR 17422 (March 26, 2012) and accompanying Issues and Decision Memorandum at Comment 26.
[80] *See* SAA at 841.
[81] *See* SSPC from Belgium at Comment 3.
[82] *See* Analysis Memo, at Exhibit I and Petitioner's Submission of New Factual Information on Constructed Value Profit and Selling Expenses, dated October 31, 2014 at Exhibit 7B.
[83] *See also* section 773(a)(7)(A) of the Act.

those of the sales from which we derived selling, general, and administrative expenses and profit.[84]  For EP, the LOT is based on the starting price, which is usually the price from the exporter to the importer.[85]

To determine whether NV sales are at a different LOT than EP or CEP sales, we examine stages in the marketing process and selling functions along the chain of distribution between the producer and the unaffiliated customer.  If the comparison-market sales are at a different LOT, and the difference affects price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison market sales at the LOT of the export transaction, we make a LOT adjustment under section 773(a)(7)(A) of the Act.

### Oman Fasteners

Because Oman Fasteners has no viable comparison market,[86] and because we based CV selling expenses on Oman Fasteners' financial statement (which records selling expenses for more than just subject merchandise, and which does not break out selling expenses by level of trade or by merchandise), we have no way of conducting a level of trade analysis.  Accordingly, we made no LOT adjustment to Oman Fasteners' NV.

### D.  Cost of Production Analysis

On June 29, 2015, the President of the United States signed into law the Trade Preferences Extension Act of 2015 (TPEA), which made numerous amendments to the AD and countervailing duty law, including amendments to section 773(b)(2) of the Act, regarding the Department's requests for information on sales at less than the cost of production (COP).[87]  This law does not specify dates of application for those amendments.[88]  On August 6, 2015, the Department published an interpretative rule, in which it announced the applicability dates for each amendment to the Act, except for amendments contained in section 771(7) of the Act, which relate to determinations of material injury by the U.S. International Trade Commission.[89]  Section 773(b)(2)(A)(ii) of the Act controls all determinations in which the complete initial questionnaire has not been issued as of August 6, 2015.  It requires the Department to request CV and COP information from respondent companies in all AD proceedings.[90]

Accordingly, the Department requested this information from Oman Fasteners in this administrative review.[91]  We examined Oman Fasteners' cost data and determined that our quarterly cost methodology is not warranted.[92]  We therefore applied our standard methodology of using annual costs based on the reported data.

---

[84] *See* 19 CFR 351.412(c)(1)(iii).

[85] *See* 19 CFR 351.412(c)(1)(i).

[86] *See* Oman Fasteners December 12, 2016, Section A Questionnaire Response at 2.

[87] *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).

[88] The 2015 amendments may be found at https://www.congress.gov/bill/114th-congress/house-bill/1295/text/pl.

[89] *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793 (August 6, 2015).

[90] *Id.*, 80 FR at 46794-95.

[91] *See* Letter from the Department to Oman Fasteners, Regarding Antidumping Questionnaire, dated November 9, 2016, at 1 and 103; *see also* Letter from the Department to OISI, Regarding Antidumping Questionnaire, dated November 9, 2016, at 1 and 103.

[92] We did not examine OISI's cost data because, as noted below, we applied adverse facts available to the company.

*Calculation of Cost of Production*

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of costs of materials and fabrication for the foreign like product, plus amounts for general and administrative (G&A) expenses and interest expenses. We relied on the COP data submitted by Oman Fasteners.

E.    *Currency Conversion*

We made currency conversions into U.S. dollars in accordance with section 773A of the Act and 19 CFR 351.415, based on the exchange rates in effect on the dates of the U.S. sales as certified by the Federal Reserve Bank.

## VII.    RECOMMENDATION

We recommend applying the above methodologies for these preliminary results of review.

☒                              ☐
_____                      _____
Agree                          Disagree

7/31/2017

X  _____

Signed by: GARY TAVERMAN

_____
Gary Taverman
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance

# EXHIBIT I

# UNITED STATES COURT OF INTERNATIONAL TRADE
## Hon. M. Miller Baker

———————————————————————

|  |  |
|---|---|
| OMAN FASTENERS, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )  Court No. 22-00348 |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |

———————————————————————

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Rules of this Court, Plaintiff Oman

Fasteners, LLC ("Oman Fasteners") respectfully moves for this Court for a

preliminary injunction to bar Defendant the United States, as well as all of

its officers and agencies, from taking any action to enforce, implement, or

execute the Department of Commerce's ("Commerce") *Final Results of the*

*Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 78,639

(Dec. 22, 2022), in *Certain Steel Nails from the Sultanate of Oman*, No. A-523-

808. The requested injunction includes, but is not limited to, a prohibition

against Defendant attempting to require the collection of estimated

antidumping duty deposits from Oman Fasteners on entry of subject

merchandise into the United States at the 154.33% rate set by Commerce in the *Final Results*.

For the reasons set forth in the accompanying Memorandum in Support, (1) Oman Fasteners is likely to prevail on the merits of its claims that Commerce's determination to impose a 154.33% duty rate is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise contrary to law; (2) Oman Fasteners will suffer serious—indeed existential—irreparable harm absent a preliminary injunction; (3) the balance of harms greatly favors Oman Fasteners, and (4) the public interest will be served by granting the requested injunction.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and enjoin the Defendant and its agents from implementing Commerce's *Final Results*, including by enjoining Defendant, including without limitation the U.S. Department of Commerce and U.S. Customs and Border Protection, from requiring the deposit of estimated antidumping duties equal to the 154.33% rate when Oman Fasteners' subject merchandise enters the United States.

Dated:     December 26, 2022

/s/ Michael R. Huston
Michael R. Huston
Michael P. House
Andrew Caridas
**Perkins Coie LLP**
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6288
mhouse@perkinscoie.com

*Counsel for Oman Fasteners*

# EXHIBIT J

## Final Results of Review

In accordance with 19 CFR 351.221(b)(4)(i), we calculated a countervailable subsidy rate for mandatory respondents Jiangsu Alcha and Alcha International. We determined the countervailable subsidy rate for Yinbang Clad based entirely on AFA, in accordance with section 776 of the Act. Because there are no other producers or exporters subject to this review and not selected for individual examination (*i.e.,* non-selected companies), Commerce does not need to establish the rate for non-selected companies in this review.

Commerce determines that, for the period January 1, 2020, through December 31, 2020, the following net countervailable subsidy rates exist:

| Company | Subsidy rate (percent *ad valorem*) |
| --- | --- |
| Jiangsu Alcha Aluminium Co., Ltd.[9]/Alcha International Holdings Limited [10] ................................. | 17.80 |
| Yinbang Clad Material Co., Ltd ................................. | * 252.22 |

* Rate based on AFA.

## Disclosure

Commerce will disclose to the parties in this proceeding the calculations performed for these final results within five days of the date of publication of this notice in the **Federal Register**.[11]

## Assessment Rates

Pursuant to sections 751(a)(1) and (a)(2)(C) of the Act and 19 CFR 351.212(b)(2), Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, countervailing duties on all appropriate entries of subject merchandise covered by this review.

Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of these final results of review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a

statutory injunction has expired (*i.e.,* within 90 days of publication).

## Cash Deposit Instructions

Pursuant to section 751(a)(1) and (a)(2)(C) of the Act, Commerce intends to instruct CBP to collect cash deposits of estimated countervailing duties in the amounts shown for the companies listed above on shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review. These cash deposit instructions, when imposed, shall remain in effect until further notice.

## Administrative Protective Order

This notice also serves as a reminder to parties subject to an administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

## Notification to Interested Parties

Commerce is issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(5).

Dated: August 30, 2022.

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix

## List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes Since the *Preliminary Results*
IV. Scope of the *Order*
V. Subsidies Valuation
VI. Loan Interest Rate Benchmarks, Discount Rates, and Benchmarks
VII. Use of Facts Otherwise Available and Adverse Inferences
VIII. Analysis of Programs
IX. Analysis of Comments
    Comment 1: Whether Commerce Should Apply Adverse Facts Available (AFA) to the Export Buyer's Credit (EBC) Program
    Comment 2: Whether Commerce Should Make Certain Revisions to its Calculation of the Benchmark for Primary Aluminum for Less Than Adequate Remuneration (LTAR)
    Comment 3: Whether Commerce Should Use Distinct Benchmarks to Calculate the Benefit from Primary Aluminum for LTAR Provided to Jiangsu Alcha and Baotou Alcha

    Comment 4: Whether Commerce Should Assign an AFA Rate for Policy Loans to the Aluminum Sheet Industry to Baotou Alcha
    Comment 5: Whether Commerce Should Revise Baotou Alcha's Benefit Calculation for Policy Loans to the Aluminum Sheet Industry
    Comment 6: Whether Commerce Should Modify the Total AFA Rate Applied to Yinbang Clad
X. Recommendation

[FR Doc. 2022–19193 Filed 9–2–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

## International Trade Administration

## Initiation of Antidumping and Countervailing Duty Administrative Reviews

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) has received requests to conduct administrative reviews of various antidumping duty (AD) and countervailing duty (CVD) orders with July anniversary dates. In accordance with Commerce's regulations, we are initiating those administrative reviews.

**DATES:** Applicable September 6, 2022.

**FOR FURTHER INFORMATION CONTACT:** Brenda E. Brown, AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230, telephone: (202) 482–4735.

**SUPPLEMENTARY INFORMATION:**

## Background

Commerce has received timely requests, in accordance with 19 CFR 351.213(b), for administrative reviews of various AD and CVD orders with July anniversary dates.

All deadlines for the submission of various types of information, certifications, or comments or actions by Commerce discussed below refer to the number of calendar days from the applicable starting time.

## Notice of No Sales

With respect to antidumping administrative reviews, if a producer or exporter named in this notice of initiation had no exports, sales, or entries during the period of review (POR), it must notify Commerce within 30 days of publication of this notice in the **Federal Register**. All submissions must be filed electronically at *https:// access.trade.gov,* in accordance with 19

---

[9] This rate applies to Jiangsu Alcha and its cross-owned companies: Baotou Alcha and Alcha Materials.

[10] We cumulated the benefits from subsidies received by Alcha International, which exported subject merchandise produced by Jiangsu Alcha, to the United States during the POR, with the benefits from subsidies received by Jiangsu Alcha, during the POR in accordance with 19 CFR 351.525(c). For further discussion, *see* the Issues Decision Memorandum at "Attribution of Subsidies."

[11] *See* 19 CFR 351.224(b).

CFR 351.303.[1] Such submissions are subject to verification, in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act). Further, in accordance with 19 CFR 351.303(f)(1)(i), a copy must be served on every party on Commerce's service list.

**Respondent Selection**

In the event Commerce limits the number of respondents for individual examination for administrative reviews initiated pursuant to requests made for the orders identified below, Commerce intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POR. We intend to place the CBP data on the record within five days of publication of the initiation notice and to make our decision regarding respondent selection within 35 days of publication of the initiation **Federal Register** notice. Comments regarding the CBP data and respondent selection should be submitted within seven days after the placement of the CBP data on the record of this review. Parties wishing to submit rebuttal comments should submit those comments within five days after the deadline for the initial comments.

In the event Commerce decides it is necessary to limit individual examination of respondents and conduct respondent selection under section 777A(c)(2) of the Act, the following guidelines regarding collapsing of companies for purposes of respondent selection will apply. In general, Commerce has found that determinations concerning whether particular companies should be "collapsed" (*e.g.,* treated as a single entity for purposes of calculating antidumping duty rates) require a substantial amount of detailed information and analysis, which often require follow-up questions and analysis. Accordingly, Commerce will not conduct collapsing analyses at the respondent selection phase of this review and will not collapse companies at the respondent selection phase unless there has been a determination to collapse certain companies in a previous segment of this AD proceeding (*e.g.,* investigation, administrative review, new shipper review, or changed circumstances review). For any company subject to this review, if Commerce determined, or continued to treat, that company as collapsed with others, Commerce will assume that such

companies continue to operate in the same manner and will collapse them for respondent selection purposes. Otherwise, Commerce will not collapse companies for purposes of respondent selection.

Parties are requested to (a) identify which companies subject to review previously were collapsed, and (b) provide a citation to the proceeding in which they were collapsed. Further, if companies are requested to complete the Quantity and Value (Q&V) Questionnaire for purposes of respondent selection, in general, each company must report volume and value data separately for itself. Parties should not include data for any other party, even if they believe they should be treated as a single entity with that other party. If a company was collapsed with another company or companies in the most recently completed segment of this proceeding where Commerce considered collapsing that entity, complete Q&V data for that collapsed entity must be submitted.

**Deadline for Withdrawal of Request for Administrative Review**

Pursuant to 19 CFR 351.213(d)(1), a party that has requested a review may withdraw that request within 90 days of the date of publication of the notice of initiation of the requested review. The regulation provides that Commerce may extend this time if it is reasonable to do so. Determinations by Commerce to extend the 90-day deadline will be made on a case-by-case basis.

**Deadline for Particular Market Situation Allegation**

Section 504 of the Trade Preferences Extension Act of 2015 amended the Act by adding the concept of a particular market situation (PMS) for purposes of constructed value under section 773(e) of the Act.[2] Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." When an interested party submits a PMS allegation pursuant to section 773(e) of the Act, Commerce will respond to such a submission consistent with 19 CFR 351.301(c)(2)(v). If Commerce finds that a PMS exists under section 773(e) of the Act, then it

will modify its dumping calculations appropriately.

Neither section 773(e) of the Act nor 19 CFR 351.301(c)(2)(v) set a deadline for the submission of PMS allegations and supporting factual information. However, in order to administer section 773(e) of the Act, Commerce must receive PMS allegations and supporting factual information with enough time to consider the submission. Thus, should an interested party wish to submit a PMS allegation and supporting new factual information pursuant to section 773(e) of the Act, it must do so no later than 20 days after submission of initial responses to section D of the questionnaire.

**Separate Rates**

In proceedings involving non-market economy (NME) countries, Commerce begins with a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of merchandise subject to an administrative review in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.

To establish whether a firm is sufficiently independent from government control of its export activities to be entitled to a separate rate, Commerce analyzes each entity exporting the subject merchandise. In accordance with the separate rates criteria, Commerce assigns separate rates to companies in NME cases only if respondents can demonstrate the absence of both *de jure* and *de facto* government control over export activities.

All firms listed below that wish to qualify for separate rate status in the administrative reviews involving NME countries must complete, as appropriate, either a Separate Rate Application or Certification, as described below. For these administrative reviews, in order to demonstrate separate rate eligibility, Commerce requires entities for whom a review was requested, that were assigned a separate rate in the most recent segment of this proceeding in which they participated, to certify that they continue to meet the criteria for obtaining a separate rate. The Separate Rate Certification form will be available on Commerce's website at *https://enforcement.trade.gov/nme/nme-sep-rate.html* on the date of publication of this **Federal Register** notice. In responding to the certification, please

---

[1] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011).

[2] *See* Trade Preferences Extension Act of 2015, Public Law 114–27, 129 Stat. 362 (2015).

follow the ''Instructions for Filing the Certification'' in the Separate Rate Certification. Separate Rate Certifications are due to Commerce no later than 30 calendar days after publication of this **Federal Register** notice. The deadline and requirement for submitting a Separate Rate Certification applies equally to NME-owned firms, wholly foreign-owned firms, and foreign sellers who purchase and export subject merchandise to the United States.

Entities that currently do not have a separate rate from a completed segment of the proceeding [3] should timely file a Separate Rate Application to demonstrate eligibility for a separate rate in this proceeding. In addition, companies that received a separate rate in a completed segment of the proceeding that have subsequently made changes, including, but not limited to, changes to corporate structure, acquisitions of new companies or facilities, or changes to their official company name,[4] should timely file a Separate Rate Application to demonstrate eligibility for a separate rate in this proceeding. The Separate Rate Application will be available on Commerce's website at *https:// enforcement.trade.gov/nme/nme-sep-rate.html* on the date of publication of this **Federal Register** notice. In responding to the Separate Rate Application, refer to the instructions contained in the application. Separate Rate Applications are due to Commerce no later than 30 calendar days after publication of this **Federal Register** notice. The deadline and requirement for submitting a Separate Rate Application applies equally to NME-owned firms, wholly foreign-owned firms, and foreign sellers that purchase and export subject merchandise to the United States.

Exporters and producers must file a timely Separate Rate Application or Certification if they want to be considered for respondent selection. Furthermore, exporters and producers who submit a Separate Rate Application or Certification and subsequently are selected as mandatory respondents will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents.

**Initiation of Reviews**

In accordance with 19 CFR 351.221(c)(1)(i), we are initiating administrative reviews of the following AD and CVD orders and findings. We intend to issue the final results of these reviews not later than July 31, 2023.

| | Period to be reviewed |
| --- | --- |
| **AD Proceedings** | |
| BELGIUM: Citric Acid and Certain Citrate Salts, A–423–813 | 7/1/21–6/30/22 |
| S.A. Citrique Belge N.V. | |
| Citribel nv. | |
| COLOMBIA: Citric Acid and Certain Citrate Salts, A–301–803 | 7/1/21–6/30/22 |
| Sucroal S.A. | |
| INDIA: Polyethylene Terephthalate (PET) Film, A–533–824 | 7/1/21–6/30/22 |
| Ester Industries Ltd. | |
| Garware Polyester Ltd. | |
| Jindal Poly Films Ltd. | |
| MTZ Polyesters Ltd. | |
| Polyplex Corporation Ltd. | |
| SRF Limited. | |
| Uflex Ltd. | |
| Vacmet India Ltd. | |
| ITALY: Certain Pasta, A–475–818 | 7/1/21–6/30/22 |
| Aldino S.r.l. | |
| La Molisana S.p.A. | |
| Pasta Castiglioni. | |
| Pastificio Chiavenna S.r.l. | |
| Pastificio Di Martino Gaetano e Flli S.p.A. | |
| Pastificio Favellato srl. | |
| Pastificio Gentile S.r.l. | |
| Pastificio Liguori S.p.A. | |
| Pastificio Mediterranea S.R.L. | |
| Pastificio Mennucci S.p.A. | |
| Pastificio Rigo S.P.A. | |
| Pastificio Tamma S.r.l. | |
| Rummo S.p.A. | |
| Sgambaro SpA. | |
| Valdigrano di Flavio Pagani S.r.L. | |
| ITALY: Prestressed Concrete Steel Wire Strand [5], A–475–843 | 11/19/20–5/31/22 |
| JAPAN: Stainless Steel Sheet and Strip in Coils, A–588–845 | 7/1/21–6/30/22 |
| Daido Kogyo Co., Ltd. | |
| Hanwa Co., Ltd. | |
| Honda Trading Corporation. | |
| JFE Shoji Trading Corp. | |
| Kawasaki Steel Corporation. | |
| Mitsui & Co., Ltd. | |
| Nippon Metal Industries. | |
| Nippon Steel Corporation. | |

---

[3] Such entities include entities that have not participated in the proceeding, entities that were preliminarily granted a separate rate in any currently incomplete segment of the proceeding (*e.g.*, an ongoing administrative review, new shipper review, *etc.*) and entities that lost their separate rate in the most recently completed segment of the proceeding in which they participated.

[4] Only changes to the official company name, rather than trade names, need to be addressed via a Separate Rate Application. Information regarding new trade names may be submitted via a Separate Rate Certification.

| | Period to be reviewed |
|---|---|
| Nippon Steel Trading Co., Ltd. | |
| Nippon Yakin Kogyo. | |
| Nisshin Steel Co., Ltd. | |
| Okaya & Co., Ltd. | |
| Sakamoto Industries Co., Ltd. | |
| Shinsho Corporation. | |
| Sumitomo Corporation. | |
| Tomiyasu & Co., Ltd. | |
| Toyo Kihan Co., Ltd. | |
| MALAYSIA: Certain Steel Nails, A–557–816 ................................................................................................................... | 7/1/21–6/30/22 |
| Alsons Manufacturing India, LLP | |
| Astrotech Steels Pvt. Ltd. | |
| Atlantic Marine Group Ltd. | |
| Chia Pao Metal Co., Ltd. | |
| Chin Lai Hardware Sdn., Bhd. | |
| Chuan Heng Hardware Paints and Building Materials Sdn., Bhd. | |
| Come Best (Thailand) Co., Ltd. | |
| Gbo Fastening Systems AB. | |
| Geekay Wires Limited. | |
| Impress Steel Wire Industries Sdn., Bhd. | |
| Inmax Industries Sdn., Bhd. | |
| Inmax Sdn., Bhd. | |
| Kerry-Apex (Thailand) Co., Ltd. | |
| Kimmu Trading Sdn., Bhd. | |
| Madura Fasteners Sdn., Bhd. | |
| Modern Factory for Steel Industries Co., Ltd. | |
| Oman Fasteners LLC | |
| Region System Sdn., Bhd. | |
| Region International Co., Ltd. | |
| RM Wire Industries Sdn., Bhd. | |
| Soon Shing Building Materials Sdn., Bhd. | |
| Storeit Services LLP | |
| Sunmat Industries Sdn., Bhd. | |
| Tag Fasteners Sdn., Bhd. | |
| Tag Staples Sdn., Bhd. | |
| Tampin Sin Yong Wai Industry Sdn., Bhd. | |
| Top Remac Industries. | |
| Trinity Steel Private Limited. | |
| UD Industries Sdn., Bhd. | |
| Vien Group Sdn., Bhd. | |
| Watasan Industries Sdn., Bhd. | |
| WWL India Private Ltd. | |
| OMAN: Certain Steel Nails, A–523–808 ........................................................................................................................ | 7/1/21–6/30/22 |
| Al Ansari Teqmark, LLC | |
| Al Kiyumi Global LLC | |
| Al Sarah Building Materials LLC | |
| Astrotech Steels Private Ltd. | |
| Buraimi Iron & Steel, LLC | |
| CL Synergy (Pvt) Ltd. | |
| Diamond Foil Trading LLC | |
| Geekay Wires Ltd. | |
| Gulf Nails Manufacturing, LLC | |
| Gulf Steel Manufacturers, LLC | |
| Modern Factory for Metal Products, LLC | |
| Muscat Industrial Company, LLC | |
| Muscat Nails Factory Golden Asset Trade, LLC | |
| Oman Fasteners LLC | |
| Omega Global Uluslararasi Tasimacilik Lojistik Ticaret Ltd. Sti. | |
| Trinity Steel Pvt. Ltd. WWL Indian Private Ltd. | |
| WWL Indian Private Ltd. | |
| REPUBLIC OF KOREA: Certain Steel Nails, A–580–874 ............................................................................................... | 7/1/21–6/30/22 |
| Agl Co., Ltd. | |
| Americana Express (Shandong) Co. Ltd. | |
| Ansing Fasteners Co. Ltd. | |
| Astrotech Steels Private Limited. | |
| Beijing Catic Industry Limited. | |
| Beijing Jinheung Co., Ltd. | |
| Big Mind Group Co., Ltd. | |
| Changzhou Kya Trading Co., Ltd. | |
| China Staple Enterprise Tianjin Co. Ltd. | |
| D&F Material Products Ltd. | |
| Daejin Steel Company. | |
| De Well Group Korea Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Dezhou Hualude Hardware Products Co. Ltd. | |
| DLF Industry Co., Limited. | |
| Doublemoon Hardware Company Ltd. | |
| DT China (Shanghai) Ltd. | |
| YEDuo-Fast Korea Co. Ltd. | |
| Ejen Brothers Limited. | |
| England Rich Group (China) Ltd. | |
| Ever Leading International Inc. | |
| Fastgrow International Co., Inc. | |
| Geekay Wires Limited. | |
| Glovis America, Inc. | |
| GWP Industries (Tianjin) Co., Ltd. | |
| Haas Automation Inc. | |
| Han Express Co. Ltd. | |
| Handuk Industrial Co., Ltd. | |
| Hanmi Staple Co., Ltd. | |
| Hebei Minmetals Co., Ltd. | |
| Hebei Longshengyuan Trade Co Ltd. | |
| Hebei Cangzhou New Century Foreign Trade Co., Ltd. | |
| Hebei Shinyee Trade Co. Ltd. | |
| Hengtuo Metal Products Company Limited. | |
| Home Value Co., Ltd. | |
| Hongyi (Hk) Hardware Products Co., Limited. | |
| Hongyi (Hk) Industrial Co., Limited. | |
| Huanghua RC Business Co., Ltd. | |
| Huanghua Yingjin Hardware Products Co., Ltd. | |
| Inmax Industries Sdn. Bhd. | |
| JCD Group Co., Limited. | |
| Je-il Wire Production Co., Ltd. | |
| Jinheung Steel Corporation | |
| Jining Jufu International Trade Co. | |
| Jinsco International Corporation. | |
| Joo Sung Sea & Air Co., Ltd. | |
| Jushiqiangsen (Tianjin) International Trade Co., Ltd. | |
| Kabool Fasteners Co. Ltd. | |
| KB Steel | |
| Kerry-Apex (Thailand) Co., Ltd. | |
| Koram Inc. | |
| Korea Wire Co., Ltd. | |
| KPF Co., Ltd. | |
| Kuehne & Nagel Ltd. | |
| Linyi Double-Moon Hardware Products Co., Ltd. | |
| Linyi Flyingarrow Imp. & Exp. Co., Ltd. | |
| Linyi Jianchengde Metal Hardware Co. | |
| Linyi Yitong Chain Co., Ltd. | |
| Manho Rope and Wire Ltd. | |
| Max Co., Ltd. | |
| Mingguang Ruifeng Hardware Products Co., Ltd. | |
| Nailtech Co., Ltd. | |
| Nanjing Senqiao Trading Co., Ltd. | |
| Needslink, Inc. | |
| Ocean King International Industries Limited. | |
| Paslode Fasteners (Shanghai) Co., Ltd. | |
| Peace Korea Co., Ltd. | |
| Qingdao Ant Hardware Manufacturing Co., Ltd. | |
| Qingdao Best World Industry-Trading Co., Ltd. | |
| Qingdao Cheshire Trading Co., Ltd. | |
| Qingdao Hongyuan Nail Industry Co., Ltd. | |
| Qingdao Jcd Machinery Co., Ltd. | |
| Qingdao Jiawei Industry Co., Limited. | |
| Qingdao Jisco Co., Ltd. | |
| Qingdao Master Metal Products Co., Ltd. | |
| Qingdao Meijialucky Industry and Co. | |
| Qingdao Mst Industry And Commerce Co., Ltd. | |
| Qingdao Ruitai Trade Co., Ltd. | |
| Qingdao Shantron Int'l Trade Co., Ltd. | |
| Qingdao Shenghengtong Metal Products Co., Ltd. | |
| Qingdao Sunrise Metal Products Co., Ltd. | |
| Qingdao Tian Heng Xiang Metal Products Co., Ltd. | |
| Qingdao Top Metal Industrial Co., Ltd. | |
| Rewon Systems, Inc. | |
| Rise Time Industrial Ltd. | |
| Shandong Dominant Source Group Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Shandong Guomei Industry Co., Ltd. | |
| Shanghai Curvet Hardware Products Co., Ltd. | |
| Shanghai Goldenbridge International Co., Ltd. | |
| Shanghai Pinnacle International Trading Co., Ltd. | |
| Shanghai Zoonlion Industrial Co., Ltd. | |
| Shanxi Pioneer Hardware Industrial Co., Ltd. | |
| Shanxi Sanhesheng Trade Co., Ltd. | |
| Shaoxing Bohui Import & Export Co., Ltd. | |
| Shijiazhuang Yajiada Metal Products Co., Ltd. | |
| Shijiazhuang Tops Hardware Manufacturing Co., Ltd. | |
| Shin Jung TMS Corporation Ltd. | |
| SSS Hardware International Trading Co., Ltd. | |
| Storeit Services LLP. | |
| Test Rite International Co., Ltd. | |
| Tangshan Jason Metal Materials Co., Ltd. | |
| The Inno Steel Industry Company. | |
| Tianjin Bluekin Industries Limited. | |
| Tianjin Coways Metal Products Co., Ltd. | |
| Tianjin Hweschun Fasteners Manufacturing Co. Ltd. | |
| Tianjin Jinchi Metal Products Co., Ltd. | |
| Tianjin Jinghai County Hongli Industry and Business Co., Ltd. | |
| Tianjin Jinzhuang New Material Sci Co., Ltd. | |
| Tianjin Lianda Group Co., Ltd. | |
| Tianjin Zhonglian Metals Ware Co., Ltd. | |
| Tianjin Zhonglian Times Technology Co., Ltd. | |
| Un Global Company Limited. | |
| Unicorn (Tianjin) Fasteners Co., Ltd. | |
| United Company For Metal Products | |
| W&K Corporation Limited | |
| Weifang Wenhe Pneumatic Tools Co., Ltd. | |
| Wulian Zhanpengmetals Co., Ltd. | |
| WWL India Private Ltd. | |
| Xian Metals And Minerals Import And Export Co., Ltd. | |
| Youngwoo Fasteners Co., Ltd. | |
| Zhangjiagang Lianfeng Metals Products Co., Ltd. | |
| Zhaoqing Harvest Nails Co., Ltd. | |
| REPUBLIC OF KOREA: Corrosion-Resistant Steel Products, A–580–878 ......................................................................... | 7/1/21–6/30/22 |
| Dongkuk Steel Mill Co., Ltd. | |
| Hyundai Steel Company | |
| KG Dongbu Steel Co., Ltd. | |
| POSCO | |
| POSCO International Corporation | |
| POSCO STEELEON Co., Ltd. | |
| SeAH Coated Metal | |
| SeAH Steel Corporation | |
| REPUBLIC OF KOREA: Passenger Vehicle and Light Truck Tires, A–580–908 ............................................................... | 1/6/21–6/30/22 |
| Hankook Tire & Technology Co., Ltd. | |
| Hankook Tire America Corp. | |
| Kumho Tire Co., Inc. | |
| Nexen Tire Corporation | |
| REPUBLIC OF KOREA: Stainless Steel Sheet and Strip in Coils, A–580–834 ............................................................... | 7/1/21–6/30/22 |
| DK Corporation | |
| Dongbu Steel Co., Ltd. | |
| Dongkuk Steel Mill Co., Ltd. | |
| Hyundai Steel Co [6] | |
| Inchon Iron & Steel Co., Ltd [7]. | |
| KG Dongbusteel Co., Ltd. | |
| Pohang Iron & Steel Co., Ltd. (POSCO) [8] | |
| POSCO International Corp. | |
| Taihan Electric Wire Co., Ltd. | |
| Topco Global Ltd. | |
| SOCIALIST REPUBLIC OF VIETNAM: Certain Steel Nails, A–552–818 ........................................................................... | 7/1/21–6/30/22 |
| Anhui Sunwell Products Co. Ltd. | |
| Atlantic Manufacture Inc. | |
| Come Best (Thailand) Co., Ltd. | |
| Cuong Dinh Co. Ltd. | |
| Delmar International (Vietnam) Ltd. | |
| Detchun Vietnam Joint Stock Company | |
| Dinh Nguyen Service Trading Production Co. Ltd. | |
| Dinh Thanh Phat Trade One Member Co. Ltd. | |
| Easy Link Industrial Co. Ltd. | |
| Geekay Wires Limited | |
| Hiep Dat Dong Nai Corporation | |

|  | Period to be reviewed |
|---|---|
| Inmax Industries Sdn., Bhd. | |
| Jinhai Hardware Co., Ltd. | |
| Kim Hoang Industrial Nails Production and Trading Service Co. Ltd. | |
| KPF Vietnam Co., Ltd. | |
| KPF Vina Co., Ltd. | |
| Pudong Prime International Co., Ltd. | |
| Storeit Services LLP | |
| T.H.I. Group (Shanghai) Limited. | |
| The Inno Steel Co., Ltd. | |
| Topy Fasteners Vietnam Co., Ltd. | |
| Vina Hardwares J.S.C. | |
| TAIWAN: Certain Steel Nails, A–583–854 ............................................................................................................. | 7/1/21–6/30/22 |
| A-Jax Enterprises Limited | |
| A-Jax International Company Limited. | |
| A-Stainless International Company Limited | |
| Advanced Global Sourcing Limited | |
| Aimreach Enterprises Company Limited | |
| Alisios International Corporation | |
| Allwin Architectural Hardware Inc. | |
| A.N. Cooke Manufacturing Co., Pty., Limited | |
| Asia Engineered Components | |
| Asia Link Industrial Corporation | |
| Asia Smarten Way Corp. (Taiwan) | |
| Astrotech Steels Private Ltd. | |
| Autolink International Company Limited | |
| BCR Inc. | |
| Bestwell International Corporation | |
| Boss Precision Works Co., Ltd. | |
| Budstech CI Limited | |
| Bulls Technology Company Limited | |
| Canatex Industrial Company Limited | |
| Cata Company Limited | |
| Cenluxmetals Company Limited | |
| Chang Bin Industrial Co., Ltd. | |
| Channg Chin Industry Corporation | |
| Charng Yu Industrial Company | |
| Chen Nan Iron Wire Co., Ltd. | |
| Chen Yu-Lan | |
| Chia Da Fastener Company Limited | |
| Chiang Shin Fasteners Industries Ltd. | |
| Chin Tai Sing Precision Manufactory Co., Ltd. | |
| Chun Yu Works & Company Limited | |
| Concord International Engineering & Trading Co., Ltd. | |
| Create Trading Co., Ltd. | |
| Cross International Co., Ltd. | |
| Da Wing Industry Company Limited | |
| Dar Yu Enterprise Co., Ltd. | |
| Eagre International Trade Co., Ltd. | |
| Ever-Top Hardware Corporation | |
| Excel Components Manufacturing Co., Ltd. | |
| Faithful Engineering Products Co., Ltd. | |
| Fastguard Fastening Systems Inc. | |
| Fastnet Corporation | |
| Fujian Xinhong Mech. & Elec. Co., Ltd. | |
| Funtec International Co., Ltd. | |
| Fuzhou Royal Floor Co., Ltd. | |
| FWU Kuang Enterprise Co., Ltd. | |
| GoFast Company Limited | |
| H–H Fasteners Company | |
| H-Locker Components Inc. | |
| Hau Kawang Enterprise Co., Ltd. | |
| Hecny Group | |
| Hi-Sharp Industrial Corp., Ltd. | |
| Hom Wei Enterprise Corporation | |
| HWA Hsing Screw Industry Co., Ltd. | |
| Hwaguo Industrial Fasteners Co., Ltd. | |
| Hy-Mart Fastener Co., Ltd. | |
| Hyup Sung Indonesia | |
| In Precision Link Co., Ltd. | |
| Intai Technology Corporation | |
| JCH Hardware Company Inc. | |
| Jet Crown International Co., Ltd. | |
| Ji Li Deng Fasteners Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Jinhai Hardware Co., Ltd. | |
| Jinn Her Enterprise Limited. | |
| Jockey Ben Metal Enterprise Co., Ltd. | |
| Kan Good Enterprise Co., Ltd. | |
| Katsuhana Fasteners Corporation. | |
| Kay Guay Enterprises Co., Ltd. | |
| Key Use Industrial Works Co., Ltd. | |
| KOT Components Co., Ltd. | |
| K. Ticho Industries Co., Ltd. | |
| K Win Fasteners Inc. | |
| Kuan Hsin Screw Industry Co., Ltd. | |
| Liang Ying Fasteners Industry Co., Ltd. | |
| Long Chan Enterprise Co., Ltd. | |
| Lu Chu Shin Yee Works Co., Ltd. | |
| Mechanical Hardwares Co. | |
| Midas Union Co., Ltd. | |
| Min Hwei Enterprise Co., Ltd. | |
| Ming Cheng Precision Co., Ltd. | |
| Ming Zhan Industrial Co., Ltd. | |
| ML Global Ltd. | |
| Newfast Co., Ltd. | |
| Noah Enterprise Co., Ltd. | |
| Nytaps Taiwan Corporation. | |
| Pao Shen Enterprises Co., Ltd. | |
| Par Excellence Industrial Co., Ltd. | |
| Pengteh Industrial Co., Ltd. | |
| Pneumax Corp. | |
| Printech T Electronics Corporation. | |
| Pro-an International Co., Ltd. | |
| Pronto Great China Corp. | |
| Professional Fasteners Development Co., Ltd. | |
| P.S.M. Fasteners (Asia) Limited. | |
| Qi Ding Enterprise Co., Ltd. | |
| Region System Sdn. Bhd. | |
| Region Industries Co., Ltd. | |
| Region International Co., Ltd. | |
| Right Source Co., Ltd. | |
| Rodex Fasteners Corp. | |
| Rong Chang Metal Co., Ltd. | |
| San Shing Fastech Corporation. | |
| SBSCQ Taiwan Limited. | |
| Shang Jeng Nail Co., Ltd. | |
| Shanxi Pioneer Hardware Industrial Co., Ltd. | |
| Somax Enterprise Co., Ltd. | |
| Spec Products Corporation. | |
| Star World Product and Trading Co., Ltd. | |
| Sumeeko Industries Co., Ltd. | |
| Sunshine Spring Co., Ltd. | |
| Suntec Industries Co., Ltd. | |
| Supreme Fasteners Corp. | |
| Szu I Industries Co., Ltd. | |
| Tag Fasteners Sdn. Bhd. | |
| Taifas Corporation. | |
| Taiwan Geer-Tai Works Co., Ltd. | |
| Taiwan Quality Fastener Co., Ltd. | |
| Team Builder Enterprise Limited. | |
| Techno Associates Taiwan Co., Ltd. | |
| Techup Development Co., Ltd. | |
| TG Co., Ltd. | |
| Tianjin Jinchi Metal Products Co., Ltd. | |
| Topps Wang International Ltd. | |
| Ume-Pride International Inc. | |
| Unistrong Industrial Co., Ltd. | |
| United Nail Products Co., Ltd. | |
| Vanguard International Co., Ltd. | |
| Wa Tai Industrial Co., Ltd. | |
| Win Fastener Corporation. | |
| Wiresmith Industrial Co., Ltd. | |
| World Kun Co., Ltd. | |
| WTA International Co., Ltd. | |
| Wumax Industry Co., Ltd. | |
| Wyser International Corporation. | |
| Yeun Chang Hardware Tool Company Limited. | |

| | Period to be reviewed |
|---|---|
| Yng Tran Enterprise Company Limited. | |
| Yoh Chang Enterprise Company Limited. | |
| Your Standing International Inc. | |
| Yow Chern Company. | |
| Yumark Enterprises Corporation. | |
| Yu Tai World Co., Ltd. | |
| Zenith Good Enterprise Corporation. | |
| TAIWAN: Corrosion-Resistant Steel Products, A–583–856 ............................................................................................... | 7/1/21–6/30/22 |
| China Steel Corporation. | |
| Chung Hung Steel Corporation. | |
| Great Fortune Steel Co., Ltd. | |
| Great Grandeul Steel Co., Ltd. | |
| Great Grandeul Steel Company Limited (Somoa) (aka Great Grandeul Steel Company Limited Somoa). | |
| Great Grandeul Steel Corporation. | |
| Prosperity Tieh Enterprise Co., Ltd. | |
| Sheng Yu Steel Co., Ltd. | |
| Synn Industrial Co., Ltd. | |
| Xxentria Technology Materials Company Ltd. | |
| Yieh Phui Enterprise Co., Ltd. | |
| TAIWAN: Passenger Vehicle and Light Truck Tires, A–583–869 .................................................................................... | 1/6/21–6/30/22 |
| Cheng Shin Rubber Ind. Col Ltd. | |
| Nankang Rubber Tire Corp., Ltd. | |
| TAIWAN: Polyethylene Terephthalate (PET) Film, A–583–837 ....................................................................................... | 7/1/21–6/30/22 |
| Nan Ya Plastics Corporation. | |
| Shinkong Materials Technology Corporation. | |
| TAIWAN: Stainless Steel Sheet and Strip in Coils, A–583–831 ..................................................................................... | 7/1/21–6/30/22 |
| Broad International Resources Ltd. | |
| Chain Chon Industrial Co., Ltd. | |
| Cheng Feng Plastic Co., Ltd. | |
| Chia Far Industrial Factory Co., Ltd. | |
| Chien Shing Stainless Co. | |
| China Steel Corporation. | |
| Chung Hung Steel Corp. | |
| Chyang Dah Stainless Co., Ltd. | |
| Dah Shi Metal Industrial Co., Ltd. | |
| Da-Tsai Stainless Steel Co., Ltd. | |
| DB Schenker (HK) Ltd. Taiwan Branch. | |
| DHV Technical Information Co., Ltd. | |
| Froch Enterprises Co., Ltd. | |
| Gang Jou Enterprise Co., Ltd. | |
| Genn Hann Stainless Steel Enterprise Co., Ltd. | |
| Goang Jau Shing Enterprise Co., Ltd. | |
| Goldioceans International Co., Ltd. | |
| Gotosteel Ltd. | |
| Grace Alloy Corp. | |
| Hung Shuh Enterprises Co., Ltd. | |
| Hwang Dah Steel Inc. | |
| Jie Jin Stainless Steel Industry Co., Ltd. | |
| JJSE Co., Ltd. | |
| KNS Enterprise Co., Ltd. | |
| Lancer Ent. Co., Ltd. | |
| Lien Chy Laminated Metal Co., Ltd. | |
| Lien Kuo Metal Industries Co., Ltd. | |
| Lih Chan Steel Co., Ltd. | |
| Lung An Stainless Steel Ind. Co., Ltd. | |
| Master United Corp. | |
| Maytun International Corp. | |
| NKS Steel Ind. Ltd. | |
| PFP Taiwan Co., Ltd. | |
| Po Chwen Metal. | |
| Prime Rocks Co., Ltd. | |
| S More Steel Materials Co., Ltd. | |
| Shih Yuan Stainless Steel Enterprise Co., Ltd. | |
| Silineal Enterprises Co., Ltd. | |
| Stanch Stainless Steel Co., Ltd. | |
| Ta Chen Stainless Pipe Co., Ltd. | |
| Tah Lee Special Steel Co., Ltd. | |
| Taiwan Nippon Steel Stainless. | |
| Tang Eng Iron Works. | |
| Teng Yao Hardware Industrial Co., Ltd. | |
| Tibest International Inc. | |
| Ton Yi Industrial Corp. | |
| Tsai See Enterprise Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Tung Mung Development Co., Ltd.[9] | |
| Vasteel Enterprises Co., Ltd. | |
| Vulcan Industrial Corporation. | |
| Wuu Jing Enterprise Co., Ltd. | |
| Yc Inox Co., Ltd. | |
| Yes Stainless International Co., Ltd. | |
| Yieh Mau Corp. | |
| Yieh Phui Enterprise Co., Ltd. | |
| Yieh Trading Corp. | |
| Yieh United Steel Corporation. | |
| Yu Ting Industries Co., Ltd. | |
| Yue Seng Industrial Co., Ltd. | |
| Yuen Chang Stainless Steel Co., Ltd. | |
| Yung Fa Steel & Iron Industry Co., Ltd. | |
| THAILAND: Citric Acid and Certain Citrate Salts, A–549–833 | 7/1/21–6/30/22 |
| COFCO Biochemical (Thailand) Co., Ltd. | |
| Sunshine Biotech International Co., Ltd. | |
| Xitrical Group Co., Ltd. | |
| THAILAND: Passenger Vehicle and Light Truck Tires, A–549–842 | 1/6/21–6/30/22 |
| Deestone Corporation Ltd. | |
| General Rubber (Thailand) Co., Ltd. | |
| LLIT (Thailand) Co., Ltd. | |
| Maxxis International (Thailand) Co., Ltd. | |
| Otani Radial Company Limited. | |
| Prinx Chengshan Tire (Thailand) Co., Ltd. | |
| Sanpo (Thailand) Co., Ltd. | |
| Sentury Tire (Thailand) Co., Ltd. | |
| Sumitomo Rubber (Thailand) Co., Ltd. | |
| Zhongce Rubber (Thailand) Co., Ltd. | |
| THE PEOPLE'S REPUBLIC OF CHINA: Collated Steel Staples, A–570–112 | 7/1/21–6/30/22 |
| China Staple (Tianjin) Co., Ltd. | |
| Shanghai Yueda Nails Co., Ltd. | |
| Shijiazhuang Shuangming Trade Co., Ltd. | |
| Tianjin Hweschun Fasteners Manufacturing Co., Ltd. | |
| Tianjin Jinyifeng Hardware Co., Ltd. | |
| Zhejiang Best Nail Industrial Co., Ltd./Shaoxing Bohui Import & Export Co., Ltd. | |
| Unicorn Fasteners Manufacturing Co., Ltd. | |
| THE PEOPLE'S REPUBLIC OF CHINA: Tapered Roller Bearings,[10] A–570–601 | 6/1/2021–5/31/2022 |
| THE PEOPLE'S REPUBLIC OF CHINA: Certain Walk-Behind Lawn Mowers and Parts Thereof, A–570–129 | 12/30/20–6/30/22 |
| Ningbo Daye Garden Machinery Co., Ltd. | |
| Ningbo Lingyue Intelligent Equipment Co., Ltd. | |
| Zhejiang Amerisun Technology Co., Ltd. | |
| Zhejiang Dobest Power Tools Co., Ltd. | |
| THE PEOPLE'S REPUBLIC OF CHINA: Xanthan Gum, A–570–985 | 7/1/21–6/30/22 |
| A.H.A. International Co., Ltd. | |
| Beijing Rodia Auto Sport Ltd. | |
| CP Kelco (Shandong) Biological Company Limited. | |
| Deosen Biochemical (Ordos) Ltd. | |
| Deosen Biochemical Ltd. | |
| Deosen USA Inc. | |
| East Chemsources Ltd. | |
| Foodchem Biotech Co., Ltd. | |
| Greenhealth International Co., Ltd. (Hong Kong). | |
| Guangzhou Zio Chemical Co., Ltd. | |
| Hangzhou Yuanjia Chemical Co., Ltd. | |
| Hebei Xinhe Biochemical Co., Ltd. | |
| H&H International Forwarders Co. | |
| Inner Mongolia Fufeng Biotechnologies Co., Ltd. | |
| Inner Mongolia Jianlong Biochemical Co., Ltd. | |
| Jianlong Biotechnology Co., Ltd. | |
| Langfang Meihua Biotechnology Co., Ltd. | |
| Meihua Group International Trading (Hong Kong) Limited. | |
| Xinjiang Meihua Amino Acid Co., Ltd. | |
| Nanotech Solutions SDN BHD. | |
| Neimenggu Fufeng Biotechnologies Co., Ltd. | |
| Powertrans Freight Systems, Inc. | |
| Qingdao Yalai Chemical Co., Ltd. | |
| Shandong Fufeng Fermentation Co., Ltd. | |
| Shandong Hiking International Commerce Group Co., Ltd. | |
| Shanghai Smart Chemicals Co., Ltd. | |
| Shanghai Tianjia Biochemical Co., Ltd. | |
| Shanxi Reliance Chemicals Co., Ltd. | |

*Federal Register* / Vol. 87, No. 171 / Tuesday, September 6, 2022 / Notices

| | Period to be reviewed |
|---|---|
| The TNN Development Ltd. | |
| The TNN Development USA Inc. | |
| Unionchem Corp. Ltd. | |
| Wanping Bio Chem Co., Ltd. | |
| Weifang Hongyuan Chemical Co., Ltd. | |
| Xinjiang Meihua Amino Acid Co., Ltd. | |
| Xinjiang Fufeng Biotechnologies Co., Ltd. | |
| Z Sports. | |
| TURKEY: Common Alloy Aluminum Sheet,[11] A–489–839 .................................................................................................................. | 10/15/20–3/31/22 |
| ASAS Aluminyum Sanayi ve Ticaret A.S. | |
| Assan Aluminyum Sanayi ve Ticaret A.S. | |
| Kibar Dis Ticaret A.S. | |
| TURKEY: Steel Concrete Reinforcing Bar, A–489–829 ...................................................................................................................... | 7/1/21–6/30/22 |
| Colakoglu Metalurji A.S./Colakoglu Dis Ticaret A.S. (COTAS). | |
| Diler Dis Ticaret A.S. | |
| Ekinciler Demir ve Celik Sanayi A.S. | |
| Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. | |
| Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. | |
| Kaptan Demir Celik Endustrisi ve Ticaret A.S.[12] | |
| Sami Soybas Demir Sanayi ve Ticaret A.S. | |
| UKRAINE: Oil Country Tubular Goods, A–823–815 ............................................................................................................................ | 7/1/21- 6/30/22 |
| Interpipe Europe S.A., Interpipe Ukraine LLC. | |
| PJSC Interpipe Niznedneprovskv Tube Rolling Plant (aka Interpipe NTRP), LLC Interpipe Niko Tube. | |
| **CVD Proceedings** | |
| INDIA: Polyethylene Terephthalate (Pet) Film, C–533–825 ................................................................................................................ | 1/1/21–12/31/21 |
| Ester Industries, Ltd. | |
| Garware Polyester Ltd. | |
| Jindal Poly Films Ltd. (India) (aka Jindal Poly Films Ltd.). | |
| MTZ Polyesters Ltd. | |
| Polyplex Corporation Ltd. | |
| SRF Limited of India (aka SRF Limited). | |
| Uflex Ltd. | |
| Vacmet India Limited. | |
| ITALY: Certain Pasta, C–475–819 ....................................................................................................................................................... | 1/1/21–12/31/21 |
| Pastificio Favellato srl. | |
| Pastificio Gentile S.r.l. | |
| Pastificio Mediterranea S.R.L. | |
| Sgambaro SpA. | |
| REPUBLIC OF KOREA: Corrosion-Resistant Steel Products, C–580–879 .......................................................................................... | 1/1/21–12/31/21 |
| Hyundai Steel. | |
| Hyundai Steel Co., Ltd. | |
| KG Dongbu Steel Co., Ltd. | |
| POSCO. | |
| POSCO Coated & Color Steel Co., Ltd. | |
| POSCO International. | |
| POSCO Steeleon Co., Ltd. | |
| SeAH Coated Metal. | |
| SeAH Steel Corporation. | |
| SOCIALIST OF REPUBLIC OF VIETNAM: Certain Steel Nails, C–552–819 ........................................................................................ | 1/1/21–12/31/21 |
| Anhui Sunwell Products Co., Ltd. | |
| Atlantic Manufacture Inc. | |
| Come Best (Thailand) Co., Ltd. | |
| Cuong Dinh Co., Ltd. | |
| Delmar International (Vietnam) Ltd. | |
| Detchun Vietnam Joint Stock Company. | |
| Dicha Sombrilla Co., Ltd. | |
| Dinh Nguyen Service Trading Production Co. Ltd. | |
| Dinh Thanh Phat Trade One Member Co., Ltd. | |
| Easy Link Industrial Co. Ltd,. | |
| Geekay Wires Limited. | |
| Hiep Dat Dong Nai Corporation. | |
| Inmax Industries Sdn., Bhd. | |
| Jinhai Hardware Co., Ltd. | |
| Kim Hoang Industrial Nails Production and Trading Service Co. Ltd. | |
| KPF Vietnam Co., Ltd. | |
| KPF Vina Co., Ltd. | |
| Nor-Cal Products Vietnam Co. Ltd. | |
| Pudong Prime International Co., Ltd. | |
| Shark Industry Co., Ltd. | |
| Storeit Services LLP. | |
| T.H.I. Group (Shanghai) Limited. | |
| The Inno Steel Co., Ltd. | |
| Topy Fasteners Vietnam Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Vina Hardwares J.S.C. | |
| SOCIALIST REPUBLIC OF VIETNAM: Passenger Vehicle and Light Truck Tires, C–552–829 ................................................. | 11/10/20–12/31/21 |
| Bridgestone Tire Manufacturing Vietnam, LLC. | |
| Kumho Tire (Vietnam) Co., Ltd. | |
| Kumho Tire Co., Inc. | |
| Sailun (Vietnam) Co., Ltd. | |
| THE PEOPLE'S REPUBLIC OF CHINA: Certain Walk-Behind Lawn Mowers and Parts Thereof, C–570–130 ......................... | 10/30/20–12/31/21 |
| Ningbo Daye Garden Machinery Co., Ltd. | |
| Ningbo Lingyue Intelligent Equipment Co. Ltd. | |
| Zhejiang Amerisun Technology Co., Ltd. | |
| Zhejiang Dobest Power Tools Co., Ltd. | |
| THE PEOPLE'S REPUBLIC OF CHINA: Certain Collated Steel Staples, C–570–113 ................................................................ | 1/1/21–12/31/21 |
| A-Jax International Co., Ltd. | |
| Anping Haotie Metal Technology Co. | |
| Changzhou Kya Trading Co., Ltd. | |
| China Dinghao Co., Ltd. | |
| China Wind International Ltd. | |
| Dezhou Hualude Hardware Products Co., Ltd. | |
| Dt China (Shanghai) Ltd., Ningbo Branch. | |
| Ejen Brothers Limited. | |
| eTeklon Co., Ltd. | |
| Fastnail Products Limited. | |
| Foshan Chan Seng Import and Export Co., Ltd. | |
| Guangdong Meite Mechanical Co., Ltd. | |
| H&B Promotional Limited. | |
| Hangzhou Great Import & Export Co., Ltd. | |
| Hangzhou Light Industrial Products, Arts & Crafts, Textiles Import & Export Co., Ltd. | |
| Hangzhou Strong Lion New Material Co., Ltd. | |
| Hebei Cangzhou New Century Foreign Trade Co., Ltd. | |
| Hebei Jinshi Industrial Metal Co., Ltd. | |
| Hebei Machinery Import and Export Co., Ltd. | |
| Hebei Minmetals Co., Ltd. | |
| Hengtuo Metal Products Co., Ltd. | |
| Hk Quanyi Coil Spring Metals Product Limited. | |
| Huanghua Baizhou Trading Co., Ltd. | |
| Jiangmen Rui Xing Yuan Import and Export Co., Ltd. | |
| Jiaxing Brothers Hardware Co., Ltd. | |
| Jinhua Qual Max Trading Co., Ltd. | |
| Kinglong Manufacturing Co., Ltd. | |
| Milan Pacific International Limited. | |
| Mingguang Ruifeng Hardware Products Co., Ltd. | |
| Ningbo (Yinzhou) Yongjia Electrical Tools Co., Ltd. | |
| Ningbo Alldo Stationery Co., Ltd. | |
| Ningbo Guangbo Import & Export Co., Ltd. | |
| Ningbo Huayi Import & Export Co., Ltd. | |
| Ningbo Mascube Imp. & Exp. Corp. | |
| Ningbo Mate Import & Export Co., Ltd. | |
| Ningbo Pacrim Manufacturing Co., Ltd. | |
| Ningbo S-Chande Import & Export Co., Ltd. | |
| Ningbo Sunlit International Co., Ltd. | |
| Ningbo Yuanyu Imp. & Exp. Co., Ltd. | |
| Ninghai Huihui Stationery Co., Ltd. | |
| Oli-Fast Fasteners (Tianjin). | |
| Qingdao Top Metal Industrial Co., Ltd. | |
| Qingdao Top Steel Industrial Co., Ltd. | |
| Rayson Electrical Mfg., Ltd. | |
| Rebon Building Material Co., Limited. | |
| Rise Time Industrial Ltd. | |
| Shanghai Genmes Office Products Co., Ltd. | |
| Shanghai Jade Shuttle Hardware. | |
| Shanghai Lansi Trading Co., Ltd. | |
| Shanghai Yinwo Technologies Development Co., Ltd. | |
| Shaoxing Best Nail Industrial Co., Ltd. | |
| Shaoxing Bohui Import Export Co., Ltd. | |
| Shaoxing Feida Nail Industry Co., Ltd. | |
| Shaoxing Huasheng Stationery Manufacturing Co., Ltd. | |
| Shaoxing Jingke Hardware Co., Ltd. | |
| Shaoxing Mingxing Nail Co., Ltd. | |
| Shaoxing Shunxing Metal Producting Co., Ltd. | |
| Shaoxing Xinyi Hardware & Tools Co., Ltd. | |
| Shaoxing Yiyou Stationery Co., Ltd. | |
| Shenzhen Jinsunway Mould Co., Ltd. | |
| Shijiazhuang Shuangming Trade Co., Ltd. | |

| | Period to be reviewed |
|---|---|
| Shouguang Hongsheng Import and Export Co., Ltd. | |
| Shun Far Enterprise Co., Ltd. | |
| Suntec Industries Co., Ltd. | |
| Suqian Real Faith International Trade Co., Ltd. | |
| Taizhou Dajiang Ind. Co., Ltd. | |
| Team One (Shanghai) Co., Ltd. | |
| Tianjin Bluekin Industries Co., Ltd. | |
| Tianjin D&C Technology Development. | |
| Tianjin Huixinshangmao Co., Ltd. | |
| Tianjin Hweschun Fasteners Manufacturing Co., Ltd. | |
| Tianjin Jin Xin Sheng Long Metal Products Co., Ltd. | |
| Tianjin Jinyifeng Hardware Co., Ltd. | |
| Tsi Manufacturing LLC. | |
| Tung Yung International Limited. | |
| Unicom (Tianjin) Fasteners Co., Ltd. | |
| Wire Products Manufacturing Co., Ltd | |
| Yangjiang Meijia Economic & Trade Co., Ltd. | |
| Youngwoo (Cangzhou) Fasteners Co., Ltd. | |
| Yuchen Imp. and Exp. Co., Ltd | |
| Yueqing Yuena Electric Science and Technology Co., Ltd. | |
| Zhejiang Best Nail Industrial Co., Ltd. | |
| Zhejiang Fairtrade E-Commerce Co., Ltd. | |
| Zhejiang KYT Technology Co., Ltd. | |
| TURKEY: Common Alloy Aluminum Sheet, C–489–840 ............... | 8/14/20–12/31/21 |
| ASAS Aluminyum Sanayi ve Ticaret A.S.[13] | |
| TURKEY: Steel Concrete Reinforcing Bar, C–489–830 ............... | 1/1/21–12/31/21 |
| Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. | |

[5] In the notice of initiation for June anniversary orders, published in the **Federal Register** on August 9, 2022 (87 FR 48459) (*June Initiation Notice*), Commerce inadvertently misspelled the name of this order as "Pressed Concrete Steel Wire Strand." Commerce hereby corrects the name of the order.

[6] Stainless steel sheet and strip in coils produced and exported by Inchon Iron & Steel Co., Ltd. were excluded from the order effective June 8, 1999. *See Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from the Republic of Korea,* 64 FR 30664, 30688 (June 8, 1999). On June 28, 2002, Commerce determined that INI Steel Company is the successor-in-interest to Inchon Iron & Steel Co., Ltd. *See Stainless Steel Sheet and Strip in Coils from the Republic of Korea: Notice of Final Results of Changed Circumstances Antidumping Duty Administrative Review,* 67 FR 43583 (June 28, 2002). On July 3, 2006, Commerce determined that Hyundai Steel Company is the successor-in-interest to INI Steel Company, formerly Inchon Iron and Steel Co., Ltd. *See Notice of Final Results of Changed Circumstances Antidumping Duty Administrative Review: Stainless Steel Sheet and Strip in Coils from the Republic of Korea,* 71 FR 37906 (July 3, 2006). Accordingly, we are initiating this administrative review for Inchon Iron & Steel Co., Ltd. and Hyundai Steel Co. where they are either the producer or exporter of subject merchandise but not both.

[7] *Id.*

[8] On December 1, 2011, Commerce revoked the order with respect to Pohang Iron & Steel Co., Ltd. (POSCO). *See Notice of Implementation of Determination Under Section 129 of the Uruguay Round Agreements Act and Revocation of the Antidumping Duty Order on Stainless Steel Plate in Coils from the Republic of Korea; and Partial Revocation of the Antidumping Duty Order on Stainless Steel Sheet and Strip in Coils from the Republic of Korea,* 76 FR 74771, 74772 (December 1, 2011). Accordingly, we are initiating this administrative review for POSCO where it is the exporter or exporter of subject merchandise but not both.

[9] Stainless steel sheet and strip in coils produced and exported by Tung Mung Development Co., Ltd. were excluded from the antidumping duty order on stainless steel sheet and strip in coils from Taiwan, effective October 16, 2002. *See Notice of Amended Final Determination in Accordance with Court Decision of the Antidumping Duty Investigation of Stainless Steel Sheet and Strip in Coils from Taiwan,* 69 FR 67311, 67312 (November 17, 2004). Accordingly, we are initiating this administrative review for Tung Mung Development Co., Ltd. where it was the producer or exporter of subject merchandise but not both.

[10] In the *June Initiation Notice,* Commerce listed Changshan Peer Bearing Co., Ltd. as a company for which we are initiating an administrative review. However, because this company withdrew its request for review before the date of the *June Initiation Notice,* Commerce hereby corrects the inadvertent inclusion of Changshan Peer Bearing Co., Ltd. in that notice.

[11] In the notice of initiation for April anniversary orders, published in the **Federal Register** on June 9, 2022 (87 FR 35165) (*April Initiation Notice*), Commerce spelled the name of this company as "ASA Aluminyum Sanayi ve Ticaret A.S." as a result of the name having been misspelled by the petitioner in its review request. After consulting with the petitioner, Commerce hereby corrects the name of this company. *See* Memorandum, "Clarification of Certain Companies Requested for Review," dated August 29, 2022. In addition, the *April Initiation Notice* incorrectly indicated the following companies are a single entity: Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Americas, Inc., and Kibar Dis Ticaret A.S. Commerce has not found these three companies to be a single entity. Finally, Kibar Americas, Inc. is not a foreign producer or exporter and thus the *April Initiation Notice* incorrectly indicated that this company is subject to review.

[12] This company is part of a collapsed entity with Kaptan Metal Dis Ticaret Ve Nakliayt A.S. Commerce is initiating a review of the collapsed entity.

[13] In the *April Initiation Notice,* Commerce inadvertently omitted this company from the list of

**Suspension Agreements**

None.

**Duty Absorption Reviews**

During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an AD order under 19 CFR 351.211 or a determination under 19 CFR 351.218(f)(4) to continue an order or suspended investigation (after sunset review), Commerce, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether AD duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

**Gap Period Liquidation**

For the first administrative review of any order, there will be no assessment of antidumping or countervailing duties on entries of subject merchandise entered, or withdrawn from warehouse, for consumption during the relevant

companies for which this administrative review was initiated. Commerce hereby adds this company to the list of initiated companies. In addition, Kibar Americas, Inc. is not a foreign producer or exporter and thus the *April Initiation Notice* incorrectly indicated that this company is subject to review.

"gap" period of the order (*i.e.*, the period following the expiry of provisional measures and before definitive measures were put into place), if such a gap period is applicable to the POR.

## Administrative Protective Orders and Letters of Appearance

Interested parties must submit applications for disclosure under administrative protective orders in accordance with the procedures outlined in Commerce's regulations at 19 CFR 351.305. Those procedures apply to administrative reviews included in this notice of initiation. Parties wishing to participate in any of these administrative reviews should ensure that they meet the requirements of these procedures (*e.g.*, the filing of separate letters of appearance as discussed at 19 CFR 351.103(d)).

## Factual Information Requirements

Commerce's regulations identify five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). These regulations require any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The regulations, at 19 CFR 351.301, also provide specific time limits for such factual submissions based on the type of factual information being submitted. Please review the *Final Rule*,[14] available at *www.govinfo.gov/content/pkg/FR-2013-07-17/pdf/2013-17045.pdf*, prior to submitting factual information in this segment. Note that Commerce has temporarily modified certain of its requirements for serving documents

containing business proprietary information, until further notice.[15]

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information using the formats provided at the end of the *Final Rule*.[16] Commerce intends to reject factual submissions in any proceeding segments if the submitting party does not comply with applicable certification requirements.

## Extension of Time Limits Regulation

Parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by Commerce.[17] In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under 19 CFR 351.408(c), or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, Commerce may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, Commerce will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This policy also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which Commerce will grant untimely-filed requests for the extension of time limits. Please review the *Final Rule*, available at *https://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to

submitting factual information in these segments.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: August 31, 2022.

**James Maeder,**
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2022–19195 Filed 9–2–22; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–549–839]

### Steel Propane Cylinders From Thailand: Preliminary Results of Antidumping Duty Administrative Review; 2020–2021

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily determines that Sahamitr Pressure Container Plc. (also known as Sahamitr Pressure Container Public Company Limited) (SMPC) made sales of subject merchandise at less than normal value (NV) during the period of review (POR) August 1, 2020, through July 31, 2021. We invite interested parties to comment on these preliminary results.

**DATES:** Applicable September 6, 2022

**FOR FURTHER INFORMATION CONTACT:** Jolanta Lawska, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–8362.

**SUPPLEMENTARY INFORMATION:**

## Background

In accordance with section 751(a)(2) of the Tariff Act of 1930, as amended (the Act), Commerce is conducting an administrative review of the antidumping duty (AD) order on steel propane cylinders from Thailand. On October 7, 2021, in accordance with 19 CFR 251.221(c)(1)(i), we initiated the administrative review of the AD order on steel propane cylinders from Thailand with respect to SMPC.[1] On March 30, 2022, Commerce extended the deadline for the preliminary results to August 31, 2022.[2] For a complete

---

[14] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* the frequently asked questions regarding the *Final Rule*, available at *https://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

[15] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19*, 85 FR 41363 (July 10, 2020).

[16] *See* section 782(b) of the Act; *see also Final Rule*; and the frequently asked questions regarding the *Final Rule*, available at *https://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

[17] *See* 19 CFR 351.302.

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 55811 (October 7, 2021).

[2] *See* Memorandum, "Steel Propane Cylinders from Thailand: Extension of Time Limit for

# EXHIBIT K

Barcode:4349414-01 A-523-808 REV - Admin Review

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
Administrative Review
POR: 7/01/2021 – 6/30/2022
**Public Document**
EC/OIV:  DP

March 2, 2023

**MEMORANDUM TO:**      James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**THROUGH:**      Eric Greynolds $\mathcal{EDG}$
Office Director, Office IV
  Antidumping and Countervailing Duty Operations

**FROM:**      Dakota Potts
International Trade Compliance Analyst, Office IV
  Antidumping and Countervailing Duty Operations

**SUBJECT:**      Certain Steel Nails from the Sultanate of Oman:  Extension of
Deadline for Preliminary Results of Antidumping Duty
Administrative Review

---

## I.      BACKGROUND

The Department of Commerce (Commerce) is conducting an administrative review of the
antidumping duty order on certain steel nails from the Sultanate of Oman covering the period
from July 1, 2021, through June 30, 2022.[1]  The preliminary results of this administrative review
are currently due no later than April 3, 2023.[2]

## II.      EXTENSION OF TIME LIMIT FOR PRELIMINARY RESULTS

Section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), requires Commerce to
complete the preliminary results within 245 days after the last day of the anniversary month of an
order for which a review is requested.  If it is not practicable to complete the review within this
time period, section 751(a)(3)(A) of the Act allows Commerce to extend the time limit for the
preliminary results to a maximum of 365 days after the last day of the anniversary month.

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 54463 (September 6, 2022).
[2] The current preliminary results deadline falls on April 1, 2023, which is a Saturday. Commerce's practice dictates
that, where a deadline falls on a weekend or Federal holiday, the appropriate deadline is the next business day. *See
Notice of Clarification: Application of "Next Business Day" Rule for Administrative Determination Deadlines
Pursuant to the Tariff Act of 1930, As Amended*, 70 FR 24533 (May 10, 2005).

INTERNATIONAL
**TRADE**
ADMINISTRATION

Barcode:4349414-01 A-523-808 REV - Admin Review 7/1/21 - 6/30/22

We determine that it is not practicable to complete the preliminary results of this review by the current deadline of April 3, 2023, because additional time is needed to issue and review supplemental responses.

Therefore, we are extending the time period for issuing the preliminary results of this review by 118 days, to 363 days after the last day of the anniversary month, until July 28, 2023.

☒

☐

_____

_____

Agree

Disagree

3/2/2023

X _James Maeder_____

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

2