2023-1661

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**OMAN FASTENERS, LLC,**
Plaintiff-Appellee

**v.**

**UNITED STATES,**
Defendant

**MID CONTINENT STEEL & WIRE, INC.,**
Defendant-Appellant

Appeal from the United States Court of International Trade in No. 1:22-cv-00348-MMB, Judge M. Miller Baker

# SECOND CORRECTED NONCONFIDENTIAL OPENING BRIEF OF DEFENDANT-APPELLANT MID CONTINENT STEEL & WIRE, INC.

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**

Dated: May 1, 2023

*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1661

**Short Case Caption** Oman Fasteners, LLC v. US

**Filing Party/Entity** Mid Continent Steel & Wire, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/01/2023

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Mid Continent Steel & Wire, Inc. | | Wholly owned by DEACERO USA Inc., a subsidiary of DEACERO S.A.P.I. de C.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| The Bristol Group PLLC | Adam H. Gordon | Jennifer M. Smith |
| Lauren Fraid | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


STATEMENT OF RELATED CASES .......... 1

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 2

I. NATURE OF THE CASE .......... 2

II. STATEMENT OF FACTS .......... 3

III. PROCEDURAL POSTURE .......... 14

SUMMARY OF ARGUMENT .......... 15

ARGUMENT .......... 19

I. STANDARD OF REVIEW .......... 19

II. THE TRADE COURT ABUSED ITS DISCRETION BY CONSOLIDATING THE HEARING ON THE PRELIMINARY INJUNCTION WITH A TRIAL ON THE MERITS .......... 21

III. THE TRADE COURT ABUSED ITS DISCRETION BY FINDING THAT OMAN FASTENERS SATISFIED THE HIGH STANDARD FOR THE EXTRAORDINARY REMEDY OF INJUNCTIVE RELIEF .......... 24

A. The Trade Court Erred By Finding That The Public Interest Would Not Be Disserved By A Permanent Injunction .......... 26

i. The Trade Court's Decision Regarding the Lawfulness of Commerce's Rejection of OF's Late Filing and Denial of a Retroactive Extension Is Clearly Erroneous .......... 29

ii. The Trade Court Abused Its Discretion When It Invalidated Commerce's Decision to Apply Total AFA to OF at the Corroborated Petition Rate ..................... 48

B. The Trade Court Erred By Finding That OF's Speculative Claims Of Irreparable Harm Satisfied The Standard For Injunctive Relief ................................................................... 64

C. The Trade Court's Conclusion That Remedies Available At Law Are Inadequate To Compensate OF Is A Clear Error In Judgment ........................................................................... 69

D. The Trade Court Erred By Finding That The Balance Of Equities Weigh In OF's Favor ............................................. 72

CONCLUSION ........................................................................... 76

**CONFIDENTIAL MATERIAL DELETED FROM THE NONCONFIDENTIAL BRIEF**

Business proprietary information contained in brackets on pages 65, 66, 68, and Appx0026-0036 of the brief is redacted from the nonconfidential brief. This business proprietary information is subject to the protective order in the administrative proceeding before the U.S. Department of Commerce, the U.S. Court of International Trade, and Federal Circuit Rule 28(d). The material redacted includes business proprietary information submitted before the U.S. Department of Commerce and the U.S. Court of International Trade, detailing the Plaintiff-Appellee's financial status as well as other financial, business, and industry information.

Dated: May 1, 2023

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015) .......... 48

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .......... 26

*Atl. Sugar Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 48

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) .......... 18, 24, 68

*BMW of N. Am. LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019) .......... 60, 61

*Canadian Wheat Bd. v. United States*,
641 F.3d 1344 (Fed. Cir. 2011) .......... 72

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .......... 45

*Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC v. United States*,
389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) .......... 62, 71

*Consolo v. Fed. Maritime Comm'n*,
383 U.S. 607 (1966) .......... 48

*Corley v. United States*,
556 U.S. 303 (2009) .......... 38

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021) .......... passim

*Dongtai Peak Honey Indus. Co., Ltd. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015) .......... passim

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ........................................................... passim

*Electra-Med Corp. v. United States*,
791 Fed. Appx. 179 (Fed. Cir. 2019) ............................................25

*Euzebio v. McDonough*,
989 F.3d 1305 (Fed. Cir. 2021) .....................................................41

*Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) ........................................................................41

*Ferrostaal Metals Gmbh v. United States*,
518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)...................................50

*FPC v. Transcon. Gas Pipe Line Corp.*,
423 U.S. 326 (1976) ........................................................................28

*Harmoni Int'l Spice, Inc. v. United States*,
211 F. Supp. 3d 1298 (Ct. Int'l Trade 2017)...................................26

*Higashi v. United States*,
225 F.3d 1343 (Fed. Cir. 2000) .....................................................41

*Hitachi Energy USA Inc. v. United States*,
34 F.4th 1375 (Fed. Cir. 2022).......................................................55

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ........................................................................48

*Ishida v. United States*,
59 F.3d 1224 (Fed. Cir. 1995) .......................................................38

*Kannuu Pty Ltd. v. Samsung Elecs. Co., Ltd.*,
15 F.4th 1101 (Fed. Cir. 2021).......................................................18

*KYD, Inc. v. United States*,
607 F.3d 760 (Fed. Cir. 2010) ..........................................56, 57, 58

*Leslie Salt Co. v. United States*,
55 F.3d 1388 (9th Cir. 1995) .......................................................... 37

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......................................................... 22, 23, 24

*N.H. Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018) .......................................................... 36, 37

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) .......................................................... 49

*Neo Solar Power Corp. v. United States*,
190 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) .......................................................... 33

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......................................................... 47, 50, 54

*Olympic Adhesives, Inc. v. United States*,
899 F.2d 1565 (Fed. Cir. 1990) .......................................................... 49

*Oman Fasteners, LLC v. United States*,
CIT Case No. 22-cv-00348-MMB (Feb. 15, 2023) .......................................................... 1

*Otter Prods., LLC v. United States*,
37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) .......................................................... 63

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) .......................................................... 47

*Papierfabrik Aug. Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) .......................................................... 57

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) .......................................................... 28, 35

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014) .......................................................... 45

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) .......... 19, 22

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018) .......... 38

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 69

*SeAH Steel VINA Corp. v. United States*,
950 F.3d 833 (Fed. Cir. 2020) .......... 72

*Severstal Exp. GMBH v. United States*,
Court No. 18-00057, 2018 WL 1705298 (Ct. Int'l Trade Apr. 5, 2018) .......... 62, 63

*Trinity Mfg., Inc. v. United States*,
549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021), aff'd, No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023) (per curiam) .......... 39, 40

*Tung Mung Dev. Co. v. United States*,
No. 99-07-00457, 2001 WL 844484 (Ct. Int'l Trade Jul. 3, 2001) .......... 49

*United States v. Eurodif S.A.*,
555 U.S. 305 n.6 (2009) .......... 47

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 28, 35

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 22, 23, 25

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... passim

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 47

19 U.S.C. § 1673b.......... 71

19 U.S.C. § 1673d .......... 71

19 U.S.C. § 1673f(b)(2).......... 26

19 U.S.C. § 1677e(a) .......... 12, 49, 53

19 U.S.C. § 1677e(a)(1) .......... 46, 55

19 U.S.C. § 1677e(a)(2) .......... 55

19 U.S.C. § 1677e(a)(2)(B) .......... 46

19 U.S.C. § 1677e(b) .......... 50

19 U.S.C. § 1677e(b)(2) .......... 56

19 U.S.C. § 1677e(b)(2)(A) .......... 57

19 U.S.C. § 1677e(c)(1) .......... 57

19 U.S.C. § 1677e(d)(1)(B) .......... 57

19 U.S.C. § 1677e(d)(2) .......... 57

19 U.S.C. § 1677e(d)(3) .......... 57

28 U.S.C. § 2639(a)(1).......... 26

## REGULATIONS

19 C.F.R. § 351.301(a) .......... 45, 46

19 C.F.R. § 351.301(c)(1) .......... 29, 37

19 C.F.R. § 351.302(a) .......... 38

19 C.F.R. § 351.302(b) ........ passim

19 C.F.R. § 351.302(c) ........ passim

19 C.F.R. § 351.302(c)(2) ........ 31, 37

19 C.F.R. § 351.302(d) ........ 4, 31, 51

19 C.F.R. § 351.302(d)(1)(i) ........ 29, 38

19 C.F.R. § 351.303(b)(1) ........ passim

19 C.F.R. § 351.303(c) ........ 42

19 C.F.R. § 351.303(c)(1) ........ 42

19 C.F.R. § 351.303(c)(2)(i) ........ 42

19 C.F.R. § 351.303(c)(2)(ii) ........ 43

19 C.F.R. § 351.303(c)(2)(iii) ........ 43

19 C.F.R. § 351.303(d)(2)(v) ........ 42

**ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS**

*Antidumping and Countervailing Duties; Protection of Proprietary Information*, 57 Fed. Reg. 30,900 (Dep't of Commerce July 13, 1992) ........ 43

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 58,231 (Dep't of Commerce Nov. 19, 2018) ........ 60

*Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dep't of Commerce Dec. 22, 2022) ........ passim

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014-2016*,
82 Fed. Reg. 36,738 (Dep't of Commerce Aug. 7, 2017) ................. 59

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*,
87 Fed. Reg. 43,240 (Dep't of Commerce Jul. 20, 2022) ............ 9, 10

*Modification of Regulation Regarding the Extension of Time Limits*,
78 Fed. Reg. 3367-70 (Dep't of Commerce Jan. 16, 2013) ............. 37

*Extension of Time Limits*,
78 Fed. Reg. 57,790 (Dep't of Commerce Sept. 23, 2013) ........ 30, 37

## MISCELLANEOUS AUTHORITIES

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
H.R. Doc. Rep. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198) ........................................... 50, 57

USCIT Rule 65 ........................................................................... 19

USCIT Rule 65(a)(2) ........................................................... 1, 19, 22

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Defendant-Appellant Mid Continent Steel & Wire, Inc. ("Mid Continent") is not aware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.

## JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(5) of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Defendant-Appellant states that this Court's jurisdiction rests upon the following bases:

(a) The United States Court of International Trade ("Trade Court") possessed jurisdiction pursuant to 28 U.S.C. § 1581(c).

(b) The statutory basis for this Court's jurisdiction is 28 U.S.C. § 1292(a)(1).

(c) The Trade Court entered its judgment on February 15, 2023.[1] Pursuant to Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure, this appeal was filed timely on March 22, 2023.

[1] The Trade Court issued an amended judgment on February 22, 2023. The public version of the judgment was issued on February 27, 2023.

## STATEMENT OF THE ISSUES

(1) Whether the Trade Court abused its discretion by consolidating the hearing for preliminary injunction with a trial on the merits under USCIT Rule 65(a)(2).

(2) Whether the Trade Court erred in finding that Plaintiff-Appellee Oman Fasteners, LLC ("OF") met the high standard for the extraordinary remedy of an injunction.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

This appeal challenges a ruling by the Trade Court to grant a permanent injunction against the U.S. Department of Commerce ("Commerce"). Mid Continent appeals the decision in *Oman Fasteners, LLC v. United States*, CIT Case No. 22-cv-00348-MMB, slip op. 23-17 (Feb. 15, 2023), Appx0001-0039, wherein the Trade Court permanently enjoined Commerce from requiring cash deposits on imports of steel nails at a rate of 154.33%, and ordered that Commerce instead require cash deposits on those imports at a rate of 1.65%. Mid Continent seeks dissolution of the permanent injunction and retroactive imposition of the lawfully-assigned 154.33% cash deposit rate.

## II. STATEMENT OF FACTS

This appeal arises from an antidumping ("AD") case involving imports of steel nails from Oman. An AD case determines whether imported goods are unfairly traded or "dumped," *i.e.*, being sold in the United States at prices that are below their "normal value," which is typically the price of the same or similar products in the foreign country. To analyze dumping, Commerce gathers highly detailed data concerning, among other things, a company's U.S. sales. The accuracy of these data is critical. U.S. sales data are reported in electronic form (databases) to allow Commerce to analyze dumping using sophisticated computer programs.

An AD order on imports of certain steel nails from Oman was imposed in 2015. After an order is imposed, parties have the ability to ask Commerce to calculate, on an annual basis, the actual amount of dumping on the past year's imports. The results of these reviews set the rate used to calculate and collect final duties, as well as the rate used to collect duty deposits on future imports. Since 2015, such "annual" reviews have been conducted each year with respect to the order at issue in the instant appeal. This appeal arises from the sixth

such review. *See Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dep't of Commerce Dec. 22, 2022) ("*Final Results*") and accompanying Issues and Decision Memorandum ("IDM"), Appx1650-1672.

In the sixth review, consistent with standard practice, Commerce issued a multi-part questionnaire to OF to gather information for the agency's analysis. Section C of the questionnaire solicited information on the company's U.S. sales. On December 10, 2021, OF responded to section C of the initial questionnaire. *See* Appx3553-3554. Due to significant deficiencies in the response, on January 25, 2022, Commerce issued an extensive supplemental questionnaire containing:

> 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database.

Appx2783-2784. OF's response was due February 3, 2022. *See* Appx0101.

Commerce also advised OF that:

> If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official(s) in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. *** Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. *** Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.
>
> If Commerce does not receive either the requested information or a written extension request before 5 p.m. EST on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be returned to you. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination.

Appx0101-0102.

OF requested extensions of the deadline on two separate occasions, ultimately receiving an extra 11 days, more than double the time originally provided, to complete and file the supplemental Section

C response (the "Response"). It was ultimately due February 14, 2022. *See* Appx0101, Appx0111-0114, Appx0115-0117, Appx0118-0119.

Despite this significant amount of extra time, OF failed to file the Response in its entirety by the deadline. *See* Appx1658. OF then ignored its error for over a month, apparently hoping that Commerce would not notice it.

Commerce did notice, however. On March 22, 2022, Commerce rejected the untimely Response in accordance with its regulations and removed it from the record. *See* Appx0120-0121.

This prompted a series of requests by OF seeking a retroactive extension of the deadline it had missed 38 days earlier. In its first request two days later, OF asserted that "good cause, extraordinary circumstances and fundamental fairness justify" a retroactive extension. Appx0139, Appx0151. OF asked Commerce to allow it to belatedly file "certain accompanying electronic data files — all but one of which consisted of voluntarily submitted back-up Excel data files," and to "re-file the Supplemental Section C Response in its entirety...." Appx0151. OF discussed "obstacles" it faced in preparing the Response, alleged technological issues counsel encountered on the filing deadline,

and how counsel "believed in good faith" that there was sufficient time to submit the Response despite such issues (which, incidentally, were caused by human error). Appx0143-0145.

On March 28, 2022, Mid Continent opposed OF's request, pointing out that none of the issues OF described constituted "extraordinary circumstances" as required by Commerce's regulations. Appx0233-0239. Mid Continent noted that "the submission of the Excel files was not 'entirely voluntary,'" and that the initial questionnaire "clearly instructed Oman Fasteners to submit electronic versions of all calculation worksheets and data, which is well-understood to apply to all subsequent supplemental questionnaires." Appx0235. Additionally, "the submission of the SAS dataset{[2]} containing the revised U.S. sales database was not voluntary but constituted an essential — and perhaps the most critical — part of the supplemental questionnaire response and was specifically requested by {Commerce} in question 37 of the supplemental questionnaire," and it was beyond question that the

[2] SAS is the name of the computer programming language used to create Commerce's antidumping calculation program.

database was untimely filed and no timely extension had been sought. *Id.*

On March 30, 2022, OF responded, making important admissions plainly showing that it did not satisfy the "extraordinary circumstances" requirement, saying it missed the deadline because:

- counsel "fail{ed} to ensure that all the electronic data files accompanying … {the} Response were confirmed in ACCESS before the 5:00pm deadline, and fail{ed} to recognize the importance of immediately requesting an extension with respect to those electronic data files";
- "counsel's expectations regarding the time required to submit all the accompanying electronic data files proved incorrect";
- "counsel failed to appreciate the materiality of the late submission of certain of the electronic data files"; and
- "counsel regrettably failed to appreciate that {Commerce} would deem the entire submission untimely, and therefore failed to immediately request leave to submit out of time."

Appx0240-0256.[3]

On April 1, 2022, Mid Continent reiterated its opposition to OF's request. *See* Appx0257-0262.

[3] We note that at no time during the underlying review did OF's counsel submit any certified or sworn explanation of why it had missed the deadline.

On April 20, 2022, Commerce rejected OF's request for reconsideration and provided a detailed explanation of the bases for its decision, including:

- its regulations require timely and complete submissions, and OF failed to demonstrate "extraordinary circumstances";
- the U.S. sales database "was explicitly requested in question 37 of the section C supplemental questionnaire," and was not timely submitted;
- OF was "fully cognizant" of the deadline;
- Commerce does not bear the burden of demonstrating prejudice by an untimely filing; and
- Commerce "must maintain its deadlines to administer its statutory mandate", and its "ability to manage its proceedings and administer its statutory mandate would be impeded if Commerce were required to demonstrate harm caused by every occurrence of a late submission."

*See* Appx0263-0266. On April 22, 2022, OF renewed its request for reconsideration, asking "that the failure of a party's law firm to complete submission of all the electronic data exhibits ahead of the deadline not result in consequences to the client. Our client…was not responsible for the filing here; we as the lawyers bore that responsibility." Appx0269. OF also claimed that Commerce had an "established practice" of granting retroactive extensions that warranted such an extension here. *See* Appx0270-0283.

On May 2, 2022, Mid Continent opposed OF's renewed request, because OF did "not provide any new or additional grounds to support its request," the company did not demonstrate "extraordinary circumstances" as required by regulation, and Commerce did not have an "established practice" as described by OF. Appx0293-0297. On May 4, 2022, OF responded to Mid Continent's letter. *See* Appx0298-0304.

On May 20, 2022, Commerce rejected OF's second request for reconsideration, explaining the requirements established by its regulations and that Commerce did not have the "established practice" OF claimed. *See* Appx0305-0307.

OF submitted a <u>third</u> retroactive extension request on May 24, 2022. *See* Appx0308-0321. This request demanded that Commerce accept its response, stating that Commerce's failure to grant the request "would inevitably result in litigation that will either significantly delay and complicate {Commerce}'s work on the final phase of this administrative review or result in a remand of {Commerce}'s final results." Appx0309-0310.

Commerce issued its Preliminary Results on July 20, 2022. *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results*

*of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 43,240 (Dep't of Commerce Jul. 20, 2022), and accompanying Decision Memorandum, Appx1353-1369. Commerce confirmed its decision that OF had not demonstrated extraordinary circumstances required for a retroactive extension and affirmed its decision to reject the untimely and incomplete Response and to remove it from the record. *See id.*

Commerce explained that the late Response involved "extensive U.S. sales information essential for Commerce's ability to calculate an accurate dumping margin," "numerous areas in Oman Fasteners' U.S. sales data requiring additional information and explanation," and deficiencies regarding OF's U.S. sales reconciliation. Appx1363-1365. In sum, Commerce found that:

> we cannot calculate an accurate dumping margin with the current data on the record. The U.S. sales reconciliation has numerous unsupported conflicting adjustments which raise doubt about the reported total U.S. sales value. Further, the myriad issues with reported terms of delivery and delivery expenses, insurance rates, rebates, credit, billing adjustments, packing and freight revenue charges raise concerns that the price buildup for various CONNUMs would not be reliable, and thus, the integrity of the entire U.S. sales SAS database and its accuracy is in question. Furthermore, because several transactions

> in the U.S. sales SAS database have incorrectly reported CONNUM information, the CONNUM matching conducted in our calculation methodology would not accurately compare similar products to their correct cost buildup. Finally, the issues with the U.S. sales SAS database spill over into the cost information, because the cost reconciliation includes the four adjustments for expenses reported in the U.S. sales SAS database which are incorrect and conflict with the U.S. sales information on the record.

Appx1365.

Commerce therefore determined that it lacked necessary information for its calculations and that OF failed to act to the best of its ability by not complying with the filing deadline. *See* Appx1365-1366. Accordingly, Commerce applied total facts available with adverse inferences ("AFA") to OF, assigning the highest dumping margin alleged in the petition, 154.33%, which had been corroborated and used in this way in earlier reviews. *See* Appx1365-1367.

After briefing and a hearing, which centered around this issue, on December 22, 2022, Commerce issued its *Final Results*, which continued to reject OF's extension requests and its untimely and incomplete response. *See* Appx1650-1672. Commerce explained that OF "waited until 38 days after the untimely submission of the {Response} to bring any filing issues to Commerce's attention, two days

after the {Response} was rejected and removed from the record." Appx1658.

Consequently, Commerce found that "numerous deficiencies remain on the record," and "much of the other information pertaining to OF's U.S. sales remains unsubstantiated on the instant record." Appx1663. Commerce explained that:

> With respect to the U.S. sales reconciliation, the U.S. sales reconciliation that is on the record has numerous unsupported conflicting adjustments. The conflicting adjustments raise doubts concerning the reliability of the reported total U.S. sales values. For this reason, Commerce requested information in the supplemental section C questionnaire to resolve these apparent discrepancies.

Appx1665-1666 (footnote omitted).

Commerce continued:

> Without a detailed explanation from Oman Fasteners of the discrepancies pertaining to movement expenses, billing adjustments, bank charges, packing expenses, freight revenue, insurance, rebates, payment dates, and an accurate U.S. sales database, we cannot calculate an accurate dumping margin. Furthermore, the myriad issues with reported terms of delivery and delivery expenses, rebates, billing adjustments, packing, and freight revenue charges raise concerns that the price buildup for various control numbers would not be reliable and, thus, the integrity of the entire U.S. sales database and its accuracy are called into question.

Appx1666. As a result, OF "has rendered Commerce incapable of calculating an accurate dumping margin based on record information," making it necessary to rely on total facts otherwise available under 19 U.S.C. § 1677e(a). *Id.*

Furthermore, Commerce found "that Oman Fasteners did not provide a convincing explanation for why its submission was late." Appx1670. In light of OF's behavior, Commerce determined that OF "failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines," Appx1666, "and, in doing so, greatly inhibited Commerce's ability to calculate an accurate dumping margin based on the respondent's own data." Appx1670. Accordingly, Commerce continued to apply total AFA to OF, using the 154.33% rate. *See* Appx1671.

## III. PROCEDURAL POSTURE

On December 23, 2022, OF appealed to the Trade Court, challenging the *Final Results* and requesting a preliminary injunction

enjoining Commerce from requiring cash deposits at the 154.33% rate set in the review. *See* Appx0046-0047.

On February 15, 2023, following a highly compressed proceeding, the Trade Court consolidated OF's motion for a preliminary injunction with a trial on the merits. *See* Appx0001. The Trade Court granted judgment in favor of OF, remanded the proceeding to Commerce, permanently enjoined Commerce from requiring cash deposits at the 154.33% rate, and ordered that Commerce instead require cash deposits at a rate of 1.65%. *See* Appx0001-0039.

This appeal followed.

## SUMMARY OF ARGUMENT

The Trade Court is correct in its assertion that "this is not a close case." Appx0013. OF does not come close to satisfying the rigorous standard required for the extraordinary and drastic remedy of injunctive relief.

Yet the Trade Court reached a different conclusion, finding that OF not only met the requirements for an injunction, but demonstrated success on the merits based on the agency record. As a result, the Trade Court converted OF's motion for preliminary injunction into a

motion for a permanent injunction, granted judgment on the merits in OF's favor, and issued a permanent injunction against Commerce.

The Trade Court abused its discretion in reaching this judgment, committing multiple legal and factual errors in the process.

First, the Trade Court abused its discretion by consolidating the proceeding, despite opposition by the parties to consolidate, where no opportunity was provided to address hundreds of pages of new evidence that OF submitted after briefing was completed, and where OF refused to make a witness available for deposition.

While styled as a "judgment on the agency record," Appx0001, the Trade Court relied on a record developed only through "limited discovery" that consisted of factual information primarily presented by OF <u>after</u> briefing on its motion for injunction was completed. Mid Continent opposed OF's attempt to introduce new evidence after briefing, but its opposition was never addressed or ruled on by the Trade Court. Moreover, the Trade Court provided no opportunity to submit briefs or analysis concerning the new evidence, which became the "record" the Trade Court actually used in its determination.

Second, the Trade Court improperly converted OF's motion for preliminary injunction to a motion for permanent injunction, thereby applying the wrong legal standard to its analysis.

Third, the Trade Court's determination that the public interest would not be disserved by a permanent injunction is clearly erroneous. As this Court has held, Commerce's application of trade laws in a uniform and fair fashion falls within the public interest. The Trade Court entirely premised its public interest determination on the fact that it ruled in OF's favor on the merits. Yet the underlying merits decision is fatally flawed. The Trade Court's analysis included the following errors:

(1) relying on the preamble to an inapplicable regulation to find that Commerce abused its discretion;

(2) elevating that preamble to have greater legal force than the regulations themselves;

(3) partly invalidating the regulatory requirements of timely submissions, "good cause" for timely extension requests, and "extraordinary circumstances" for untimely extension requests;

(4) ignoring binding judicial precedent upholding Commerce's broad discretion to enforce its deadlines;

(5) stating that Commerce did not provide sufficient notice of the preamble despite its publication in the Federal Register;

(6) finding that OF complied with Commerce's filing requirements despite filing substantively different versions of its response, contrary to Commerce's regulations;

(7) binding Commerce to an unofficial statement made in a different proceeding, contrary to this Court's decisions;

(8) invalidating Commerce's authority to require a party follow its regulations when submitting factual information; and

(9) invalidating Commerce's determination to apply total AFA to OF using the petition rate of 154.33%. Judicial precedent makes clear that AFA may be warranted where a party fails to submit requested information or an extension request before the filing deadline.

While each of these legal errors individually constitutes an abuse of discretion, in total, they amount to clearly erroneous determinations that cannot withstand legal scrutiny.

Fourth, the Trade Court improperly found that OF's claims of irreparable injury satisfied the injunctive relief standard. The Trade Court ignored evidence on the record that directly undermined OF's claims and hypothetical analysis.

Fifth, the Trade Court's cursory analysis (a two-sentence footnote) of OF's claim that remedies available at law cannot compensate for the company's alleged irreparable harm is a clear error in judgment – it entirely ignored the availability of recovery under OF's counsel's malpractice insurance, which Mid Continent briefed below.

Sixth, the Trade Court's judgments regarding the balance of equities are clearly erroneous. The Trade Court did not consider the balance of equities as it relates to Mid Continent, and it ignored at least one decision finding that the invalidation of statutory effect favors denying an injunction.

For these reasons, the Trade Court's decision should be reversed, the permanent injunction should be vacated, and the 154.33% cash deposit rate should be reinstated with retroactive effect.

## ARGUMENT

### I. STANDARD OF REVIEW

The Court reviews the grant of an injunction by the district court (here, the Trade Court) for abuse of discretion. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1377 (Fed. Cir. 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

An abuse of discretion "is established by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Kannuu Pty Ltd. v. Samsung Elecs. Co., Ltd.*, 15 F.4th 1101, 1106 (Fed. Cir. 2021) (internal citations and quotation marks omitted). "A clear error of judgment occurs when the record contains no basis on which the district court rationally could have made its decision or if the judicial action is arbitrary, fanciful or clearly unreasonable." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (internal citations and quotation marks omitted). Issues of law that serve as the basis of the lower court's decision are reviewed *de novo*. *See id.* at 1148 (internal citations omitted).

## II. THE TRADE COURT ABUSED ITS DISCRETION BY CONSOLIDATING THE HEARING ON THE PRELIMINARY INJUNCTION WITH A TRIAL ON THE MERITS

The Trade Court abused its discretion when it consolidated the hearing on the preliminary injunction with a trial on the merits under USCIT Rule 65.

Rule 65(a)(2) provides that "{b}efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."

The Trade Court consolidated the appeal despite opposition by the parties, and despite requiring an expedited briefing schedule that severely constrained the time Mid Continent had to brief the issues below. *See* Appx0001, Appx3123-3124, Appx3339. While Mid Continent entered its appearance on December 30, 2022, the Trade Court did not grant access to the confidential record until January 3, 2023, seven days before its opposition brief was due. *See* Appx0049. Moreover, the Trade Court denied Mid Continent's request for a modest extension of the briefing schedule. *See* Appx0049.

As important, the record in the expedited proceeding below, based entirely on "limited discovery," Appx0010, changed radically after Mid

Continent filed its Opposition to the Motion for Preliminary Injunction, yet the Trade Court provided no opportunity for additional briefing.

OF's motion for preliminary injunction provided numerous exhibits seeking to support its argument that the four factors for a preliminary injunction were established. *See* Appx2363-3056. Mid Continent's opposition to OF's Motion included detailed evidence and analysis undermining OF's case. *See* Appx3057-3287.

In an attempt to salvage its motion, after briefing was complete OF filed hundreds of pages of new documents responding to Mid Continent's analysis, essentially creating an entirely new record. Appx3342-3514. OF did this despite an order from the Trade Court that OF "shall not submit any further evidentiary materials, including any supplemental declaration by Mr. Karaga, in support of its motion." *See* Appx0050. Moreover, OF waited until the eleventh hour — less than 18 hours before the deposition of its President and CEO and one business day before the hearing on the preliminary injunction motion was scheduled to begin — to dump these documents on the parties. *See* Appx3516.

Mid Continent filed an opposition that was never directly addressed or ruled on by the Trade Court. *See* Appx3515-3522. Instead, the Trade Court accepted the new materials, but never provided an opportunity to submit supplemental briefing on the new evidence. *See* Appx0051-0052, Appx3523-3525.

Among the newly-presented materials were several declarations. Mid Continent sought to depose two of the declarants. OF refused to make a critical declarant available — a senior executive of one of OF's customers who provided a key declaration supporting OF's Motion — denying Mid Continent the ability to examine the witness concerning its representations to the Trade Court. *See* Appx3586-3588. Mid Continent brought this to the attention of the Trade Court, without consequence. *See id.*

OF's document dump and refusal to make a witness available for deposition, combined with the Trade Court's acceptance of OF's new record and failure to provide an opportunity to submit comments or analysis, were highly prejudicial to Mid Continent's ability to evaluate and challenge the very materials upon which the Trade Court based its ruling.

Consolidating the proceeding under Rule 65(a)(2) based on this one-sided, contested record where the parties were unable to fully brief the Trade Court on pertinent issues and information was "clearly unreasonable," *Robert Bosch LLC*, 659 F.3d at 1148, and constitutes an abuse of discretion.

## III. THE TRADE COURT ABUSED ITS DISCRETION BY FINDING THAT OMAN FASTENERS SATISFIED THE HIGH STANDARD FOR THE EXTRAORDINARY REMEDY OF INJUNCTIVE RELIEF

The Trade Court made numerous errors of law, clearly erroneous factual findings, and clear errors in judgment by concluding that OF had satisfied that stringent standard required to obtain the "drastic and extraordinary remedy" of injunctive relief. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)).

After improperly consolidating the appeal, the Trade Court decided, on the merits, that Commerce abused its discretion by rejecting OF's untimely questionnaire response, applying total AFA to the company, and applying the 154.33% petition rate as the AFA rate. *See* Appx0001-0039. In reaching this judgment, the Trade Court committed

a number of legal errors, including invalidating regulations and disregarding judicial precedent.

Having determined that OF had succeeded on the merits, the Trade Court then committed another legal error by converting OF's motion for preliminary injunction into a motion for permanent injunction. *See* Appx0024. This in turn led the Trade Court to apply the wrong legal standard in its analysis. Specifically, the Trade Court should have considered the four factors necessary for a preliminary injunction outlined in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) — likelihood of success on the merits; irreparable harm; whether the balance of equities weighs in favor of injunctive relief; and whether the public interest would not be disserved by a permanent injunction. Instead, the Trade Court considered the four factors for a permanent injunction provided by *eBay*, 547 U.S. at 391 — irreparable harm; whether available remedies at law are inadequate to compensate for that harm; balance of equities; and public interest. Regardless of which legal standard is applied, the Trade Court clearly

erred when it held that OF met the rigorous burden required to obtain injunctive relief.[4]

As the U.S. Supreme Court held, "{i}t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should not issue; rather, a court must determine that an injunction should issue under the traditional four-factor test set out" by *eBay*. *Monsanto*, 561 U.S. at 158 (emphases in original). A party seeking injunctive relief bears the burden of demonstrating that all four factors have been met under either standard. *See, e.g.*, *Bio-Rad*, 967 F.3d at 1377 ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.") (quoting *eBay*, 547 U.S. at 391). Here, OF failed to meet this

[4] While success on the merits is not one of the four *eBay* factors considered for permanent injunctive relief, it was the basis on which the Trade Court converted OF's preliminary injunction motion to a permanent injunction motion. *See* Appx0024. It also was the specific reason the Trade Court gave for deciding that the public interest would not be disserved by a permanent injunction. Appx0038. Whether reviewed under the *eBay* or the *Winter* standard, the likelihood of success on the merits is central to this Court's analysis.

burden, and the Trade Court's conclusion otherwise is clearly erroneous.

### A. The Trade Court Erred By Finding That The Public Interest Would Not Be Disserved By A Permanent Injunction

One factor heavily considered when evaluating whether to award a permanent injunction is whether the public interest would not be disserved by such an injunction. *See eBay*, 547 U.S. at 391. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (internal citations omitted); *accord Electra-Med Corp. v. United States*, 791 Fed. Appx. 179, 182 (Fed. Cir. 2019) ("The public interest is a central consideration of determining whether an injunction is appropriate.") (internal citations omitted).

As discussed below, Commerce complied with the law and interpreted and applied the trade statutes "uniformly and fairly," which this Court has held falls within the public interest. *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010).

Conversely, an injunction that disrupts the statutory scheme is

not within the public interest. First, it disregards the statutory presumption of correctness regarding Commerce's determination, under 28 U.S.C. § 2639(a)(1). Second, it fundamentally undermines the statutory cash deposit requirement. *See* 19 U.S.C. § 1673f(b)(2). Third, it implicitly "endorse{s} non-cooperation with Commerce," contrary to the public interest in promoting enforcement of the trade laws. *See Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1318 (Ct. Int'l Trade 2017).

The Trade Court rejected arguments that the public interest would be best served by allowing the statute to operate as Congress intended and requiring cash deposits to be collected until any change following a final decision in the underlying appeal. *See* Appx0037-0038. The Trade Court found in favor of OF on this factor, specifically because it had ruled for OF on the merits:

> The Court, however, has determined on the merits that the 154.33 percent duty rate set by Commerce is unlawful. Therefore, the Government has no legitimate interest in collecting cash deposits at that rate. Enjoining such collection cannot possibly undermine the statute's remedial purposes, because Oman has no liability to pay 154.33 percent duties. Injunctive relief here will not disserve the public interest.

Appx0038.

As this plainly shows, the Trade Court's determination on the public interest prong rests entirely on its merits determination. Indeed, only by addressing the Trade Court's merits analysis can Mid Continent challenge the Trade Court's finding on the public interest factor. The merits analysis is thus squarely before this Court in the context of our challenge to the permanent injunction awarded below. If, as shown below, the Trade Court's merits analysis is unsound, then the Trade Court's finding in OF's favor on this element is infirm, and the permanent injunction should be dissolved.

#### i. The Trade Court's Decision Regarding the Lawfulness of Commerce's Rejection of OF's Late Filing and Denial of a Retroactive Extension Is Clearly Erroneous

The Trade Court wrongly held that Commerce abused its discretion by: (1) rejecting OF's Response for being untimely and incomplete under 19 C.F.R. § 351.303(b)(1); and (2) denying OF's request for a retroactive extension made 38 days after the deadline, only after Commerce rejected the submission. *See* Appx0013-0019.

To reach this clearly erroneous judgment, the Trade Court effectively invalidated several parts of Commerce's regulations and ignored judicial precedent.

"Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978)). "To do otherwise would 'run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency.'" *PSC VSMPO-Avisma*, 688 F.3d at 760 (cleaned up) (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). "Accordingly, absent such constraints or circumstances, courts will defer to the judgment of an agency regarding the development of the agency record." *Dongtai Peak Honey Indus. Co., Ltd. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) (internal citation and quotation marks omitted).

Commerce has established processes and timelines for submitting requested information. Per its regulations, "{a}n electronically filed document must be received successfully in its entirety by {Commerce}'s electronic records system, ACCESS, by 5 p.m. Eastern Time on the due date." 19 C.F.R. § 351.303(b)(1). Its regulations also require that Commerce "will reject any untimely filed…questionnaire response" and "not consider or retain in the official record of the proceeding" untimely filed factual information. *Id.* §§ 351.301(c)(1), 351.302(d)(1)(i).

Commerce's regulations recognize that extensions of time may be needed, and describe different standards that must be met depending on whether a request is made before or after the deadline.

For a request for extension made before the deadline (*i.e.*, "timely"), a party must provide reasons establishing "good cause." *Id.* §§ 351.302(b)-(c). The preamble to this regulation, which was published in the Federal Register in 2013, warns against filing a request too close to the deadline:

> Parties should be aware that the likelihood of {Commerce} granting an extension will decrease the closer the extension request is filed to the applicable time limit because {Commerce} must have time to consider the extension request and decide on its disposition. Parties should not assume that they will

> receive an extension of a time limit if they have not received a response from {Commerce}.

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,792 (Dep't of Commerce Sept. 23, 2013). The preamble also provides the following guidance:

> For submissions that are due at 5:00 p.m., if {Commerce} is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next work day. *See* 19 CFR 351.103(b).

*Id.*

Importantly, for a request for extension made after a deadline has passed — "untimely" requests like those made by OF — a party must "demonstrate{} that an extraordinary circumstance exists." 19 C.F.R. § 351.302(c). The regulation defines an "extraordinary circumstance" as "an unexpected event that: (i) Could not have been prevented if reasonable measures had been taken, and (ii) Precludes a party or its representative from timely filing an extension request through all reasonable means." *Id.* § 351.302(c)(2).

The transmittal letter accompanying Commerce's questionnaire notified OF of these regulatory requirements:

> If Commerce does not receive either the requested information or a written extension request before 5 p.m. EST on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be returned to you. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination.

Appx0101-0102.

In the case at bar, 19 C.F.R. § 351.302(b) and its preamble do not apply because OF did not submit a timely extension request for its Response. Rather, OF filed an untimely request for a retroactive extension 38 days after the deadline and only after Commerce rejected the Response for being untimely and incomplete. *See* Appx1658. Accordingly, OF had to show an extraordinary circumstance for its untimely extension request under 19 C.F.R. § 351.302(c).

OF basically admitted to Commerce that it could not satisfy the "extraordinary circumstance" requirement. In OF's own words, the deadline was missed because:

- counsel "fail{ed} to ensure that all the electronic data files accompanying {the} Response were confirmed in ACCESS before the 5:00pm deadline, and fail{ed} to recognize the

importance of immediately requesting an extension with respect to those electronic data files";

- "counsel's expectations regarding the time required to submit all the accompanying electronic data files proved incorrect";
- "counsel failed to appreciate the materiality of the late submission of certain of the electronic data files"; and
- "counsel regrettably failed to appreciate that {Commerce} would deem the entire submission untimely, and therefore failed to immediately request leave to submit out of time."

Appx0240-0256.[5] Counsel's failings described above cannot reasonably constitute "an extraordinary circumstance," or even the lower "good cause" standard required for timely extension requests.

Not surprisingly, Commerce determined that OF failed to demonstrate "extraordinary circumstances" because OF "made no

[5] The Trade Court also made a clearly erroneous factual finding regarding OF's rationale for not contacting Commerce about its filing issues. Specifically, the Trade Court stated that Commerce "said there would be no further extensions." Appx0007. This is incorrect. Commerce stated that it "d{id} not anticipate providing any additional extensions for Oman Fasteners' response," which is fundamentally different. Appx3091 (emphasis added). As noted above, Commerce granted OF an extra 11 days, more than double the time originally provided, to prepare and file the Response. Thus, Commerce's wording conveyed the fact that, after having already granted OF several extensions, it needed to proceed apace with the review given the statutory time limits, while at the same time not completely curtailing any possibility of an additional extension.

attempt to contact Commerce and request an extension of the deadline" and instead, "waited until 38 days after the untimely submission of the {Response} to bring any filing issues to Commerce's attention, two days after the {Response} was rejected and removed from the record." Appx1658; *see also Neo Solar Power Corp. v. United States*, 190 F. Supp. 3d 1255, 1261-63 (Ct. Int'l Trade 2016) (finding that a technical filing problem was not an extraordinary circumstance, and the respondent could have taken reasonable measures to prevent the untimely filing by "contact{ing} the ACCESS Help Desk before the deadline expired to receive assistance with a response to the technical problem" and "made not one slip-up but at least three errors, failure to plan for contingencies, failure to call for help on {the deadline}, and failure to call on" the next business day).

Commerce also rejected OF's claim that the late-filed portions of the response were voluntarily-submitted Excel back-up versions because the initial questionnaire instructions — which applied to supplemental responses — "clearly instructed Oman Fasteners to submit a copy of the computer programs/spreadsheets/worksheet that you used to calculate the prices, expenses, and adjustments reported in

your U.S. sales list....” Appx1658-1659 (internal citation and quotation marks omitted). Thus, Commerce properly rejected the late filing and the untimely extension request in accordance with its regulations.

Moreover, as Commerce discussed, 19 C.F.R. § 351.303(b)(1) states that “{a}n electronically filed document must be received successfully <u>in its entirety</u> by {Commerce’s} electronic records system, ACCESS, by 5 p.m. {ET} on the due date.” Appx1659. Commerce had no regulatory obligation to accept those portions of the Response submitted before the deadline. *See id.* Commerce emphasized that even if it did accept those portions, “the most integral component of the {Response} is the revised SAS U.S. sales database, which was requested in SAS format by the section C supplemental questionnaire,” was filed late. *Id.* As a result, “the record would still lack a U.S. sales database reflective of the numerous requests for information and revision contained in the section C supplemental questionnaire.” *Id.*

Despite Commerce’s reasonable and lawful determination, the Trade Court improperly eviscerated Commerce’s “rules of procedure,” “methods of inquiry,” and “development of the agency record.” *Dongtai Peak*, 777 F.3d at 1351 (quoting *Vt. Yankee Nuclear Power Corp.*, 435

U.S. at 543-44; *PSC VSMPO-Avisma*, 688 F.3d at 760 (internal quotation marks omitted)).

The Trade Court based its decision that Commerce abused its discretion on the preamble to 19 C.F.R. § 351.302(b), which concerns timely extension requests. The Trade Court stated that the preamble was "buried" almost ten years ago, "has never been codified through a regulation," and has never "otherwise reasonably communicated to the bar," Appx0013-0014, which the Trade Court described as "absolutely outrageous" at the hearing, Appx3930. The Trade Court found that:

> because {Commerce} has not codified its practice or otherwise provided clear notice to the bar that this virtually automatic 15½-hour extension is available, it is an abuse of discretion for Commerce to require a showing of "extraordinary circumstances" to support a retroactive extension request in the narrow circumstance where, as here, the filing is completed after 5:00 p.m. but prior to 8:30 a.m. the following work day—that is, when the filing is completed within the automatic window that Commerce's rulemaking comment response authorizes.

Appx0015. Further, the Trade Court "emphasize{d} that Oman's completion of its filing within the 15½-hour window is essential to Part III.B.1.a of this decision," *i.e.*, the determination regarding success on the merits. Appx0015 n.10. This makes clear that the Trade Court's

interpretation of the preamble is the lynchpin of its finding of success on the merits.

The Trade Court committed at least seven errors of law in its analysis.

First, the preamble to the regulation regarding timely extension requests, 19 C.F.R. § 351.302(b), does not apply here because OF did not submit a timely extension request, despite explicit notice in Commerce's questionnaire. Thus, at the outset, the Trade Court examined the wrong regulation.

Second, the Trade Court improperly elevated the preamble to have the same legal force as Commerce's regulations themselves. Preambles that are not subject to public notice and comment do not possess the same legal force as statutes or regulations. *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 76 (1st Cir. 2018) ("Although the 2008 regulation was subject to notice and comment, the preamble…was not."); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) ("It is undisputed that the preamble has not been subjected to notice and comment.").

The preamble to 19 C.F.R. § 351.302(c)(2) was not subject to public notice and comment, appearing in the final rule only. *Compare*

*Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. 3367-70 (Dep't of Commerce Jan. 16, 2013) (proposed rule) *with Extension of Time Limits*, 78 Fed. Reg. at 57,790-96 (final rule). The preamble also does not appear in the codified regulation. Thus, the preamble was not the product of formal agency action, and therefore, does not possess the same legal force as the regulation itself.

Third, the Trade Court actually elevated the preamble to have greater legal force than the regulations. In effect, the Trade Court rendered wholly or partially inoperative Commerce's regulations requiring:

(1) electronically filing a document "in its entirety…by 5 p.m. Eastern Time on the due date," 19 C.F.R. § 351.303(b)(1);

(2) Commerce to "reject any untimely filed…questionnaire response," *id.* § 351.301(c)(1);

(3) Commerce to "not consider or retain in the official record of the proceeding" untimely filed factual information, *id.* § 351.302(d)(1)(i);

(4) "good cause" for timely extension requests, *id.* §§ 351.302(a)-(c); and

(5) "an extraordinary circumstance" for an untimely extension request, *id.* § 351.302(c).

This is a result that courts actively seek to avoid. *C.f., e.g.*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) ("one of the most

basic interpretive canons" is that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)); *Ishida v. United States*, 59 F.3d 1224, 1230 (Fed. Cir. 1995) ("The rules of statutory construction require a reading that avoids rendering superfluous any provision of a statute.").

Fourth, the Trade Court's decision contravenes directly relevant precedent that affirms Commerce's authority to enforce its deadlines. In *Dongtai Peak*, 777 F.3d 1343, examining an earlier version of the regulation at issue here, this Court recognized the significance of such interests regarding Commerce's enforcement of its deadlines. In that case, the respondent claimed that good cause (the standard applying at that time) existed for an untimely extension request where the respondent missed a filing deadline due to a national holiday, deadlines for other questionnaire responses, and issues with its translator, U.S.-based attorneys, and computers. *See id.* at 1347.

This Court found Commerce's determination that good cause did not exist to be reasonable because the respondent had failed to demonstrate why it was unable to file a timely extension request

despite knowing about all of the issues prior to the deadline. *See id.* at 1351. This Court recognized that "{i}t is not for {respondent} to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information." *Id.* at 1352 (internal quotation marks and citation omitted). This Court also reiterated that it "has made clear Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply." *Id.* at 1353.

A more recent decision underscores Commerce's broad discretion regarding untimely extension requests and confirms the validity of the "extraordinary circumstance" requirement. *See Trinity Mfg., Inc. v. United States*, 549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021), *aff'd*, No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023) (per curiam).

*Trinity* involved a sunset review in which the domestic industry's representative, experiencing a combination of technical and medical issues, failed to file a response. He became aware of the lapse when Commerce issued a letter to the U.S. International Trade Commission ("ITC") indicating that the filing had not been made and that Commerce

intended to revoke the AD order. *See id.* at 1375. Only then did he request reconsideration and a retroactive extension, a request that was renewed and denied several times, identifying intermittent internet problems and medical issues as causing the error. *See id.* at 1378.

The Trade Court affirmed Commerce's denial of the extension request, finding that the technical and medical issues did not establish extraordinary circumstances. The court held that "{t}he current regulation defines how Commerce will exercise its discretion when it receives an untimely extension request. Rather than abuse that discretion, Commerce reasonably applied the criteria the amended regulation sets forth." *Id.* at 1378. The court also observed that Commerce's "interests in deterring late filings" "are served by a rule confining the granting of such requests to extraordinary circumstances." *Id.* at 1378-79. On appeal, this Court affirmed.

These cases demonstrate that courts have not only recognized Commerce's broad discretion to enforce its deadlines but have upheld the agency's interest in doing so.

Fifth, the Trade Court erred when it held that Commerce did not provide sufficient notice with respect to its preamble. The preamble to

19 C.F.R. § 351.302(b), however, was published in the Federal Register on September 23, 2013. *See* 78 Fed. Reg. at 57,792. Courts have repeatedly held that "{t}he publication of rules and regulations in the Federal Register gives legal notice of their contents to those subject to, or affected by, them, 'regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance.'" *Higashi v. United States*, 225 F.3d 1343, 1349 (Fed. Cir. 2000) (quoting *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947)); *accord Euzebio v. McDonough*, 989 F.3d 1305, 1314 (Fed. Cir. 2021). Thus, contrary to the Trade Court's complaint that the preamble was "buried" and never "reasonably communicated to the bar," Appx0013-0014, its publication in the Federal Register proves otherwise.

Sixth, the Trade Court erred in its finding with respect to Commerce's regulation allowing parties one day after filing a document to finalize bracketing of confidential information. *See* 19 C.F.R. § 351.303(c). Under this rule, "{i}f a submission contains information for which the submitter claims business proprietary treatment, the submitter may elect to file the submission under the one-day lag rule described in paragraph (c)(2) of this section." *Id.* § 351.303(c)(1). The

rule specifies that the submitter "must file a business proprietary document with {Commerce} within the applicable time limit." *Id.* § 351.303(c)(2)(i) (emphases added). The document must note that the bracketing of proprietary information is not final on each page containing such information. *Id.* § 351.303(d)(2)(v).

The submitter subsequently must file the final version of the document, which "must be identical in all respects to the business proprietary document filed on the previous day except for any bracketing corrections" and the non-final notations, along with the public version of the document, by the close of business the next business day. *Id.* §§ 351.303(c)(2)(ii)-(iii) (emphasis added).

This rule is separate and distinct from Commerce's other rules on filing deadlines and extensions and was promulgated in 1992, more than two decades before the 2013 preamble discussed above, to help "avoid inadvertent disclosures of business proprietary information and violations of administrative protective orders." *Antidumping and Countervailing Duties; Protection of Proprietary Information*, 57 Fed. Reg. 30,900 (Dep't of Commerce July 13, 1992) (interim final rule).

Since its inception, the "one-day lag rule" has made clear that substantive changes (*i.e.*, changes other than revisions to bracketing) are not permitted after the original deadline. *See id.* at 30,902-03.

With respect to this regulation, the Trade Court committed a legal error when it excused OF's failure to ask for an extension — timely or otherwise — by stating that "the next day counsel timely filed the final versions under Commerce's 'one-day lag rule.'" Appx0007. The Trade Court appeared to believe, erroneously, that the one-day lag rule permits a party to cure substantive filing deficiencies the day after a filing is due. This is clearly not the case.

To the contrary, OF violated the one-day lag rule by failing to timely file its complete response — including its revised U.S. sales database — on time as required by the regulations. That it filed the complete response the day after it was due is irrelevant.

The version of the Response that OF timely filed on the due date did not contain the U.S. sales database, while the final, one-day lag version did. This was a substantive change that is not permitted under Commerce's rules. Accordingly, the Trade Court's determination that OF timely filed the final version of its questionnaire response under the

one-day lag rule is irrelevant and wrong, and its reliance on this finding to support its ruling is clearly erroneous.

Seventh, the Trade Court incorrectly concluded that Commerce abused its discretion by rejecting OF's retroactive extension request in light of the agency's alleged "one-bite rule." Appx0017-0018. The Trade Court determined that Commerce "has a 'practice' of allowing a law firm one tardy filing—a 'one-bite rule,' as it were," based on a single statement in a different proceeding. Appx0018 (citing Letter from Thomas Gilgunn, Program Manager, AD/CVD Operations, Office VII, to Arnold & Porter Kaye Scholer LLP, *Antidumping Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea* (Aug. 3, 2018), at 2-3 ("*Corrosion-Resistant Steel Products*")).

The Trade Court committed two errors of law in this finding. First, it is well established that Commerce is not bound by its actions in prior proceedings because each proceeding "is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014). In fact, "Commerce may change its conclusions from one review to the next based on new

information and arguments, as long as it does not act arbitrarily and it articulates a reasonable basis for the change." *Qingdao*, 766 F.3d at 1387.

Second, as Commerce made clear in *Corrosion-Resistant Steel Products*, the "practice is grounded in 19 CFR 351.301(a)." Appx0017. Significantly, 19 C.F.R. § 351.301(a) reinforces Commerce's broad <u>discretion</u> to "request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information." There is nothing in this provision that <u>requires</u> Commerce to provide additional opportunities to submit information.

The Trade Court did not address 19 C.F.R. § 351.301(a) in its decision, however. Instead, its decision effectively forces Commerce to accept all untimely extension requests that may fit the "one-bite rule," thereby eliminating the agency's discretion to establish and enforce it regulatory deadlines.

#### ii. The Trade Court Abused Its Discretion When It Invalidated Commerce's Decision to Apply Total AFA to OF at the Corroborated Petition Rate

The Trade Court erred when it found that Commerce abused its discretion by applying total AFA to OF and by using the previously-corroborated 154.33% petition margin as the AFA rate.

The Trade Court held that Commerce's abuse of discretion when rejecting OF's retroactive extension request "means {Commerce}'s invocation of facts otherwise available here was unlawful—necessary information was not missing from the record 19 U.S.C. § 1677e(a)(1), nor did Oman 'fail{} to provide such information by the deadline{} for submission, *id.*, § 1677e(a)(2)(B)." Appx0019. In other words, the Trade Court's analysis with respect to Commerce's application of total AFA is predicated on its finding of an abuse of discretion regarding the extension request. As discussed above, that finding cannot withstand legal scrutiny. On this basis alone, the Trade Court's decision should be reversed.

Putting that issue aside, the Trade Court's determination regarding Commerce's application of total AFA to OF and the rate chosen is clearly erroneous.

Commerce's AFA determination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Additionally, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Accordingly, a party challenging Commerce's findings under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation marks omitted).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (internal citations and quotation marks omitted). Here, because Congress has entrusted Commerce to administer the statute at issue in fact-intensive inquiries, Commerce's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinding" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

Moreover, "{a}n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citing *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)). Thus, Commerce's factual determinations will be upheld if they are reasonable and supported by the record, even if some evidence detracts from them. *See Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Indeed, it is improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (internal citation omitted).

Unfortunately, that is exactly what happened here: the Trade Court substituted its own opinion for Commerce's and did so by ignoring the plain language of the AFA statute and relevant judicial precedent.

A respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Tung Mung Dev. Co. v. United States*, No. 99-07-00457, 2001 WL 844484, at *27 (Ct. Int'l Trade Jul. 3, 2001) (citing *Olympic*

*Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990)); *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (recognizing that "the burden of creating an adequate record lies with interested parties and not with Commerce" (quotation marks and citation omitted)). OF failed to satisfy this obligation in the underlying review.

Commerce "shall" use facts otherwise available to reach its determination if: (1) "necessary information is not available on the record"; or (2) an interested party withholds information requested by Commerce, fails for provide such information by the deadlines in the form and manner requested, significantly impedes the proceeding, or provides information that cannot be verified. 19 U.S.C. § 1677e(a).

Commerce may apply AFA where a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. The motive or intent (or lack thereof) behind a

party's failure to cooperate to the best of its ability is irrelevant. *See id.* "Additionally, the SAA makes clear that the application of AFA is a tool given to Commerce 'to ensure that {a} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'" *Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357, 1374 (Ct. Int'l Trade 2021) (quoting Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, H.R. Doc. Rep. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198).

As OF admits, Commerce's supplemental questionnaire was "extensive," reflecting the numerous and significant deficiencies in its initial questionnaire response. Appx2783-2784. The supplemental questionnaire contained:

> 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database.

*Id.* In short, the questionnaire was intended to address numerous problems with the most fundamental parts of OF's U.S. sales data.

The cover letter to the questionnaire also notified OF of the deadline and the consequences for failing to submit its response or an extension request by that time:

> If Commerce does not receive either the requested information or a written extension request before 5 p.m. EST on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be returned to you. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination.

Appx0101-0102.

Despite the request for this critical information, warnings about the repercussions for untimely filings, and receiving multiple extensions of time, OF failed to file the Response in its entirety by the deadline. *See* Appx1658. Instead, OF ignored its late submission for over a month, evidently hoping that Commerce would not notice. Commerce did notice, however, and observed that OF "waited until 38 days after the untimely submission of the {Response} to bring any filing issues to

Commerce's attention, two days after the {Response} was rejected and removed from the record." *Id.*

In accordance with its regulations, Commerce properly rejected the Response. *See id.* Consequently, Commerce determined that "numerous deficiencies remain on the record," and "much of the other information pertaining to Oman Fasteners' U.S. sales remains unsubstantiated on the instant record." Appx1663. Commerce explained that:

> With respect to the U.S. sales reconciliation, the U.S. sales reconciliation that is on the record has numerous unsupported conflicting adjustments. The conflicting adjustments raise doubts concerning the reliability of the reported total U.S. sales values. For this reason, Commerce requested information in the supplemental section C questionnaire to resolve these apparent discrepancies.

Appx1665-1666 (footnote omitted).

Commerce determined that:

> Without a detailed explanation from Oman Fasteners of the discrepancies pertaining to movement expenses, billing adjustments, bank charges, packing expenses, freight revenue, insurance, rebates, payment dates, and an accurate U.S. sales database, we cannot calculate an accurate dumping margin. Furthermore, the myriad issues with reported terms of delivery and delivery expenses, rebates, billing adjustments, packing, and freight revenue charges raise concerns

> that the price buildup for various control numbers would not be reliable and, thus, the integrity of the entire U.S. sales database and its accuracy are called into question.

Appx1666. As a result, OF "has rendered Commerce incapable of calculating an accurate dumping margin based on record information," making it necessary to rely on total facts otherwise available under 19 U.S.C. § 1677e(a). *See id.* Put another way, this deficiency left a large gap in the record. For obvious reasons, Commerce found that OF "did not provide a convincing explanation for why its submission was late." Appx1670.

Commerce then determined that OF "failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines," Appx1666, "and, in doing so, greatly inhibited Commerce's ability to calculate an accurate dumping margin based on the respondent's own data." Appx1670. Accordingly, Commerce applied total AFA to OF.

Despite these facts and Commerce's reasonable and lawful determination, the Trade Court concluded that Commerce "provided no explanation justifying its conclusion that a 16-minute delay is a failure

to cooperate." Appx0021. This statement is legally and factually incorrect.

First, judicial precedent makes clear that AFA may be warranted where a party fails to submit requested information or an extension request before the filing deadline. In *Dongtai Peak*, this Court dealt with a challenge to Commerce's decision to resort to AFA in precisely this context:

> As this court has noted, "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries," and "{w}hile the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." Nippon Steel, 337 F.3d at 1382 (emphases added). Because Dongtai Peak was aware of the deadline and had the opportunity to file an extension request prior to its expiration, its failure to do so indicates an inattentiveness or carelessness with regard to its obligations. <u>This warranted application of AFA</u>.

777 F.3d at 1355-56 (emphasis added). Thus, the Trade Court's judgment that Commerce is not permitted, by law, to find that a party

failed to cooperate by failing to submit requested information or an extension request by the deadline, is clearly erroneous.[6]

Second, as Commerce explained, the delay at issue here was not 16 minutes. Rather, OF failed to file a request for retroactive extension for 38 days, which was two days after Commerce rejected the late-filed and incomplete Response. Appx1658.

The Trade Court next held that "Commerce abused its discretion by selecting the punitive 154.33 percent rate" from the petition as the AFA rate. Appx0022. This judgment is clearly erroneous, belied by both statute and judicial precedent.

It is well settled that "{a}s long as a rate is properly corroborated according to the statute, Commerce has acted within its discretion and the rate is not punitive." *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300 (Fed. Cir. 2021) (internal quotation marks and citation

---

[6] The Trade Court also cites to *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022), to suggest that Commerce did not examine OF's actions and assess the extent of the company's abilities, cooperation, and efforts in responding to the Response. *See* Appx0020. In *Hitachi*, this Court found that "{t}he government does not assert that Hyundai withheld information, or committed any of the transgressions in § 1677e(a)(1) or (2)." 34 F.4th at 1386. That is not the situation here, where Commerce made such determinations.

omitted); *see also KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) ("{A}n AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins such as the margin at issue in this case.").

When applying AFA to an interested party, Commerce may rely on information from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2). Information derived from the petition is considered secondary information pursuant to subsection 1677(3)(c). "When Commerce 'relies on secondary information rather than on information obtained in the course of an investigation or review,' it 'shall, to the extent practicable, corroborate that information from independent sources that are reasonably at {its} disposal.'" *Deacero*, 996 F.3d at 1299 (quoting 19 U.S.C. § 1677e(c)(1)).

In its corroboration, Commerce should satisfy itself that the secondary information to be used has probative value. *See* SAA at 870;

*Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016). Commerce is not required to estimate what the non-cooperating party's dumping margin would have been if it had cooperated or demonstrate that the dumping margin reflects an alleged commercial reality of the party. *See* 19 U.S.C. § 1677e(d)(3). Moreover, Commerce may corroborate the highest petition margin using individual transaction-specific margins. *See, e.g.*, *id.* § 1677e(b)(2)(A), (d)(1)(B), (d)(2); *Deacero*, 996 F.3d at 1300-01 (upholding Commerce's corroboration, in which it relied on transaction-specific margin calculations).

Courts have affirmed this approach. *See, e.g.*, *Papierfabrik*, 843 F.3d at 1380-82 (holding that Commerce sufficiently corroborated the highest petition margin of 75.36% as the AFA rate because the respondent's transaction-specific margins in a previous review included one margin of almost 50% and another of 144.63%); *KYD*, 607 F.3d at 765-67 (holding that Commerce's choice of the highest petition margin of 122.88% as the AFA rate was supported by evidence submitted with the petition and by Commerce's calculation of "high-volume transaction-specific margins for cooperative companies which are both higher than

the 122.88 percent petition rate and are close to that rate"); *see also* *Deacero*, 996 F.3d at 1300-01 (holding that substantial evidence supports Commerce's corroboration of the highest petition margin as the AFA rate, which was derived from reliable independent sources of information submitted with the petition and petition supplements, and aligned with the respondent's transaction-specific margins from a previous review that were in the range of or exceeded the AFA rate).

Here, in light of OF's failure to cooperate, Commerce reasonably selected the petition margin of 154.33% as the AFA rate for OF, which is not designed to be punitive, but to induce future cooperation. *See* Appx1671.[7] Commerce adequately corroborated the 154.33% margin both when the case was filed and when it was initially used as the AFA rate in the first review:

> Specifically, we are applying a rate of 154.33 percent, which was calculated by Petitioner in the petition in this investigation. We have corroborated this rate with information obtained in the course of this

[7] Apart from the petition margin, the record contains a number of very low calculated margins, ranging from 0.00% to 9.11%. OF itself acknowledged that these rates would not adequately induce full future cooperation: "Oman Fasteners has experience selling merchandise while facing duty deposits ranging between 0 and 9.1 percent." Appx2953-2954. In other words, OF has been able to conduct "business as usual" with such margins.

> administrative review, consistent with section 776(c)(1) of the Act. For further discussion, see the Preliminary Decision Memorandum.

Appx0062 (*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014-2016*, 82 Fed. Reg. 36,738 (Dep't of Commerce Aug. 7, 2017)).

Indeed, as the Preliminary Decision Memorandum shows, Commerce corroborated the petition margin <u>using OF's own data</u>:

> Because the margin alleged in the petition is secondary information under section 776(c)(1) of the Act, in order to determine the probative value of the dumping margin alleged in the petition for assigning an AFA rate, we examined the information on the record. <u>We compared the petition dumping margin of 154.33 percent to the transaction-specific margins calculated for Oman Fasteners, which were not calculated using total AFA. We preliminarily find that the 154.33 percent petition margin falls within the range of the highest transaction-specific margins calculated for Oman Fasteners, which appear to be non-aberrational sales in terms of transaction quantities or other such terms when compared with other sales in Oman Fasteners' database.</u> Thus, in accordance with section 776(c)(1) of the Act, we have preliminarily corroborated the highest dumping margin contained in the petition, 154.33 percent, as AFA, using transaction-specific margins from the mandatory respondent Oman Fasteners.

Appx0073 (footnotes omitted) (emphasis added). The 154.33% rate was again used in the second review as AFA. *See* Appx0086 (*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 58,231, 58,232 (Dep't of Commerce Nov. 19, 2018)).

Because Commerce properly corroborated the petition rate according to the statute using the transaction-specific method here, the agency has acted within its discretion, and the petition rate is not punitive as a matter of law.

The case to which the Trade Court cites, *BMW of North America LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019), *see* Appx0022-0023, involved "unique factual circumstances," *BMW*, 926 F.3d at 1302, which are not applicable here. *BMW* concerned a 2010-2011 AD administrative review. *See id.* at 1294. Due to litigation regarding the ITC's determination in a five-year ("sunset") review, Commerce revoked the underlying order and discontinued the administrative review in July 2011, but resumed the administrative review more than two years later. *See id.* at 1294-95. BMW believed that the administrative review had been permanently terminated and failed to respond to a

questionnaire that Commerce emailed to its former counsel in December 2013. *See id.* at 1295-96, 1298-99.

This Court ultimately determined that it "cannot ascertain whether Commerce properly selected an AFA rate that was not unduly punitive" because "Commerce did not address how the procedural irregularities surrounding the administrative review process affected its view of BMW's level of culpability." *Id.* at 1302. The unique "procedural anomalies" and "years-long delay" at issue in that case, which may have been potentially "mitigating circumstances," *id.* at 1296, 1302, are not relevant here.[8]

By contrast, OF did not show any mitigating circumstances. As detailed above, OF's counsel admitted culpability for the missed deadline, and then tried to fly under the radar, apparently hoping the missed deadline would go unnoticed.

[8] The final results of BMW's administrative review were issued in January 2015, before the statute was amended later that year. *See BMW*, 926 F.3d at 1296, 1301 n.3. This Court stated that its "decision relies on case law that interprets statutory language that is identical in both versions of the statute pre-and-post-dating the amendments." *Id.* at 1301 n.3.

### B. The Trade Court Erred By Finding That OF's Speculative Claims Of Irreparable Harm Satisfied The Standard For Injunctive Relief

The Trade Court made a clearly erroneous judgment in finding that OF met the "high burden required to show irreparable harm and that injunctive relief is warranted." *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC v. United States*, 389 F. Supp. 3d 1386, 1403 (Ct. Int'l Trade 2019).

A party seeking a permanent injunction must show "that is has suffered an irreparable injury." *eBay*, 547 U.S. at 391. To obtain a preliminary injunction, a party must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).

"Irreparable harm constitutes potential harm that cannot be redressed by a legal or equitable remedy at the conclusion of the proceedings, so that a preliminary injunction is the only way of protecting the plaintiffs." *Severstal Exp. GMBH v. United States*, Court No. 18-00057, 2018 WL 1705298, at *3 (Ct. Int'l Trade Apr. 5, 2018) (internal citations omitted). "Generally, financial loss alone is not

irreparable." *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1315 (Ct. Int'l Trade 2014) (internal citations omitted).

"Critically, irreparable harm may not be speculative." *Id.* (internal citation omitted). As such, "a mere possibility of injury, even where prospective injury is great," is insufficient to show irreparable harm. *Id.* (internal citations and quotation marks omitted). Rather, "{a} presently existing, actual threat must be shown." *Id.* (internal citations and quotation marks omitted).

First, the Trade Court accepted OF's assertion that Commerce's preliminary results "forced" the company to cease all U.S. shipments of subject merchandise. Appx0026. This is not true. OF had the ability to continue shipping but chose not to do so. It chose to stop shipping because, as a matter of its own AD risk management strategy, it acts as its own non-resident importer of record. Appx2959. As a result, OF is liable for all AD duties, and in this case, chose to stop shipping to the U.S. rather than support those customers. Any injury in this regard is self-inflicted.

The Trade Court next found that OF risked insolvency "from running out of cash" and "through [ financial description ]." Appx0026-

0031. With respect to "running out of cash," OF presented an exhibit with "{s}imple mathematics" that conveniently showed that OF's accessible cash would be exactly $[amt] — no more, no less — by the end of March 2023. Appx0029, Appx3589. The figures in this exhibit, however, were never properly substantiated, and OF did not provide sufficient documentary support for them. Yet, the Trade Court uncritically accepted them as accurate.

Additionally, OF's claims of [ action ] to [entities] are entirely speculative, and the Trade Court's analysis is unsupported. *See* Appx0030. OF provided no evidence that its [entities] have provided notice of [ action ], and in fact admitted that it had not received any such notification from its [entities]. *See* Appx3075-3078.

Moreover, the Trade Court improperly found that, without an injunction, OF would need to terminate "more employees." Appx0033. This claim speaks to potential future events, not events that have occurred or are presently occurring. Indeed, outside of testimony by OF's President and CEO, OF provided no support for this assertion.

Further, the Trade Court found that OF would face irreparable harm to its customer relationships. *See* Appx0032. In this

determination, the Trade Court failed to consider information submitted by Mid Continent regarding the current state of the market, which undermines OF's claim.

Specifically, Mid Continent submitted a declaration from its Executive Vice President of Sales & Marketing, showing that since late Q3-2022 the U.S. market for nails has deteriorated significantly. *See* Appx3268-3287.

First, higher mortgage interest rates have significantly reduced demand for home purchasing. Second, the United States has seen a 21% decline in residential wood to wood construction. Third, inflation has caused a decline in the consumption of wood pallets, the second largest market segment for nails. Fourth, currently there is a glut of nail inventories at all customer levels in the United States. Due to supply chain issues over the pandemic, shipments of imported steel nails that were scheduled to arrive in early 2022 were delayed. As supply chain problems eased over the course of 2022, large amounts of orders arrived in close succession, with many arriving just as demand dropped for the reasons above. *See id.*

Because of this, customers across the entire United States have excessive inventories of steel nails. New orders are off significantly as customers try to right-size their stocking levels to meet the new slower demand. This is the situation across the board. The glut of steel nails in the United States combined with the capacity of other import sources and domestic steel nail producers far exceeds the supply needed to match the current and projected demand for steel nails over the next few years. *See id.*

In addition, pricing of steel nails in the United States has fallen dramatically since the end the summer of 2022. Prices of imported steel nails have fallen 30 to 40% since Q3-2022 and prices of domestically produced steel nails are down [#]% over the same time period. *See id.*

As this shows, the current market reality is that customers are sitting on very large volumes of inventory that they need to shed before they resume purchasing. This is a process that will take months at the least, given current economic uncertainty. By all appearances, OF's customers will be working down excess inventory for a long period before contemplating new orders. Rather than being likely to leave OF while waiting for the outcome of this litigation, its customers will

simply consume inventory. Thus, OF cannot reasonably claim that its loss of customers would be related entirely to the AD rate from this review.

None of the above information is discussed in the Trade Court's decision. *See* Appx0001-0039. Thus, the Trade Court made a clearly erroneous (or at least, incomplete) judgment as to OF's claim that any loss of customers would be the result of the AFA rate.

The Trade Court's determination as to the "irreparable harm" factor clearly colors its decision regarding the remaining permanent injunction factors. While the Trade Court dedicated 12 pages of its opinion to discussing irreparable harm, it spent only two pages discussing <u>all</u> of the other three prongs (availability of remedies at law, balance of equities, and public interest). *Compare* Appx0025-0037 (discussion of irreparable harm) *with* Appx0025 n.14 (discussion of remedies available at law), Appx0037-0038 (discussion of balance of equities and public interest).

A court must find that the requesting party adequately demonstrated all four factors in order to obtain injunctive relief. *See, e.g.*, *Bio-Rad*, 967 F.3d at 1377 ("According to well-established

principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.") (quoting *eBay*, 547 U.S. at 391); Appx3690-3691 (J. Baker stating that it is "the Plaintiff's burden, *i.e.*, Winter to require that the Plaintiff to satisfy each of the four elements. In my view, the balancing test…has gone by the wayside since *Winter*."). Such analysis did not occur here.

### C. The Trade Court's Conclusion That Remedies Available At Law Are Inadequate To Compensate OF Is A Clear Error In Judgment

The Trade Court summarily concluded that remedies available at law are inadequate to compensate OF for the alleged irreparable harm it suffered due to Commerce's determination. In fact, the Trade Court's entire analysis as to this factor amounts to two sentences that appear in a footnote: "There is no dispute here that Oman has no other remedy at law <u>against the government</u>. Therefore, the company satisfies the second *eBay* requirement." Appx0025 n.14 (emphasis added).

This determination is a clear error in judgment and ignores information and argument that Mid Continent presented. First, the legal standard is not limited to remedies at law "against the government." Second, OF does indeed have a remedy available at law

to compensate it for any damages it incurs. As Mid Continent explained below, under the uncontested facts of this case, any harm suffered by OF arises from its counsel's errors, and can be made whole by its counsel's professional liability insurance policy. *See* Appx3071-3072. Any and all "harm" suffered by OF due to the errors and omissions of its counsel leading to the 154.33% rate will be quantified by damages experts, and its claims paid either through a negotiated settlement or litigation. Yet the Trade Court inexplicably and improperly ignored this analysis.

As the U.S. Supreme Court has held, financial loss alone — compensable with monetary damages — is not irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). Additionally, the *eBay* standard explicitly considers whether "remedies available at law, <u>such as monetary damages</u>, are inadequate to compensate for that injury." *eBay*, 547 U.S. at 391 (emphasis added). That is the case here. Yet the Trade Court failed to consider, let alone address, this point.

Further, the Trade Court failed to recognize another remedy at law available to OF, one that it is exercising currently: requests for an

administrative review by Commerce and appeals of any determinations therefrom.

In sum, OF simply cannot demonstrate that it lacks remedies at law that can compensate it for any harm it suffers, as is required to support the extraordinary relief of an injunction in this appeal. The Trade Court made clearly erroneous factual findings and committed an error in judgment by ignoring argument showing that such remedies exist. On this basis alone, OF fails to satisfy the four-prong standard established by *eBay*, 547 U.S. at 391.

### D. The Trade Court Erred By Finding That The Balance Of Equities Weigh In OF's Favor

When considering a motion for a permanent injunction, courts evaluate whether the balance of equities weighs in favor of injunctive relief. *See eBay*, 547 U.S. at 391. When assessing the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citation and quotation marks omitted).

Here, the Trade Court's entire discussion regarding the balance of equities factor occupies a single paragraph, stating that OF would face

"catastrophe" absent injunctive relief, while harm to the Government is "minimal to non-existent, because it will receive no revenue from Oman if the company goes bankrupt." Appx0037.

This incorrect judgment reflects the Trade Court's errors of law. Under the circumstances present here, an injunction "suspend{s} the effect of the statute," 19 U.S.C. §§ 1673b and 1673d, enjoining Commerce from instructing U.S. Customs and Border Protection to require a cash deposit or bond for each entry of nails at the rate determined in the underlying review. In *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC*, the court held that the balance of the equities tipped in favor of denying a preliminary injunction, in part, due to such circumstances. *See* 389 F. Supp. 3d at 1404.[9]

Next, the Trade Court's assumption that the Government "will receive no revenue from Oman if the company goes bankrupt," Appx0037, is legally incorrect because the Government can seek to collect OF's underpaid duties from its surety under its importation bond.

[9] The Trade Court ignored Mid Continent's discussion of this case. *See* Appx0001-0039.

Additionally, the Trade Court failed to consider the balance of equities as it relates to Mid Continent, a party to this litigation. *See* Appx0037; *Winter*, 555 U.S. at 24 (requiring courts to "consider the effect on each party") (emphasis added) (internal citation omitted).

As a member of the domestic industry, Mid Continent is an intended beneficiary of the remedial effects of the antidumping duty laws included in the Tariff Act of 1930, as amended. *See, e.g.*, *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 837 (Fed. Cir. 2020) (antidumping duties are imposed to protect domestic industries against unfair trade practices); *Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011) (antidumping duty orders "are imposed to protect American industries against unfair trade practices by foreign entities who sell in the American market").

By ordering Commerce to adopt a cash deposit rate from an entirely different review, based on a completely different record, without affording the agency the opportunity to address any perceived infirmities in its prior decision, the Trade Court has improperly short-circuited and undermined the legislative scheme imposed by Congress.

This Congressionally-mandated system creates an orderly process whereby rates assigned through the administrative review process remain in place until a final decision is entered after any appeals, remands, and subsequent appeals. This scheme, consistent with the laws dealing with unfair trade, is intended to provide important remedial benefits to affected domestic producers such as Mid Continent.

Moreover, the injunction artificially distorts the dynamics of the domestic market, contrary to Congressional intent, by ordering Commerce to use a cash deposit rate of 1.65% rather than 154.33%. The real-world consequences of this error to Mid Continent (and other market participants) are significant, in terms of lost sales and lost revenue by virtue of improperly facilitated import competition.

In sum, the Trade Court's flawed analysis of the balance of equities and public interest factors contravenes statutory law and judicial precedent, and should be reversed. The injunction should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should vacate the permanent injunction issued by the Trade Court, and order retroactive imposition of the 154.33% cash deposit rate on imports of steel nails by or from OF effective on and after December 22, 2022.

Respectfully submitted,

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

Dated: May 1, 2023

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1).

This brief contains 13,982 words.

This brief complies with the typeface requirements Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure.

This response has been prepared in a proportionally spaced type face using Microsoft Word in Century Schoolbook 14-point font.

/s/ Adam H. Gordon
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

Dated: May 1, 2023

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 23-1661

**Short Case Caption:** Oman Fasteners, LLC v. US

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 10 number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 05/01/2023

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2023, a copy of the foregoing opposition was served on the following parties by operation of the Court's electronic-filing system:

Michael P. House
Partner
**Perkins Coie LLP**
700 Thirteenth Street NW,
Suite 800
Washington, DC 20005
Email: MHouse@perkinscoie.com

/s/ Adam H. Gordon
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

Dated: May 1, 2023

# ADDENDUM OF REQUIRED DOCUMENTS

## TABLE OF CONTENTS


| Tab No. | Document | Appendix Pages |
|---|---|---|
| 1 | *Oman Fasteners, LLC, v. United States*, Slip op. 23-17 | Appx0001-0039 |
| 2 | *Oman Fasteners, LLC, v. United States*, Order | Appx0040-0042 |

# Tab 1

## *Oman Fasteners, LLC, v. United States,* Slip op. 23-17

## Appx0001-0039

**PUBLIC VERSION**

**Slip Op. 23-17**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

---

**Court No. 22-00348**

---

OMAN FASTENERS, LLC,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

MID CONTINENT STEEL & WIRE, INC.,

*Defendant-Intervenor*.

---

Before: M. Miller Baker, Judge

**OPINION**

[Consolidating Plaintiff's motion for a preliminary injunction with trial on the merits, granting judgment on the agency record in favor of Plaintiff, remanding for further proceedings, and enjoining Defendant from requiring Plaintiff to post 154.33 percent cash deposits on subject merchandise pending further order of the court.]

Dated: February 15, 2023
Amended: February 22, 2023

*Michael R. Huston*, Perkins Coie LLP of Washington, DC, argued for Plaintiff. With him on the briefs were

**PUBLIC VERSION**

*Michael P. House* and *Andrew Caridas*. *John M. Devaney* examined Plaintiff's witness.

*Kelly M. Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant and cross-examined Plaintiff's witness. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Ian A. McInerney*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Adam H. Gordon*, The Bristol Law Group PLLC of Washington, DC, argued for Defendant-Intervenor and cross-examined Plaintiff's witness. With him on the brief were *Jennifer M. Smith* and *Lauren Fraid*.

*Baker*, Judge: "[T]he power to tax [is] the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819) (Marshall, C.J.). Wielding that power, the Commerce Department imposed a duty rate of 154.33 percent on Oman Fasteners, LLC (Oman), an importer of steel nails, solely for missing a filing deadline by 16 minutes. *See Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg.

**PUBLIC VERSION**

78,639 (Dep't Commerce Dec. 22, 2022).[1] The rate previously applicable to such imports was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't Commerce Nov. 29, 2021), meaning that Commerce raised Oman's duty rate by more than *ninety-three-fold*.

Oman brings this suit challenging Commerce's decision. In the ordinary course, Oman would move for judgment on the agency record and, if successful, the court would remand to the Department for a recalculation of the challenged antidumping duties. In the meantime, however, Oman would still be required to pay estimated cash deposits[2] set at 154.33 percent

---

[1] For background on administrative reviews in antidumping proceedings and the role of mandatory respondents such as Oman, see *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334–35 (CIT 2020).

[2] The Tariff Act of 1930 provides that when Commerce makes an affirmative determination that merchandise is being dumped, the Department "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin"—here, 154.33 percent. 19 U.S.C. § 1673d(c)(1)(B)(ii). This requirement is intended as security for the eventual payment of antidumping duties.

Later, U.S. Customs and Border Protection "liquidates" the entry to make a "final computation or ascertainment of duties owed." *ARP Materials, Inc. v. United States*, 520 F. Supp. 3d 1341, 1347 (CIT 2021) (citing 19 C.F.R. § 159.1;

**PUBLIC VERSION**

until the court entered a final judgment affirming a new rate recalculated by Commerce. The Department then would issue new cash deposit instructions and revoke the 154.33 percent rate. *See Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1313–14 (CIT 2022) (discussing 19 U.S.C. § 1516a(c)(3) and holding that remand redeterminations do not become effective until sustained by a "final disposition of the court").

Claiming that it can't afford to pay such exorbitant cash deposits or (alternatively) shut down most of its business while this litigation and administrative proceedings play out, Oman moves for a preliminary injunction requiring the government to collect such deposits at the preexisting 1.65 percent rate set in the preceding administrative review. Exercising its discretion, the court consolidates Oman's motion with trial on the merits—in this context, a motion for judgment on the agency record.

Because Commerce's challenged actions here are the very definition of abuse of discretion, the court grants judgment on the agency record in favor of Oman and remands for further proceedings consistent with this opinion. And because the company has demonstrated the requirements for obtaining

---

19 U.S.C. § 1500), *aff'd*, 47 F.4th 1370 (Fed. Cir. 2022). Following liquidation, if the importer's deposit was lower than the final duty assessed, Customs collects any additional amounts due, with interest; if the deposit exceeded the final assessment, Customs refunds the difference, with interest. *Id.* (citing 19 U.S.C. § 1505(b)).

injunctive relief, including showing irreparable injury, the court enjoins the government to collect cash deposits at the previous rate of 1.65 percent pending further order of the court. *Cf. Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting) ("The power to tax is not the power to destroy while this Court sits.").

I

A

The memorandum accompanying Commerce's decision explains that Oman had until 5:00 p.m. Eastern Time on February 14, 2022, to upload its supplemental section C questionnaire response to the Department's ACCESS electronic filing system, but Commerce received the response "between 4:41 p.m. ET and 5:16 p.m. ET." ECF 38-3, at 17.[3] The Department "received no notification from Oman . . . of filing difficulties or an additional request for extension of the deadline prior to 5:00 p.m." and cited a regulation providing that "[a]n electronically filed document must be received successfully *in its entirety* by . . . ACCESS, by 5 p.m. [ET] on the due date." *Id.* (emphasis and brackets in original) (quoting 19 C.F.R. § 351.303(b)(1)).

[3] ECF 38-3 contains exhibits to the public version of Oman's motion. ECF 36-3 contains sealed versions of the same material. In this opinion, citations to exhibits refer to the page numbers stated in the ECF header.

Oman explains[4] that ACCESS offers a "check file" feature that pre-screens a submission to ensure there are no technical issues that will cause it to be rejected. Counsel used that feature and it found no problems, so he began uploading material 50 minutes prior to the 5:00 p.m. deadline, which he believed—based on past experience—would be sufficient time. ECF 38-1, at 7–8. Unexpectedly, and notwithstanding the "check file" feature's approval of the submission, ACCESS rejected the first submission twice due to technical defects, and it took a total of 17 minutes for the system to issue the two error messages. *Id.* at 8. Counsel reformatted the problem materials and filed them at 4:41 p.m. and 4:46 p.m. He then began uploading additional files, "all but one of which were Excel-format copies of the PDF exhibits that counsel had already uploaded." *Id.* at 9. But the system ran slowly and did not accept the "U.S. sales SAS database" piece of the submission until 5:16 p.m. *Id.* at 9.

---

[4] Oman did not provide a declaration from counsel substantiating its account of the events surrounding its 16-minute delay in completing its filing. The record contains counsel's statements offered before Commerce that were not under oath but were subject to false statement liability under 18 U.S.C. § 1001. *See* 19 C.F.R. § 351.303(g). As the parties have not addressed whether representations encompassed by § 1001 suffice to support injunctive relief in lieu of sworn testimony, the court recounts counsel's explanation solely for purposes of providing context. No party disputes that Oman completed its filing 16 minutes late, so the court accepts that fact as true.

Counsel decided not to contact Commerce about the matter for two reasons. First, the Department had said there would be no further extensions. *Id.* at 9–10; *see also* ECF 38-3, at 63 (Commerce letter to counsel stating, in relevant part, "Commerce does not anticipate providing any additional extension for Oman Fasteners' response . . . ."). Second, the February 14 submissions were "bracketing not final" versions, and the next day counsel timely filed the final versions under Commerce's "one-day lag rule."[5] ECF 38-1, at 10.

Just over five weeks later, the Department rejected Oman's entire supplemental section C questionnaire response (including the portions submitted prior to 5:00) as untimely and struck it from the record. ECF 38-3, at 17. In response, Oman made several requests that Commerce reconsider and grant a retroactive extension of time, but the Department refused, finding that "Oman . . . failed to demonstrate that a qualifying extraordinary circumstance existed to warrant an untimely extension of the deadline." *Id.* (citing 19 C.F.R.

---

[5] The "one-day lag rule" allows a party to submit only a business proprietary version of a document by the deadline with a notice that "bracketing of business proprietary information is not final for one business day after date of filing." 19 C.F.R. § 351.303(d)(2)(v) (title case removed). The party then has one extra business day to double-check its designations of confidential information and then to file a final confidential submission together with a redacted public version. *Id.* § 351.303(c), (c)(2)(iii). The party may make no changes to the final submission other than adjusting bracketing and removing the notice about bracketing not being final. *Id.* § 351.303(c)(2)(ii).

**PUBLIC VERSION**

§ 351.302(c)(2)).[6] Commerce faulted counsel for not seeking an extension before the deadline and instead "wait[ing] until 38 days after the untimely submission of the [response] to bring any filing issues to Commerce's attention . . . ." *Id.* The Department said counsel did not allow enough time to file because, as is often said on Wall Street, past performance is no guarantee of future results: Oman's "assertion that certain prior filings took a particular amount of time is not relevant.

---

[6] The regulation the Department cited provides as follows:

> (c) *Requests for extension of specific time limit.* Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section. An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists. The request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303, and state the reasons for the request. An extension granted to a party must be approved in writing.
>
> > (1) An extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary.
> >
> > (2) An extraordinary circumstance is an unexpected event that:
> >
> > > (i) Could not have been prevented if reasonable measures had been taken, and
> > >
> > > (ii) Precludes a party or its representative from timely filing an extension request through all reasonable means.

19 C.F.R. § 351.302(c).

**PUBLIC VERSION**

Prior filing times do not guarantee a given submission will require a specific length of time to file, and simply because filing on ACCESS had taken less time in previous cases does not constitute an extraordinary circumstance." *Id.* at 225.

The Department cited its "broad discretion" in establishing and enforcing deadlines and said past cases "demonstrate that Commerce establishes deadlines and maintains those deadlines throughout the proceeding and *occasionally accepts late filings depending on the facts of the particular case before it*." *Id.* at 18 (emphasis added).

Commerce then found that "the record lacks necessary information because Oman Fasteners did not timely file its SCQR. Oman Fasteners failed to act to the best of its ability and provide requested information by the deadline for submission of that information. . . . Therefore, in accordance with [19 U.S.C. § 1677e(a)], we are relying on facts available." *Id.* at 25 (emphasis added).

In selecting from facts otherwise available, Commerce also applied an adverse inference. In considering what rate to assign Oman, the Department noted that "the record of this proceeding includes certain calculated margins, ranging from 0.63 percent to 9.10 percent, as well as the Petition rate of 154.33 percent from the initiation of the underlying investigation," *id.* at 29, and decided, "[I]t is appropriate to assign Oman Fasteners the Petition rate of 154.33 percent based on its failure to cooperate, because it is a rate on the

record which would confer an adverse inference and induce cooperation." *Id.* at 30. Oman thus suffered what trade cases commonly refer to as "adverse facts available," or "AFA," a fate statutorily reserved to respondents that do not "cooperate . . . to the best of [their] ability" with an antidumping or countervailing duty investigation. 19 U.S.C. § 1677e(b).[7]

B

Oman timely sued on December 23, 2022, the day after Commerce issued its decision. *See* ECF 1 (summons); ECF 10 (complaint). Three days later, Oman filed public (ECF 38) and confidential (ECF 36) versions of its motion for a preliminary injunction. At that time the court set an expedited briefing schedule and advised the parties that it was considering consolidating Oman's preliminary injunction motion with trial on the merits—in this context, treating Oman's motion as a motion for judgment on the agency record. *See* USCIT R. 56.2 (providing for judgment on the agency record); *see also* USCIT R. 65(a)(2) (allowing consolidation of a preliminary injunction motion with trial on the merits).

Mid Continent Steel & Wire, Inc., then intervened as a defendant as of right. ECF 37. After the completion of briefing and limited discovery, the court conducted an evidentiary hearing with live witness

[7] For background on Commerce's use of adverse facts available in antidumping proceedings, see *Hung Vuong*, 483 F. Supp. 3d at 1336–39.

testimony and heard legal argument on February 1, 2023. At the outset of the hearing, the court advised the parties that it would likely consolidate the preliminary injunction motion with trial on the merits by treating the motion as one for judgment on the agency record. *See* ECF 83, at 4:12–5:19.

II

Oman sues under § 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii), challenging Commerce's final determination in an administrative review of an antidumping order under 19 U.S.C. § 1675. ECF 10, at 2. The court has jurisdiction per 28 U.S.C. § 1581(c).

In cases brought under § 516A of the Tariff Act, the Court of International Trade "shall review the matter as specified in subsection (b) of such section." 28 U.S.C. § 2640(b). In relevant part, subsection (b) provides that "the Court of International Trade must sustain 'any determination, finding[,] or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' " *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). In addition, Commerce's exercise of discretion in § 516A cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see*

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in cases reviewed under 28 U.S.C. § 2640(b), "section 706 review applies since no law provides otherwise").

III

A

Under Rule 65, the court has discretion to consolidate a hearing on a preliminary injunction with the trial on the merits. *See* USCIT R. 65(a)(2). In this administrative law context, that means treating Oman's motion as one for judgment on the agency record. *See* USCIT R. 56.2. Here, the court so consolidates Oman's motion with the trial on the merits. The court finds that so doing promotes judicial economy, reduces expense to the parties, and furthers speedy resolution of this dispute. *See* USCIT R. 1 (stating that the court's rules are to be "construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding").

B

On the merits, Oman asserts three separate and independent theories challenging Commerce's decision to apply facts otherwise available with an adverse inference. *First*, the Department abused its discretion in denying Oman a retroactive extension of time in these circumstances. *Second*, even if the Department properly refused to grant Oman a retroactive extension, the Department abused its discretion in applying

an adverse inference. *Finally*, even if the Department properly applied an adverse inference, the Department abused its discretion in selecting such a high rate (154.33 percent). The court easily agrees with Oman as to each of its theories; this is not a close case.

1

Oman argues that in denying it a retroactive extension, the Department abused its discretion for two reasons. The court considers each in turn.

a

Almost ten years ago, buried in a response to a party's comment made during rulemaking, Commerce casually revealed that it grants virtually automatic 15½-hour[8] extensions for completion of filings:

> Parties should be aware that the likelihood of the Department granting an extension will decrease the closer the extension request is filed to the applicable time limit because the Department must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an

[8] As a technical matter, the automatic extension is actually a *minimum* 15½-hour extension due to the Department's reference to "the next work day." A party with a deadline of 5:00 p.m. on an ordinary Friday, for example, would receive an extension to 8:30 a.m. the following Monday, and a party whose deadline falls on the Friday before a holiday weekend would receive an extension to Tuesday. Here, however, the deadline was on a Monday.

> extension of a time limit if they have not received a response from the Department. *For submissions that are due at 5:00 p.m., if the Department is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next work day.*

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,792 (Dep't Commerce Sept. 20, 2013) (emphasis added). This offhand comment response—which has never been codified through a regulation or otherwise reasonably communicated to the bar—means that a party in Oman's situation could (and unquestionably should) have a boilerplate request for an extension ready to file at 4:55 p.m. if a required filing encounters technical difficulties of the type that Oman claims to have suffered here. In the real world, such a last-minute extension request is virtually certain to obtain at least a 15½-hour extension for completing a filing.[9]

---

[9] Counsel for the government argued at the hearing that the extension is not automatic because Commerce could deny it, but when pressed by the court she conceded that it would be very unlikely that Commerce would be able to deny such a last-minute extension request prior to the 5:00 p.m. cutoff. ECF 83, at 275:7–276:8. The Department's rulemaking comment response unambiguously states that if Commerce does not rule on the extension request by 5:00 p.m., the deadline bumps to 8:30 a.m. the next work day—thus making the extension essentially automatic in

The court finds that because the Department has not codified its practice or otherwise provided clear notice to the bar that this virtually automatic 15½-hour extension is available, it is an abuse of discretion for Commerce to require a showing of "extraordinary circumstances" to support a retroactive extension request in the narrow circumstance where, as here, the filing is completed after 5:00 p.m. but prior to 8:30 a.m. the following work day—that is, when the filing is completed within the automatic window that Commerce's rulemaking comment response authorizes.[10]

---

practice because a ruling at 5:01 p.m. would be too late to prevent the extension from taking effect.

[10] The court emphasizes that Oman's completion of its filing within the 15½-hour window is essential to Part III.B.1.a of this decision and distinguishes this case from matters such as *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346 (CIT 2022), *appeal filed*, No. 22-2024 (Fed. Cir. Sept. 14, 2022), where counsel filed an extension request in time to get the "automatic extension" but then failed to complete the substantive filing by 8:30 a.m., and *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), in which the Federal Circuit found that Commerce was justified in excluding responses filed *ten days* after the deadline when the submitting party submitted an untimely request for extension and provided no explanation for why the party had not timely filed a request. The court expresses no view on whether the Department's failure to grant an extension in these circumstances would be an abuse of discretion if Commerce had clearly put the bar on notice of its last-minute extension policy through codification in a regulation or some other method reasonably calculated to provide notice to the bar. *See Celik*

b

Oman also argues that the Department has a "policy of leniency" for filing errors, ECF 38-1, at 30, and erred by failing to explain its departure from past practice in this proceeding. Oman points to this statement by Commerce in another proceeding:

> . . . Commerce's *practice* is to allow a law firm that misses a filing deadline one opportunity to submit the untimely information where [the] law firm failed to: 1) file a complete submission before the specified hour on the date of the deadline; 2) timely file the public version of the response; or 3) respond on the date of the deadline, but promptly contacted Commerce. We also note that Commerce allows a law firm a second opportunity to submit the untimely information only if that law firm has: 1) not previously been afforded such an opportunity in a past segment of any proceeding; and 2) identified the steps it

---

*Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1361 (CIT 2022) ("[I]t is not reasonable for the court to expect a filer to be on notice of, or to allow a litigant to be prejudiced by, a substantive regulatory provision buried within preamble language, especially a provision that was published in the Federal Register [approximately eight and a half] years before the due date of a filing and never issued as a regulation or rule."). *Celik Halat* issued on February 15, 2022—the day after the missed deadline in this case. At argument, counsel represented that Oman was unaware of Commerce's automatic extension policy until the court "unearthed it" in *Celik Halat*. ECF 83, at 248–51.

> has taken to avoid untimely filings in the future. This practice is grounded in 19 CFR 351.301(a) . . . .
>
> . . . . Pursuant to the practice described above, we previously accepted Hyundai Steel's narrative response because we determined that the law firm representing Hyundai Steel was eligible to receive a second opportunity. [Commerce then discovered it had accepted untimely information from that firm in a different matter two and a half years earlier.] It is inconsistent with Commerce's practice to allow the law firm another opportunity to file untimely information in this administrative review. . . .
>
> . . . . As a result, pursuant to our regulations and practice, [the Department rejected the untimely filing and removed it from the record].

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, Dep't No. A-580-878, Commerce Letter to Respondent's Counsel at 2–3 (Aug. 3, 2018) (emphasis added and footnote references omitted).

There is no dispute that Oman's counsel is eligible for leniency under the "practice" quoted above. The record shows that Oman brought the language to Commerce's attention and asked it to apply that "practice" here. *See* ECF 38-3, at 234–41; *see also id.* at 261. The Department, astonishingly, responded that it "does not have an 'established' practice of leniency for first-time offenders for late submissions." *Id.* at 269.

**PUBLIC VERSION**

Commerce's response disregards its own prior statements and therefore constitutes an abuse of discretion (at best) or arbitrary and capricious action (at worst). The Department said, *five times*, that it has a "practice" of allowing a law firm one tardy filing—a "one-bite rule," as it were.[11] This court will hold Commerce to its stated practice. *Cf. NLRB v. Wash. Star Co.*, 732 F.2d 974, 977 (D.C. Cir. 1984) (per curiam) ("The present sometimes-yes, sometimes-no, sometimes-maybe policy of [enforcing] due dates cannot, however, be squared with our obligation to preclude arbitrary and capricious management of the [agency]'s mandate."); *see also Cappadora v. Celebrezze*, 356 F.2d 1, 6 (2d Cir. 1966) (Friendly, J.) ("[O]nce appropriate rules have been established, the discretion conferred in day to day administration cannot have been assumed to extend to unreasonable deviation from such rules on an *ad hoc* basis at the whim of the [agency].").

* * *

Under these circumstances, Commerce abused its discretion by not granting Oman a retroactive

---

[11] At common law, a plaintiff seeking damages for a dog bite "must prove that the defendant knew about the dog's vicious propensities, a scienter requirement commonly referred to as the 'one-bite rule.' " *Carreiro v. Tobin*, 66 A.3d 820, 822–23 (R.I. 2013) (quoting *DuBois v. Quilitzsch*, 21 A.3d 375, 380 (R.I. 2011)); *cf. McLaughlin v. Union Oil Co. of Cal.*, 869 F.2d 1039, 1045 (7th Cir. 1989) (Posner, J.) ("There is no 'one explosion' rule in OSHA cases comparable to the fabled 'one bite' rule of tort liability for injury inflicted by a house pet.").

extension. That, in turn, means the Department's invocation of facts otherwise available here was unlawful—necessary information was *not* missing from the record, 19 U.S.C. § 1677e(a)(1), nor did Oman "fail[ ] to provide such information by the deadline[ ] for submission," *id.* § 1677e(a)(2)(B).

Because the court finds Commerce's resort to facts otherwise available unlawful, the court necessarily finds the same as to the use of an adverse inference. Proper invocation of facts otherwise available is a statutory prerequisite to use of an adverse inference. *See id.* § 1677e(b)(1)(A) (permitting the Department to "use an inference that is adverse to the interests of that party *in selecting from among the facts otherwise available*") (emphasis added).

2

Even if Commerce did not abuse its discretion in denying an extension of time to Oman and therefore properly applied facts otherwise available because of the company's late filing, *see id.* § 1677e(a)(2)(B), the court finds that Commerce abused its discretion in applying an adverse inference.

When the Department "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," *id.* § 1677e(b)(1), the Tariff Act permits (but does not require) Commerce to "use an inference that is adverse to the interests of that party in selecting from the facts otherwise available," *id.* § 1677e(b)(1)(A). On the one

hand, "the standard does not require perfection and recognizes that mistakes sometimes occur," but on the other, "it does not condone inattentiveness [or] carelessness . . . ." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* at 1383. "Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id.* at 1382. Where "Commerce made no such examination," the Federal Circuit found invocation of an adverse inference to be unsupported by substantial evidence on the record. *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022).

Here, the extent of the Department's justification for applying an adverse inference consisted of a single clause within a single sentence: "Additionally, pursuant to section 776(b) of the Act [i.e., 19 U.S.C. § 1677e(b)], because Oman Fasteners failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines, we are applying an adverse inference when selecting from the facts available." ECF 38-3, at 25. That sentence tells the court nothing about *why* the Department concluded that Oman failed to cooperate to the best of its ability by missing a filing deadline by 16 minutes.

**PUBLIC VERSION**

Agency action is improper where the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 423 U.S. 29, 43 (1983). Here, Oman told Commerce that the ACCESS system initially notified counsel that his filings *met* the system's requirements, yet after some delay the system then unexpectedly rejected them. The Department did not address Oman's assertion that the ACCESS system's performance contributed to the late filing.

Beyond failing to address Oman's contention that the company was not wholly at fault, Commerce's application of an adverse inference is an abuse of discretion for the additional reason that the Department provided no explanation justifying its conclusion that a 16-minute filing delay is a failure to cooperate. Commerce's *ipse dixit* here is not enough. *See City of Miami, Okla. v. Fed. Energy Regulatory Comm'n*, 22 F.4th 1039, 1042, 1043 (D.C. Cir. 2022) (chiding agency for *ipse dixit* explanation and failure to analyze evidence and finding "[t]hat is hardly acceptable evaluation of the evidence"); *State Farm*, 463 U.S. at 48 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . .").

3

Finally, even if Commerce did not abuse its discretion by refusing to grant a retroactive extension to Oman, and even if the Department did not abuse its discretion by applying an adverse inference in

selecting from facts otherwise available, the court finds that Commerce abused its discretion by selecting the punitive 154.33 percent rate. "That the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (CIT 2018). Section "1677e(d)(2) contemplates the selection of the highest rate when the situation merits the highest rate." *Id.* at 1350. If Commerce fails to reasonably explain why its chosen rate was appropriate, the court must find it inappropriate. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019).

Here, the Department simply stated that 154.33 percent "is a rate on the record *which would confer an adverse inference* and induce cooperation." ECF 38-3, at 30 (emphasis added). That is not an explanation. It amounts to, "We choose this as the adverse rate because it's crushing." But the Federal Circuit has noted that while "Commerce is at liberty to exercise its judgment and select a rate it finds appropriate to deter non-compliance, there is an extremely large range of rates between 1.43% and 126.44%." *BMW*, 926 F.3d at 1302. The same is true here, except the relevant range is even greater. In past administrative reviews, the highest rate that Oman received was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't

Commerce Nov. 29, 2021),[12] yet Commerce inexplicably opted for a 154.33 percent rate this time. As the Federal Circuit has repeatedly admonished the Department, an adverse inference rate cannot be punitive or aberrational and must "reflect[ ] the seriousness of the non-cooperating party's misconduct." *BMW*, 926 F.3d at 1301. Commerce made no effort to justify the draconian sanction it imposed here.

* * *

[12] *See also Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2014–2016*, 83 Fed. Reg. 4030, 4031 (Dep't Commerce Jan. 29, 2018) (0.63 percent); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 58,231, 58,232 (Dep't Commerce Nov. 19, 2018) (0.00 percent); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 Fed. Reg. 71,372, 71,372 (Dep't Commerce Dec. 27, 2019) (also 0.00 percent); and *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 Fed. Reg. 14,309, 14,310 (Dep't Commerce Mar. 15, 2021) (also 0.00 percent). The highest margin Oman received was in the original antidumping order, *see Certain Steel Nails from the Republic of Korea, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 80 Fed. Reg. 39,994, 39,996 (Dep't Commerce July 13, 2015) (9.10 percent), although Commerce reduced that rate to 4.22 percent after multiple remands from this court, *see Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1353 (CIT 2022), *appeal filed*, No. 23-1039 (Fed. Cir. Oct. 14, 2022).

For the reasons outlined above, the court concludes that Oman is entitled to judgment on the agency record. *See* USCIT R. 56.2.

IV

After a grant of judgment on the agency record, relief as of right is limited to a remand for further proceedings. *See* 19 U.S.C. § 1516a(c)(3) (authorizing the court to remand to Commerce "for disposition consistent with the" court's final decision). Oman, however, also seeks extraordinary relief in the form of an injunction enjoining the government from collecting cash deposits at a 154.33 percent rate pending further order of the court.

After prevailing on the merits of a cause of action created by Congress, and absent statutory direction to the contrary, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (stating that "Congress may intervene and guide or control the exercise of the courts' [equitable] discretion, but we do not lightly assume that Congress has intended to depart from established principles") (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), a plaintiff seeking permanent injunctive relief must demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[13] As nothing in the Tariff Act otherwise suggests an intent by Congress to depart from ordinary equitable principles in this context of a request to enjoin the collection of cash deposits, the court considers whether Oman has satisfied the three *eBay* requirements in dispute.[14]

A

When a plaintiff demonstrates "a viable threat of serious harm which cannot be undone," *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (emphasis removed), such harm, economic or otherwise, can constitute irreparable injury for purposes of injunctive relief. For example, judicial relief "may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy." *J.*

---

[13] In the administrative law context, where a court must remand a successful challenge to agency action for further proceedings, "permanent" injunctive relief is something of a misnomer. Here, where the court has granted judgment on the agency record to Oman, the entry of injunctive relief is permanent only in the sense that it would remain in effect until the court sustains a final determination by Commerce.

[14] There is no dispute here that Oman has no other remedy at law against the government. Therefore, the company satisfies the second *eBay* requirement.

*Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1377 (CIT 2020) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.)).

Oman's president and CEO, Steve Karaga, submitted a declaration in support of the company's motion and elaborated on that declaration in testimony in open court. In his testimony, he explained that Commerce's staggering increase in the duty rate requires the company to pick its poison: either shut down most of the business (to avoid paying cash deposits), fire most of the workforce, ruin customer relationships, and risk insolvency due to fixed costs exceeding revenue and/or [[ ]], or blithely continue business as usual for a few months (while paying the cash deposits that cannot be passed along to customers) until insolvency is reached. *Cf.* Ernest Hemingway, *The Sun Also Rises* 136 (1926) (" 'How did you go bankrupt?' Bill asked. 'Two ways,' Mike said. 'Gradually, then suddenly.' ").

1

As to shutting down most of the company's business to escape liability for cash deposits, the court finds that Mr. Karaga credibly identified at least four distinct kinds of ensuing irreparable injury, any one of which independently supports injunctive relief.

a. *Insolvency from running out of cash*

Mr. Karaga explained that more than [[ ]] of the company's revenue comes from U.S. market

**Confidential Information Redacted**



**PUBLIC VERSION**

sales, ECF 83, at 61:15–22,[15] and more than [[ ]] of the company's revenue comes from U.S. sales of subject merchandise (steel nails subject to the antidumping duty order),[16] *id.* at 58:22–59:5. The [[ ]] figure represents between [[ ]] of Oman's 2022 revenue. *Id.* at 62:15–22. After nails, the company's second-largest product consists of steel staples that represent [[ ]] of its 2022 sales, or approximately [[ ]]. *Id.* at 62:23–63:8. In his testimony, Mr. Karaga referred to an exhibit (ECF 36-2, at 17) that showed Oman's projected 2022 revenue through December 19 as [[ ]]. ECF 83, at 63:9–64:4.

Mr. Karaga stated that because Oman cannot afford (as discussed further below) to pay cash deposits for the 154.33 percent antidumping duties, *id.* at 65:23–66:9, the company has discontinued shipments of nails to the United States,[17] which he said would cause the company's sales revenue to drop to approximately [[ ]] of the company's 2022 revenue, *id.* at 64:5–65:19. He noted that the company's [[ ]] dropped from [[ ]] to [[ ]] in November 2023, that [[ ]] increased in the following month, and that he expected

---

[15] Citations to ECF 83 refer to the sealed hearing transcript.

[16] The remainder of this opinion uses the word "nails" instead of the statutory term "subject merchandise."

[17] Oman has continued shipments of staples not subject to the antidumping duty order. *Id.* at 76:9–16.

**Confidential Information Redacted**



**PUBLIC VERSION**

January 2023 forward figures to show [[ ]]. *Id.* at 83:3–23.

Asked about the government and Mid Continent's assertions that Oman can make up lost revenue from not shipping nails by selling other products, Mr. Karaga noted that the company's profit and loss statement shows that there was "[[ ]]," i.e., at the same time the company stopped shipping nails. *Id.* at 83:24–84:17. He explained that a major reason for the [[ ]] is that [[ ]]. *Id.* at 84:22–86:7. He also explained that "[[ ]]," such that it would be implausible to suggest Oman could make up for lost sales of nails by selling other products. *Id.* at 86:8–21.[18]

[18] Asked whether the company can make up for the lost U.S. sales by selling to some other market, Mr. Karaga testified that other markets make up [[ ]]. *Id.* at 125:14–126:7. He testified about the company's efforts to develop business in other countries but stated that Oman has never been able to develop a single market representing more than [[ ]], in part because of [[ ]] and in part because of heavy competition from other companies subject to U.S. antidumping orders. *Id.* at 126:11–129:9.

**Confidential Information Redacted**



**PUBLIC VERSION**

Mr. Karaga testified extensively about the company's assets and the significance of lines of credit the company has with three Omani banks, including whether [[ ]]. *Id.* at 112:16–116:25. [[ ]] *Id.* at 111:2–13. He explained that regardless of whether [[ ]],[19] the company faces imminent insolvency. *Id.* at 160:19–163:7. He stated that the company had [[ ]] of accessible cash in bank accounts as of January 2023, but that it is obligated to pay [[ ]] in the first quarter to [[ ]],[20] [[ ]] for a tax payment due no later than March 31, and $22 million in Section 232 steel duties owed to the U.S. government. *Id.* at 211:25–214:9; *see also* ECF 79 (sealed demonstrative exhibit outlining those figures). Simple mathematics shows that these liabilities will exhaust the accessible cash by the end of March if [[ ]]. Mr. Karaga testified that he is

---

[19] Mr. Karaga acknowledged that [[ ]], but he also testified that the company must [[ ]]. *Id.* at 170:21–171:13.

[20] Mr. Karaga said this figure represents amounts [[ ]] and does not [[ ]]. *Id.* at 222:8–223:9.

certain that [[ ]], the company will not be able to generate enough profits to cover expenses and existing obligations, such as land leases and salaries, ECF 83, at 160:19–163:7, and he also testified that the company cannot pay its fixed costs based on the minimal revenue left after halting imports of nails, *id.* at 106:22–108:14.

The court finds that Oman will be insolvent by the end of March 2023 [[ ]] because the company will run out of cash due to the dramatic loss of revenue from sales of nails.[21] This looming insolvency constitutes irreparable injury. *J. Conrad*, 457 F. Supp. 3d at 1377.

b. *Insolvency through default with lenders*

Mr. Karaga testified that he has been advised by the company's finance manager that the company is [[ ]]. *Id.* at 112:16–115:25. The court finds that Oman is [[ ]]. For example, the [[ ]]"

[21] Mr. Karaga also explained that the company has [[ ]]. *Id.* at 111:14–112:15.

**PUBLIC VERSION**

ECF 36-2, at 47.[22] That is exactly what Oman has done—it has suspended most of its business because it can't pay the cash deposits.

Mr. Karaga testified that if the banks do invoke the default provisions, "[w]e would become immediately insolvent. We wouldn't be able to meet any of our obligations." *Id.* at 116:6–12.[23] The court finds that Oman is at immediate risk of insolvency because it is [[ ]]. Such injury is irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

---

[22] Oman's two other credit facilities have similar [[ ]] provisions. *See* ECF 36-2, at 69 ([[ ]]); *id.* at 82 ([[ ]]).

[23] Asked whether the company has attempted to obtain additional credit from other banks, he replied that it would be ridiculous to try because any bank would ask for the company's financial records; he further explained that [[ ]]. *Id.* at 117:7–119:23. The court finds Mr. Karaga's answer convincing.

c. *Damage to customer relationships*

Mr. Karaga explained that Oman faces the imminent loss of its customer base if it cannot resume shipments of nails to the United States. More than [[ ]] of the company's business comes from [[ ]]. ECF 83, at 89:9–19. Mr. Karaga testified that the customers whose letters and declarations the company submitted as part of the evidentiary record represent [[ ]] of the company's business, and that they have advised him that [[ ]] in view of Oman's ceasing shipments. *Id.* at 94:10–96:20. "[[ ]]" *Id.* at 98:23–99:7. He also explained that while Oman [[ ]], *id.* at 104:15–105:17, competing companies [[ ]] that would pose a significant obstacle to Oman being able to win back lost business. *Id.* at 178:2–22.

The court finds that the injury to Oman's customer relationships from having to cease importing nails is irreparable. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[L]oss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.") (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008), and *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382–83 (Fed. Cir. 2006)).

**Confidential Information Redacted**



**PUBLIC VERSION**

d. *Termination of employees*

Mr. Karaga testified that his company has terminated [[ ]] to date and is preparing to terminate more. ECF 83, at 71:4–73:15. While the [[ ]], he does not know whether [[ ]] *Id.* Hiring new employees is not a straightforward matter because it requires visa applications, which typically takes a minimum of 30 days because the Omani government awards visas in batches. *Id.* at 207:6–208:6.

Moreover, Mr. Karaga testified that if the company doesn't receive relief from the court, it will certainly terminate [[ ]] more employees. *Id.* at 73:7–17. If Oman proceeds to a round of layoffs involving [[ ]], Mr. Karaga estimates that it would take one or two years to replace them. *Id.* at 205:16–206:5.

The court finds that the disruption to Oman's business resulting from the previous layoffs and the risk of further such layoffs constitutes irreparable injury. *See Std. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515–16 (Fed. Cir. 1990) (employee layoffs are irreparable injury); *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1010–11 (Fed. Cir. 2009) (same).

**PUBLIC VERSION**

2

Instead of halting most of the company's imports (and thus most of the company's business), in theory Oman has another option: Mr. Karaga testified about a hypothetical in which his company continues to import nails into the United States, which would require paying the 154.33 percent cash deposits. He explained that Oman is the importer of record for its own products, which makes the company directly responsible for paying cash deposits at whatever dumping margin Commerce assigns. ECF 83, at 66:10–17. Asked whether Oman has the financial resources to pay the deposits, he replied, "The Company does not." *Id.* at 66:7–9. Mr. Karaga testified that the company has not determined what the precise annual cost of the cash deposits would be based on historical sales of nails, but he estimated it to be "[[ ]]" based on the 2022 entry value of nails multiplied by 154 percent. *Id.* at 66:18–67:6. The financial data Mr. Karaga used were provided by the company's finance manager, "[[ ]]." *Id.* at 67:7–17.

Mr. Karaga asked the financial manager to project the amount of time for which Oman could afford to pay the 154.33 percent duty if the company continued importing nails. He testified that "we would run out of cash in [[ ]]. At this point in time, after looking at it again that would be in [[ ]] we would run out of cash." *Id.* at

**Confidential Information Redacted**



**PUBLIC VERSION**

68:10–22. The reason he gave was that "[o]ur cash would be completely consumed by cash deposits for the 154 percent dumping margin." *Id.* at 68:23–69:3. Mr. Karaga testified about a cash flow projection submitted as Exhibit D in support of his declaration (ECF 36-2, at 24–25), which he explained was "[[ ]]." ECF 83, at 137:23–139:8. He later reiterated that the document "is a simulation created for the purpose of demonstrating the cash burn rate if we continued to sell subject merchandise and posted deposits." *Id.* at 159:4–14. The exhibit shows Oman's opening cash balance on [[ ]] and projects that the amount, again in the hypothetical scenario in which the company continues to import nails, will decline to [[ ]]. ECF 36-2, at 24–25. Mr. Karaga testified that those figures reflect [[ ]].[24] ECF 83, at 140:2–141:25.

Asked what effect the deposits would have on the company's sales if it just raised prices to compensate

---

[24] Mr. Karaga testified that the only asset the company can access to fund its ongoing operations is [[ ]]; he specifically said that the company cannot use [[ ]], nor can the company use [[ ]]. ECF 83, at 215:16–219:13.

**Confidential Information Redacted**



**PUBLIC VERSION**

for the duties, Mr. Karaga referred to Oman's previous price adjustments in response to antidumping duties. The company's antidumping duty increased between 2015 and 2017 and, in response, Oman raised prices for nails and [[

]] *Id.* at 119:24–120:21. In 2018, the duty decreased substantially; in response the company lowered prices by about [[

]]. *Id.* at 120:22–121:21. Mr. Karaga said the company's takeaway from these experiences is that "nails are a commodity business" and "price is . . . a critical factor." *Id.* at 121:22–122:4. The company provided multiple declarations from customers stating that if Oman [[

]]. *See* ECF 63-1, at 137–60. Mr. Karaga stated that he felt foolish having to ask the customers for these declarations because they state the obvious to anyone familiar with the industry. *See* ECF 83, at 95:9–12 ([[

]]).

The court finds that simply paying cash deposits at the 154.33 percent rate set by Commerce is not a viable option for Oman. If the company pays the cash deposits without raising its prices, it will run out of money no later than April. If the company raises its prices to compensate for the cash deposit payments, it will lose its customers for these price-sensitive commodity products, and the company will go insolvent

even sooner because of lost revenue. These harms are irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

B

To grant permanent injunctive relief, the court must consider "the balance of hardships" between Oman and the government. *eBay*, 547 U.S. at 391. That balance is lopsidedly in Oman's favor. Absent injunctive relief, the company faces catastrophe. The harm to the government from granting such relief, in contrast, is minimal to non-existent, because it will receive no revenue from Oman if the company goes bankrupt.

C

The final *eBay* factor in dispute is whether Oman has shown "that the public interest would not be disserved by a permanent injunction." 547 U.S. at 391. Oman argues that the public interest is served by ensuring that Commerce "compl[ies] with the law, and interpret[s] and appl[ies] trade statutes uniformly and fairly." ECF 38-1, at 63 (quoting *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010)).

The government responds that the public interest is reflected in the balance struck in the antidumping statute, which authorizes injunctive relief against liquidation of entries covered by a challenged determination. *See* ECF 48, at 23–25 (citing 19 U.S.C. § 1516a(c)(2)). The statute, however, makes no provision for such relief against cash deposit requirements. *Id*. The government contends that this balance

protects an importer's interest in ultimately recouping cash deposit overpayments while also protecting the government's interest in "collecting the money it is owed for any entries made during that period." *Id.* at 25. The government further contends the statute's remedial purposes will be undermined if it cannot collect cash deposits on an interim basis because the importer might be unable to pay its ultimate liability. *Id.*

The court, however, has determined on the merits that the 154.33 percent duty rate set by Commerce is unlawful. Therefore, the government has no legitimate interest in collecting cash deposits at that rate. Enjoining such collection cannot possibly undermine the statute's remedial purposes, because Oman has no liability to pay 154.33 percent duties. Injunctive relief here will not disserve the public interest.

* * *

In sum, Oman has demonstrated that it will suffer irreparable injury in the absence of injunctive relief, that the balance of the hardships is in its favor, and that the public interest will not be disserved by such relief. As there is no dispute that Oman lacks any remedy at law, the company satisfies the *eBay* requirements for permanent injunctive relief.

## Conclusion

For the reasons provided above, the court grants judgment on the agency record in favor of Oman and enjoins Defendant from collecting cash deposits at the

**PUBLIC VERSION**

punitive rate set by Commerce. A separate order will enter. *See* USCIT R. 58(a).

Dated: February 15, 2023 /s/ *M. Miller Baker*
New York, New York M. Miller Baker, Judge

# Tab 2

## *Oman Fasteners, LLC, v. United States,* Order

## Appx0040-0042

**UNITED STATES COURT OF INTERNATIONAL TRADE**

OMAN FASTENERS, LLC,
*Plaintiff*,
v.
UNITED STATES,
*Defendant*,
and
MID CONTINENT STEEL & WIRE, INC.,
*Defendant-Intervenor*.

Ct. No. 22-00348

Before: M. Miller Baker, Judge

**ORDER**

For the reasons stated in Slip Opinion 23-17 (ECF 90), filed today, the court hereby **ORDERS** as follows:

1. Under USCIT Rule 65(a)(2), the court consolidates the proceedings on Plaintiff Oman Fasteners, LLC (Oman)'s motion for a preliminary injunction (ECF 18 and 36, confidential; ECF 15 and 38, public) with trial on the merits and thereby treats Plaintiff's motion as a USCIT Rule 56.2 motion for judgment on the agency record.

2. The court **GRANTS** Plaintiff's motion for judgment on the agency record.

3. The court **REMANDS** this case to the Department of Commerce, and **ORDERS** that on remand the Department must place both the business proprietary and public versions of Oman's supplemental section C questionnaire response on the record. The court **FURTHER ORDERS** that Commerce

shall then consider that supplemental section C response for purposes of calculating Oman's rate.

4. Defendant the United States, as well as all its officers and agencies, is hereby **ENJOINED** from taking any action to enforce, implement, or execute the Department's *Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 78,639 (Dec. 22, 2022), in *Certain Steel Nails from the Sultanate of Oman*, Case No. A-523-808 (*2022 Final Results*).

5. Upon entry into the United States on and after December 22, 2022, of subject merchandise produced by Oman, Defendant, through its agency U.S. Customs and Border Protection (Customs), is specifically **ENJOINED** from collecting estimated antidumping duty case deposits on such merchandise equal to the 154.33 percent dumping margin applied to Oman by Commerce in its *2022 Final Results*.

6. Upon entry into the United States on and after December 22, 2022, of subject merchandise produced by Oman, Defendant, through its agent Customs, is **ENJOINED** to continue to collect estimated antidumping duty cash deposits equal to 1.65 percent (the cash deposit rate applicable to Oman Fasteners set in *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't Commerce Nov. 29, 2021)).

7. The foregoing injunction shall remain in effect until further order of the court.

8. Within 120 days of the date of this order, Commerce must file a remand determination that complies with this order and with Slip Opinion 23-17.

9. Within 14 days after the Department files the remand determination, the parties are to submit a joint status report with their recommendation on how this case should proceed, including a proposed briefing schedule should one be necessary.[1]

Dated: February 15, 2023 
New York, New York

/s/ *M. Miller Baker*
M. Miller Baker, Judge

[1] Any proposed scheduling order must advise the court of which appendix preparation method the parties choose. *See* https://www.cit.uscourts.gov/sites/cit/files/Joint%20Appendix%20Preparation%20in%20Cases%20Assigned%20to%20Judge%20Baker.pdf.