2023–1661

IN THE

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

OMAN FASTENERS, LLC,

*Plaintiff-Appellee*

v.

UNITED STATES,

*Defendant*

MID CONTINENT STEEL & WIRE, INC.,

*Defendant-Appellant*

Appeal from the United States Court of International Trade
in No. 22-00348, Judge M. Miller Baker

## APPELLEE'S NONCONFIDENTIAL RESPONSE BRIEF

Andrew T. Dufresne
Sopen Shah
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53073
(608) 663–7492

Michael P. House
Michael R. Huston
Andrew Caridas
Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, D.C. 20005
(202) 654–6288
MHouse@perkinscoie.com

Attorneys for Plaintiff-Appellee

May 22, 2023

## Certificate of Interest

I certify that the information below is complete to the best of my knowledge.

Date: May 22, 2023             Signature:  /s/Michael P. House

                              Name:       Michael P. House

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Oman Fasteners LLC | n/a | Guerrero International LLC |

| 4. Other Legal Representatives | | |
|---|---|---|
| Perkins Coie LLP: | John M. Devaney | Shuaiqi Yuan |
| | Angela R. Jones | Caroline Bisk |
| | Karl J. Worsham | |

| 5. Related Case |
|---|
| *Mid Continent Steel & Wire, Inc. v. United States*, No. 2023-1039 (Fed. Cir.) |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

# TABLE OF CONTENTS

Table of Authorities ........................................................................ v

Table of Abbreviations and Conventions ..................................... xii

Statement of Related Cases ........................................................ xiii

Introduction .................................................................................. 1

Jurisdiction ................................................................................... 4

Issues Presented ........................................................................... 4

Statement of the Case ...................................................................5

    A.    Statutory background .................................................. 6

    B.    The present controversy ............................................ 11

        1.    Commerce imposed the maximum punishment on Oman Fasteners for a one-time minor filing mistake ....... 11

        2.    Oman Fasteners moved for a preliminary injunction because Commerce's decision was unlawful and was inflicting severe irreparable harm ...................................... 16

        3.    The Trade Court ruled in favor of Oman Fasteners on multiple, independently sufficient grounds .................... 21

Summary of Argument ................................................................. 26

Standards of Review .................................................................... 29

Argument ..................................................................................... 30

    I.    The Court should dismiss this appeal .............................. 30

        A.    The Trade Court's consolidation decision is not reviewable now .......................................................... 31

        B.    Mid Continent lacks standing to appeal the injunction ......... 33

1.   Mid Continent has the burden to establish standing to appeal .......................................................... 34

2.   Mid Continent has not established standing to appeal the injunction against the government ........................... 35

II.   The Trade Court did not abuse its discretion with its case-management orders ........................................................... 38

III.   The Trade Court did not abuse its discretion by enjoining the government from collecting estimated duty deposits at 154.33% ........................................................................ 43

A.   The Trade Court correctly determined that Commerce's 154.33% rate would cause Oman Fasteners irreparable harm .......................................................................... 43

1.   The Trade Court correctly found irreparable harm based on impending insolvency ........................................ 45

2.   Mid Continent's other irreparable-harm challenges also lack merit ...................................................... 48

B.   The Trade Court correctly found that Oman Fasteners had inadequate remedies at law ................................... 50

1.   Mid Continent's liability-insurance speculation would not remedy Commerce's unlawful actions ........... 50

2.   Further administrative review would not remedy Commerce's unlawful actions ......................................... 52

C.   The Trade Court correctly determined that the balance of hardships dramatically favored Oman Fasteners ............... 52

D.   The Trade Court did not abuse its discretion by finding that the injunction would not harm the public interest ........ 56

1.   The Trade Court correctly determined that Commerce's 154.33% rate was unlawful ........................... 56

2.  Mid Continent has not shown that the Trade Court made three independent legal errors on the merits ......... 62

    a.  Mid Continent has not shown reversible error regarding Commerce's denial of an extension ......... 63

    b.  Mid Continent has not shown reversible error regarding Commerce's application of an adverse inference ...................................................................... 67

    c.  Mid Continent has not shown reversible error regarding Commerce's selection of the 154.33% petition rate ................................................... 69

E.  Even assuming that the Trade Court applied the wrong standard, Oman Fasteners is entitled to an injunction ...........71

Conclusion ........................................................................................73

Certificate of Compliance

Certificate of Authority

---

**Confidential Material Omitted**

The material redacted from pages 16, 20, 24, 25, 44, 45, 46, 47, and 48 of this brief constitutes business-confidential details underlying Oman Fasteners' showing of irreparable harm before the Trade Court.

---

## TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Albemarle Corp. v. United States,*
   821 F.3d 1345 (Fed. Cir. 2016) ...................................................6, 7

*Am. Signature, Inc. v. United States,*
   598 F.3d 816 (Fed. Cir. 2010) ........................................................ 30

*Amoco Prod. Co. v. Village of Gambell,*
   480 U.S. 531 (1987) ......................................................................72

*Apple Inc. v. Qualcomm Inc.,*
   992 F.3d 1378 (Fed. Cir. 2021) ...................................................... 36

*Argentum Pharms. LLC v. Novartis Pharms. Corp.,*
   956 F.3d 1374 (Fed. Cir. 2020) ...................................................... 35

*AVX Corp. v. Presidio Components, Inc.,*
   923 F.3d 1357 (Fed. Cir. 2019) ................................................ 29, 35

*BMW of N. Am. LLC v. United States,*
   926 F.3d 1291 (Fed. Cir. 2019) ........................................ 10, 23, 61, 69, 70

*Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC,*
   17 F.4th 129 (Fed. Cir. 2021) ........................................................ 35

*Cabot Corp. v. United States,*
   788 F.2d 1539 (Fed. Cir. 1986) ......................................................31

*California Ridge Wind Energy LLC v. United States,*
   959 F.3d 1345 (Fed. Cir. 2020) ................................................55, 71

*Canadian Wheat Bd. v. United States,*
   641 F.3d 1344 (Fed. Cir. 2011) ..........................................36, 37, 55

*Celik Halat ve Tel Sanayi A.S. v. United States,*
   557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ......................... 8, 9, 64

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*
   664 F.3d 922 (Fed. Cir. 2012) ...................................................... 49

*City of Miami, Okla. v. Fed. Energy Regulatory Comm'n,*
   22 F.4th 1039 (D.C. Cir. 2022) .................................................... 59

*Confederación de Asociaciones Agrícolas*
*del Estado de Sinaloa A.C. v. United States,*
   389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) ........................... 53, 54

*Deacero S.A.P.I. de C.V. v. United States,*
   996 F.3d 1283 (Fed. Cir. 2021) ............................................... 69, 70

*Devia v. Nuclear Regul. Comm'n,*
   492 F.3d 421 (D.C. Cir. 2007) ..................................................... 55

*Diamond v. Charles,*
   476 U.S. 54 (1986) ...................................................................... 35

*Dongtai Peak Honey Indus. Co. v. United States,*
   777 F.3d 1343 (Fed. Cir. 2015) .............................................. 65, 66

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) ..................................................................... 46

*eBay Inc. v. MercExchange, L.L.C.,*
   547 US. 388 (2006) ..............................23, 24, 25, 43, 52, 55, 71, 72

*ePlus, Inc. v. Lawson Software, Inc.,*
   700 F.3d 509 (Fed. Cir. 2012) .................................................... 40

*General Elec. Co. v. United Techs. Corp.,*
   928 F.3d 1349 (Fed. Cir. 2019) ................................................... 37

*Hitachi Energy USA Inc. v. United States,*
   34 F.4th 1375 (Fed. Cir. 2022) .............................................. 59, 68

*Hung Vuong Corp. v. United States,*
   483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ............................... 9

*Jazz Photo Corp. v. United States*,
439 F.3d 1344 (Fed. Cir. 2006) ............................................... 29, 30

*KYD, Inc. v. United States*,
607 F.3d 760 (Fed. Cir. 2010) ................................................. 69, 70

*Langston v. Dep't of Army*,
102 F. App'x 693 (Fed. Cir. 2004) ............................................... 46

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................... 34

*McKinney v. U.S. Dep't of Treasury*,
799 F.2d 1544 (Fed. Cir. 1986)..................................................... 37

*Mid Continent Steel & Wire, Inc. v. United States*,
941 F.3d 530 (Fed. Cir. 2019).......................................................11

*Modern Font Applications LLC v. Alaska Airlines, Inc.*,
56 F.4th 981 (Fed. Cir. 2022) ....................................................... 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
423 U.S. 29 (1983) ........................................................................ 60

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) .......................................10, 23, 59, 60, 67, 68

*NLRB v. Washington Star Co.*,
732 F.2d 974 (D.C. Cir. 1984)....................................................... 58

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995) ......................................................... 6

*Orenshteyn v. Citrix Sys., Inc.*,
691 F.3d 1356 (Fed. Cir. 2012) ..................................................... 33

*Orion Tech., Inc. v. United States*,
704 F.3d 1344 (Fed. Cir. 2013) ..................................................... 30

*Papierfabrik Aug. Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) ................................................. 69, 70

*Penda Corp. v. United States,*
   44 F.3d 967 (Fed. Cir. 1994)................................................. 34, 35

*Phigenix, Inc. v. Immunogen, Inc.,*
   845 F.3d 1168 (Fed. Cir. 2017) .................................... 36

*POSCO v. United States,*
   296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ........................ 60, 61

*Qingdao Sea-Line Trading Co. v. United States,*
   766 F.3d 1378 (Fed. Cir. 2014) .............................. 64, 65

*Rhone Poulenc, Inc. v. United States,*
   899 F.2d 1185 (Fed. Cir. 1990) ........................................ 6

*Sampson v. Murray,*
   415 U.S. 61 (1974) .................................................51, 52

*SeAH Steel VINA Corp. v. United States,*
   950 F.3d 833 (Fed. Cir. 2020) .................................... 36, 37, 55, 56

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947) .........................................................57

*SolarWorld Ams., Inc. v. United States,*
   962 F.3d 1351 (Fed. Cir. 2020) .................................... 56

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .................................................... 34

*Taylor v. United States,*
   303 F.3d 1357 (Fed. Cir. 2002)................................... 40

*Trinity Mfg., Inc. v. United States,*
   549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021),
   *aff'd under Fed. Cir. R. 36,*
   2023 WL 234228 (Fed. Cir Jan. 18, 2023) ........................... 65, 66

*US Magnesium LLC v. United States,*
   839 F.3d 1023 (Fed. Cir. 2016)................................... 44

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) ....................................................... 38

*Wind Tower Trade Coalition v. United States,*
   741 F.3d 89 (Fed. Cir. 2014) ......................................... 4

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...................................................... 71, 72

*Wittman v. Personhuballah,*
   578 U.S. 539 (2016) ...................................................... 34

**Constitution, Statutes, and Regulations**                **Pages**

U.S. Const. art. III .................................. 2, 4, 26, 29, 34, 35, 36, 37, 56

5 U.S.C. § 706(2)(A) ........................................................ 56

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................ 56

   (c)(3) ................................................................ 23

   (f)(3) ................................................................ 17

   § 1673 ................................................................. 6

   § 1673a(b) .......................................................... 6

   § 1673d (c)(1)(B)(ii) .......................................... 7

   § 1673e ................................................................ 6

   § 1677(9) ............................................................. 7

   (9)(C) ................................................................ 17

   § 1677a ................................................................ 6

   § 1677b ................................................................ 6

   § 1677e(a) ........................................................... 9

   (a)(1) .......................................................... 22, 58

(a)(2)(B) ............................................................... 22, 58

(b) ....................................................................... 68

(b)(1) ................................................................ 9, 59

(d) ....................................................................... 60

(d)(2) ................................................... 10, 61, 69, 70

28 U.S.C. § 1292(a)(1) ......................................... 4, 32

§ 1292(c)(1) ..................................................... 2, 4, 32

§ 2631(j)(1)(B) .......................................................17

19 C.F.R. § 351.212(e) ..............................................7

§ 351.213(e) ............................................................7

§ 351.221(b)(2) .......................................................7

§ 351.302(c) ............................................................ 8

§ 351.303 (d)(2)(v) ................................................. 8

## Other Authorities                                    Pages

78 Fed. Reg. 57,790 (Dep't Commerce Sept. 20, 2013) ................................8, 57

86 Fed. Reg. 50,034 (Dep't Commerce Sept. 7, 2021) .....................................12

87 Fed. Reg. 78,639 (Dept' Commerce Dec. 22, 2022) ...................................16

*Certain Corrosion-Resistant Steel Products from*
   *the Republic of Korea,*
   Commerce Dep't Letter No. A-580-878 (Aug. 3, 2018) .............................. 9

*Certain Steel Nails from India, the Republic of Korea,*
   *Malaysia, the Sultanate of Oman, Taiwan,*
   *the Republic of Turkey & the Socialist Republic of Vietnam,*
   79 Fed. Reg. 36,019 (Dept' Commerce June 25, 2014) ...............................11

*Draft Results of Redetermination Pursuant to Court Remand*,
    Case No. A-523-808, Doc. No. 4369614-01
    (Dep't Commerce Apr. 26, 2023) ........................................................... 26, 55

Trade Court Rule 56.2 ..........................................................................................19

Trade Court Rule 65(a)(2) ......................................................... 4, 19, 26, 31, 39

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| AFA | adverse facts available |
| Appx____ | appendix page ____ |
| BlueBr__ | Mid Continent's opening brief page ___ |
| Commerce | U.S. Department of Commerce |
| Customs | U.S. Customs & Border Protection |
| Dkt. ___ | docket item ___ on appeal |
| Mid Continent | defendant-appellant Mid Continent Steel & Wire, Inc. |
| Oman Fasteners | plaintiff-appellee Oman Fasteners, LLC |
| Trade Court | United States Court of International Trade |
| $(x{:}y{-}z)$ | page $x$, lines $y{-}z$ |
| § | unless otherwise specified, all uses of "§" refer to sections of U.S.C. Title 19 |

## STATEMENT OF RELATED CASES

This case may be directly affected by this Court's decision in *Mid Continent Steel & Wire, Inc. v. United States*, No. 2023-1039, a pending case that challenges the Department of Commerce's ("Commerce") final determination in its initial antidumping duty investigation of Oman Fasteners, LLC, the plaintiff-appellee in this action.

## Introduction

This case arises from Commerce's attempt to impose a catastrophic administrative penalty—a punishment so severe that it would have bankrupted plaintiff Oman Fasteners—for the most minor of infractions: a one-time, 16-minute partial filing delay that caused no prejudice. Throughout the multi-year history of this antidumping investigation, Commerce has consistently set Oman Fasteners' annual antidumping duty rates between 0% and 5%. Yet in the proceeding at issue here, Commerce imposed an astronomical rate of 154.33%. Had that decision stood, it would have required Oman Fasteners to pay more than $450 million in retroactive duties for the period under review. And in addition, Commerce's decision required Oman Fasteners immediately to begin paying tens of millions more in monthly duty deposits that made it impossible to do business at all.

The Court of International Trade ("Trade Court") found that Commerce's decision was "the very definition of abuse of discretion," Appx4, that it was unlawful for "three separate and independent" reasons, Appx12, and that "this is not a close case," Appx13. In a 39-page opinion, the Trade Court explained that Commerce had inexplicably abandoned its published policy of leniency for first-time filing mistakes, had failed to explain its

decision to label Oman Fasteners "uncooperative," and had selected the harshest possible punishment without fulfilling the statutory requirements. The court therefore remanded the review of Oman Fasteners' imports to Commerce with instructions to determine an accurate antidumping margin based on the evidence.

The Trade Court also enjoined the government from collecting cash deposits at the 154.33% rate. The court found based on evidence and live testimony that: (1) Oman Fasteners had been irreparably harmed by Commerce's decision and would become insolvent if Commerce's punitive rate stood; (2) the company has no adequate remedy at law against the government; (3) the balance of the hardships is "lopsided" in Oman Fasteners' favor; and (4) an injunction is in the public interest.

The government, to its credit, has declined to appeal the Trade Court's injunction. Only Mid Continent Steel & Wire—a domestic competitor of Oman Fasteners and an intervenor in the Trade Court—brings this appeal. But Mid Continent has no authority to appeal now. Only the Trade Court's *injunction*, not its remand to Commerce, is presently appealable under 28 U.S.C. § 1292(c)(1), and Mid Continent lacks Article III standing to appeal an injunction that binds only the government. Nor can Mid Continent appeal

now the Trade Court's decision to consolidate the preliminary injunction proceeding with a trial on the merits; the Trade Court's merits determination and attendant procedural rulings are not appealable until the remand is complete. This Court should accordingly dismiss this appeal.

Even if Mid Continent had a basis for appellate jurisdiction, its brief does not come close to showing that the Trade Court *abused its discretion*. The Trade Court "easily agree[d] with Oman [Fasteners]" as to each of its legal arguments, any of which were grounds to vacate Commerce's administrative decision. Appx13. The court also made detailed factual findings that Oman Fasteners' witness had credibly testified to "at least four distinct kinds of … irreparable injury, any one of which independently supports injunctive relief." Appx26. Those conclusions were detailed and well-reasoned. Mid Continent cannot show that the Trade Court made any error, much less run the table by showing that the Trade Court abused its discretion as to *all* of its findings.

At bottom, the Trade Court's injunction simply ensures that Oman Fasteners will survive long enough for Commerce to lawfully determine its antidumping duty. That was the only just outcome, not an abuse of discretion. This Court should either dismiss the appeal or affirm the injunction.

– 3 –

## Jurisdiction

Mid Continent asserts that this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). BlueBr1. That is incorrect. This Court lacks jurisdiction because Mid Continent has failed to establish Article III standing to appeal. But if this Court did have jurisdiction, it would be under 28 U.S.C. § 1292(c)(1). *Wind Tower Trade Coalition v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014).

## Issues Presented

**I.** The Trade Court enjoined *the government* from collecting estimated duty deposits at the 154.33% rate while Commerce calculates a final, accurate antidumping rate on remand. The court's remand order is not appealable now, and Mid Continent has not demonstrated Article III standing to appeal an injunction that does not bind it. Should this Court dismiss this appeal?

**II.** The Trade Court consolidated Oman Fasteners' motion for a preliminary injunction with a trial on the merits under that court's Rule 65(a)(2). Mid Continent has never argued that it needed more time to brief the merits, and the Trade Court found that the ample record provided everything it needed to resolve this case, which was "not … close." Appx13. Did the Trade Court abuse its discretion by consolidating proceedings under Rule 65(a)(2)?

**III.**  The Trade Court determined that Commerce's antidumping rate of 154.33% was unlawful for three independent reasons and remanded for Commerce to reconsider it. The Trade Court also found that imposing that rate would have wrought drastic irreparable harm on Oman Fasteners before it could obtain review on the merits, that Oman Fasteners had no adequate remedy at law, that the balance of hardships decisively favored Oman Fasteners, and an injunction was in the public interest. Did the Trade Court abuse its discretion by enjoining the government from collecting cash deposits at the 154.33% rate during the remand?

## Statement of the Case

In Commerce's sixth annual antidumping review of steel nails imported by Oman Fasteners, the agency rejected the company's entire submission because of a partial 16-minute delay, applied an adverse inference, and imposed the maximum punishment possible under the statute—a duty rate 1.5 times the value of everything Oman Fasteners imported. The Trade Court enjoined the government's enforcement of that decision and remanded for Commerce to calculate the rate based on the evidence. The government did not appeal the injunction against it. Dkt 13. Only Mid Continent, an intervenor not subject to the injunction, appeals.

### A.     Statutory background

**1.**     The Tariff Act of 1930 authorizes Commerce to impose anti-dumping duties on "foreign merchandise" that is "sold in the United States at less than its fair value." 19 U.S.C. § 1673. Those duties are supposed to equal the amount by which the subject merchandise's "normal value" exceeds its export price, a difference called the "dumping margin." 19 U.S.C. §§ 1673, 1673e, 1677a, 1677b; *see Albemarle Corp. v. United States*, 821 F.3d 1345, 1347–1348 (Fed. Cir. 2016). Domestic industries may petition the government if they think unlawful dumping is injuring them. 19 U.S.C. § 1673a(b). Commerce investigates and, if it finds dumping (and if the U.S. International Trade Commission finds material injury), imposes antidumping duties at the dumping margin rate.

Antidumping duties are not a punishment for importers; they exist to level the playing field between domestic and foreign manufacturers. *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). The "basic purpose" of the statute—and Commerce's fundamental obligation in administering it—is to "determin[e] [antidumping] margins as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990). "[A]ccuracy and fairness must be Commerce's primary objectives." *Albemarle*, 821 F.3d at 1354.

2.    When Commerce finds dumping, it typically requires the posting of a cash deposit with U.S. Customs & Border Protection ("Customs") on future imports of subject merchandise "in an amount based on the estimated … dumping margin." 19 U.S.C. § 1673d(c)(1)(B)(ii); *see* Appx3 n.2. Upon request by the importer or domestic industry, Commerce must annually review an antidumping duty order to adjust the rate based on imports from the prior 12-month period. 19 C.F.R. § 351.213(e); *see* 19 U.S.C. § 1677(9).

When Commerce issues its final decision in an annual antidumping review, two things happen. First, that decision determines the final rate to be assessed on the importer's past entries. Any shortfall (or excess) compared with the previously collected cash deposits is collected from (or refunded to) the importer. 19 C.F.R. § 351.212(e). Second, Customs collects cash deposits on new imports at the new rate. 19 U.S.C. § 1673d(c)(1)(B)(ii).

During each annual review, Commerce sends questionnaires to mandatory respondents like Oman Fasteners seeking sales and cost information. 19 C.F.R. § 351.221(b)(2). Responses are typically due at 5 PM through Commerce's "ACCESS" e-filing system. Respondents may—and typically do—

submit a "Bracketing Not Final" version of their submissions on the due date and then submit redacted and sealed versions on the next business day. 19 C.F.R. § 351.303(d)(2)(v) (the "one-day lag rule").

**3.** Respondents can seek extensions of time to respond to Commerce's requests for information. 19 C.F.R. § 351.302(c); *see also* Appx7-8. And importantly for this case, Commerce has a published policy of granting virtually automatic extensions until the morning of the next business day if a respondent requests an extension near the agency's 5 PM close of business: If Commerce does not respond to an extension request by 5 PM, then the submission is "due by the opening of business (8:30 AM) … on the next work day." Appx13-14 (quoting *Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,792 (Sept. 20, 2013)). Although Commerce established that next-morning extension policy years ago, it "never … reasonably communicated [it] to the bar." Appx13-14. The agency instead "buried" the policy until it was unearthed sua sponte by the Trade Court in *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1361 (Ct. Int'l Trade 2022), after the key events in this case. Appx15-16.

In addition, Commerce has repeatedly applied a published "practice" to forgive a law firm's first tardy filing in an administrative review so long

as the firm identifies steps to avoid untimely filings in the future. Appx16-18 (quoting *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, Commerce Dep't Letter No. A-580-878, at 2-3 (Aug. 3, 2018)).

In short, Commerce has two different written policies to ensure that, when minor snags occur, it receives needed information and calculates an accurate antidumping rate.

**4.**     In certain specified situations, Commerce must rely on facts not in the administrative record, called "facts otherwise available," to determine an antidumping rate. 19 U.S.C. § 1677e(a). And where a respondent "fail[s] to cooperate" in Commerce's investigation "by not acting to the best of its ability to comply with a request for information," Commerce may go further and apply an adverse inference. *Id.* § 1677e(b)(1). Commerce regularly uses the phrase "adverse facts available" (or "AFA") to describe that situation, but that is "misleading because it collapses together the two distinct steps" with distinct statutory prerequisites. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (Ct. Int'l Trade 2020); *see Celik Halat*, 557 F. Supp. 3d at 1353 n.3 (Commerce's claimed "AFA" authority "conflates [two statutory] authorities").

A party's isolated and unintentional mistake does not necessarily justify an adverse inference. This Court has explained that the statutory lack-of-cooperation standard "does not require perfection and recognizes that mistakes sometimes occur." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). And even when an adverse inference is appropriate, the statute requires Commerce to adopt "a reasonably accurate estimate of the respondent's actual rate" and explain why its chosen rate "reflects the seriousness of the non-cooperating party's misconduct." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1300-1301 (Fed. Cir. 2019) (citations omitted); *see* 19 U.S.C. §1677e(d)(2) (any adverse-inference rate must be "based on [an] evaluation … of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available"). "Commerce must not overreach reality in seeking to maximize deterrence." *BMW*, 926 F.3d at 1301. And "an unusually high rate" should be reserved for "serious misconduct" such as a party's "deliberate falsity and intentional concealment." *Id.*

### B.    The present controversy

#### 1.    Commerce imposed the maximum punishment on Oman Fasteners for a one-time minor filing mistake

**a.**    In 2014, Commerce began an antidumping investigation into steel nails from Oman. *Certain Steel Nails*, 79 Fed. Reg. 36,019 (June 25, 2014); *see Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 534 (Fed. Cir. 2019). Commerce named Oman Fasteners a mandatory respondent. After its initial investigation, Commerce set Oman Fasteners' dumping margin at 9.10%, which was rejected upon judicial review and adjusted on remand to 4.22%. Appx23 n.12. That initial dumping finding is the subject of a separate ongoing challenge before this Court in No. 2023-1309; Oman Fasteners maintains that the dumping margin is below the 2.0% statutory *de minimis* threshold.

After the initial investigation, Commerce conducted five annual administrative reviews of Oman Fasteners' subject imports. Oman Fasteners fully cooperated with each review, and each time Commerce found that Oman Fasteners' dumping margin was zero or close to it: Commerce set margins of 0.63%, 0.00%, 0.00%, 0.00%, and 1.65%. Appx22-23 & n.12.

**b.**     In September 2021, Commerce initiated the administrative re-
view at issue here, the sixth annual review, covering Oman Fasteners' im-
ports from 2020 to 2021. *Initiation of Antidumping and Countervailing Duty
Administrative Reviews,* 86 Fed. Reg. 50,034 (Sept. 7, 2021). During that re-
view, Commerce issued a supplemental questionnaire to Oman Fasteners
and asked for a response within 10 days. Appx101-110. Oman Fasteners
requested an 11-day extension based on the press of other business and chal-
lenges related to COVID-19. Commerce gave 7 days, Appx2498-2499, then
another 4 days, but warned that it would not likely grant "any additional
extension," Appx2505-2506.

On the day that Oman Fasteners' supplemental questionnaire re-
sponse was due, counsel began the process of submitting that response more
than an hour before the 5 PM deadline. At 3:41 PM, Counsel started by pre-
screening the response with ACCESS's "check file" feature, a tool that ena-
bles filing parties to determine whether their files contain errors or problems
that might prevent submission. Appx2894-Appx2895 (14:18-15:6). "Check
file" found no issues with the planned submission, suggesting that the
remainder of the filing should proceed without delay. Counsel then began
uploading the response shortly after 4 PM, nearly an hour before the dead-

line. *Id.* That should have been plenty of time; prior comparable uploads took minutes. *Id.*; *see also* Appx2542-2546.

Alas, the technology went awry. Eight minutes after submitting the first files, counsel received a notice that ACCESS had rejected them—despite the all-clear from the prescreening tool. Appx2527. Counsel tried again, and nine minutes later received another rejection notice. Appx2528. After reformatting, counsel successfully filed the bulk of the submission—the response narrative and all supporting PDF files—by 4:46 PM. Appx2529-2530. Counsel attempted to upload the remaining documents—Excel-format copies of the PDFs already uploaded and a database of U.S. sales—as quickly as possible. Appx2531-2536. But ACCESS dragged, and the final file went through at 5:16 PM. Appx2536.

Counsel could not have known until minutes before 5 PM that ACCESS would not accept the files on time. Oman Fasteners' complete initial response had uploaded in only 9 minutes, Appx144, and the system's misleading and sluggish behavior was unusual. Commerce had already warned that it "[did] not anticipate providing any additional extension," Appx2505, and there was no reason to think the agency could respond in the minutes before 5 PM. It turns out that, if Oman Fasteners had submitted a late-breaking

extension request, then the entire submission would surely have been timely under Commerce's policy granting an automatic extension to 8:30 AM the next morning. But at the time, that next-morning extension policy was still "buried" by Commerce. Appx13. Counsel thus reasonably believed that abandoning the filing to pursue a last-minute extension would be futile and only cause more delay.

The 16-minute delay indisputably had no impact whatsoever on the proceeding. Commerce has never argued that it planned to do anything with Oman Fasteners' files at the stroke of 5 PM. And Mid Continent timely received the filing the next day pursuant to the one-day lag rule. Appx2616.

**c.**    Five weeks after Oman Fasteners' submission, Commerce rejected Oman Fasteners' *entire response* as untimely and struck it from the record. Appx7. Commerce then issued its preliminary results in July 2022, announcing a 154.33% dumping margin—a 93-fold increase above the 1.65% rate that had been set in the prior annual review. Appx2139-2152. Commerce did not claim that the 154.33% rate was even a reasonable approximation of Oman Fasteners' actual dumping; the agency instead simply applied "adverse facts available" and selected the highest possible rate—the 154.33%

rate requested by Oman Fasteners' competitor Mid Continent in its 2014 petition. Appx2149-2150.

As soon as Oman Fasteners realized that Commerce had a problem, it immediately and repeatedly asked Commerce to re-consider, explaining the problems with ACCESS that had precipitated the minor filing delay and asking for Commerce's first-time grace policy. Appx138-140; Appx240-248; Appx267-291; Appx298-302; Appx308-310, Appx315-317. The agency did not dispute that Oman Fasteners qualified for grace based on the criteria previously applied, but it disclaimed the policy. Appx306.

Commerce's draconian margin would have required Oman Fasteners to pay more than $450 million for the imports it had made during the sixth review period. The rate would have also immediately compelled the company to pay the government duty deposits equal to 1.5 times the value of any new nail imports. Facing that crushing burden, Oman Fasteners had no choice but to cease all U.S. imports of the subject merchandise. It could neither raise prices to offset the rate nor pay the sky-high deposits for more than a couple months before depleting its cash reserves. Appx34-37.

Commerce refused Oman Fasteners' requests to delay the effective date pending judicial review. Appx2748-2749; Appx2878-2879. It published

its final results on December 22, 2022, *Certain Steel Nails from Oman*, 87 Fed. Reg. 78,639 (Dec. 22, 2022), and Customs immediately required cash deposits of 154.33% on all subject merchandise. Appx3-4; Appx3573-3574. At that point, Oman Fasteners began sliding toward total collapse. The company ceased U.S. nail sales (which were ▮▮fraction▮▮ of its business); it was forced to terminate ▮▮fraction▮▮ its employees to say solvent; and it had to shut down most of its business. Appx4. Valuable relationships were threatened as Oman Fasteners' long-term domestic customers had no choice but to turn elsewhere for nails. More layoffs and insolvency loomed—likely within weeks.

> **2.    Oman Fasteners moved for a preliminary injunction because Commerce's decision was unlawful and was inflicting severe irreparable harm**

**a.**    Oman Fasteners immediately challenged the 154.33% rate at the Trade Court on December 23, 2023, one day after Commerce published its final determination. Appx10; Appx1673-1691. Then the day after Christmas, Oman Fasteners moved for a preliminary injunction. Appx10; Appx2360-2441. It explained that Commerce's actions were unlawful for three separate and independent reasons, Appx2390-2423, and that the punitive 154.33% deposit rate was causing the company to suffer intense and irreparable harm, Appx2423-2433. Oman Fasteners also explained that the other injunction

factors favored relief: the government had no legitimate interest in driving Oman Fasteners out of business, and no one was harmed by allowing Oman Fasteners to survive while judicial review proceeded. Appx2433-2440.

Oman Fasteners' motion included a detailed declaration from its president and CEO, Steve Karaga, explaining how Commerce's 154.33% deposit rate was impacting his company, customers, and workforce. Appx2952-2966. The motion also included letters from Oman Fasteners' customers attesting to their need to soon turn elsewhere for product, from the Sultanate of Oman, and from the U.S. Ambassador to Oman, who had urged Commerce to avoid damaging the economy of a strategic Middle East ally. Appx2447-2448; Appx2929-2932; Appx2935; Appx2937-2939; Appx2941-2942 (customer letters); Appx2944-2949 (Oman letter); Appx2951 (U.S. Ambassador letter).

Mid Continent exercised its statutory right to intervene, 28 U.S.C. § 2631(j)(1)(B), because it manufactures "a domestic like product" and was a petitioner in the original antidumping duty investigation. 19 U.S.C. §§ 1677(9)(C), 1516a(f)(3); *see* Appx10; Appx4118-4120.[1]

---

[1] Upon intervening, Mid Continent asked for more time to oppose the preliminary injunction, including because its counsel was busy "[p]artici-
(footnote continued on next page)

**b.**    The Trade Court actively managed the injunction proceedings to ensure that all parties had an opportunity to submit the evidence and testimony that might be important to the court's decision, while also moving toward an expeditious hearing. The Trade Court even moved back the hearing date for Oman Fasteners' injunction motion to accommodate the government's and Mid Continent's interests.

During the preliminary-injunction briefing, Oman Fasteners gave notice of its plan to offer live testimony from Mr. Karaga at the upcoming hearing, Appx4197-4198, the Trade Court allowed Mr. Karaga to testify, Appx50, and the parties agreed to his deposition, Appx4209. Oman Fasteners also sought to introduce its unaudited 2022 financial statements, which were not previously available, and additional evidence connected to its reply brief. Appx3342-3343. The government agreed not to oppose that evidence as untimely in exchange for slightly later hearing and deposition dates. Appx4210. Oman Fasteners and the government jointly proposed a modest

---

pat[ing] as" an amicus in this Court. Appx4125. Counsel neglected to mention that he had submitted that amicus brief eleven months earlier. *See PrimeSource Building Prods., Inc. v. United States*, No. 21-2066 (Fed. Cir. Feb. 1, 2022), ECF No. 36. Oman Fasteners explained the urgency of its situation, and the Trade Court denied Mid Continent's extension motion. Appx49.

continuance to allow time to "address this new material at the deposition of Mr. Karaga" and allow "fulsome presentation of the issues." Appx4210-4211. Mid Continent "[d]id not oppose moving the hearing." Appx4209.

After a teleconference, the Trade Court set the hearing back even farther, Appx3523, after both the government and Mid Continent "advised the court that if the hearing is rescheduled to a time convenient for them, they will not object to allowing [Oman Fasteners] to seek to introduce the [proffered evidence accompanying its reply]." Appx3524.

**c.**    The Trade Court told the parties that it was considering consolidating Oman Fasteners' motion with a trial on the merits under that court's Rule 65(a)(2), by issuing a judgment on the agency record under Rule 56.2. Appx48. Oman Fasteners' merits arguments raised questions of law, and the court explained that consolidation would likely make sense as "a matter of judicial efficiency." Appx3656 (5:6-10).

The Trade Court set a live hearing on the preliminary injunction motion that lasted all day. Appx52. The parties stipulated to most of the operative facts, Appx3572-3580; Appx3658-3660 (7:15-9:18), and to authenticity and admissibility of most of the relevant documents, Appx3580-3582; Appx3660-3663 (9:21-12:12). The court heard multiple hours of testimony

**Confidential Material Omitted**

and evidence about Oman Fasteners' irreparable harm, followed by oral argument on the motion.

Neither the government nor Mid Continent called any witnesses. Appx3656-3657 (5:25-6:10). Oman Fasteners called Mr. Karaga, who testified about his role at the company and his 34 years of experience in the fastener industry. Appx3703-3706 (52:13-55:24). He explained the scope, operations, and customers of Oman Fasteners' business. Appx3707-3714 (56:1-63:24). He detailed the expertise and role of his employees who had assisted his analyses. Appx3718-3719 (67:7-68:9). And he testified about the effect of the 154.33% deposit rate on Oman Fasteners. Appx3715-3717, Appx3734-3737 (64:5-65:19, 65:23-66:9, 83:3-84:17, 84:22-86:21).

Mr. Karaga explained, at length and in detail, why Oman Fasteners had no choice but to stop shipping subject merchandise to its U.S. customers facing Commerce's 154.33% rate. The company lacked the resources to pay the staggering projected █ $ value ███ deposits for the year under the 154.33% deposit rate. Appx3716-3718 (65:3-67:6). If it paid that rate, Oman Fasteners would soon "run out of cash." Appx3719-3720 (68:19-69:3). The decision to stop shipping was "terribly difficult"—it wiped out nearly all of Oman Fasteners revenue and required terminating █fraction█ its workforce. Appx3720-

3721 (69:11-70:7). And "hundreds more" employees would have to be termi-

nated soon. Appx3724 (73:7-15). Mr. Karaga walked the court through the

financial details and projections that he had relied on to make that painful

decision. The government and Mid Continent both cross-examined Mr.

Karaga at length. Appx3788-3835 (137:21-184:13) (government); Appx3835-

3861 (184:20-210:23) (Mid Continent).

### 3. The Trade Court ruled in favor of Oman Fasteners on multiple, independently sufficient grounds

On February 15, 2023, the Trade Court issued judgment on the agency

record. The court determined that Commerce's antidumping duty rate was

unlawful for multiple reasons and remanded for Commerce to recalculate the

rate based on the information that Commerce had unlawfully excluded from

the record. Appx12-24; Appx40 ¶ 2. The court also held that Oman Fasteners

was entitled to an injunction to prevent Customs from collecting the exorbi-

tant, punitive deposits that would make any eventual relief useless. Appx24-

38; Appx40-41 ¶¶ 3-6.

**a.** On the merits, the Trade Court held Commerce's punitive

154.33% rate unlawful for three separate reasons, explaining that this was

"not a close case." Appx12-13. Commerce's actions were "the very definition of abuse of discretion." Appx4.

First, Commerce abused its discretion by not granting an extension of time to Oman Fasteners in these particular circumstances. Appx13-19. It was arbitrary and capricious for Commerce to impose a draconian sanction when it would have accepted the entire filing until 8:30 AM the next day had counsel known to submit an extension request when last-minute problems arose with the filing system. Appx13-14. What's more, Commerce failed to explain its departure from its "one-bite" policy of leniency, for which Oman Fasteners undisputedly qualified. Appx16-18. Commerce's unexplained failure to treat like situations alike was arbitrary and capricious. Appx18. And because Commerce should have granted Oman Fasteners an extension, Commerce had no authority to resort to "facts otherwise available"—the necessary information was not missing from the record, and Oman Fasteners did not "fail[ ] to provide" it. Appx19 (citing 19 U.S.C. § 1677e(a)(1), (a)(2)(B)).

Second, the Trade Court concluded that, even if Commerce had lawfully relied on "facts otherwise available," the agency abused its discretion in applying an adverse inference. Appx19-21. An adverse inference requires Commerce to "examine [a] respondent's actions and assess the extent of [its]

abilities, effort, and cooperation." *Nippon Steel*, 337 F.3d at 1382. But Commerce did not do that here. Appx20-21. The Trade Court also faulted Commerce for not explaining why an unintentional 16-minute delay arising from e-filing difficulties was a "failure to cooperate." Appx21.

Third, the Trade Court determined that, even assuming that Commerce could rely on "facts otherwise available" *and* apply an adverse inference, the agency abused its discretion by selecting the punitive 154.33% rate. Appx21-23. Commerce had selected the rate without adequate explanation or justification, contrary to the statute and this Court's precedent. Appx22-23 (citing *BMW*, 926 F.3d at 1301-1302). The "draconian" rate was "punitive [and] aberrational," and it did not reflect "the seriousness of" Oman Fasteners' conduct. Appx23 (citations omitted).

**b.**    The Trade Court next made detailed factual findings in Oman Fasteners' favor on the injunction factors. The remand redetermination to which Oman Fasteners was entitled under 19 U.S.C. § 1516a(c)(3) would be illusory if the company went out of business in the interim. Appx24-25. The Trade Court accordingly evaluated a potential injunction under *eBay Inc. v. MercExchange, L.L.C.*, 547 US. 388, 391 (2006).

– 23 –

**Confidential Material Omitted**

On the first *eBay* factor, the Trade Court found irreparable harm in spades. Appx25-37. It "f[ound] that Mr. Karaga [had] credibly identified at least four distinct kinds of ensuing irreparable injury." Appx26. First, Commerce's unlawful deposit rate guaranteed that Oman Fasteners would quickly become insolvent. Appx25-30. Because Oman Fasteners could not afford to pay 154.33% cash deposits, it had to stop shipping nails to the United States, resulting in a revenue cliff. Appx27. More than ▮fraction▮ of the company's revenue came from U.S. sales, and more than ▮fraction▮ from nails subject to the antidumping order. The Trade Court credited testimony that other products and markets could not make up for that gap. Appx28. In view of the company's existing liabilities, it would have run out of cash by end of March without U.S. steel-nail sales. Appx29-30. If Oman Fasteners instead resumed shipping nails and paying the 154.33% rate, then it would have run out of cash in early April. Appx34-36. That "looming insolvency" constituted irreparable injury. Appx30.

Second, the unlawful rate thrust Oman Fasteners toward imminent insolvency through ▮business harm▮. Appx30-31. Third, the unlawful rate damaged or imminently threatened relationships with essential customers, which would soon turn to other suppliers and likely sign long-term

purchase agreements that would make them difficult to win back. Appx32. And fourth, the unlawful rate had already forced Oman Fasteners to terminate ███████ its employees, and its continuing effects would threaten many more. Appx33. Each of those problems likewise constituted irreparable injury. Appx33.

The Trade Court explained why remaining *eBay* factors also favored Oman Fasteners. Oman Fasteners lacked any adequate remedy at law against the government. Appx25 n.14. The balance of hardships "lopsidedly" favored Oman Fasteners because it faced "catastrophe" that far outweighed the "minimal to non-existent" harm to the government. Appx37. And the public interest would not be disserved by an injunction because the government had "no legitimate interest in collecting cash deposits at [the unlawful 154.33%] rate." Appx37-38.

The Trade Court accordingly enjoined Customs from collecting cash deposits at the 154.33% rate during the remand redetermination, and restored Oman Fasteners' prior 1.65% cash deposit rate. Appx41 ¶¶ 5-6.

**c.**    The Trade Court ordered Commerce to file its remand determination by June 15. Appx42 ¶ 8. In April, after considering all of the evidence, Commerce released its draft remand determination: Oman Fasteners' correct

dumping margin for the sixth review period is 0.0%. *See* Case No. A-523-808, Doc. No. 4369614-01 (Apr. 26, 2023) ("*Draft Remand*").

## Summary of Argument

The Court should dismiss this appeal, which Mid Continent is not entitled to bring now. If this Court does not dismiss, it should affirm.

**I.**     This Court should dismiss this appeal for two reasons. *First*, the Trade Court's decision to consolidate proceedings under Rule 65(a)(2) is not presently appealable. Appealing that procedural ruling must accompany any appeal of the Trade Court's judgment on the agency record, which must wait for completion of the remand proceeding. *Second*, Mid Continent lacks standing to challenge an injunction preventing *the government* from collecting estimated duty deposits from Oman Fasteners at the 154.33% rate. Mid Continent is not subject to that injunction, and it cannot establish any injury in fact as necessary for Article III standing. Mid Continent lacks any legally protected interest in the injunction, which merely keeps Oman Fasteners in business until a final rate can be determined. It is that final rate, not the interim collection of estimated duty deposits, that would protect Mid Continent from any supposed unfair trade.

**II.**    Even if the issue were appealable now, the Trade Court did not abuse its case-management discretion by consolidating the injunction hearing with the merits. Mid Continent complains only that it wanted more depositions or time to brief irreparable harm. But consolidation affected only the timing of the Trade Court's decision on *the merits*—not the court's consideration of irreparable harm. In any event, Mid Continent does not even attempt to show that extra time or briefing would have changed the outcome here.

**III.**    The Trade Court did not abuse its discretion by enjoining the government from collecting antidumping duty deposits at the punitive 154.33% rate while this case is on remand. All the injunction factors favor Oman Fasteners, and "this is not a close case." Appx13.

*First*, the Trade Court found four independent forms of irreparable harm, and Mid Continent does nothing more than ask this Court to reweigh the evidence. It is enough to affirm for this Court to find that the Trade Court did not clearly err on even *one* of those harms.

*Second*, the Trade Court correctly found that Oman Fasteners had no adequate remedy at law. Mid Continent speculates that Oman Fasteners could recover monetary damages from a third party's liability insurer. But Mid Continent has no support for that argument in the record, and no

authority suggesting that such a possibility provides an adequate alternative remedy. Damages years down the line would not remedy the irreparable harm to Oman Fasteners' business—lost employees, lost customer relationships, and potentially insolvency.

*Third*, the Trade Court properly found that the balance of hardships tips dramatically: Oman Fasteners faced existential doom, the government faced at most an inconvenience. Although Mid Continent now argues that the Trade Court should have considered its unspecified "hardships," it forfeited that argument by not pressing it below. In any event, Mid Continent suffers no hardship from the Trade Court's decision, and certainly none that would outweigh Oman Fasteners' harm.

*Fourth*, the Trade Court correctly found that the public interest favors an injunction because the government does not have an interest in collecting exorbitant and unlawful duties. Despite the government's decision not to appeal, Mid Continent argues that the government has an interest in the 154.33% rate because it is lawful. But Mid Continent fails to show that the Trade Court erred at all, let alone on *all three* grounds supporting its decision to enjoin the 154.33% rate.

*Finally*, Mid Continent argues for the first time in this Court that the Trade Court should have applied the preliminary-injunction standard rather than the one for a permanent injunction. That argument is forfeited. And anyway, the two standards are very similar except that the preliminary injunction standard sets a *lower* bar for the merits: it requires likely, not actual, success. Oman Fasteners would thus win under the preliminary-injunction standard too.

## Standards of Review

Mid Continent, as the party seeking appellate review, has the burden to establish standing to participate in every phase of the proceeding, including the appeal. *AVX Corp. v. Presidio Components, Inc.*, 923 F.3d 1357, 1361–1362 (Fed. Cir. 2019). Article III standing to appeal is a threshold jurisdictional requirement that is separate from Mid Continent's statutory entitlement to participate in the Trade Court proceeding. *Id.* To demonstrate Article III standing, Mid Continent must establish that the injunction it appeals has caused it to suffer a concrete injury in fact. *Id.* at 1361.

This Court reviews the Trade Court's trial-management decisions for abuse of discretion. *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1349 (Fed. Cir. 2006).

The Trade Court's grant of injunctive relief is also reviewed for abuse of discretion. *Am. Signature, Inc. v. United States*, 598 F.3d 816, 823 (Fed. Cir. 2010). To establish abuse of discretion, Mid Continent would need to show that the Trade Court "made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact findings." *Id.* (citation omitted). This Court reviews factual findings for clear error, which requires accepting those findings unless this Court is left with a "definite and firm conviction that a mistake has been committed." *Jazz Photo*, 439 F.3d at 1349 (citation omitted). The Court reviews legal questions de novo. *Id.*

This Court can affirm the Trade Court's judgment on any ground supported by the record. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1350 (Fed. Cir. 2013).

ARGUMENT

## I.     The Court should dismiss this appeal

Mid Continent challenges the Trade Court's decision to consolidate the injunction hearing with a trial on the merits and to enjoin the government's collection of cash deposits at the 154.33%. But neither of those decisions is appealable by Mid Continent now. Mid Continent has no statutory

basis to appeal the Trade Court's decision consolidating proceedings below. And Mid Continent has not carried its burden to establish standing to appeal the Trade Court's injunction binding only the government. This Court should dismiss Mid Continent's appeal for lack of appellate jurisdiction.

### A.    The Trade Court's consolidation decision is not reviewable now

Mid Continent first argues that the Trade Court abused its discretion by consolidating Oman Fasteners' preliminary injunction motion with a trial on the merits under Rule 65(a)(2). BlueBr21-24. But the Trade Court's judgment on the agency record was not an appealable *final* order, because of the pending Commerce remand. *Cabot Corp. v. United States*, 788 F.2d 1539, 1542–1543 (Fed. Cir. 1986). If Mid Continent wants to appeal the Trade Court's judgment on the agency record, then it must wait until that court accepts Commerce's remand results. And the Trade Court's attendant procedural decision to enter that judgment through the consolidation procedure in Rule 65(a)(2) is similarly appealable only at that time.

Mid Continent claims that this Court has jurisdiction under 28 U.S.C. § 1292(a)(1), BlueBr1, which authorizes interlocutory appeals of *injunctions*.[2] But the Trade Court's judgment on the agency record remanding Oman Fasteners' case to Commerce, Appx40-41 ¶¶ 2-3, was not an injunction.

Mid Continent has no other basis for appellate jurisdiction of the Trade Court's consolidation decision. The collateral-order doctrine permits interlocutory appeals of decisions that "(1) are conclusive, (2) resolve important questions separate from the merits, and (3) are effectively unreviewable on appeal from the final judgment." *See Modern Font Applications LLC v. Alaska Airlines, Inc.*, 56 F.4th 981, 984 (Fed. Cir. 2022) (cleaned up). The Trade Court's consolidation decision is not "conclusive" on any "important questions separate from the merits." *Id.* (cleaned up). Mid Continent's only argument against consolidation is that it purportedly provided insufficient opportunity to respond to Oman Fasteners' evidence about irreparable harm. BlueBr22-23. But that issue concerned only the *injunction*—not whether Oman Fasteners was entitled to judgment *on the agency record*. The Trade Court's procedural decision to consolidate did not "resolve" or even impli-

---

[2] Mid Continent presumably meant to invoke 28 U.S.C. § 1292(c)(1).

cate any questions about irreparable harm. And any properly stated objections to the consolidation decision will be reviewable on appeal following the agency remand.

Nor can Mid Continent rely on pendent jurisdiction, *Orenshteyn v. Citrix Systems, Inc.*, 691 F.3d 1356, 1358 (Fed. Cir. 2012), because Mid Continent lacks standing to appeal the injunction. *See infra* Section I.B. Regardless, pendent jurisdiction is discretionary and reserved for "rare" and "exceptional circumstances" not present here. *Orenshteyn*, 691 F.3d at 1358. Mid Continent does not mention any such circumstances, or even explain what remedy would be appropriate if this Court found that the consolidation was error. *See* BlueBr21-24. There would be no sense in this Court ordering the Trade Court to entertain another round of briefing on the agency record when that court already determined that the merits here are "not … close." Appx13. And Mid Continent does not identify any additional argument it would have presented on the merits if afforded additional time.

### B.    Mid Continent lacks standing to appeal the injunction

This Court should also dismiss Mid Continent's appeal of the Trade Court's injunction for a different jurisdictional reason: Mid Continent lacks

Article III standing to challenge this injunction against the government that the government itself has not appealed.

### 1. Mid Continent has the burden to establish standing to appeal

As the lone appellant, it is Mid Continent's burden to establish Article III standing for this appeal. *See Wittman v. Personhuballah*, 578 U.S. 539, 543–544 (2016). Mid Continent must show "(1) … an injury in fact, (2) that is fairly traceable to the challenged conduct …, and (3) that is likely to be redressed by a favorable judicial decision" from this Court. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). Injury-in-fact requires an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (citation omitted). An injury is "particularized" only if it "affect[s] the appellant in a personal and individual way." *Id.* (cleaned up) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

A party typically does not have Article III standing to challenge a judgment against another party. *See, e.g.*, *Penda Corp. v. United States*, 44 F.3d 967, 971 (Fed. Cir. 1994). In *Penda*, this Court dismissed the appeal for lack of standing where an intervenor attempted to appeal a judgment against the

government that the government had not appealed. *Id.* at 968. The Court explained that mere "status as an intervenor at trial" is "insufficient" to establish Article III standing to appeal, *id.* at 971 (citing *Diamond v. Charles*, 476 U.S. 54, 68 (1986)), even with a statutory right to appeal, *AVX*, 923 F.3d at 1359. For that reason, trial-level participants often cannot appeal adverse judgments even though they had a right to participate below. *See, e.g.*, *Penda*, 44 F.3d at 968; *Argentum Pharms. LLC v. Novartis Pharms. Corp.*, 956 F.3d 1374, 1376–1378 (Fed. Cir. 2020) (dismissing appeal by PTAB petitioner); *Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 17 F.4th 129, 139-140 (Fed. Cir. 2021) (dismissing appeal by TTAB petitioner).

If the record below does not establish appellant's Article III standing, then Mid Continent must "create [the] necessary record in this [C]ourt." *Argentum*, 956 F.3d at 1376 (citation omitted).

### 2. Mid Continent has not established standing to appeal the injunction against the government

The record below does not support Article III standing for an appeal because Mid Continent relied only on its statutory right to intervene. Even after Oman Fasteners flagged the standing problem in its response to Mid Continent's motion to expedite proceedings in this Court, Dkt. 8 at 16, Mid

Continent did not develop any argument or introduce any relevant evidence to show injury in fact. Mid Continent "should have made its standing arguments and proffered its evidence … in its opening brief." *Apple Inc. v. Qualcomm Inc.*, 992 F.3d 1378, 1382 (Fed. Cir. 2021); *Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1173 (Fed. Cir. 2017). It did not, and there is no reason to forgive that forfeiture now. *Cf. Apple*, 992 F.3d at 1382.

Even if Mid Continent did not forfeit the issue, it fails to establish Article III standing. Its only point even arguably related to standing is to call itself an "intended beneficiary" of the Tariff Act provisions authorizing antidumping investigations. BlueBr74 (citing *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 837 (Fed. Cir. 2020); *Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011)). That is why Mid Continent had a *statutory* right to intervene in the Trade Court proceedings. But that is not enough for Article III standing to appeal an injunction binding only the government. An injunction limiting the government's ability to collect cash deposits does not create an injury in fact for Mid Continent.

Mid Continent's citations to *SeAH Steel* and *Canadian Wheat Board* are unavailing. Those cases did not involve an intervenor's standing to appeal an injunction against only the government involving collection of estimated

duty deposits during remand proceedings. *SeAH Steel* involved an appeal of a final judgment following a remand redetermination. And in *Canadian Wheat Board*, the government itself appealed an injunction ordering Commerce to instruct Customs to liquidate entries.

Even if Mid Continent had argued that it competes with Oman Fasteners, that would not save its appeal. "[C]ompetitive injury in the abstract" is not specific enough for Article III. *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1555 (Fed. Cir. 1986) (no standing based on ownership of direct-competitor companies); *General Elec. Co. v. United Techs. Corp.*, 928 F.3d 1349, 1354 (Fed. Cir. 2019) (no standing based on claim of competitive "economic loss" by costs to design around patent).

Mid Continent has not introduced any evidence of actual economic harm to it that will follow the amount of Oman Fasteners' estimated duty deposits. And even if it had, the injunction does not invade Mid Continent's "legally protected interest." It is the final dumping margin that will eventually be set for Oman Fasteners that will protect Mid Continent's interest in "[ ]fair trade practices." BlueBr74 (citation omitted). Mid Continent does not even allege that duty deposits of 154.33% are necessary to offset dumping by Oman Fasteners. BlueBr61-62 (noting that the 154.33% rate does not reflect a

weighted average of dumping but rather the "highest transaction-specific margins" that Mid Continent purportedly "calculated for Oman Fasteners"). This injunction implicates only the government's *interim* collection of *estimated* duty deposits at an unlawful rate that would bankrupt Oman Fasteners. Mid Continent lacks any legitimate interest in that draconian and punitive deposit rate before the final, accurate rate is properly calculated. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772–773 (2000) (finding that mere prospect of favorable recovery did not provide standing).

Commerce's *Draft Remand* determination that Oman Fasteners' dumping margin is 0.0%, pages 25-26, *supra*, further undermines any allegation that Mid Continent was injured because Customs did not collect deposits from Oman Fasteners at the 154.33% rate.

## II. The Trade Court did not abuse its discretion with its case-management orders

Even if this Court had jurisdiction of this appeal, there is nothing to Mid Continent's arguments that the Trade Court "abused its discretion when it consolidated the hearing on the preliminary injunction with a trial on the merits." BlueBr21; *see* BlueBr2, 21-24. Mid Continent does not dispute that the Trade Court had the power to consolidate. It says only that it wanted

(1) more time to take a deposition of one of Oman Fasteners' declarants attesting to Oman Fasteners' irreparable harm and (2) "an opportunity to submit supplemental briefing" on Oman Fasteners' supplemental evidence of irreparable harm. BlueBr23.

In the first place, Mid Continent's arguments have nothing to do with the Trade Court's decision to consolidate the preliminary injunction hearing with a trial on the merits under Rule 65(a)(2). By consolidating the proceedings and entering judgment on the agency record, the Trade Court resolved *the merits* of this case. But Mid Continent's objections to the Trade Court's case-management decisions are not about the merits—the evidence that is the focus of Mid Continent's complaints concerned the irreparable harm standard for injunctive relief. Appx3673-3674 (22:8-23:8); BlueBr21-24. The merits were determined on a closed agency record, and Mid Continent does not even assert that it would have argued the merits differently if the Trade Court had not consolidated proceedings below. (Indeed, Mid Continent was a party to the administrative proceedings before Commerce and thus directly involved in creating the agency record.) Mid Continent's arguments about the procedures for litigating evidence of irreparable harm have no discernable bearing on the issue of consolidation.

In any event, the Trade Court did not abuse its discretion in scheduling the injunction briefing or hearing. Such case-management decisions are at the heart of a trial court's discretion. "Trial management is particularly subject to the wide latitude of the district court," *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012), and "intrusions into a district court's trial management are rarely appropriate on appeal," *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002) (citation omitted). The Trade Court appropriately balanced judicial efficiency and the parties' interests, and Mid Continent fails to show prejudice.

Mid Continent got a fair shot to analyze the evidence that the Trade Court considered. The parties submitted extensive briefing and evidence before and during an all-day hearing. Indeed, Mid Continent concedes that it submitted "detailed evidence and analysis," BlueBr22, and it both deposed and cross-examined Mr. Karaga, Appx3835-3861 (184:20-210:23).

Still, Mid Continent complains that the 12 days it had with Oman Fasteners' reply-brief evidence was insufficient. BlueBr22. Mid Continent forfeited this issue when it withdrew its objection to the timing of Oman Fasteners' reply-brief evidence once the Trade Court pushed back the hearing date from January 23 to February 1. Appx3523-3524.

Regardless, Mid Continent had the opportunity to make arguments about the "new" evidence at the hearing, and the record shows it did. *E.g.*, Appx3836, Appx3838-3855 (185:12-22, 187:14-204:12 (cross-examination about Oman Fasteners' 2022 financial statement, i.e., "Motion Exhibit A" or "Document 63-1")). Mid Continent offers no analysis of the "new" evidence in its opening brief—much less analysis that undermines the Trade Court's decision.[3]

Mid Continent also complains that it could not depose one of Oman Fasteners' customer declarants for one hour. BlueBr23. Contrary to Mid Continent's assertion, Oman Fasteners did not "refuse[] to make a critical declarant available." BlueBr23. The third-party declarant, Mr. Waterman, was unavailable in the short window before the Trade Court hearing—so

---

[3] Mid Continent also insists that the Trade Court "never directly addressed or ruled on" its opposition to Oman Fasteners' supplemental evidence. BlueBr23. But the Trade Court's decision to allow Oman Fasteners to seek to introduce that evidence at the hearing necessarily denied Mid Continent's opposition. Mid Continent forfeited any further challenge when it "advised the court that if the hearing [was] rescheduled to [February 1]," it would "not object" to the timing of Oman Fasteners evidence, Appx3524, and did not object to that evidence at the hearing.

Oman Fasteners offered an equally knowledgeable officer from the same cus-
tomer in the declarant's stead. Mid Continent refused that offer. Appx3588.

Mid Continent forfeited this issue too. Mid Continent's complaint that
it brought the lack of this deposition "to the attention of the Trade Court,
without consequence," BlueBr23, is perplexing because Mid Continent did
not ask the Trade Court for deposition-related relief. It submitted a "Status
Report" the day before the hearing telling the Trade Court about the issue
but requested no action, saying that "[r]egardless of this development," it
"st[ood] ready to proceed with the hearing as scheduled" and "intend[ed] to
rely upon the Waterman Declaration." Appx3588.

Moreover, Mid Continent does not explain how its inability to depose
one particular customer declarant constitutes reversible error. Mid Continent
does not even speculate what Mr. Waterman's deposition would have
shown. Mr. Waterman was just one of *six* supportive customer declarants,
Appx3663 (12:17-18), four of whom Mid Continent did not even seek to
depose, Appx3587. The Trade Court noted that the collective declarations
stood for the "obvious" proposition that customers would not pay an extra
154.33% for a commodity like steel nails. Appx36. And ultimately, the Trade

Court based its irreparable-harm holding not on customer declarations but on Mr. Karaga's credible hearing testimony. Appx32.

⚹⚹

In all, Mid Continent fails to identify any prejudice from the Trade Court's consolidation decision. And Mid Continent's claims of prejudice from the timing and the conduct of the preliminary injunction hearing—to which Mid Continent did not object—are conclusory at best. BlueBr23.

## III. The Trade Court did not abuse its discretion by enjoining the government from collecting estimated duty deposits at 154.33%

A plaintiff seeking a permanent injunction must show (1) irreparable harm, (2) inadequate remedies at law, (3) a favorable balance of hardships, and (4) that the public interest would not be disserved by the injunction. *eBay*, 547 U.S. at 391. The Trade Court correctly found that standard "easily" satisfied in this case. Appx13. Mid Continent's arguments that the Trade Court abused its discretion merely ask this Court to reweigh the evidence and endorse arguments it never made below.

### A. The Trade Court correctly determined that Commerce's 154.33% rate would cause Oman Fasteners irreparable harm

The Trade Court found, based on its assessment of the evidence and the credibility of Mr. Karaga, that Oman Fasteners had established four sep-

– 43 –

Confidential Material Omitted

arate kinds of irreparable harm flowing from Commerce's decision. Appx26.

First, Oman Fasteners faced insolvency from running out of cash when it was

forced to either stop shipments of subject merchandise or else pay 154.33%

cash deposits. Appx26-30. Second, it faced insolvency through ███████

`business harm`███████. Appx30-31. Third, it faced irreparable damage to cus-

tomer relationships. Appx32. And fourth, it faced irreparable harm through

the termination of substantial numbers of employees. Appx33. All four fac-

tual findings "independently support[ed] injunctive relief." Appx26. For

Mid Continent to prevail, it would need to show that *all four* conclusions

were clearly erroneous.

Mid Continent complains that certain evidence is not "discussed in"

the Trade Court's opinion, BlueBr69, but the Trade Court did not need to

discuss everything presented to it. The standard of review "presume[s] that

a fact-finder reviews all of the evidence presented unless it states otherwise,

even if its opinion does not recite every piece of evidence." *US Magnesium

LLC v. United States*, 839 F.3d 1023, 1031 (Fed. Cir. 2016) (cleaned up). The

evidence that the Trade Court cited supports its conclusions, and that is

enough. And for the reasons below, Mid Continent's evidence does not come

close to compelling a different result.

**Confidential Material Omitted**

### 1.  The Trade Court correctly found irreparable harm based on impending insolvency

The Trade Court found that, without an injunction, Oman Fasteners would face insolvency from running out of cash, Appx26-30, and through `business harm`, Appx30-31.

**a.**    As to Oman Fasteners' ability to pay the deposit rate, the Court credited Mr. Karaga's testimony about the company's volume of imports and its dependence on U.S. sales, Appx26-27 (citing Appx3709-3710, Appx3712-3715 (58:22-59:5, 61:15-22, 62:15-64:4)); its inability to compensate through other products or markets, Appx28 (citing Appx3734-3737, Appx3776-3780 (83:24-84:17, 84:22-86:21, 125:14-126:7, 126:11-129:9)); and its assets and credit, Appx29 (citing Appx3762-3767, Appx3811-3814, Appx3821-3822, Appx3873-3874 (111:2-13, 112:6-116:25, 160:19-163:7, 170:21-171:13, 222:8-223:9)). The Trade Court also credited Mr. Karaga's testimony about the revenue cliff created when Commerce's decision forced Oman Fasteners to stop all U.S. shipments. Appx27-28 (citing Appx3715-3717, Appx3734 (64:5-65:19, 65:23-66:9, 83:3-23)). The court credited Mr. Karaga's testimony that, without U.S. nail sales, the company's costs would overtake its resources within a matter of weeks. Appx29-30 (citing Appx3811-3814 (160:19-163:7)). And

**Confidential Material Omitted**

the court also credited Mr. Karaga's testimony that if Oman Fasteners paid cash deposits at 154.33% without raising its prices, it would run out of money no later than April. Appx36.

Regarding ██████████, the Court found that Oman Fasteners was already in ██████████ under the terms of its ██████████, meaning that it was in "immediate risk of insolvency" given its ██████████ ██████████. Appx31. The court relied on Mr. Karaga's testimony and the plain language of the ██████████. Appx30-31.

**b.** Mid Continent's four counterarguments are unpersuasive.

First, Mid Continent argues that "financial loss alone" is not irreparable harm. BlueBr64-65. But the Trade Court did not find that Oman Fasteners would incur "financial loss alone." It found that Oman Fasteners would suffer *insolvency*. That finding was not clearly erroneous, and bankruptcy is indisputably irreparable harm. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *see also Langston v. Dep't of Army*, 102 F. App'x 693, 696 (Fed. Cir. 2004) (insolvency is "self-evident" irreparable harm).

Second, Mid Continent insists that Oman Fasteners could have kept shipping. BlueBr65. But that is a question of fact, and the Trade Court found otherwise: it credited testimony that Oman Fasteners would have run out of

cash within two months had it kept shipping nails while forced to pay 1.5 times their value in cash deposits. Appx34-35 (citing Appx3717-3720, Appx3788-3792, Appx3810 (66:7-67:17, 68:10-69:3, 137:23-139:8, 140:2-141:25, 159:4-14)). Mid Continent does not offer anything from the record to contradict that finding; it just disagrees. That disagreement does not approach showing clear error.

Third, Mid Continent questions a demonstrative exhibit that showed the timeline for when Oman Fasteners' cash would be extinguished. BlueBr65-66. Mid Continent insists that the numbers were not "properly substantiated." *Id.* But that was a question of credibility and weight for the Trade Court. Mid Continent had the opportunity to make those arguments already, and the Trade Court was not convinced. Besides, the chart was hardly the keystone of the court's analysis—it was a demonstrative relegated to a "*see also*" parenthetical. Appx29.

Fourth, Mid Continent calls the risk of ████████ "entirely speculative." BlueBr66. But that was also a question of fact. Mid Continent quibbles that Oman Fasteners did not submit evidence that some ██████ had *already* provided ████████, BlueBr66, but it was for the Trade Court to find whether the absence of that evidence made Oman Fasteners'

**Confidential Material Omitted**

injury non-imminent. And the Trade Court found sufficient imminence based on the ███document███ and the facts that ███business harm███ ████████████████████████ and Oman Fasteners would need to submit ███document███ to the other ███party███ shortly. Appx29-30. Those findings were not clearly erroneous.

### 2.    Mid Continent's other irreparable-harm challenges also lack merit

**a.**    The Trade Court found that, without an injunction, Oman Fasteners would need to terminate more employees. Appx33. Mid Continent concedes that layoffs constitute irreparable harm but insists that was a "potential future event." It also argues that Oman Fasteners provided only Mr. Karaga's testimony about this fact. BlueBr66. That is irrelevant; the court heard Mr. Karaga knowledgeably testify regarding the factors underlying past and future terminations, and it found him credible. That credibility determination was the Trade Court's unique province as factfinder, and its conclusions regarding the likelihood and immediacy of further layoffs were not clearly erroneous.

**b.**    The Trade Court also found that Oman Fasteners faced irreparable harm to customer relationships. Appx32. Mid Continent does not dispute

that injury to customer relationships constitutes irreparable harm. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). The Trade Court explored this topic thoroughly. It credited testimony about the importance of key customers to Oman Fasteners' business, Appx32 (citing Appx3740 (89:9-19)); about what those customers had told Oman Fasteners about their relationship, *id.* (citing Appx3745-3747, Appx3749-3750 (94:10-96:20, 98:23-99:7)); and about the inability of Oman Fasteners to get those customers back if they were forced to find alternate suppliers, *id.* (citing Appx3755-3756, Appx3829 (104:15-105:17, 178:8-22)).

Mid Continent does not really dispute anything about that testimony. It argues only that the Trade Court "failed to consider" a declaration from its own Executive Vice President of Sales & Marketing about the "current state of the market." BlueBr66-69. But the Trade Court did not need to give that evidence any weight, and it did not need to cite everything it considered. The Trade Court appropriately credited evidence about Oman Fasteners' *actual* interactions with *actual* customers (who presumably were aware of the state of the market). The question is not whether the Trade Court *could have* come out the other way, and Mid Continent's single declaration does not show that it *clearly* had to.

## B. The Trade Court correctly found that Oman Fasteners had inadequate remedies at law

The Trade Court correctly found that Oman Fasteners lacked any adequate remedies at law against the government. Appx25. The harms to Oman Fasteners inflicted by Commerce were irreparable, and damages are not available against the government. Mid Continent now contends that Oman Fasteners had two adequate remedies at law: (1) a potential liability-insurance claim, and (2) a request for administrative review. BlueBr70-72. Neither argument has any substance.

### 1. Mid Continent's liability-insurance speculation would not remedy Commerce's unlawful actions

Mid Continent's liability-insurance argument has no basis whatsoever in the record. And regardless, the argument makes no sense because it would not remedy Commerce's harm to Oman Fasteners. The "wrong" that Oman Fasteners needed remedied was not the 16-minute-late filing—it was Commerce's unlawful response. Even if Mid Continent were correct about the availability of an insurance recovery, that would not remedy the wrong. It could merely shift some monetary harm to third parties.

Mid Continent also cites no authority whatsoever for its suggestion that an adequate remedy exists where a company *may* be able to assert a tort

claim against a third party in *another* case to offset *some part* of its harms, and that third party might in turn carry insurance for *some part* of that tort claim. This Court should not find that such unsupported and speculative assertions constitute an adequate alternative remedy for Oman Fasteners. While Mid Continent insists that "uncontested facts" show that Oman Fasteners "can be made whole," BlueBr71, it misrepresents the record. Mid Continent cites just two pages of its own brief below, which contain no factual citations— just speculation. *See* Appx3071-3072.

Moreover, any potential future tort claim against a third party would not allow Oman Fasteners to resume its U.S. sales and thereby stave off the imminent risk of bankruptcy, to halt employee layoffs, or to stop the loss of customer goodwill. Mid Continent makes no argument about remedies for these irreparable harms. That is enough to summarily reject the argument.

Mid Continent's citations to *Sampson v. Murray*, 415 U.S. 61, 90 (1974), and *eBay*, 547 U.S. at 391, are unavailing. BlueBr71. Although monetary damages can compensate for some financial loss, the harms that Commerce inflicted here—insolvency, lost goodwill, and layoffs—go far beyond financial loss and would be irreparable for all the reasons discussed above. Also, Mid Continent's cited cases refer to corrective relief being available "in the

ordinary course of litigation." *Sampson*, 415 U.S. at 90; *see eBay*, 547 U.S. at 392-393. No one disputes that damages are unavailable to Oman Fasteners in this litigation.

### 2. Further administrative review would not remedy Commerce's unlawful actions

Mid Continent next argues that Oman Fasteners has other remedies because Commerce is redetermining a new rate on remand. That argument is specious: the Trade Court explained why the remand redetermination would be meaningless without an injunction. The Trade Court found as a matter of fact that Oman Fasteners "can't afford" to pay 154.33% in cash deposits "or (alternatively) shut down most of its business while … proceedings play[ed] out." Appx4. And even if Oman Fasteners could somehow survive through further review, that route would not remedy damaged customer relationships or employee layoffs. Mid Continent does not argue otherwise.

### C. The Trade Court correctly determined that the balance of hardships dramatically favored Oman Fasteners

The hardships in this case weigh "lopsidedly" in Oman Fasteners' favor, as the Trade Court correctly found. Appx37. Having considered all the evidence and the witness's credibility, the Trade Court determined that Oman Fasteners "face[d] catastrophe" without an injunction, while any

harm to the government with an injunction would be "minimal to non-existent" because the government would collect *no* duties if Oman Fasteners went bankrupt. Appx37.

Mid Continent's piecemeal criticisms do nothing to undermine the Trade Court's conclusion. The Trade Court did not "ignor[e]" Mid Continent's argument that an injunction suspends the effect of the statute. *Contra* BlueBr73. Rather, the Trade Court determined that the government had no legitimate interest in collecting the unlawful duty deposits, and anyway, that interest was unaffected by an injunction because Oman Fasteners had stopped shipping—so the government was collecting nothing.

Mid Continent says the Trade Court's finding that the government will receive no revenue if Oman Fasteners goes bankrupt is "legally incorrect" because "the Government can seek to collect [Oman Fasteners'] underpaid duties from its surety under its importation bond." BlueBr73. That is non-sense. Because Oman Fasteners would not be able to import nails, there would be no duties to collect, and no third-party surety to collect from.

Mid Continent also complains (BlueBr73) that the Trade Court did not address a trial-court decision it cited: *Confederación de Asociaciones Agrícolas del Estado de Sinaloa A.C. v. United States*, 389 F. Supp. 3d 1386, 1404 (Ct. Int'l

Trade 2019). That case did not bind the Trade Court, much less this Court. And Mid Continent offers no real analysis of the case on appeal, perhaps because it is easily distinguishable. In *Asociaciones Agrícolas*, the requested relief would have barred collecting *any* cash deposit, and it would have prevented Commerce from "resuming its antidumping investigation" at all, which would have "exceed[ed] the status quo." 389 F. Supp. 3d at 1404 (emphasis omitted). Here, by contrast, the injunction simply adjusts the deposit rate *to* the status quo before Commerce imposed its unlawful 154.33% rate and allows Oman Fasteners to survive while Commerce resumes its antidumping review. The injunction thus *effectuates* the statute and safeguards the "Congressionally-mandated system" for "assign[ing] antidumping duties," *contra* BlueBr74-75, because the 154.33% rate was *contrary* to that system and had no basis in the evidence of Oman Fasteners' U.S. sales.

Mid Continent also argues that the Trade Court did not address hardships *to Mid Continent*. BlueBr74. But Mid Continent never argued that it would suffer hardships when it briefed this factor below. *See* Appx3116-3117 (arguing that "the government would face hardship"). The Trade Court need not have considered hardships that Mid Continent never raised, so Mid Con-

tinent has forfeited this argument. *California Ridge Wind Energy LLC v. United States*, 959 F.3d 1345, 1351 (Fed. Cir. 2020).

Regardless, even on appeal, Mid Continent fails to specify what its hardships are. It says that it is an "intended beneficiary" of the antidumping law, cites cases saying that the trade laws protect industries from "unfair trade practices," and complains that the injunction "artificially distorts the dynamics of the domestic market." BlueBr74-75 (quoting *Canadian Wheat*, 641 F.3d at 1351; and citing *SeAH Steel*, 950 F.3d at 837). But Mid Continent has things backwards. Oman Fasteners engaged in *no* unfair trade practices here—that is the whole point of the Trade Court's order. Commerce itself now agrees, having since determined in its preliminary remand results that Oman Fasteners' *actual* dumping margin is 0.0%, *see Draft Remand*, even *lower* than the 1.65% injunction rate. It is the enjoined 154.33% rate that distorted the market—dramatically so.

Moreover, even if Mid Continent had attempted to show harm to itself, the balance of equities is about the parties *to the injunction. See eBay*, 547 U.S. at 391; *cf. Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007) (declining to consider hardship to intervenor in analogous context of ripe-

ness). Mid Continent is a statutory intervenor that has failed to demonstrate even Article III standing to challenge the injunction.

### D. The Trade Court did not abuse its discretion by finding that the injunction would not harm the public interest

The Trade Court properly concluded that the government had no legitimate interest in collecting cash deposits at the 154.33% because that rate was unlawful for multiple independent reasons. Appx38. Mid Continent's arguments to the contrary are wrong.

### 1. The Trade Court correctly determined that Commerce's 154.33% rate was unlawful

The Trade Court reviews Commerce's exercise of discretion under the Administrative Procedure Act, and Commerce's decisions are set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020). Commerce's findings of fact are reviewed for substantial evidence, 19 U.S.C. § 1516a(b)(1)(B)(i), which is "evidence that a reasonable mind might accept as adequate to support a conclusion." *SeAH Steel*, 950 F.3d at 840 (citation omitted). If Commerce has "failed to explain" its decision, then substantial evidence does not exist. *Id.* at 847–

848. The courts will assess Commerce's decision only on the grounds that the agency gave. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

The Trade Court correctly determined that Commerce's assignment of the punitive 154.33% rate to Oman Fasteners was patently unlawful for three independent reasons: (a) Commerce abused its discretion in refusing to accept Oman Fasteners' evidence in the particular circumstances here; (b) Commerce failed to justify its application of an adverse inference; and (c) Commerce selected the highest rate alleged in the petition (154.33%) without justifying it based on Oman Fasteners' culpability. Appx12-13.

**a.**    The Trade Court properly concluded that Commerce abused its discretion by rejecting all of Oman Fasteners' information based on a one-time, non-prejudicial filing delay. Appx13-19. The Trade Court observed that Commerce had buried its practice of granting "virtually automatic 15½-hour extensions"—a window that would have allowed Oman Fasteners to make a timely submission here. Appx13-14 (citing 78 Fed. Reg. at 57,792). Under that policy, had Oman Fasteners simply sought an extension at 4:55 PM based on the ACCESS system's malfunctions, the company would almost certainly have received the automatic extension until 8:30 AM. Appx14. But Commerce did not notify the bar about such extensions. Appx15. Because Com-

merce would have automatically accepted Oman Fasteners' information—up to 15½ hours late—if the company had only known to submit a last-minute extension request, it was unreasonable for Commerce to reject the entire submission due to the 16-minute delay. Appx15-16 & n.10. The Trade Court also held that Commerce had failed to explain its departure from its published policy of leniency for a law firm's first-time filing mistake. Appx16-18. "There is no dispute that Oman[ Fasteners'] counsel [wa]s eligible for leniency under" that policy. Appx17. The agency's disregard of its prior statements and unexplained failure to treat like situations alike was arbitrary and capricious. Appx18 (citing, *inter alia*, *NLRB v. Washington Star Co.*, 732 F.2d 974, 977 (D.C. Cir. 1984) (per curiam)).

The Trade Court concluded that, because Commerce should have granted Oman Fasteners an extension to submit its information here, the agency erred by invoking "facts otherwise available." Appx19 (citing 19 U.S.C. § 1677e(a)(1), (a)(2)(B)). The necessary information was not missing from the record, and Oman Fasteners did not fail to provide it—necessary preconditions for Commerce to use "facts otherwise available." Appx19 (citing 19 U.S.C. § 1677e(a)(1), (a)(2)(B)).

**b.** The Trade Court also correctly concluded that Commerce abused its discretion by applying an adverse inference. Appx19-21. To apply an adverse inference, Commerce needed to find that Oman Fasteners "failed to cooperate by not acting to the best of its ability." 19 U.S.C. § 1677e(b)(1). As this Court has held, that standard "does not require perfection and recognizes that mistakes sometimes occur." Appx20 (quoting *Nippon Steel*, 337 F.3d at 1382). And "[b]efore making an adverse inference, Commerce must examine [a] respondent's actions and assess the extent of [its] abilities, effort, and cooperation in responding to Commerce's requests for information." Appx20 (quoting *Nippon Steel*, 337 F.3d at 1382). If "Commerce ma[kes] no such examination," then an adverse inference is unsupported by substantial evidence. Appx20 (citing *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022)).

Commerce did not perform the statutorily required examination here. It instead relied solely on the 16-minute filing delay and did not explain why that delay constitutes a failure to cooperate. Appx21 (citing *City of Miami, Okla. v. Fed. Energy Regulatory Comm'n*, 22 F.4th 1039, 1042, 1043 (D.C. Cir. 2022)). The record here does not show anything like "inattentiveness" or "carelessness." *Nippon Steel*, 337 F.3d at 1382. It shows that Oman Fasteners'

counsel made its best efforts at compliance, encountered a late-breaking and unexpected filing-system error, and then made a reasonable judgment call to attempt to complete the filing as quickly as possible.

If a one-time, inadvertent, minor filing delay arising from technical difficulties triggers an adverse inference, then Commerce *would* require perfection, contrary to this Court in *Nippon Steel*. Nor did Commerce make any attempt to address Oman Fasteners' assertion that the "ACCESS system's performance contributed to the late filing." Appx20-21 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 423 U.S. 29, 43 (1983)). Commerce's failure to justify its decision was an abuse of discretion. Appx21.

**c.**    Even assuming that Commerce could both exclude Oman Fasteners' information and apply an adverse inference, the Trade Court properly determined that Commerce further abused its discretion by selecting the punitive 154.33% rate—the highest penalty available under the statute. Appx21-23; *see* 19 U.S.C. § 1677e(d). "That the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." Appx22 (quoting *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (Ct. Int'l Trade 2018)). To the contrary, the statute "contemplates the selection of the highest rate" only when "the situation

merits." *Id.* (quoting *POSCO*, 296 F. Supp. 3d at 1350); *see also* 19 U.S.C. § 1677e(d)(2). This Court has held that "Commerce must … not overreach reality in seeking to maximize deterrence." *BMW*, 926 F.3d at 1300–1302 (cleaned up). And "an unusually high rate" is reserved for "serious misconduct," such as "deliberate falsity and intentional concealment." *Id.*

Importantly, the statute requires that "Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party." *BMW*, 926 F.3d at 1302; *see* 19 U.S.C. §1677e(d)(2) (adverse-inference rate must be "based on [an] evaluation … of the situation that resulted in [Commerce] using an adverse inference"). But as the Trade Court observed (Appx22-23), Commerce's tautological statement that 154.33% "would confer an adverse inference and induce cooperation" was "not an explanation" at all. "It amounts to, 'We chose this as the adverse inference rate because it's crushing.'" Appx22. Commerce admitted below that it performed no evaluation of whether Oman Fasteners' conduct warranted the maximum punishment; it instead simply applied a "practice" to select "the highest" possible adverse-inference rate. Appx4182.

Even if any adverse inference were permissible here, the 154.33% rate did not remotely reflect "the seriousness of [Oman Fasteners']" conduct, Appx23 (citations omitted), given the company's committed attempts to make a timely filing and years of complete cooperation in the antidumping investigation and administrative reviews. Oman Fasteners was nothing like the type of willful violator that might deserve the harshest punishment.

The Trade Court thus "easily agree[d] with" Oman Fasteners that Commerce abused its discretion three times over. Appx13. "[T]his is not a close case." *Id.*

### 2.    Mid Continent has not shown that the Trade Court made three independent legal errors on the merits

Mid Continent spends 40-plus pages arguing that, contrary to the Trade Court's finding, an injunction disserves the public interest because the 154.33% rate was lawful. BlueBr17. But the government's decision not to appeal belies Mid Continent's claims of harm to the public interest. In any event, Mid Continent's brief does not come close to showing that the Trade Court was wrong about *all three* of Commerce's errors.

### a.    Mid Continent has not shown reversible error regarding Commerce's denial of an extension

Mid Continent argues that the Trade Court erred in concluding that Commerce's denial of a retroactive extension was unlawful. BlueBr29-47. Not so.

**i.**    The Trade Court relied on Commerce's professed practice of granting "virtually automatic 15½-hour extensions," and Mid Continent's criticisms are incorrect and irrelevant.

Mid Continent argues that the Trade Court should not have relied on the next-morning extension practice because the practice appears in the "preamble to [a] regulation" "regarding *timely* extension requests," which is "inapplicable" because Oman Fasteners' extension request was untimely. BlueBr17, BlueBr38. But the exact location of the practice is irrelevant; the Trade Court's legal point is that Oman Fasteners would have been spared disaster had Commerce given reasonable notice of its practice to the bar.

Mid Continent contends that the Trade Court erred in finding "that Commerce did not provide sufficient notice" of the next-morning extension policy because the policy appeared in the Federal Register. BlueBr42. But publication of "preamble[s]" in the Federal Register does not give legal

notice of their contents, *see Celik Halat*, 557 F. Supp. 3d at 1361, and Mid Continent offers no authority to the contrary, BlueBr43.

Next, Mid Continent argues that the Trade Court erred in giving the next-morning extension practice "legal force" equal to or greater than Commerce's regulations. BlueBr28-40. Mid Continent is wrong. Commerce, not the Trade Court, gave the next-morning extension practice its legal force—as Commerce's application of its own regulations. The Trade Court merely evaluated Commerce's actions against Commerce's own standard and concluded that the agency abused its discretion.

**ii.** Even if the Trade Court's reliance on Commerce's next-morning extension practice was erroneous, that would be harmless because the court independently concluded that Commerce abused its discretion by not explaining its arbitrary departure from its first-time-grace policy.

Mid Continent's arguments about the Trade Court's reliance on Commerce's consistent practice also fall flat. Although Commerce may draw "different conclusions" in different proceedings "based on different facts in the record," it must stand by its word. Mid Continent concedes that Commerce cannot "act arbitrarily" and must "articulate[ ] a reasonable basis for the change" from one review to the next. BlueBr46-47 (quoting *Qingdao Sea-*

*Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)). Here, Commerce failed to articulate any reasonable basis for its departure from its stated "practice" of leniency for first-time mistakes. Appx16-18; *cf. Qingdao*, 766 F.3d at 1387 ("Commerce explained the differences between the two financial statements."). While the statute and regulations did not require Commerce *to create* its first-time-grace policy, once created, the APA did require Commerce to apply that practice consistently.

Mid Continent next takes issue with Oman Fasteners' counsel's two reasons for declining to contact Commerce to report the 16-minute delay. BlueBr43-46, BlueBr34 n.5. But that is irrelevant because the Trade Court did not rely on those reasons for its legal holdings. *See* Appx6 n.4. And anyway, the record amply demonstrates that counsel's decisions when confronting the filing problem were at least *reasonable*.

Mid Continent's favored authorities, *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), and *Trinity Manufacturing., Inc. v. United States*, No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023) (Rule 36), are clearly distinguishable. As the Trade Court explained, Oman Fasteners' "completion of its filing" within the 15½-hour automatic-extension window "distinguishes this case from *Dongtai Peak*. Appx15. In

– 65 –

that case, Commerce excluded responses filed *ten days* after the deadline when the submitting party had provided no reason for not timely filing an extension request. Appx15. Importantly, the party knew days beforehand why it could not meet the deadline and could easily have submitted the request then. *Dongtai Peak*, 777 F.3d at 1351. That is markedly different from the circumstances here, where ACCESS precleared the files only to unexpectedly reject them, and Oman Fasteners could not have realized that it would miss the deadline until minutes before that deadline arrived.

*Trinity Manufacturing* is also distinguishable. (In addition to being an affirmance under this Court's Rule 36. *See* 2023 WL 234228.) There, Commerce denied a retroactive extension request because the respondent failed to explain how supposed technical or medical issues had caused its counsel to think that he had filed on time or prevented him from exercising "ordinary due diligence" (i.e., glancing at automatic receipts) to confirm the filing. *See Trinity Mfg., Inc. v. United States*, 549 F. Supp. 3d 1370, 1378–1379 (Ct. Int'l Trade 2021). Here, counsel provided a detailed explanation for the technical issues, including with the ACCESS filing system, that caused the 16-minute filing delay. *See* Appx6 n.4; Appx20-21.

### b.    Mid Continent has not shown reversible error regarding Commerce's application of an adverse inference

Mid Continent argues that the Trade Court erred in concluding that Commerce's application of an adverse inference was unlawful. BlueBr48-57. Again, that is wrong.

Mid Continent argues that the Trade Court's adverse-inference holding was "predicated on" the Trade Court's earlier (supposedly incorrect) conclusion that Commerce should not have denied Oman Fasteners an extension. BlueBr48. But the Trade Court explicitly said that its adverse-inference reasoning was independent: Commerce abused its discretion in applying an adverse inference "[e]ven if Commerce did not abuse its discretion in denying an extension of time." Appx19.

Next, Mid Continent argues that *any* failure to "submit requested information or an extension request before the filing deadline" justifies an adverse inference, and that Oman Fasteners' delay here was actually 38 days. BlueBr49-57. Both assertions are incorrect. Mid Continent's reasoning was rejected by this Court's holding that the best-of-its-ability standard "does not require perfection and recognizes that mistakes sometimes occur." *Nip-*

*pon Steel*, 337 F.3d at 1382; *see Hitachi Energy*, 34 F.4th at 1386.[4] Mid Continent's position demands perfection in responding to Commerce's requests for information. And Oman Fasteners' delay in submitting the requested information to Commerce was undisputedly 16 minutes. Appx6. It took 38 days for Commerce to review the filing and reject it—prompting Oman Fasteners attempted to seek an extension the very next day. Appx138-139. Regardless, Commerce's decision to impose an adverse inference must be predicated on the circumstances surrounding Oman Fasteners' 16-minute late submission, not its subsequent extension request. *See* 19 U.S.C. § 1677e(b) (adverse inference may be used against party "not acting to the best of its ability to comply with a request for information").

---

[4] Mid Continent attempts to distinguish *Hitachi Energy* on its facts, BlueBr57 n.6, but it does not address this Court's statement of law in *Nippon Steel* and *Hitachi Energy* that Commerce must examine a respondent's actions and assess its abilities, efforts, and cooperation in responding to Commerce's requests for information.

**c.     Mid Continent has not shown reversible error regarding Commerce's selection of the 154.33% petition rate**

Finally, Mid Continent argues that the Trade Court erred in finding Commerce's selection of the 154.33% rate unlawful. BlueBr57-63. But its arguments are inconsistent with this Court's precedent.

Mid Continent says that the 154.33% rate is lawful because Commerce "corroborated" it, as required by the statute. BlueBr52-59 (citing *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300 (Fed. Cir. 2021); *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010); and *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016)). But the statutory corroboration requirement is separate from the additional requirement that Commerce select an adverse-inference rate "based on [Commerce's] *evaluation of the situation* that resulted in … using an adverse inference." 19 U.S.C. §1677e(d)(2) (emphasis added). A rate selected by Commerce is unlawful where, as here, Commerce does not reasonably explain how the rate reflects the seriousness of the party's conduct. *See* Appx23 (an "adverse inference rate … must 'reflect[ ] the seriousness of the non-cooperating party's misconduct'" (quoting *BMW*, 926 F.3d at 1301)); *see also* Appx22 (citing *BMW*, 926 F.3d at 1301). The statute expressly requires Commerce to "evaluat[e]"

the whole "situation," including the party's degree of culpability. 19 U.S.C. § 1677e(d)(2); *see Deacero*, 996 F.3d at 1301.

That is why *KYD* does not help Mid Continent; the 154.33% rate here was *not* "determined in accordance with the statutory requirement[ ]" in § 1677e(d)(2) to "evaluate" the whole "situation," including degree of culpability. *See* 607 F.3d at 768. And *Deacero* is consistent with *BMW*. The respondent there "mischaracterized, misrepresented, and withheld critical information" and "failed to produce any records to support or clarify its representations when given the opportunity to do so." *Deacero*, 996 F.3d at 1301 (cleaned up); *cf. Papierfabrik*, 843 F.3d at 1384 (affirming adverse-inference rate based on "intentional" and "fraudulent" misreporting). Oman Fasteners' one-time inadvertent mistake arising from a filing system's error is nothing like that.

Mid Continent also argues that *BMW* does not apply here because Oman Fasteners did not show mitigating circumstances. BlueBr63. But as the Trade Court noted, the record *did* reflect mitigating circumstances, including problems with ACCESS that were beyond Oman Fasteners' control. Just as in *BMW*, "Commerce did not address how [the ACCESS system's unexpected

rejection, Appx21] affected its view of [Oman Fasteners'] level of culpability." 926 F.3d at 1302.

Mid Continent fails to show that the government has a legitimate interest in imposing a crushing 154.33% rate on Oman Fasteners. For that reason, the injunction serves the public interest.

### E. Even assuming that the Trade Court applied the wrong standard, Oman Fasteners is entitled to an injunction

While Mid Continent conceded below that the Trade Court can enter a permanent injunction in connection with a judgment on the agency record, Appx3124, it insists for the first time on appeal that the Trade Court erred by granting a permanent injunction under *eBay* when Oman Fasteners requested a preliminary injunction under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). BlueBr25.

Mid Continent did not argue to the Trade Court that the permanent injunction standard would make a difference to the outcome, so it should not be permitted to make that argument now. *California Ridge*, 959 F.3d at 1351; *see* Appx3878-3880. Regardless, the preliminary injunction standard would not help Mid Continent because an injunction would still be warranted. The only real difference between the two standards is that a perma-

nent injunction requires *actual* success on the merits, whereas a preliminary injunction requires only *likely* success. *See also Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) (calling the standards "essentially the same"). The Trade Court obviously would have found that Oman Fasteners was likely to succeed on the merits because it found the record sufficient to conclude that Oman Fasteners *had* succeeded on the merits—and it wasn't close. Appx12-13. The other injunction factors come out the same under *Winter* as they do under *eBay*, *see* Sections III.A, III.C, III.D, and Mid Continent does not argue otherwise.

The Trade Court properly determined that Oman Fasteners is entitled to injunctive relief.

## Conclusion

This Court should dismiss this appeal. Otherwise, it should affirm.

Respectfully submitted,

Perkins Coie LLP

by /s/Michael P. House

Michael P. House
Michael R. Huston
Andrew T. Dufresne
Sopen Shah
Andrew Caridas
Jonathan I. Tietz

Counsel for Plaintiff-Appellee

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type–volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 13,990 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the confidential word count requirements of Federal Circuit Rule 25.1(d)(1)(B). The brief contains 30 unique words marked confidential, which does not exceed the maximum of 50 words permitted by Federal Circuit Rule 26.1(d)(1)(B) for cases arising under 19 U.S.C. § 1516(a).

3.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Valkyrie A type.

Dated: May 22, 2023                    /s/Michael P. House

                                       Michael P. House

## CERTIFICATE OF AUTHORITY

I certify that I have the authorization of my co-counsel Michael P. House to file this brief with his electronic signature.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: May 22, 2023

/s/ Andrew T. Dufresne

Andrew T. Dufresne