# United States Court of Appeals for the Federal Circuit

———————————

**OMAN FASTENERS, LLC,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**MID CONTINENT STEEL & WIRE, INC.,**
*Defendant-Appellant*

———————————

2023-1661

———————————

Appeal from the United States Court of International Trade in No. 1:22-cv-00348-MMB, Judge M. Miller Baker.

———————————

Decided: January 7, 2025

———————————

MICHAEL R. HUSTON, Perkins Coie LLP, Phoenix, AZ, argued for plaintiff-appellee. Also represented by ANDREW CARIDAS, MICHAEL PAUL HOUSE, JONATHAN IRVIN TIETZ, Washington, DC; ANDREW DUFRESNE, SOPEN B. SHAH, Madison, WI.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, argued for defendant-appellant. Also represented by BENJAMIN JACOB BAY, JENNIFER MICHELE SMITH-VELUZ.

———————————

Before MOORE, *Chief Judge*, SCHALL and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Based on its 2015 antidumping-duty order covering certain steel nails from the Sultanate of Oman, the U.S. Department of Commerce conducted an administrative review under section 751 of the Tariff Act of 1930, 19 U.S.C. § 1675, of merchandise that was covered by the 2015 order and entered into the United States between July 1, 2020, and June 30, 2021 (the 2020–2021 administrative review). Oman Fasteners, LLC, a foreign producer and exporter of steel nails covered by the 2015 order, was the sole mandatory respondent in the 2020–2021 administrative review. Commerce issued a detailed questionnaire to Oman Fasteners, and on the day a response was due, counsel for Oman Fasteners submitted the response through Commerce's electronic filing system, but the system did not report acceptance of the submission (deemed necessary for completion) until 16 minutes after a deadline of 5:00 PM. The next day, as authorized by Commerce rules, counsel for Oman Fasteners made the final redactions for confidential information.

Oman Fasteners did not call its tardiness to the attention of Commerce officials. Five weeks later, after certain Commerce personnel noticed the 16-minute delay, Commerce rejected Oman Fasteners' response. Commerce proceeded to issue the final results of the review without considering any of the information in the response and instead applied an inference adverse to Oman Fasteners, under 19 U.S.C. § 1677e(b), to arrive at an antidumping-duty rate for Oman Fasteners of 154.33%. The ruling had the immediate effect of requiring the importer of all new entries of Oman Fasteners' covered nails to make cash deposits with the government of that amount. Previously, under

the 2019–2020 administrative review, the duty rate was 1.65% and therefore so was the cash-deposit rate.

Oman Fasteners filed an action in the Court of International Trade (Trade Court) to challenge the final results, and it promptly sought a preliminary injunction against imposition of the 154.33% duty rate. Domestic steel-nail producer Mid Continent Steel & Wire, Inc. (Mid Continent)—which had filed the petition that led to the 2015 antidumping-duty order and which had participated in the 2020–2021 administrative review—intervened as a defendant. After consolidating the preliminary-injunction proceeding with a trial on the merits, the Trade Court held that Commerce abused its discretion and remanded to Commerce for recalculation consistent with its opinion—a nonfinal decision not subject to appeal to this court. But it also issued an injunction that barred Commerce from enforcing the final results and from collecting cash deposits of 154.33% and limited the cash deposits to the pre-existing 1.65% rate. *Oman Fasteners, LLC v. United States*, No. 22-00348, Slip Op. 23-17, 2023 WL 2233642 (Ct. Int'l Trade Feb. 15, 2023) (*Trade Court Decision*).

Pursuant to 28 U.S.C. §§ 1292(c) and 1295(a)(5), Mid Continent filed an interlocutory appeal from the injunctive relief granted to Oman Fasteners. Oman Fasteners, in response, has defended the injunction, while also challenging Mid Continent's standing and urging dismissal for mootness in light of the intervening Commerce determination of a 0.00% rate for Oman Fasteners in the succeeding (2021–2022) administrative review (which set the going-forward cash-deposit rate). We now conclude that Mid Continent has standing and that this appeal is not moot, but we reject Mid Continent's challenges and therefore affirm the injunction on appeal.

I

A

Under the general legal framework relevant here, when Commerce finds that "foreign merchandise is . . . sold in the United States at less than its fair value" and the United States International Trade Commission determines that a domestic industry is, or is threatened to be, materially injured, Commerce must impose an antidumping duty "equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the [foreign] merchandise." 19 U.S.C. § 1673; *see also id.* §§ 1677(7) (defining "material injury"), 1677(34) (defining "dumped"), 1677(35)(A) (defining "dumping margin"), 1677a (defining "export price" and "constructed export price"), 1677b (explaining the process for determining the normal value). Once such an order is in place, Commerce must determine what duties are owed for particular entries of goods subject to the order (subject merchandise). Under our laws' "'retrospective' assessment system," 19 C.F.R. § 351.212, Commerce does not finally determine the amount of antidumping duty owed for entries at the time of entry. Such final determinations occur later, and eventually are put into effect by U.S. Customs and Border Protection (Customs)—*i.e.*, the entries are "liquidated." 19 C.F.R. §§ 159.1, 351.212(a), 351.213(a).

The usual process for finally determining the duty for (already-made) entries of subject merchandise is an administrative review, which is conducted on an up-to-annual basis, at least if requested by an "interested party," such as a domestic producer like Mid Continent. 19 U.S.C. §§ 1675(a)(1), 1677(9) (defining "interested party"); 19 C.F.R. § 351.213(b); *see* 19 C.F.R. §§ 351.212(a), 351.213(a). Through such an administrative review (often called an "annual review"), Commerce is to calculate the proper antidumping duty for the entries made during the discrete review period (generally twelve months) in which the

antidumping duty was in effect. 19 U.S.C. § 1675(a)(2)(B)(i), (iv); 19 C.F.R. § 351.213(e). Because facts that are key to the calculation of the dumping margin (*e.g.*, sales prices, production costs) may change over time, periodic assessments through administrative reviews help Commerce fulfill its broad obligation to calculate accurate dumping margins. *See, e.g., Dongtai Peak Honey Industry Co., Ltd. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

The temporal difference between entry and final determinations of duty for the entered merchandise gives rise to a requirement of cash deposits upon entry. When an antidumping-duty order is in effect, Commerce must instruct Customs to collect cash deposits from the importer of record on covered goods entered, the money to be held by the government until the final determination of the duty actually owed. 19 U.S.C. §§ 1673d(c)(1)(B)(ii), 1673e(a), 1673g; 19 C.F.R. § 351.211(a), (b)(1)–(2); *see Trade Court Decision*, at *1 n.2 ("This requirement is intended as security for the eventual payment of antidumping duties."). The cash-deposit rate for entries generally is the applicable antidumping-duty rate most recently determined—in the original antidumping-duty order or, later, in the most recently concluded administrative review. *See* 19 U.S.C. §§ 1673d(c)(1)(B)(ii), 1675(a)(2)(C); 19 C.F.R. § 351.212(a). Once the duty for a particular entry is finally determined, the importer is to pay to the government any excess of that duty over the cash deposit made upon entry and the government is to pay a refund if the cash deposit exceeded that duty. 19 U.S.C. §§ 1505(b), 1673f, 1677g (providing for interest on overpayments or underpayments); *see* 19 C.F.R. § 351.212.

Commerce, lacking subpoena power, generally must rely on the parties for information crucial to its determination. The "burden of creating an adequate record lies with interested parties and not with Commerce." *BMW of N*

*America LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (citations omitted). During an administrative review like the one here, Commerce may request information through "questionnaires requesting factual information" to determine the antidumping duty. 19 U.S.C. § 1677b(b)(2)(A)(ii); 19 C.F.R. § 351.221(b)(2). Under 19 U.S.C. § 1677e(a), "[i]f a respondent fails to provide requested information by the deadlines for submission," Commerce must "fill in the gaps" using information otherwise available to it. *BMW*, 926 F.3d at 1295 (citations omitted). "Separately," under 19 U.S.C. § 1677e(b), "if Commerce determines that an interested party has 'failed to cooperate by not acting to the best of its ability to comply' with a request for information, it may use an adverse inference in selecting a rate from" the information otherwise available to it. *Id.* (quoting § 1677e(b)).

B

Commerce initiated an antidumping investigation of certain steel-nail products imported from the Sultanate of Oman, and certain other places, based on a petition filed by Mid Continent, and Commerce subsequently determined that Oman Fasteners was dumping certain steel nails. *Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28972 (May 20, 2015). Commerce issued an antidumping-duty order on July 13, 2015, imposing a 9.10% duty on Oman Fasteners. *Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 80 Fed. Reg. 39994, 39996 (July 13, 2015).[1] Each

---

[1] After years of litigation, Commerce's initial antidumping-duty rate has been reduced to 4.22%. *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530

year since, Commerce has conducted an administrative review, and the Commerce-determined rates for Oman Fasteners preceding the present review were (in chronological order) 0.63%, 0.00%, 0.00%, 0.00%, and 1.65%. *Trade Court Decision*, at *8 & n.12 (citing decisions for 2014–2016, 2016–2017, 2017–2018, 2018–2019, and 2019–2020).[2]

On September 7, 2021, Commerce initiated an administrative review for the period of review spanning July 1, 2020, to June 30, 2021. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50034, 50037 (Sept. 7, 2021). Oman Fasteners responded to Commerce's supplemental questionnaire on December 10, 2021. J.A. 3553–54. On January 24, 2022, in accordance with 19 U.S.C. § 1677m(d), Commerce informed Oman Fasteners that the submission was deficient and gave Oman Fasteners ten days to respond to "37 separately numbered questions, plus additional sub-questions, for a total of 48 separate requests for information, clarifications and/or data covering a wide variety of subjects" pertaining to Oman Fasteners' U.S. sales. J.A. 101, 141, 2484–91, 2783–84. At Oman Fasteners' request, Commerce extended the deadline to February 14, 2022, which by

---

(Fed. Cir. 2019); *Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1353 (Ct. Int'l Trade 2022). Today, we reject Oman Fasteners' effort to reduce it even further, and we affirm the 4.22% rate. *Mid Continent Steel & Wire, Inc. v. Oman Fasteners, LLC*, No. 23-1039 (Fed. Cir. Jan. 7, 2025).

[2]    In the administrative review for 2021–2022, which is the period following the review period at issue here (2020–2021), Commerce adopted a 0.00% rate for Oman Fasteners. *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85878 (Dec. 11, 2023).

regulation meant by 5:00 PM Eastern Time that day, 19 C.F.R. § 351.303(b)(1), but Commerce warned that it did not "anticipate providing any additional extension." J.A. 118–19, 2493–94, 2498–99, 2501–03, 2505–06.

On February 14, counsel for Oman Fasteners, in preparing to submit its response electronically, pre-screened the files for submission-impairing errors by using the "check file" feature on Commerce's electronic filing system ACCESS. J.A. 2513. The "check file" identified no problem. *Id.* Although prior submissions by counsel had taken between 9 and 32 minutes, J.A. 144, counsel began uploading the files about 50 minutes before the 5:00 PM deadline. J.A. 2514. Despite the clean "check file" results, counsel received a notification that the first file was rejected 8 minutes after submitting it, and counsel received a similar notification 9 minutes after resubmitting the file. J.A. 2514, 2527–30. Counsel for Oman Fasteners reformatted and resubmitted the response narrative and a supporting PDF (Portable Document Format) document, receiving electronic confirmation of receipt by 4:46 PM. J.A. 2514–15, 2529–30. Counsel then began uploading additional files, which were in a different computer format and contained mostly (but not entirely) the same information already submitted successfully by 4:46 PM—but the last of those files were not accepted (or, therefore, successfully submitted) until 5:16 PM. J.A. 2514–16, 2531–36, 2655–65, 2670, 2893, 2895.[3] Counsel for Oman Fasteners did not

---

[3]    Regarding the files in a different format from that of the already-submitted files—*i.e.*, what Oman Fasteners characterizes as certain "back-up files"—Oman Fasteners later argued that the submission of such files was voluntary, not required. J.A. 145–46. Commerce rejected the argument, stating that those files constituted the required "copy of the computer program/spreadsheet/worksheet . . .

send Commerce any "notification . . . of filing difficulties or an additional request for extension of the deadline." J.A. 120, 2669.

The files submitted on February 14th had business proprietary information and were marked as such, with the marking properly indicating that the markings could be corrected within one day. J.A. 2651–65; 19 C.F.R. § 351.303(d)(2)(v) (authorizing the respondent to bracket such information and mark the document with the warning that "Bracketing of Business Proprietary Information Is Not Final for One Business Day After Date of Filing" at the top of each page containing such information). Pursuant to Commerce's "one-day lag rule," 19 C.F.R. §§ 351.303(c), 351.303(d)(2)(v)–(vi), 351.304(c), counsel for Oman Fasteners submitted the final business confidential submission with confidential information bracketed and a public version with confidential information redacted by 5:00 PM the next business day. J.A. 2516, 2558–66, 2892. Those versions differed from the February 14th submissions only in the information bracketed or redacted and in the removal of the February 14th version's warning that the bracketing was not final. 19 C.F.R. § 351.303(c)(2)(ii).

Commerce notified counsel for Oman Fasteners on March 22, 2022, that it was rejecting the tardy submission and would not consider it part of the record for the proceeding. J.A. 120–21 (citing 19 C.F.R. §§ 351.303(b)(1), 351.302(d)(i)); *see also* 19 U.S.C. § 1677m(d). Counsel for Oman Fasteners requested that Commerce reconsider the rejection and grant an extension. J.A. 138–51, 240–55.

_____

used to calculate the prices, expenses, and adjustments." J.A. 265; *see Issues and Decision Memorandum for the Final Results of the 2020–2021 Administrative Review of Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman* at 20 (Dep't of Commerce Dec. 16, 2022).

Commerce rejected the request, explaining that (1) Oman Fasteners had not requested an extension before the deadline or demonstrated extraordinary circumstances justifying an extension, (2) the late submissions were important for "calculat[ing] an accurate [dumping] margin," and (3) Commerce "does not bear the burden of demonstrating it or an interested party was impeded or prejudiced by a late submission to justify its rejection," and such a requirement would impede its "ability to manage its proceedings and administer its statutory mandate." J.A. 263–66.

In July 2022, Commerce issued its preliminary results for the administrative review and found a dumping margin of 154.33% for the 2020–2021 Oman Fasteners entries. *Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021*, 87 Fed. Reg. 43240, 43241 (July 20, 2022) (*Prelim. Results*). In its accompanying decision memorandum, Commerce reasoned: "Oman Fasteners failed to provide necessary U.S. sales information by the deadline for submission of that information and failed to demonstrate that any extraordinary circumstances caused the untimely filed extensions request and submission"; "necessary information [was] not available on the record"; and it should turn to information otherwise in the record under 19 U.S.C. § 1677e(a). *Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Certain Steel Nails from the Sultanate of Oman; 2020-2021* at 6–10 (Dep't of Commerce July 1, 2022) (*Prelim. Results Dec. Mem.*). Commerce then concluded that because Oman Fasteners "failed to cooperate to the best of its ability," it would use an inference adverse to the interests of Oman Fasteners, under 19 U.S.C. § 1677e(b)(1), in selecting from among the facts otherwise available in the record. *Prelim. Results*, 87 Fed. Reg. at 43241; *see Prelim. Results Dec. Mem.*, at 10–11. Specifically, it selected "the highest dumping margin alleged in [Mid Continent's 2014] Petition"—

154.33%.  *Prelim. Results Dec. Mem.*, at 11–12; *see Prelim. Results*, 87 Fed. Reg. at 43241.

Oman Fasteners asked Commerce to extend the deadline for its issuance of the administrative review's final results and to postpone, pending judicial review, its issuance to Customs of the cash-deposit instructions based on this new rate (if it was adopted in the final results) because, Oman Fasteners alleged, failure to do so would result in "irreparable harm" to Oman Fasteners.  J.A. 2748–64.  Commerce refused those requests.  J.A. 2878–79.

On December 22, 2022, Commerce issued its final results, adopting the 154.33% rate.  *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 78639 (Dec. 22, 2022) (*Final Results*).  In its accompanying memorandum, Commerce stated that "Oman Fasteners did not provide a convincing explanation for why its submission was late" and "did not notify Commerce of its error in not filing the complete submission, or attempt to remedy it."  *Issues and Decision Memorandum for the Final Results of the 2020-2021 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman* at 19–20 (Dep't of Commerce Dec. 16, 2022) (*Final Results Dec. Mem.*).  Commerce reasoned that the statute authorizes it to adopt any dumping margin "including the highest such rate or margin" and that, on the record here, although "calculated margins" ranged "from 0.63 percent to 9.10 percent," it was "appropriate to assign Oman Fasteners the Petition rate of 154.33 percent [from the petition initiating the underlying antidumping investigation] based on [Oman Fasteners'] failure to cooperate, *because it is a rate on the record which would confer an adverse inference and induce cooperation*."  *Id.* (emphasis added).  Commerce added that the statute "does not require that Commerce demonstrate that the . . . rate used reflects an alleged commercial reality of an interested party," so it was "not

required to consider whether such a rate reasonably reflects the commercial reality of Oman Fasteners." *Id.* at 19.

### C

The next day, Oman Fasteners, an "interested party" under 19 U.S.C. §§ 1516a(f)(3), 1677(9), brought suit in the Trade Court under 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii) and 28 U.S.C. § 1581(c), to challenge Commerce's decision. Arguing that Commerce erred in rejecting the response to the supplemental questionnaire, applying an adverse inference to "select the wholly discredited and punitive 154.33% petition rate," and refusing to postpone implementation of the cash-deposit rate, Oman Fasteners sought a remand to Commerce for a redetermination. J.A. 1673–91. A few days later, Oman Fasteners moved for a preliminary injunction. J.A. 2360–441. The Trade Court ordered that the government, in its opposition brief, should address whether preliminary-injunction proceedings should be consolidated under Court of International Trade Rule 65(a)(2) with a trial on the merits—more specifically, with consideration of judgment on the agency record under Rule 56.2. J.A. 48, ECF No. 26. The Trade Court also granted Mid Continent's motion to intervene as a defendant as a matter of right under 28 U.S.C. § 2631(j)(1)(B). J.A. 49, ECF No. 37.

After a confidential hearing, which the Trade Court instructed the parties to treat as a trial on the merits, J.A. 52, ECF No. 78; J.A. 3655–56, 3671, the Trade Court issued a judgment on the agency record on February 15, 2023, *Trade Court Decision*, at *13. Stating that "this is not a close case," *id.* at *4, the Trade Court concluded that Commerce abused its discretion in denying the retroactive extension and applying an adverse inference to select the "draconian sanction" of the 154.33% antidumping duty, *id.* at *7–8. "Because Commerce's challenged actions here are the very definition of abuse of discretion," the Trade Court

remanded the case to Commerce for further proceedings consistent with the court's opinion. *Id.* at \*2. Moreover, because Oman Fasteners had met "the requirements for obtaining injunctive relief, including showing irreparable injury, the [Trade C]ourt enjoin[ed] the government to collect cash deposits at the previous rate of 1.65 percent pending further order of the [Trade C]ourt." *Id.*

The United States declined to appeal from the injunction, but Mid Continent timely filed an interlocutory appeal to this court on March 23, 2023.[4] In January 2024,

---

[4] After the present appeal was filed, Commerce, in the remand ordered by the Trade Court, recalculated the dumping margin for the 2020–2021 administrative review using the previously disregarded information, and it arrived at a 0.00% rate, which the Trade Court sustained on January 5, 2024. *Oman Fasteners, LLC v. United States*, No. 22-00348, Slip Op. 24-1, 2024 WL 163368, at \*1 (Ct. Int'l Trade Jan. 5, 2024) (affirming *Final Results of Redetermination Pursuant to Court Remand*, Case No. A-523-808, Slip Op. 23-17 (Dep't of Commerce July 17, 2023)). That ruling is still in litigation, because Mid Continent (not the government) appealed the Trade Court's decision. *Oman Fasteners v. United States*, No. 24-1350 (Fed. Cir. appeal docketed Jan. 12, 2024), ECF No. 1. When Mid Continent moved to stay that appeal pending decision in the present case, Mot. to Stay Further Proceedings in this Appeal or, in the Alternative, to Consolidate with Related Appeal, *Oman Fasteners*, No. 24-1350, ECF No. 11 (Jan. 29, 2024), the government informed the court that it did not "intend to either challenge or defend the trial court's determination that Commerce abused its discretion by applying an adverse inference to Oman Fasteners," which it "underst[oo]d . . . to be the sole issue in dispute in th[e] appeal" of the Trade Court's 2024 results-sustaining decision,

Oman Fasteners filed a motion to dismiss the appeal as moot. Appellee's Mot. to Dismiss Appeal as Moot, ECF No. 48 (Oman's Motion to Dismiss). We have jurisdiction under 28 U.S.C. §§ 1292(c)(1) and 1295(a)(5).

## II

Before turning to the merits of Mid Continent's appeal, we first address Oman Fasteners' arguments that Mid Continent lacked standing to bring this interlocutory appeal, Oman Fasteners Response Br. at 33–38, and that this appeal is now moot, Oman's Motion to Dismiss at 15–22.

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). To demonstrate Article III standing to pursue its appeal, a party invoking the Article III judicial power "must have already suffered or be imminently threatened with a concrete, particularized injury, that is fairly traceable to the challenged conduct, and that is likely to be redressed by a favorable court ruling." *Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 918 F.3d 1355, 1364 (Fed. Cir. 2019); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Already*, 568 U.S. at 90; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). In applying those standards, we generally assume that Mid Continent is right about its claim on the merits. *See Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016). The term "standing" also covers non-

---

Def.'s Resp. to Mot. to Stay, *Oman Fasteners*, No. 24-1350, ECF No. 14 (Feb. 8, 2024). *See also* Docketing Statement, *Oman Fasteners*, No. 24-1350, ECF No. 15 (Feb. 12, 2024) (government's docketing statement, checking box labeled "None/Not Applicable" for "Relief sought on appeal"). We granted the requested stay. Order Granting Mot. to Stay, *Oman Fasteners*, No. 24-1350, ECF No. 18 (Mar. 25, 2024).

constitutional "prudential" inquiries—including, as relevant here, an inquiry into whether a plaintiff's "interests fall within the zone of interests protected by the law invoked," which, though called "statutory standing," is an inquiry into whether the plaintiff has a statutory right of action. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–128 (2014) (internal quotations marks and citation omitted); *see, e.g.*, *United States v. Windsor*, 570 U.S. 744, 756–58 (2013); *Bank of America Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196–97 (2017).

After a case (including an appeal) has been initiated, it "becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already*, 568 U.S. at 91 (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)); *see id.* at 90–91 (explaining that "an 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation") (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). "[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks omitted). The mootness inquiry goes to "Article III jurisdiction[,] . . . not to the merits of the case." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67 (1997); *see also Chafin*, 568 U.S. at 174 (explaining that it is improper to "confuse[] mootness with the merits").

A

Oman Fasteners argues that "Mid Continent lacks Article III standing to challenge this injunction against the government." Oman Fasteners Response Br. at 33–38. We assume for this inquiry that (as Mid Continent argues on the merits) the Trade Court committed reversible error in displacing the 154.33% duty on entries during the 2020—2021 period and enjoining use of that rate to set the

cash deposit for entries starting from Commerce's December 22, 2022 ruling. We conclude that Mid Continent has Article III standing as well as "statutory" standing.

The challenged dramatic reduction in the government-imposed burden on Oman Fasteners effected by the Trade Court's injunction caused competitive economic injuries to Mid Continent, the domestic steel-nail manufacturer that has taken the lead, in its own name, in requesting the antidumping-duty investigation initially and in opposing Oman Fasteners, year after year, in litigation and administrative reviews. *See Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383–84 (2024) (recognizing competitive injury for standing); *cf. McKinney v. U.S. Department of Treasury*, 799 F.2d 1544, 1554–55 (Fed. Cir. 1986) (explaining that "allegations of competitive injury" can confer standing but not in circumstances, unlike the present case, where the alleged injury is not tied to specific companies). Mid Continent asserts that "ordering Commerce to use a cash deposit rate of 1.65% rather than 154.33%" led to significant "real-world consequences" such as "lost sales and lost revenue by virtue of improperly facilitated import competition." Mid Continent Opening Br. at 75. That commonsensical assertion is materially undisputed. According to Oman Fasteners itself, when Commerce imposed a 154.33% cash-deposit rate in late December 2022, Oman Fasteners "had no choice but to cease all U.S. imports of the subject merchandise," as "[i]t could neither raise prices to offset the rate nor pay the sky-high deposits for more than a couple months before depleting its cash reserves." Oman Fasteners Response Br. at 15; *see also Trade Court Decision*, at *10, *12–13. And it is undisputed that, when the Trade Court's February 2023 injunction reduced the cash-deposit rate to 1.65%, Oman Fasteners resumed its entry of substantial volumes of its nails, causing competitive harm to Mid Continent. *See, e.g.*, Oral Arg. at 4:45–6:00. Mid Continent has thus

adequately established harm to its sales traceable to the challenged Trade Court decision in February 2023.

We also find the redressability requirement of standing to be met. In its merits briefs, Mid Continent argues that, if we reverse the injunction, the proper remedy is for this court to "order retroactive imposition of the 154.33% cash deposit rate on imports of steel nails by or from [Oman Fasteners] effective on and after December 22, 2022," the date of Commerce's *Final Results*. Mid Continent Opening Br. at 76; *id.* at 19; *see also* Mid Continent Reply Br. at 12–13; 87 Fed. Reg. at 78639. A variant of that position would be a reversal of the injunction and a remand for the Trade Court to decide whether to order a retroactive collection of cash deposits. Here, it suffices for us to make a very limited point—that, on the arguments presented by the parties, we have no sufficient basis for declaring such retroactive collection to be unavailable, generally or in this case, as a matter of law. That limited conclusion suffices for redressability here because the results for the 2020–2021 administrative review have not achieved finality in court, *see supra* n.4, and we cannot, in the present appeal, rule out the possibility of a rate for that review period above the 1.65% collected since the February 2023 injunction was issued. On those bases, we conclude that a reversal of the injunction could lead to redress for Mid Continent of the competitive harm at issue through retroactive collection of cash deposits. *See* Oral Arg. at 22:50–24:10; 25:02–25:52.

In addition, we conclude that Mid Continent has met "prudential" or "statutory" standing requirements. *See*, *e.g.*, *Lexmark*, 572 U.S. at 125–26. Mid Continent's interlocutory appeal of the injunction seeks protection of an interest that is within the "zone of interests" protected by the antidumping-duty provisions of the Tariff Act of 1930 (as amended). *See id.* at 127 (relying on "zone of interests" formulation); *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1335 (Fed. Cir. 2008) (same).

"[I]mposed to protect [domestic] industries against unfair trade practices," *Canadian Wheat Board v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011), an antidumping duty is the result of proceedings that, Congress has provided, can be initiated by a petition filed by a domestic-industry manufacturer "to address harm to domestic manufacturing from foreign goods sold at an unfair price," *United States v. Eurodif S.A.*, 555 U.S. 305, 310–11 (2009); 19 U.S.C. §§ 1673a(b)(1), 1677(9)(C). Mid Continent, a domestic manufacturer of steel nails, exercised its right to that process by filing a petition for, and then participating in, an antidumping investigation, which resulted in the 2015 antidumping order that covers Oman Fasteners.

Mid Continent then had an undisputed right to intervene in Oman Fasteners' court challenge to the final results of the administrative review because it would be "adversely affected or aggrieved by [the Trade Court's] decision," 28 U.S.C. § 2631(j)(1), as it is a manufacturer of a "domestic like product," 19 U.S.C. § 1677(9)(C), and thus an "interested party," 19 U.S.C. § 1516a(f)(3). Oman Fasteners does not dispute that Mid Continent may appeal the final judgment of the Trade Court sustaining Commerce's 2023 redetermination on remand of the antidumping duty, *see supra* n.4; in fact, Oman Fasteners argues that Mid Continent could and should raise in such an appeal some of the arguments Mid Continent makes here. Oman Fasteners Response Br. at 31, 33, 36–37. Accordingly, the statute plainly authorizes a member of the domestic industry like Mid Continent to challenge antidumping-duty decisions and Trade Court rulings about such decisions (if it becomes a party) as mistakenly too lax. For zone-of-interests purposes, we see no reason it should make a difference that the particular remedial device used by the Trade Court was an injunction. That injunction lowered the antidumping-duty and cash-deposit rate, producing recommencement of imports by Oman Fasteners, with an evident impact on the interest of Mid Continent that is legally

protected by a statutory right to seek redress before the agency and in court.

We therefore reject Oman Fasteners' challenge to Mid Continent's standing.

## B

We also reject Oman Fasteners' argument that this appeal became moot after it was filed, an argument that rests on the assertion that, because of an intervening development, "[t]he relief that Mid Continent seeks through this [interlocutory] appeal—to reverse or vacate the injunction—would have no effect on Oman Fasteners' cash deposit rate." Oman's Motion to Dismiss at 3, 22. Oman Fasteners points to the issuance by Commerce on December 11, 2023, of its decision setting the final calculated antidumping duty (at 0.00%) for the 2021–2022 administrative review, covering entries from July 1, 2021, through June 30, 2022, the review period following the period at issue here. *See supra* n.2. By law, Oman Fasteners says, that rate governs the cash deposits required for entries after the December 2023 decision, *see supra* p. 5, and therefore a decision by this court in the present case to set aside the injunction before us, as Mid Continent requests, could not result in reinstatement of the 154.33% cash deposit. Oman's Motion to Dismiss at 12–13.

We do not agree. Mid Continent retains a "concrete interest, however small," *Chafin*, 568 U.S. at 172, in our reversal or vacatur of the Trade Court's injunction because Mid Continent could benefit from such a result, depending on what occurs in other proceedings not now before us. *See Gilda Industries, Inc. v. United States*, 446 F.3d 1271, 1279 (Fed. Cir. 2006) (explaining that standing can exist when overturning the challenged action would provide an otherwise-foreclosed opportunity to secure relief, depending on decisions not yet made). Specifically, for imports subject to the 2020–2021 administrative review itself, still-active proceedings might produce an ultimate duty assessed at

liquidation higher than the 0.00% rate that Commerce determined on remand from the Trade Court's ruling now before us. *See supra* n.4 (appeal of Trade Court's affirmance of Commerce's remand rate of 0.00% stayed in this court). And for imports by Oman Fasteners made while the injunction was in effect but covered by other administrative reviews, other proceedings might produce a cash-deposit rate and actual duty higher than 1.65%.[5]

We cannot determine here whether Mid Continent will succeed in its separate appeal of the remand redetermination in the 2020–2021 administrative review or what rates will ultimately be found proper for imports addressed in

---

[5]    The 2022–2023 administrative review (for entries from July 1, 2022, through June 30, 2023) will establish the actual duty for entries made between December 22, 2022, through June 30, 2023, which would have been subject to the 154.33% cash-deposit rate in the absence of the injunction before us. Commerce issued preliminary results for the 2022–2023 administrative review on August 12, 2024, preliminarily adopting an actual antidumping duty of 0.00%. *Certain Steel Nails From the Sultanate of Oman: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 65593, 65594 (Aug. 12, 2024). Commerce adopted the same 0.00% rate in the final results. *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 106428 (Dec. 30, 2024). The recently initiated 2023–2024 administrative review (covering entries from July 1, 2023, through June 30, 2024), *see Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 66035, 66038–39 (Aug. 14, 2024), will establish the actual duty for other entries—made from July 1, 2023, through December 11, 2023—that also would have been subject to the 154.33% cash deposit in the absence of the injunction.

other administrative reviews but covered by the cash-deposit rate set by Commerce in December 2022 and then the drastically reduced rate set by the Trade Court's injunction in February 2023. Above, we concluded that, on the arguments presented to us, we cannot rule out the possibility of a retroactive collection of cash deposits if Mid Continent wins on the merits here (as we must assume for the mootness analysis, *Chafin*, 568 U.S. at 174). Reflecting that conclusion, we determine here only that, if Mid Continent wins here, it might—to its benefit—be put into a position it would have been in had the injunction never been issued through a requirement of retroactive cash deposits covering entries not yet subject to a final, no longer appealable, determination of the actual duty rate. *See, e.g.*, Oral Arg. at 9:46–12:24, 18:38–21:20. That is enough for us to reject Oman Fasteners' assertion of mootness. *See Chafin*, 568 U.S. at 177 (explaining that "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot'" where the relief available is "not [] 'fully satisfactory'" (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996))); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016).

## III

On the merits of Mid Continent's appeal, we affirm the Trade Court's injunction. Mid Continent argues that the Trade Court abused its discretion in enjoining Commerce from implementing the 154.33% antidumping-duty and cash-deposit rate and also challenges the Trade Court's consolidation of the hearing on the preliminary injunction with a trial on the merits (which led to the issuance of the injunction). We reject both contentions. We first address the merits of the Trade Court's granting of its injunction and then its procedure in doing so.

A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff [for a preliminary injunction] must show a likelihood of success on the merits rather than actual success." *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987); *see, e.g.*, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20–21 (2008). We review the Trade Court's grant of an injunction for abuse of discretion. *eBay*, 547 U.S. at 391; *Wind Tower Trade Coalition v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014); *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013). An abuse of discretion may be established by showing that the Trade Court "made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact findings." *Wind Tower Trade Coalition*, 741 F.3d at 95 (citation omitted). To the extent the Trade Court's decision to grant or deny an injunction "hinges on questions of law," this court reviews those determinations without deference. *Id.*

"We review Commerce's decision using the same standard of review applied by the Trade Court, while carefully considering that court's analysis. We decide legal issues de novo and uphold factual determinations if they are supported by substantial evidence." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019) (citations omitted); 19 U.S.C. § 1516a(b)(1)(B)(i); 28 U.S.C. § 2640(b). We have applied the review standard of the Administrative Procedure Act (APA), 5 U.S.C. § 706, to Commerce decisions like this one covered by 19 U.S.C. § 1516a(b)(1)(B)(i). *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020). The APA

provides for setting aside an agency decision if, for example, it is "an abuse of discretion," 5 U.S.C. § 706(2)(A), and we have reviewed decisions like the one here for an abuse of discretion, *see Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342–44 (Fed. Cir. 2021) (citing cases). When discretion is granted by Congress, it "should be exercised in light of the considerations underlying the grant of that discretion." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103 (2016) (internal quotation marks and citation omitted). Discretion is abused if, for example, its exercise rests on "'a clear error of judgment'" in the "'consideration of the relevant factors.'" *Weyerhaeuser Co. v. United States Fish & Wildlife Service*, 586 U.S. 9, 25 (2018) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)).

The Trade Court, like all trial courts, has "broad discretion to manage [its] docket[]." *Proctor & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848–49 (Fed. Cir. 2008). Exercise of that inherent power requires judgment and "weigh[ing] competing interests and maintain[ing] an even balance." *Landis v. North American Co.*, 299 U.S. 248, 254–55 (1936). We thus review management decisions by trial courts under the abuse-of-discretion standard. *See id.* at 253–57; *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984); *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1349 (Fed. Cir. 2006).

## A

We conclude that the Trade Court did not abuse its discretion by enjoining Commerce from enforcing the 154.33% antidumping-duty and cash-deposit rate. We first address the Trade Court's conclusion that Commerce reversibly erred in imposing that rate, which is the heart of the public-interest element of the injunction analysis. We then address the elements of irreparable injury, inadequacy of remedies available at law, and balance of hardships.

1

The Trade Court's determination that "[i]njunctive relief here will not disserve the public interest" rested on its conclusion that the "154.33 percent duty rate set by Commerce is unlawful." *Trade Court Decision*, at *13. The court explained that "the government has no legitimate interest in collecting cash deposits at that rate" and an injunction would not "undermine the statute's remedial purposes, because Oman has no liability to pay 154.33 percent duties." *Id.* The Trade Court reasoned that Commerce abused its discretion in denying Oman Fasteners a retroactive extension of time as well as in applying an adverse inference to select the 154.33% rate. *Id.* at *4–9. It suffices for our affirmance of the injunction for us to conclude, as we do, that applying an adverse inference to select the 154.33% rate was unsupported by the required substantial evidence and was an abuse of discretion, considering the rate selected and the facts surrounding the slightly tardy completion of the submission at issue.[6]

---

[6]    We need not separately address the Trade Court's conclusion that Commerce erred when deciding to disregard Oman Fasteners' February 14, 2022 submission in the first place. After the Trade Court set aside Commerce's December 2022 final results and remanded (on a ground we uphold here), Commerce decided to accept and consider that submission, without protesting that it disagreed with the Trade Court on the submission-rejection point, and Commerce, upon consideration of the submission, adopted a 0.00% rate. *See supra* n.4. When Mid Continent challenged the remand redetermination in the Trade Court, the government urged affirmance, without qualification and without preserving a challenge to the Trade Court's earlier conclusion on the threshold submission-rejection point. *See* Def.'s    Resp.    to    Comments    on    Remand

Commerce invoked the adverse-inference authority and made the necessary threshold finding that respondent Oman Fasteners "failed to cooperate by not acting to the best of its ability to comply with a request for information," 19 U.S.C. § 1677e(b)(1). *See Prelim. Results*, 87 Fed. Reg. at 43241; *Prelim. Results Dec. Mem.*, at 10–11; *Final Results*, 87 Fed. Reg. at 78639. To make such a determination, Commerce must "examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). If, based on such an examination, the prerequisite is met, Commerce then has authority, but is not compelled, to adopt an adverse inference. Commerce "may use an inference that is adverse to the interests of [the respondent] in selecting from" available facts to arrive at a rate, § 1677e(b)(1)(A), without being "required" to make "assumptions" about what the information, if properly submitted, would establish, § 1677e(b)(1)(B).

That "may use" grant of discretion, like any grant of discretion, must be exercised within the constraints of the statute and record. *See Weyerhaeuser*, 586 U.S. at 25.

_____

Redetermination, *Oman Fasteners, LLC v. United States*, No. 1:22-cv-00348 (Ct. Int'l Trade), ECF No. 120 (Sept. 22, 2023). Then, after the Trade Court affirmed the remand redetermination and Mid Continent appealed, the government told this court that it does not plan to challenge the Trade Court's earlier submission-rejection or § 1677e conclusions. *See supra* n.4. We do not decide whether those filings by Commerce make clear that it has chosen or would choose to exercise discretion to accept the submission (as it certainly could do) even if not compelled by the Trade Court to do so or whether for such a reason the Trade Court's specific conclusion that rejection was improper might no longer be material to the final rate adopted.

Importantly, regarding the specific rates Commerce may adopt through this discretion, we have long held that "the 'inference' that Commerce 'may use' in 'selecting from among the facts otherwise available' must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'" *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) (quoting *F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)) (first citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012); and then citing *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010)); *see also F.lli de Cecco di Filippo Fara S. Martino S.p.A.*, 216 F.3d at 1032 ("[T]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). That well-established standard, focusing on accuracy but allowing a departure for deterrence, takes due account not only of the overall statutory regime but also of particular statutory guides—that Commerce is not "required" to "estimate" what the rate "would have been" if the relevant party "had cooperated" or to "demonstrate" that the rate chosen "reflects an alleged commercial reality of the interested party," 19 U.S.C. § 1677e(d)(3), and that Commerce "may apply any of the . . . dumping margins . . . *based on the evaluation by [Commerce] of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available*," *id.* § 1677e(d)(2) (emphasis added).

Under the governing standard, we conclude—relying on the combination of considerations we discuss—that the reasoning by Commerce and the evidence before it cannot support the 154.33% result it reached. Most strikingly, Commerce's decision to use the adverse-inference authority to select a 154.33% rate, based on a 16-minute delay in submitting the requested information, is a gross departure

from the established principle that Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter noncompliance with Commerce rules and orders. As we have noted, the Commerce-determined rates for Oman Fasteners preceding the present review were 0.63%, 0.00%, 0.00%, 0.00%, and 1.65% (after the original investigation had adopted a 9.10% rate, which had been reduced to 4.22% by early August 2022). *See supra* pp. 6–7 & n.1. Even before Commerce, when considering the initially excluded information, recalculated the rate for the present administrative review as 0.00%, *see supra* n.4, a rate of 154.33% stood out as highly implausible as an accurate figure for Oman Fasteners' dumping margin for the 2020–2021 administrative-review period. Commerce did not establish a basis for reasonably finding, in light of its past findings or of the evidence in the record in this case, that the 154.33% was even remotely close to an accurate amount by which the normal value of the steel nails at issue exceeded the export price. *See* J.A. 1670–71; 19 U.S.C. §§ 1673, 1677(35)(A); *Diamond Sawblades*, 986 F.3d at 1367.

We need not decide what if any circumstances could justify such a result. A logical implication of our precedent on the governing constraints, quote *supra*, is that a *necessary* condition would be the establishment of a particularly strong need to deter non-compliance, which would have to rest on a particularly serious failure to cooperate—considering, *e.g.*, such common factors as intent, consequences for Commerce's processes and ability to carry out its statutory mandate, and recidivism. The record here cannot support any such characterization.

In its preliminary decision, Commerce devoted just two paragraphs to explaining why it proposed to apply an adverse inference under § 1677e(b). The first paragraph restates the general law and practice of Commerce, and the second states simply that Oman Fasteners failed to "act to

the best of its ability" by submitting its response by the deadline and "fail[ing] to demonstrate that extraordinary circumstances existed that would warrant" granting of an untimely filed extension request. *Prelim. Results Dec. Mem.*, at 10–11. In its final decision, Commerce included just one sentence on this issue (as part of a longer discussion about the threshold issue about missing information, under § 1677e(a)), stating only that "because Oman Fasteners failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines, we are applying an adverse inference when selecting from the facts available." *Final Results Dec. Mem.*, at 15. Explaining the selection of the 154.33% figure based on its "evaluation . . . of the situation that resulted in" the application of the adverse inference, Commerce merely declared, in conclusory fashion, that Oman Fasteners' failure to "act to the best of its ability . . . greatly inhibited Commerce's ability to calculate an accurate dumping margin based on the respondent's own data." *Id.* at 19.

That discussion fails to address facts relevant to assessing the character of the actions at issue under the governing standard. *See Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385–86 (Fed. Cir. 2022) (determining that applying an adverse inference was unsupported by substantial evidence in the record because Commerce failed to provide a reasonable justification for why it refused information and applied an adverse inference). As discussed *supra*, counsel began the filing process as far in advance of the deadline as he had found sufficient when making previous filings. J.A. 143–44 (certain prior submissions took 9 to 32 minutes). He used the "check file" feature in the electronic filing system and got a positive indication that the files would be accepted. J.A. 2513, 2894–95. When the system nevertheless rejected files, counsel immediately reformatted and began to resubmit the files, and some were accepted before the deadline and the rest were accepted

just 16 minutes after the deadline. J.A. 2514–16, 2527–36, 2894–96. Counsel then complied with the "one-day lag rule" by submitting the final redacted versions and public versions the next day before the 5:00 PM deadline. J.A. 2516, 2558–66, 2892. And the record does not reveal that the 16-minute delay in completion of the initial filing interfered in any way with Commerce's review processes, except for the interference that resulted in Commerce's own decision to reject the response and limit the record available for its calculation.

We have explained that the "best of its ability" standard of § 1677e(b)(1) "does not require perfection and recognizes that mistakes sometimes occur." *Nippon Steel Corp.*, 337 F.3d at 1382. Even considering counsel's failure to notify Commerce officials of the delay, Commerce has not explained why the evidence here establishes more than the kind of mistake that falls short of failure to cooperate—or, what is crucial, a serious failure to cooperate that would be necessary (we do not say sufficient) to justify the rate selected. The evidence here contrasts, rather than aligns, with the evidence in other cases discussing a failure to cooperate. For example, Oman Fasteners' late submission was not the result of "intentional conduct, such as deliberate concealment or inaccurate reporting." *Id.* at 1383. Nor is this a case of simply not providing requested information, *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017), or of a party's failure to "(a) take reasonable steps to keep and maintain full and complete records[;] . . . (b) have familiarity with all of [its] records[;] . . . and (c) conduct prompt, careful, and comprehensive investigations of all relevant records," *Nippon Steel Corp.*, 337 F.3d at 1382. Nor, further, are the facts like those addressed in *Dongtai Peak Honey Industry*, where Commerce excluded responses filed 10 days after the deadline and the party knew several days before the deadline that it was not going to meet it and yet filed no timely extension request. 777 F.3d at 1351. Here, Commerce got

the information 16 minutes after it was due, without having to prompt Oman Fasteners, which was diligently pursuing completion in circumstances that suggest nothing more than failure to build in temporal leeway beyond what had been needed in earlier filings. And recidivism has not been found.

Commerce has itself treated the kind of slight tardiness at issue here as more suitable for a warning than for the harsh treatment meted out in this matter. First, Commerce has stated (but not codified) a policy under which, if a party facing a 5:00 PM deadline seeks an extension before that time, but Commerce is "not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m," Commerce treats the deadline as extended automatically until the start of the next business day. *Extension of Time Limits*, 78 Fed. Reg. 57790, 57792 (Sept. 20, 2013); *see Trade Court Decision*, at *5. Oman Fasteners' counsel was apparently unaware of the policy, but it appears that, had he sent in an extension request at 4:55 PM, he would have automatically had an extension until 8:30 AM the next morning—long after the 5:16 PM time when the submission was actually completed. Treating the 16-minute delay here as a failure to cooperate that triggers an adverse inference (and supports a punishingly high duty and cash-deposit rate) is in considerable tension with Commerce's policy. Second, Commerce has stated in other proceedings that it has a policy of "leniency" toward law firms that miss a deadline for the first time, promptly contact Commerce, and adopt better practices for the future. *See Trade Court Decision*, at *6. It appears that this policy applied here except for the fact that Oman Fasteners did not notify Commerce about the delay. *Id.*; J.A. 241–44, 310. Perhaps that fact, as Commerce suggested, J.A. 306, makes the policy inapplicable even when the information was fully submitted within 16 minutes of the deadline, but the policy itself undermines any conclusion that any

failure-to-cooperate determination on the record here could support the harsh result reached.

In short, the 154.33% duty rate is very far from an accurate antidumping duty. There is no adequate basis on this record for finding the type of failure to cooperate that could (if any could) justify such a gross departure from accuracy. For those reasons, we hold that the Trade Court correctly ruled that the 154.33% rate could not stand, and it was therefore in the public interest to enjoin enforcement of that rate, including through its use as the cash-deposit rate.

2

The Trade Court did not abuse its discretion in holding that Oman Fasteners had established a "viable threat of serious harm which cannot be undone." *Trade Court Decision*, at *9 (quoting *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). The Trade Court cited four different irreparable harms: (1) insolvency from running out of cash due to a dramatic loss of revenue after the December 2022 Commerce ruling, either from ceasing its imports, *id.* at *10–11, or from losing customers by raising its prices to try to recoup part of or all the cash deposits, *id.* at *12–13, (2) an immediate risk of insolvency through default with lenders, *id.* at *11, (3) damage to its customer relationships resulting from its inability to sell nails to current customers, *id.* at *11, and (4) disruption to its business as a result of employee terminations it had made, and would need to make, in the absence of an injunction, *id.* at *11–12. Although Mid Continent contests whether the antidumping duty of 154.33% would have necessarily led to, or been the main reason for, Oman Fasteners' insolvency, Mid Continent Opening Br. at 65–69, Mid Continent does not demonstrate that the Trade Court erred in its findings regarding the layoffs and damage to goodwill, which are independently sufficient to establish irreparable harm.

*See, e.g., AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1061–63 (Fed. Cir. 2010).

### 3

Given the readily affirmed finding of irreparable injury, we see no substantial issue concerning the inadequacy of remedies at law for the injuries, an element of the justification for a permanent injunction. The Trade Court noted that there was no other remedy at law against the government, which is the party that committed the asserted wrong. *Trade Court Decision*, at *9 n.14. Mid Continent cites no authority or factual basis in this record for treating a potential recovery from third parties (*e.g.*, Oman Fasteners' law firm or its insurer) as establishing an adequate remedy at law for the government adjudicated wrong, and for all the harm suffered, including the irreparable consequences. That is enough for the injunction on appeal, but we also note the Trade Court's observation that, in the present context, the "permanent" injunction is temporally similar to a preliminary injunction, in that it is in effect before there is a final appealable judgment—which occurs (as it has in the present case, *see supra* n.4) when Commerce completes its work on remand and the dispute returns to the Trade Court. *Id.* at *9 n.13. If the injunction is viewed as a preliminary injunction, the requirement of a likelihood of success on the challenge to the 154.33% duty is established by the Trade Court's determination that the challenge is actually meritorious. *Trade Court Decision*, at *13. **[A37–38]**

### 4

The Trade Court determined that the balance of hardships was "lopsidedly" in Oman Fasteners' favor because it faced "catastrophe" "[a]bsent injunctive relief," while "[t]he harm to the government . . . [was] minimal to non-existent." *Trade Court Decision*, at *13. Oman Fasteners stopped importing nails in response to the 154.33% antidumping duty, so the government would very likely not

have received *any* cash deposits in the absence of an injunction. Although Mid Continent argues on appeal that the Trade Court "failed to consider the balance of equities as it relates to Mid Continent, a party to this litigation," Mid Continent Opening Br. at 74, Mid Continent never argued to the Trade Court that it would suffer any hardships, instead focusing on the balance of hardships between Oman Fasteners and the government. J.A. 3116–17; Oman Fasteners Response Br. at 54–55. In any event, the merits determination that the 154.33% cash deposit was unlawful weakens or nullifies any assertion by Mid Continent of cognizable harm from being deprived of the competitive benefit that cash deposit would confer on it and makes certain Mid Continent has identified no harm to it that compares with the irreparable injury to Oman Fasteners. We see no reversible error in this element of the Trade Court's injunction analysis.

## B

We conclude by addressing Mid Continent's challenge to the Trade Court's decision to grant a permanent injunction after consolidating Oman Fasteners' motion for a preliminary injunction with a trial on the merits. We have already noted that the legal effect of the permanent injunction here is similar to that of a preliminary injunction, a similarity that weakens Mid Continent's challenge as a theoretical matter. But in any event, the Trade Court followed the procedure that the Supreme Court in *University of Texas v. Camenisch* identified as appropriate for deciding a permanent injunction where an expedited decision on the merits is appropriate. 451 U.S. 390, 395–96 (1981). On December 28, 2022, before Mid Continent intervened and before the parties briefed the motion for the preliminary

injunction that had been filed,[7] the Trade Court ordered the government to address, in its response, the merits of consolidating the proceedings under Rule 65(a) and treating the motion for preliminary injunction as a motion for judgment on the agency record under Rule 56.2. J.A. 48, ECF No. 26. That order provided clear notice "before the hearing commence[d] or at a time which . . . still afford[ed] the parties a full opportunity to present their respective cases." *University of Texas*, 451 U.S. at 395 (quotations omitted); *see also id.* at 395–96 (suggesting that the issuance of a permanent injunction, instead of a preliminary injunction, may save a case from becoming moot). And Mid Continent has not established that it suffered concrete, identifiable, material harm from any lack of a necessary opportunity to present its case and challenge Oman Fasteners' case. We thus see no reversible error in the Trade Court's grant of a permanent injunction after exercising its discretion to consolidate the motion for a preliminary injunction with a trial on the merits.

## IV

For the foregoing reasons, we affirm the Court of International Trade's injunction.

## AFFIRMED

---

[7]    Oman Fasteners filed its initial (public) motion for preliminary injunction on December 26, 2022, but filed its amended motion on December 30, 2022, after the court's order. J.A. 47, ECF No. 15; J.A. 49, ECF No. 38. Mid Continent intervened on December 30, 2022, J.A. 48, ECF No. 32, and filed its (public) response to the motion for a preliminary injunction on January 10, 2023, J.A. 50, ECF No. 46. The government filed its (public) response to the motion for a preliminary injunction on January 11, 2023. J.A. 50, ECF No. 48.